**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NORWICH PHARMACEUTICALS, INC.,

*Plaintiff,*

v.

ROBERT F. KENNEDY JR., in his official capacity as Secretary of Health and Human Services, SARA BRENNER, in her official capacity as Acting Commissioner of Food and Drugs, and, UNITED STATES FOOD AND DRUG ADMINISTRATION,

*Defendants,*

TEVA PHARMACEUTICALS USA, INC.,

*Intervenor-Defendant,*

SALIX PHARMACEUTICALS, INC.,

*Intervenor-Defendant.*

Civil Action No. 1:25-cv-91

**PUBLIC JOINT APPENDIX OF ADMINISTRATIVE RECORD**

Dated: March 28, 2025

Respectfully submitted,

/s/*Matthew S. Murphy*

Matthew S. Murphy (DDC Bar No. CT0025)
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
Phone: (860) 275-8100
Fax: (860) 275-8101
mmurphy@axinn.com

William B. Schultz (D.C. Bar No. 218990)
Margaret M. Dotzel (D.C. Bar No. 425431)
ZUCKERMAN SPAEDER LLP

1800 M Street NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
Fax: (202) 822-8106
wschultz@zuckerman.com
mdotzel@zuckerman.com

*Attorney for Plaintiff Norwich Pharmaceuticals, Inc.*

*/s/ William R. Peterson*
William R. Peterson (*pro hac vice*)
Susan Stradley (*pro hac vice*)
1000 Louisiana, Suite 4000
Houston, Texas 77002-5006
(713) 890-5000
william.peterson@morganlewis.com
susan.stradley@morganlewis.com

Jason R. Scherr
(D.C. Bar No. 466645)
Douglas A. Hastings (*pro hac vice*)
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-3000
jr.scherr@morganlewis.com
douglas.hastings@morganlewis.com

Michael J. Abernathy (*pro hac vice*)
Wan-Shon Lo (*pro hac vice*)
110 North Wacker Drive, Suite 2800
Chicago, IL 60606-1511
(312) 324-1000
mike.abernathy@morganlewis.com
shon.lo@morganlewis.com

*Attorneys for Salix Pharmaceuticals, Inc*

*/s/ Gabriel I. Schonfeld*
GABRIEL I. SCHONFELD
(D.C. Bar. No. 155539)
Trial Attorney
Consumer Protection Branch
Civil Division
U.S. Department of Justice
PO Box 386
Washington, DC 20044-0386
(202) 353-1531
(202) 514-8742 (fax)

*Attorney for the Federal Defendants*

*/s/ Brian T. Burgess*
BRIAN T. BURGESS
(D.C. Bar. No. 1020915)
Goodwin Procter LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4000
BBurgess@goodwinlaw.com

*Attorney for Intervenor-Defendant Teva Pharmaceuticals USA, Inc.*

**Index of Public Joint Appendix of Administrative Record**

| Index No. | Date YYYY.MM.DD | Document Description | Bates Range (FDA_) |
|---|---|---|---|
| 3 | 2012.02.13 | Draft Guidance on Rifaximin (recommended Feb. 2012) | FDA_00029-00030 |
| 7 | 2016.10.26 | Citizen Petition, Docket No. FDA-2016-P- 3418 | FDA_00039-00122 |
| 9 | 2017.03.16 | Draft Guidance on Rifaximin (revised Mar. 2017) | FDA_00210-00230 |
| 10 | 2017.03.16 | FDA Response to Citizen Petition, Docket No. FDA-2016-P-3418 | FDA_231-00260 |
| 21 | 2017.01.13 | [Excerpt] Draft Guidance for Industry, 180-Day Exclusivity: Questions and Answers (recommended Jan. 2017) | FDA_00394-00400; -00409-11 |
| 27 | 2020.03.26 | [Excerpt] Complaint, *Salix Pharmaceuticals, LTD.; Salix Pharmaceuticals, Inc.; Bausch Health Ireland LTD.; Alfasigma S.P.A. v. Norwich Pharmaceuticals Inc.*, 1:20-cv- 00430 (D. Del.) | FDA_00477-00478 |
| 29 | 2020.11.13 | Amended Complaint, *Salix Pharmaceuticals, LTD.; Salix Pharmaceuticals, Inc.; Bausch Health Ireland LTD.; Alfasigma S.P.A. v. Norwich Pharmaceuticals Inc.*, 1:20-cv-00430 (D. Del.) | FDA_00520-00571 |
| 31 | 2022.05.12 | [Excerpt] Stipulation and Order, *Salix Pharmaceuticals, LTD.; Salix Pharmaceuticals, Inc.; Bausch Health Ireland LTD.; Alfasigma S.P.A. v. Norwich Pharmaceuticals Inc.*, 1:20-cv-00430 (D. Del.) | FDA_00579-00583 |
| 33 | 2022.08.10 | Final Judgment, *Salix Pharmaceuticals, LTD.; Salix Pharmaceuticals, Inc.; Bausch Health Ireland LTD.; Alfasigma S.P.A. v. Norwich Pharmaceuticals Inc.*, 1:20-cv- 00430 (D. Del.) | FDA_00602-00603 |
| 36 | 2023.05.17 | Memorandum Order, *Salix Pharmaceuticals, LTD.; Salix Pharmaceuticals, Inc.; Bausch Health Ireland LTD.; Alfasigma S.P.A. v. Norwich Pharmaceuticals Inc.*, 1:20-cv-00430 (D. Del.) | FDA_00607-00611 |

| | | | |
|---|---|---|---|
| 39 | 2023.06.05 | Memorandum of Points and Authorities in Support of Plaintiff's Motion for a Preliminary Injunction, *Norwich Pharmaceuticals, Inc. v. Becerra*, 1:23-cv-01611 (D.D.C.) | FDA_00620-00659 |
| 40 | 2023.11.01 | Memorandum Opinion, *Norwich Pharmaceuticals, Inc. v. Becerra*, 1:23-cv- 01611 (D.D.C.) | FDA_00660-00699 |
| 42 | 2024.04.11 | [Excerpt] *Salix Pharms., Ltd. v. Norwich Pharms. Inc.*, 22-2153 (Fed. Cir.) | FDA_00702-00723 |
| 47 | 2024.06.20 | [Excerpt] Mandate, Salix Pharms., Ltd. v. Norwich Pharms. Inc., No. 22-2153 (Fed. Cir.) | FDA_00795-00800 |
| 52 | 2024.06.20 | Complaint, *Salix Pharmaceuticals, LTD.; Salix Pharmaceuticals, Inc.; Bausch Health Ireland LTD. v. Norwich Pharmaceuticals Inc., Alovgen, PB Research & Development, LLC, Alvogen, Inc. and Algoven Group, Inc.*, 3:24-cv- 007140 (D. N.J.) | FDA_00855-00871 |

*Contains Nonbinding Recommendations*

**Draft Guidance on Rifaximin**

This draft guidance, once finalized, will represent the Food and Drug Administration's (FDA's) current thinking on this topic. It does not create or confer any rights for or on any person and does not operate to bind FDA or the public. You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations. If you want to discuss an alternative approach, contact the Office of Generic Drugs.

**Active ingredient:** Rifaximin

**Form/Route:** Tablet/Oral

**Recommended studies:** 3 studies

1. Type of study: Fasting Bioequivalence (BE) Study with Pharmacokinetic (PK) endpoints
Design: Single-dose, two-way crossover in-vivo
Strength: 550 mg
Subjects: Healthy males and nonpregnant females, general population.
Additional Comments: Applicants may consider using a reference-scaled average bioequivalence approach for rifaximin. If using this approach, please provide evidence of high variability in the bioequivalence parameters of AUC and/or Cmax (i.e., within-subject variability $\geq$ 30%). Please refer to the Progesterone Capsule Draft Guidance for additional information regarding highly variable drugs.

---

2. Type of study: Fed BE Study with Pharmacokinetic (PK) endpoints
Design: Single-dose, two-way crossover in-vivo
Strength: 550 mg
Subjects: Healthy males and nonpregnant females, general population.
Additional Comments: Please also see additional comment above.

---

3. Type of study: BE Study with Clinical Endpoint
Design: Randomized, double blind, parallel, placebo controlled in vivo
Strength: 200 mg (dose: three times daily for 3 days)
Subjects: Male and nonpregnant female subjects with traveler’s diarrhea
Additional Comments:
   (1) For details on the design of BE study with clinical endpoint please refer to the Rifaximin Draft Guidance, 200-mg strength.
   (2) The formulation of the 550-mg strength should be proportionally similar to that of the 200 mg strength.

---

**Analytes to measure (in appropriate biological fluid):** Rifaximin in plasma

**Bioequivalence based on (90% CI):** Rifaximin

**Waiver request of *in-vivo* testing:** Not applicable

*Contains Nonbinding Recommendations*

**Draft Guidance on Rifaximin**

> This draft guidance, once finalized, will represent the Food and Drug Administration's (FDA's) current thinking on this topic. It does not create or confer any rights for or on any person and does not operate to bind FDA or the public. You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations. If you want to discuss an alternative approach, contact the Office of Generic Drugs.

**Dissolution test method and sampling times:** Please note that a **Dissolution Methods Database** is available to the public at the OGD website at http://www.fda.gov/cder/ogd/index.htm. Please find the dissolution information for this product at this website. Please conduct comparative dissolution testing on 12 dosage units each of all strengths of the test and reference products. Specifications will be determined upon review of the application.

BakerHostetler

Baker&Hostetler LLP

Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304

T 202.861.1500
F 202.861.1783
www.bakerlaw.com

Lance L. Shea
direct dial: 202.861.1648
lshea@bakerlaw.com

October 17, 2016

0547 16 OCT 17 P3:20

Division of Dockets Management
Food and Drug Administration
Department of Health and Human Services
5630 Fishers Lane, rm. 1061
Rockville, MD 20852

**Re: Salix Pharmaceuticals, Inc. Citizen Petition**

To Whom It May Concern:

On behalf of Salix Pharmaceuticals, Inc. ("Salix"), we submit the attached Citizen Petition requesting that the Commissioner of the United States Food and Drug Administration refrain from approving any abbreviated new drug application submitted under Section 505(j) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 355(j), referencing any strength of Xifaxan® as the reference listed drug, unless such approval is in full accordance with the actions requested in the Petition.

This Petition is a new filing, separate and distinct from Salix's citizen petition dated May 14, 2008 and assigned docket FDA-2008-P-0300 (filed on May 15, 2008). Although FDA issued an interim response, the 2008 citizen petition has never been answered.

This Petition is being submitted under Section 505 of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 355, and in accordance with 21 C.F.R. § 10.30. In order to protect confidential trade secret information addressed by 21 C.F.R. § 20.61, this redacted version of the Petition is being filed along with publicly available references, initially. Once FDA acknowledges receipt of the Petition and provides a docket number, Salix will submit a non-redacted, confidential version of the Petition and a full set of references.

Should you have any questions regarding this Petition, please do not hesitate to contact the undersigned.

Sincerely,

Lance L. Shea
Partner

[redacted]

# CITIZEN PETITION

The undersigned submits this petition under Section 505(j) of the Federal Food, Drug, and Cosmetic Act to request the Commissioner of Food and Drugs to refrain from approving any abbreviated new drug application submitted under Section 505(j) of the Federal Food, Drug, and Cosmetic Act referencing any strength of Xifaxan® as the reference listed drug, unless such approval is in full accordance with the actions requested herein.

Salix Pharmaceuticals, Inc.

October 17, 2016

**TABLE OF CONTENTS**

**Page**

I. Actions Requested ..... 1

II. Statement of Grounds ..... 3

A. Executive summary ..... 3

B. Legal grounds ..... 6

1. Statement of the issue ..... 6

2. Section 505(j) approval criteria ..... 7

a. The sameness of active ingredient criterion ..... 8

b. The sameness of strength criterion ..... 10

c. The bioequivalence criterion ..... 12

C. Technical grounds ..... 14

1. Technical facts ..... 14

a. Description of Xifaxan® ..... 14

b. Rifaximin crystallizes into different polymorph forms, depending on manufacturing methods and controls. ..... 15

c. Xifaxan® has a specific polymorph profile. ..... 16

d. *In vitro* dissolution results generated in media containing sodium dodecyl sulphate ("SDS") are unsuitable surrogates for *in vivo* solubility performance of Proposed Generics, **Redacted** or produce results relevant to *in vivo* performance: bio-relevant media that distinguish between polymorph forms must be used. ..... 18

e. Rifaximin polymorphs differ in aqueous solubility, each from the other ..... 20

f. The *in vivo* availability of dissolved rifaximin is polymorph driven ..... 26

(i) Free fluid volumes in the gastric and proximal small intestine affect rifaximin polymorph solubility. ..... 26

(ii) The soluble concentration of rifaximin in the upper small intestine is a function of the polymorph forms present in the Drug Product. ..... 27

g. Xifaxan® is poorly soluble *in vivo*. ..... 27

**TABLE OF CONTENTS**
**(continued)**

Page

h. **Redacted** ............................................28

i. Xifaxan® virtually is unabsorbed into the systemic circulation..................30

j. Rifaximin absorption is solubility-limited, **Redacted** ............................................................................30

k. Rifaximin absorption is not consistent between polymorphs, **Redacted** ............................................ ....32

l. The site of systemic absorption of Xifaxan® **Redacted** ..........37

m. A Proposed Generic formulated **Redacted** could meet the *Draft Rifaximin Bioequivalence Guidance Documents'* bioequivalence endpoints, but be less potent at topical sites of action in the GI lumen......40

n. Higher Solubility Polymorphs pose the risk of oral contraceptive failure from drug-drug interaction and related teratogenicity, especially in HE and IBS-D patients..........................................................................42

(i) Rifaximin as a PXR activator ..................................................43

(ii) Xifaxan® in clinical CYP3A4 induction drug-drug interaction studies ..........................................................................................43

o. Different Polymorph Proposed Generics composed of Higher Solubility Polymorphs pose the risk of systemic antibiotic resistance in all users; also, Different Polymorph Proposed Generics composed of Lower Solubility Polymorphs pose the risk of systemic antibiotic resistance in HE patients.........................................................................................46

p. Different Polymorph Proposed Generics pose the risk of harming diversity of the healthy colonic microbiome. ............................................48

2. Application of technical facts ..........................................................................52

a. For approved Xifaxan® indications, potency of a finished rifaximin drug product depends on the polymorph of which its active ingredient is composed, because the bioavailability of dissolved rifaximin is polymorph-specific. ..........................................................................52

[redacted]

**TABLE OF CONTENTS**
**(continued)**

**Page**

(i) Polymorph-specific differences in drug potency are expected to affect efficacy in the treatment of TD. .... 55

(ii) Polymorph-specific differences in drug potency are expected to affect efficacy in the treatment of HE. .... 57

(iii) Polymorph-specific differences in drug potency are expected to affect efficacy in the treatment of IBS-D. .... 58

b. Potency of the finished rifaximin drug product also depends on fasted/fed conditions **Redacted** because bile acids in the proximal small bowel affect solubility, **Redacted** .... 59

c. PK parameters are unsuitable surrogates for prediction of a Different Polymorph Proposed Generic's topical bioequivalence to Xifaxan®, because Xifaxan® acts topically, is poorly soluble and poorly absorbed, **Redacted** .... 59

d. *In vitro* dissolution results generated in media containing SDS are unsuitable surrogates for *in vivo* solubility performance of Proposed Generics, because that methodology cannot **Redacted** produce results relevant to *in vivo* performance: biologically relevant conditions that distinguish between polymorph forms must be tested. .... 59

D. Application of legal and technical facts .... 60

1. FDA can lawfully approve ANDAs for Identical Polymorph Proposed Generics, but only if the criteria requested in this Petition are satisfied. .... 60

2. Different Polymorph Proposed Generics cannot be demonstrated to meet the sameness of active ingredient, sameness of strength or bioequivalence criteria, because testing technology needed to make those demonstrations does not exist. .... 60

3. FDA cannot lawfully approve ANDAs for Different Polymorph Proposed Generics, because they cannot meet the sameness or bioequivalence criteria . 61

4. FDA can lawfully approve ANDAs for Non-Q1/Q2 Identical Polymorph Proposed Generics, but only where appropriately designed bioequivalence studies with clinical endpoints are successfully completed. .... 61

**TABLE OF CONTENTS**
**(continued)**

**Page**

a. Clinical endpoints studies for non-Q1/Q2 Identical Polymorph Proposed Generics to Xifaxan® 200 mg indicated for treatment of TD. .................... 62

b. Clinical endpoints studies for non-Q1/Q2 Identical Polymorph Proposed Generics to Xifaxan® 550 mg indicated for treatment of HE. .................... 64

c. Clinical endpoints studies for non-Q1/Q2 Identical Polymorph Proposed Generics to Xifaxan® 550 mg indicated for treatment of IBS-D. ............... 65

5. Failure to grant the actions requested in this Petition will pose substantial public health risks. .................... 65

E. Conclusion .................... 66

III. Environmental Impact .................... 67

IV. Economic Impact .................... 67

V. Certification .................... 67

LIST OF TABLES

Table 1: Aqueous Solubility **Redacted** in Various Media

Table 2: Solubility of Rifaximin Forms in Various Media Under Saturation Conditions

Table 3: Kinetics of Xifaxan® 200 mg Tablet Contents Transit in the Upper GI Tract

Table 4: Mean (±SD) Plasma PK Parameters of Rifaximin 550 mg **Redacted**

Table 5: Dog PK Parameters **Redacted**

Table 6: Study of Bioavailability of the Crystalline Forms of Rifaximin in Dogs. Mean ± S.E.M. of the PK Parameters After Oral Administration of 100 mg kg-1 (n=4)

Table 7: Tmax and Cmax for Various Rifaximin Dosage Forms

Table 8: **Redacted**

Table 9: **Redacted**

Table 10: **Redacted**

Table 11: Summary of Efficacy Results of All Patients Enrolled in the Traveler's Diarrhea Study Comparing Rifaximin, Ciprofloxacin and Placebo

Table 12: Clinical Response in Study 1 (ITT population)

[redacted]

## LIST OF FIGURES

Figure 1: Rifaximin Polymorphic Forms in the Drug Substance. XRPD analysis of six rifaximin API batches (top 6 profiles).

Figure 2: Xifaxan® Polymorph Profile Across Multiple Manufacturing Lots of the Xifaxan® Finished Tablet Product.

Figure 3: Xifaxan® 550 mg Tablet Dissolution **Redacted**

Figure 4: Kinetic Solubility of Different Forms of Rifaximin **Redacted**

Figure 5: Kinetic Solubility of Different Forms of Rifaximin **Redacted**

Figure 6: Kinetic Solubility of Different Forms of Rifaximin **Redacted**

Figure 7: Kinetic Solubility of Different Forms of Rifaximin **Redacted**

Figure 8: Kinetic Solubility of Different Forms of Rifaximin **Redacted**

Figure 9: Kinetic Solubility of Different Forms of Rifaximin **Redacted**

Figure 10: Gastric (A) and Small Bowel (B) Fluid Volumes After Ingestion of 240mL of Water

Figure 11: Schematic of Rifaximin Polymorph Formation and Inter-conversion

Figure 12: Kinetic Solubility of Different Forms of Rifaximin **Redacted**

Figure 13: **Redacted**

Figure 14: PK Profile of **Redacted** **Redacted**

Figure 15: **Redacted**

Figure 16: Plasma PK Profiles of **Redacted**

Figure 17: **Redacted**

Figure 18: Solubility of Rifaximin in the Presence of Increasing Concentrations of a Mixture of Synthetic Bile Acids

Figure 19: Growth of ETEC Strain H10407 in the Presence of and Absence of 16 ug/mL Rifaximin and the Indicated Bile Acids at a Concentration of 4 mM

**ACTIONS REQUESTED AND STATEMENT OF GROUNDS**

**I. Actions Requested**

Salix Pharmaceuticals, Inc. ("Salix") requests that FDA require, at a minimum, the following criteria be satisfied for approval of any ANDA submitted for a drug (a "Proposed Generic") that references either strength and any indication of Xifaxan® as the RLD:

- Characterization studies must demonstrate that the Proposed Generic's active ingredient is identical in rifaximin polymorph profile to that of the Xifaxan® active ingredient (an "Identical Polymorph Proposed Generic");
- For any Identical Polymorph Proposed Generic that is formulated with excipients that are qualitatively the same ("Q1") and quantitatively the same ("Q2") to those in Xifaxan®:
    - Bioequivalence studies with pharmacokinetic ("PK") endpoints conducted under both fed and fasted conditions must demonstrate that the systemic absorption of the active ingredient from the Proposed Generic formulation is not greater than that of Xifaxan®;
    - A bioequivalence study with PK endpoints must establish that the Proposed Generic Formulation does not cause a clinically significant drug-drug interaction with oral contraceptives; and,
    - *In vitro* dissolution testing must demonstrate that the dissolution rate of the Proposed Generic does not differ from that of Xifaxan® by simulating *in vivo* drug release in different portions of the gastrointestinal ("GI") tract using multiple dissolution media at different pH values and with different surfactant levels.
- For any Identical Polymorph Proposed Generic that is not Q1/Q2 to the referenced Xifaxan® product ("Non-Q1/Q2 Identical Polymorph Proposed Generic"):
    - Bioequivalence studies with PK endpoints conducted under both fed and fasted conditions must demonstrate that the systemic absorption of the active ingredient from the Proposed Generic formulation is not greater than that of Xifaxan®;
    - A bioequivalence study with PK endpoints must establish that the Proposed Generic Formulation does not cause a clinically significant drug-drug interaction with oral contraceptives;

- *In vitro* dissolution testing must demonstrate that the dissolution rate of the Proposed Generic does not differ from that of Xifaxan® by simulating *in vivo* drug release in different portions of the GI tract using multiple dissolution media at different pH values and with different surfactant levels; and,

- Bioequivalence studies with clinical endpoints must demonstrate bioequivalence at topical sites of action in the GI tract as follows:

    - For a Non-Q1/Q2 Identical Polymorph Proposed Generic to Xifaxan® 200 mg indicated for treatment of Traveler's Diarrhea ("TD"), bioequivalence studies that include Time to Last Unformed Stool ("TLUS") and declaration of clinical cure endpoints, and non-inferiority margins set in accordance with non-inferiority principles;

    - For a Non-Q1/Q2 Identical Polymorph Proposed Generic to Xifaxan® 550 mg indicated for treatment of hepatic encephalopathy ("HE"), bioequivalence studies with inclusion criteria and clinical endpoints comparable to those used for the approval of the Xifaxan® 550 mg for the HE indication, and non-inferiority margins set in accordance with non-inferiority principles; or,

    - For a Non-Q1/Q2 Identical Polymorph Proposed Generic to Xifaxan® 550 mg indicated for treatment of irritable bowel syndrome with diarrhea ("IBS-D"), if the above-mentioned clinical endpoint studies of Xifaxan® 550 mg were not done for the HE indication: bioequivalence studies with inclusion criteria and endpoints comparable to those used for the approval of the Xifaxan® 550 mg for the IBS-D indication, and non-inferiority margins set in accordance with non-inferiority principles.

If all above-listed criteria are not satisfied, Salix requests that FDA refrain from approving the ANDA.

Salix requests that FDA revise the *Draft Rifaximin Bioequivalence Documents* [1] to incorporate the above-listed criteria, at a minimum.

[1] FDA, DRAFT GUIDANCE ON RIFAXIMIN (200 MG) (Nov. 2011) [hereinafter *200mg Draft Bioequivalence Guidance*]; FDA, DRAFT GUIDANCE ON RIFAXIMIN (550 MG) (Feb. 2012) [hereinafter *550mg Draft Bioequivalence Guidance*].

## II. Statement of Grounds

### A. Executive summary

Xifaxan® is an antibiotic drug that acts topically in the GI tract. In addition to treatment of IBS-D,[2] Xifaxan® is approved for the reduction in risk of overt HE,[3] and treatment of TD.[4]

While most orally administered drugs work by being rapidly and extensively dissolved in the GI tract and absorbed into the systemic circulation where they are carried to sites of action, Xifaxan® operates very differently: it is an antibiotic drug that acts topically in the GI tract to affect bacterial growth and metabolism, and other activities in the GI tract. In that application, characteristics of its active ingredient – characteristics that are unusual for orally administered drugs – raise issues for approval of Proposed Generics.

Xifaxan® is unlike most other orally administered drugs. First, it does not work by being absorbed into the bloodstream. Instead, it works by remaining in the GI tract and being carried to topical sites of action along and within shallow layers of the intestinal lining. Thus, the blood levels of its active ingredient, rifaximin, give little information about the rate and extent of rifaximin presence at the topical sites of action. Tablet dissolution and PK studies cannot demonstrate that a generic version of Xifaxan® is bioequivalent to Xifaxan®. Additionally, those sites of action have not been identified and, even if they were identified, rifaximin presence at those sites cannot be measured directly with currently available technology.

**Redacted**

**Redacted** [5] In fact, Xifaxan® is an extreme version of a Class 4 molecule under the Biopharmaceutics Classification System ("BCS").[6]

For most drugs, different polymorph forms of the active ingredient molecule behave similarly as to solubility and absorption. For those drugs, it often can be inferred that a generic version satisfies the sameness requirement of Section 505(j) of the Federal Food, Drug, and Cosmetic Act ("FDCA" or "Act") as long as the generic active ingredient is

---

[2] "XIFAXAN® is indicated for the treatment of irritable bowel syndrome with diarrhea (IBS-D) in adults." Xifaxan® Prescribing Information § 1.3 (Rev. 11/2015) [hereinafter *Xifaxan® PI*].

[3] "XIFAXAN® is indicated for reduction in risk of overt hepatic encephalopathy (HE) recurrence in adults." *Xifaxan® PI* § 1.2.

[4] "XIFAXAN® is indicated for the treatment of travelers' diarrhea (TD) caused by noninvasive strains of *Escherichia coli* in adults and pediatric patients 12 years of age and older." *Xifaxan® PI* § 1.1.

[5] **Redacted**

[6] *See* FDA, WAIVER OF IN VIVO BIOAVAILABILITY AND BIOEQUIVALENCE STUDIES FOR IMMEDIATE-RELEASE SOLID ORAL DOSAGE FORMS BASED ON A BIOPHARMACEUTICS CLASSIFICATION SYSTEM: GUIDANCE FOR INDUSTRY (May 2015) [hereinafter *Draft Biowaiver Guidance*].

the same molecule as pioneer active ingredient. For those drugs, molecular identity matters to approval instead of the polymorph form.

Again, Xifaxan® is not like most drugs. Several polymorph forms of rifaximin are available for drug formulation.[7] Each has different solubility characteristics. The polymorph profile of Xifaxan®'s active ingredient is **Redacted**

**Redacted**

Thus, the polymorph profile of the active ingredient matters greatly to approval of generic versions of Xifaxan®. Because the different rifaximin polymorphs will have different levels of bioavailability, they will have different drug potencies at topical sites of action and in the systemic circulation. For Xifaxan® indications, different rifaximin polymorph profiles are different drugs.

This fact raises efficacy and safety concerns. If the generic is less potent than Xifaxan®, there is a risk of lower efficacy at topical sites of action and development of antibiotic resistant bacteria in the GI tract. If the generic is more potent than Xifaxan®, there is a risk of different efficacy effects at topical sites of action. Moreover, there are several safety concerns from higher systemic potency: (1) toxicity in HE and IBS-D patients; (2) drug-drug interactions with oral contraceptives resulting in unwanted pregnancies, especially in IBS-D patients because many are women of childbearing age; and (3) development of antibiotic-resistant bacteria in body systems beyond the GI tract.

As discussed more fully below, the risk of toxicity in HE patients is posed by more soluble generics because those patients experience higher rifaximin levels in the bloodstream than healthy people. For example, when HE patients were given Xifaxan® in one study, they experienced **Redacted**
Use of a generic rifaximin polymorph that is more bioavailable than Xifaxan 's would be expected to push systemic exposures even higher. Although Xifaxan®'s safety profile has been good in HE patients, use of such a generic would raise the risk of toxicity and development of antibiotic resistance.

Risk of drug-drug interactions with oral contraceptives in IBS-D patients is posed because: (1) many IBS-D patients are women of childbearing age; (2) IBS-D patients absorb more rifaximin into the bloodstream than healthy people; and (3) rifaximin in the bloodstream can lower the effectiveness of certain oral contraceptives. For example, when IBS-D patients were given Xifaxan® in one study, **Redacted**
Although Xifaxan does not increase the risk of oral contraceptive failure, use of a more bioavailable generic rifaximin polymorph could well increase the risk of contraceptive

---

[7] For discussion of rifaximin polymorph forms, see *infra* § II.C.1.b; for discussion of the Xifaxan® polymorph active ingredient, see *infra* § II.C.1.c.; for discussion of solubility differences between polymorphs, see *infra* § II.C.1.e

failure, hence unwanted pregnancies. That risk is concerning, because it is magnified in patients taking rifaximin, which has been identified as a dose-dependent teratogen.

Antibiotic resistance risk is posed to all patients because the rifaximin molecule is made from rifamycin. Many rifamycin drugs, such as rifampin, are rapidly absorbed into the bloodstream and used to treat diseases such as tuberculosis. Unfortunately, rifamycin drugs must be prescribed limitedly, as antibiotic resistance to them has been found to develop rapidly. Because of its poor bioavailability, Xifaxan® does not pose substantial risk of antibiotic resistance development in the GI tract or other body systems. This was shown by studies done to support applications for Xifaxan®'s marketing approval. To Salix's knowledge, the same has not been shown for other polymorphs of rifaximin that are available for drug formulation; the requisite testing has not been done.

Stated broadly, this Petition makes the following points:

- Only the Xifaxan® polymorph profile has been studied sufficiently for drug approval; its efficacy, safety and bioavailability have been demonstrated. Those criteria have not been demonstrated for the other rifaximin polymorph profiles.

- Different polymorph forms of rifaximin should be considered different drugs because they have different potencies at topical sites of action in the GI tract (raising efficacy differences) and in the systemic circulation (raising safety concerns). The sameness requirement cannot be met merely because the proposed generic active ingredient has the molecular identity of rifaximin: it must have the same polymorph profile as Xifaxan®.

- Methods to directly measure bioavailability of either Xifaxan® or Proposed Generics at topical sites of action in the GI tract do not exist.

- Tablet dissolution and PK studies provide evidence insufficient to support a finding that the bioequivalence requirement is satisfied for a generic form of Xifaxan®.

- Bioequivalence studies with clinical efficacy endpoints can give evidence to support a finding that the bioequivalence requirement is satisfied; however, such is far from sufficient evidence.

- A generic with an active ingredient polymorph profile different from Xifaxan® that is approved without adequate testing will pose substantial safety concerns.

For the reasons stated in this Petition, FDA should approve a generic version of Xifaxan® only where it has a polymorph profile identical to the Xifaxan® polymorph profile and FDA has sufficient evidence to find that the bioequivalence requirement is met. To that end, the Petition requests that FDA refuse to approve a generic version of Xifaxan® containing an active ingredient that is a rifaximin polymorph profile different from that of the Xifaxan® active ingredient. Further, it requests that FDA require different kinds of

approval testing depending on certain characteristics of the Proposed Generic formulation that contains a polymorph profile identical to that of Xifaxan®.

Salix appreciates the challenges that the Division has attempted to address through the studies recommended in the *Draft Rifaximin Bioequivalence Guidance Documents*. Yet, because of Xifaxan®'s unusual polymorph-specific properties, those studies will not generate data sufficient to ensure that a Proposed Generic will be safe and effective for any currently approved Xifaxan® indication as it is alternated with or substituted for Xifaxan®.

FDA's approval of, and therapeutic equivalence determination with respect to any Proposed Generic that appears to be bioequivalent to Xifaxan® based on the Agency's current criteria, but that is nevertheless not equivalent to Xifaxan® because of insufficient testing, could jeopardize patient health. Additionally, FDA would likely have to downgrade any therapeutic equivalence rating for such a generic from "AB" to "BX," and subsequently seek withdrawal of approval.

This, of course, was the path FDA followed after the Agency determined, based on new bioequivalence information, that generic versions of Bupropion Hydrochloride Extended-Release Tablets, 300 mg, were not therapeutically equivalent to the RLD.[8] More recently, FDA found itself embroiled in long and costly litigation after the Agency downgraded, from "AB" to "BX," the therapeutic equivalence rating for a Methylphenidate HCl Extended-Release Tablets drug product after information showed that the generic was not bioequivalent to its RLD.[9] That litigation continues to this day on appeal to the Fourth Circuit.

Therefore, at a minimum, approval of an ANDA that references either strength and any indication of Xifaxan® as the RLD must be given pursuant to criteria set forth in the Actions Requested, *supra*. Failure to do so will pose real and substantial public health risks.[10]

**B. Legal grounds**

**1. Statement of the issue**

For the reasons elaborated *infra*, a Proposed Generic with an active ingredient that is different in polymorph profile to that of the Xifaxan® active ingredient (a "Different Polymorph Proposed Generic") cannot satisfy either the sameness or the bioequivalence

---

[8] *See* Watson Laboratories, Inc., Withdrawal of Approval of Buproplon Hydrochloride Extended-Release Tablets, 300 Milligrams, 79 Fed. Reg. 19,626 (Apr. 9, 2014) [hereinafter *Watson Laboratories Withdrawal*]; Impax Laboratories, Inc., Withdrawal of Approval of Bupropion Hydrochloride Extended-Release Tables, 300 Milligrams, 78 Fed. Reg. 16,685 (Mar. 18, 2013) [hereinafter *Impax Laboratories Withdrawal*].

[9] *See Mallinckrodt Inc. v. FDA*, No. 14-cv-3607 (D. Md. July 29, 2015), ECF. No. 47 [hereinafter *Mallinckrodt v. FDA*].

[10] Likewise, approval of a 505(b)(2) NDA referencing either strength and any indication of Xifaxan® must be given pursuant to the same criteria.

requirements through currently available testing methods, and must seek approval through another regulatory pathway. This is because different polymorphic forms of rifaximin are, in the peculiar context of this BCS Class 4 antibiotic, not properly considered the same active ingredient as Xifaxan® and do not have the same potency (strength), either topically or systemically, when used to treat the indications for which Xifaxan® is approved.

In addition, an Identical Polymorph Proposed Generic cannot satisfy the Act's bioequivalence requirement, absent the testing requested in this Petition.

**2. Section 505(j) approval criteria**

Under Section 505(j) of the Act,[11] FDA may approve an ANDA for a generic drug without direct evidence of the product's safety and effectiveness, relying instead on the Agency's prior finding that the RLD is safe and effective.

The core principle underlying the generic drug approval system is the assurance that a generic drug will be as safe and effective as the RLD and interchangeable with it.[12] Accordingly, FDA will not approve an ANDA unless it has met the following criteria:

(1) Sameness of the active ingredient;[13]

(2) Sameness of route of administration, dosage form or strength;[14]

(3) Bioequivalence; [15] and

(4) Adequacy of methods, or facilities and controls, to assure and preserve identity, strength, quality, and purity.[16]

As to the sameness criteria, a generic drug must be identical to the RLD in four statutory categories: (1) active ingredient; (2) route of administration; (3) dosage form; and (4)

---

[11] 21 U.S.C. § 355(j).

[12] FDA, APPROVED DRUG PRODUCTS WITH THERAPEUTIC EQUIVALENCE EVALUATIONS vii-viii (36th ed. 2016) [hereinafter "*Orange Book*"] ("FDA believes that products classified as therapeutically equivalent can be substituted with the full expectation that the substituted product will have the same clinical effect and safety profile as the prescribed product.").

[13] 21 U.S.C. § 355(j)(4)(C)(i) ("[I]f the listed drug has only one active ingredient, information submitted with the application is insufficient to show that the active ingredient is the same as that of the listed drug.").

[14] 21 U.S.C. § 355(j)(4)(D)(i) ("[I]f the application is for a drug whose route of administration, dosage form, or strength of the drug is the same as the route of administration, dosage form, or strength of the listed drug referred to in the application, information submitted in the application is insufficient to show that the route of administration, dosage form, or strength is the same as that of the listed drug . . . .").

[15] 21 U.S.C. § 355(j)(4)(F) ("[I]nformation submitted in the application is insufficient to show that the drug is bioequivalent to the listed drug referred to in the application . . . .").

[16] 21 U.S.C. § 355(j)(4)(A) ("[T]he methods used in, or the facilities and controls used for, the manufacture, processing, and packing of the drug are inadequate to assure and preserve its identity, strength, quality, and purity.").

strength.[17] Drugs that satisfy these four statutory categories are considered to be "pharmaceutical equivalents."[18] Pursuant to FDA regulations, a generic is pharmaceutically equivalent to its RLD if it:

> contain[s] identical amounts of the identical active ingredient . . . and meet[s] the identical compendia *or other applicable standard of identity, strength, quality, and purity, including potency* and, where applicable, content uniformity, disintegration times, and/or dissolution rates.[19]

Accordingly, this Petition asserts that any Proposed Generic cannot be "the same as" Xifaxan® in either its active ingredient or strength (potency) unless it is an Identical Polymorph Proposed Generic.

**a. The sameness of active ingredient criterion**

FDA officials have acknowledged that "differences in physical characteristics of the drug substance forms, leading to potential differences in drug product performance" are relevant to the evaluation of sameness,[20] and that the statutory imperative to ensure sameness may require the prescription of "additional standards," including standards for crystalline structure.[21] FDA has also recognized that different solid-state properties "can have a significant influence on the apparent solubility" of a drug substance, and therefore its bioavailability.[22]

Indeed, the Agency's longstanding position is that, in appropriate circumstances, requiring identical polymorphic structure is necessary to comply with the sameness-of-active-ingredient requirement. Specifically, in the 1992 final regulations implementing the Hatch-Waxman Act, the Agency recognized that different polymorphs could sometimes give rise to sameness-of-active-ingredient issues, and maintained that it would assess such arguments on a case-by-case basis:

> Under the statute, an ANDA applicant must show that its active ingredient is the same as that in the reference listed drug. FDA will consider an active ingredient to be the same as that of the reference listed drug if it meets the same standards for identity. In most cases, these standards are

---

[17] 21 U.S.C. §§ 355(j)(4)(C)(i), 355(j)(4)(D)(i).

[18] *Pfizer, Inc. v. Shalala*, 182 F.3d 975, 977 (D.C. Cir. 1999); *see also Ranbaxy Labs., Inc. v. First DataBank, Inc.*, 2015 WL 3618429, at *1 (M.D. Fla. June 9, 2015); *Schering Corp. v. First DataBank, Inc.*, 2007 WL 1176627, at *1 (N.D. Cal. Apr. 20, 2007).

[19] 21 C.F.R. § 320.1(c) (emphasis added).

[20] Frank O. Holcombe, Jr., Ph.D., *Issues of Polymorphism and Abbreviated New Drug Applications*, Advisory Comm. for Pharmaceutical Science (Apr. 8, 2002), *available at* http://www.fda.gov/ohrms/dockets/ac/02/briefing/3860b2_11_holcome-Issues%20of%20Polymorphism.pdf (last accessed Sept. 26, 2016).

[21] Abbreviated New Drug Application Regulations, 57 Fed. Reg. at 17,959 (Apr. 28, 1992) (internal citations omitted) (emphasis added) [hereinafter *ANDA Regulations*].

[22] FDA, GUIDANCE FOR INDUSTRY, ANDAS: PHARMACEUTICAL SOLID POLYMORPHISM 3 (2007) [hereinafter *Polymorphism Guidance*].

> described in the U.S. Pharmacopeia (U.S.P.). *However, in some cases, FDA may prescribe additional standards that are material to the ingredient's sameness. For some drug products, standards for crystalline structure or stereoisomeric mixture may be required.*[23]

It is a well-settled principle of administrative law that "[o]nce a rule is final, an agency can amend it only through a new rulemaking."[24] Accordingly, the FDA's 2007 guidance on polymorphism ("Polymorphism Guidance") must be construed in a way that is harmonious with its 1992 final regulations. This is not a difficult undertaking, since the 2007 Guidance is indeed fully consonant with the 1992 final regulations.

The 2007 Polymorphism Guidance merely rejects the notion that the FDCA's "sameness" language *per se* requires that the active ingredient in a generic "'exhibit the same physical and chemical characteristics . . . and [that] solid state forms of the drug have not been altered.'"[25] Equally unobjectionable is the view, articulated in the Polymorphism Guidance, that, inherently, "differences in drug substance polymorph forms do not render drug substances different active ingredients for the purposes of ANDA approvals within the meaning of the Act and FDA regulations."[26]

FDA has thus recognized that it must assess active ingredient "sameness" on a case-by-case basis, and should prescribe standards—including specification of crystalline structure—when necessary to ensure sameness.

From a technical perspective, molecules of the same chemical structure can exist in different 3-dimensional structures, referred to as enantiomers or chiral forms. It is well-recognized that pure chiral structures of the same chemical formula can have different pharmacokinetic and/or biological properties. At a higher order, above the 3-dimensional molecular conformation, the drug substance can exhibit polymorph crystalline structures.

For BCS Class 4 drugs that act locally in the GI tract, such as Xifaxan®, the polymorph crystalline structure of the drug substance can influence the rate at which the soluble drug substance reaches the site of action. Thus, this is the exact case in which specification of polymorphic crystalline structure is necessary to ensure "sameness" of active ingredient as well as strength (potency). Xifaxan's topical site of action and extremely low solubility create a unique situation in which the drug's potency, solubility and absorption are all polymorph-driven. Consequently, as elaborated below, this Petition demonstrates that FDA should require specification of crystalline structure—the same polymorph profile as Xifaxan®—for any Proposed Generic.

---

[23] Abbreviated New Drug Application Regulations, 57 Fed. Reg. at 17,959 (Apr. 28, 1992) (internal citations omitted) (emphasis added).

[24] *32 Cty. Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002) (quoting *Columbia Falls Aluminum Co. v. Env't Prot. Agency*, 139 F.3d 914, 919 (D.C. Cir. 1998)).

[25] FDA, GUIDANCE FOR INDUSTRY, ANDAS: PHARMACEUTICAL SOLID POLYMORPHISM 5 (2007) [hereinafter *Polymorphism Guidance*] (quoting Abbreviated New Drug Application Regulations, 57 Fed. Reg. 17,950, 17,958-59 (Apr. 28, 1992)).

[26] *Polymorphism Guidance* at 5.

#### b. The sameness of strength criterion

Neither FDA's pertinent final rules nor its Polymorphism Guidance address how differing polymorph forms may impact route of administration, dosage form, and strength. Additionally, the terms "potency" and "strength" are not defined within the FDCA or the specific regulations interpreting the ANDA provisions. However, the Agency has defined both of these terms in its regulations for Current Good Manufacturing Practices, with "potency" being essential to ascertaining a drug's "strength":

Strength means:

> (i) The concentration of the drug substance (for example, weight/weight, weight/volume, or unit dose/volume basis), and/or
>
> (ii) *The potency*, that is, the therapeutic activity of the drug product as indicated by appropriate laboratory tests or by adequately developed and controlled clinical data (expressed, for example, in terms of units by reference to a standard).[27]

Strength is thus measured not merely by unit dosage (*e.g.*, 550 mg), but by broader reference to potency, which in turn is measured by the therapeutic activity of the drug at a given dose. If a generic drug does not have an identical therapeutic activity at the same dose as its RLD, it cannot be the same strength or potency.

FDA has previously recognized the centrality of potency to sameness. For example, regarding a generic follicle stimulating hormone ("FSH") product based on Pergonal as the RLD, FDA employed the following test:

> To be considered to have the same active ingredients as the reference listed drug, generic FSH products based on Pergonal as the reference listed drug must have the same primary structure . . . as Pergonal (assured by the same natural source material), *the same potency*, and the same degree of batch-to-batch uniformity.[28]

In that case, FDA found that the FSH generic had the same active ingredient as Pergonal because it found that any potential difference in potency of the two drugs was not clinically significant.

[27] 21 C.F.R. § 210.3(b)(16) (emphasis added). The Agency's regulations implementing the biologics provision of the Public Health Service Act defines potency in a similar manner. *See* 21 C.F.R. § 600.3(s) ("The word *potency* is interpreted to mean the specific ability or capacity of the product, as indicated by appropriate laboratory tests or by adequately controlled clinical data obtained through the administration of the product in the manner intended, *to effect a given result*.") (latter emphasis added).

[28] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Eval. & Research, to A. Peter Frank, Vice President and Counsel, Docket No. 92P-0487, 12 (June 17, 1997) (emphasis added).

Similarly, in 2010, FDA granted in part a citizen petition ("CP") objecting to a generic version of the anticoagulant Lovenox (enoxaparin sodium injection), a low molecular weight heparin product. In responding to the Lovenox CP, FDA acknowledged that both potency and strength were salient to pharmaceutical equivalence and "sameness."[29] The Agency concluded that the unique characteristics of Lovenox—its inherent molecular diversity—necessitated the establishment of a specific standard of identity, and it employed five criteria to ensure that generic enoxaparin was pharmaceutically equivalent to Lovenox.[30]

FDA's decisions in both the Pergonal and Lovenox CPs resulted in litigation that further elucidated FDA's conceptualization of "sameness" as encompassing not merely an evaluation of the active ingredient alone, but also its potency.[31] Importantly, in the Pergonal litigation, *Serono Laboratories, Inc. v. Shalala*, FDA asserted that pharmaceutical equivalence required a multi-factor assessment of clinical identity, including sameness of potency.[32] The D.C. Circuit deferred to FDA's determination that "sameness" did not require absolute "chemical" identity, but instead a broader notion of "clinical" identity, including identical potency.[33] In affirming this broader definition of sameness, the D.C. Circuit agreed with FDA's position that "the statutory phrase [*i.e.*, sameness] must be read in the context of the kind of drug at issue."[34]

In the Lovenox litigation, *Sanofi-Aventis U.S. LLC v. Food & Drug Administration*, the U.S. District Court for the District of Columbia again deferred to FDA's sameness determination,[35] including FDA's assertion that sameness is determined on a case-by-case basis, "considering the individual characteristics of the particular drug at issue."[36] Because FDA articulated rational bases for establishing its five-part standard of identity criteria for enoxaparin—which included equivalence of potency[37] as well as certain physicochemical properties[38]—its sameness determination was upheld.[39]

---

[29] Letter from Douglas Throckmorton, M.D., Deputy Dir., Ctr. for Drug Eval. & Research, to Peter O. Safir et al., Docket No. 2003-P-0273, 2 n.5, 9 n.40 (July 23, 2010) [hereinafter *FDA Lovenox CP Response*].
[30] *Lovenox CP Response* at 11, 44.
[31] *See Serono Labs., Inc. v. Shalala*, 158 F.3d 1313 (D.C. Cir. 1998) (Pergonal litigation); *Sanofi-Aventis U.S. LLC v. Food & Drug Admin.*, 842 F. Supp. 2d 195 (D.D.C. 2012) (Lovenox litigation; on merits) [hereinafter *Lovenox II*]; *Sanofi-Aventis U.S. LLC v. Food & Drug Admin.*, 733 F. Supp. 2d 162 (D.D.C. 2010) (Lovenox litigation; preliminary injunction denied) [hereinafter *Lovenox I*].
[32] *Serono Labs.*, 158 F.3d at 1318-19.
[33] *Serono Labs.*, 158 F.3d at 1319.
[34] *Serono Labs.*, 158 F.3d at 1319.
[35] *See Lovenox I*, 733 F. Supp. 2d at 169-71; *see also Lovenox II*, 842 F. Supp. 2d at 202.
[36] *Lovenox I*, 733 F. Supp. 2d at 171 (internal quotation marks omitted); *see also Lovenox II*, 842 F. Supp. 2d at 202.
[37] *See FDA Lovenox CP Response* at 2 n.5 (potency is part of the assessment of pharmaceutical equivalency), at 9 n.40 (same), at 11, 44 (issuing a five-part standard of identity for enoxaparin that includes "equivalence of physiochemical properties").
[38] The physicochemical properties of a drug include its solid state properties such as polymorphism. *See* Eun Hee Lee, *A Practical Guide to Pharmaceutical Polymorph Screening & Selection*, 9 ASIAN J. PHARMACEUTICAL SCIS. 163 (2014) [hereinafter *Lee 2014*].
[39] *Lovenox I*, 733 F. Supp. 2d at 173-74; *Lovenox II*, 842 F. Supp. 2d at 214.

The Pergonal and Lovenox litigation illustrate that the sameness criterion is to be addressed on a case-by-case basis, taking into account the specific kind of drug at issue, including differences in potency or physicochemical properties—such as polymorphism—that may significantly affect drug product performance.

Different polymorph forms of a molecule can exhibit differing solubility and dissolution rates.[40] Indeed, FDA has specified that different polymorphs are the "same" active ingredient "when dissolution, solubility and absorption are shown to be equivalent,"[41] and consequently *not the same* when dissolution, solubility or absorption differs.

Different solubility or dissolution rates, in turn, affect a drug's potency and strength and are thus legally relevant to pharmaceutical equivalence/sameness.[42] A Proposed Generic that has a different polymorphic structure from Xifaxan® will have different solubility and dissolution rates and will not be absorbed at the same rate as Xifaxan®. It will therefore not have the same therapeutic activity as Xifaxan® and cannot, by definition, have the same strength (potency). In the words of one federal court, "[D]ifferent polymorphic forms containing the same active ingredient may be considered by the FDA as equivalents. However, this is the case only if the dissolution, solubility and absorption of the polymorphs are the same."[43] Each of these three characteristics—dissolution, solubility and absorption—must be identical to establish "sameness" under the FDCA.

#### c. The bioequivalence criterion

In addition to sameness (pharmaceutical equivalence), the FDCA requires a generic to be *bioequivalent* to the RLD. The statute states that:

> A drug shall be considered to be bioequivalent to a listed drug if . . . the rate and extent of absorption of the drug do not show a significant difference from the rate and extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses.[44]

---

[40] *Polymorphism Guidance* at 3 ("[T]he solid-state properties of a drug substance can have a significant influence on the apparent solubility of the drug substance. Since polymorph forms differ in their internal solid-state structure, a drug substance that exists in various polymorph forms can have different aqueous solubilities and dissolution rates.").

[41] Letter from Carl C. Peck, M.D., Dir., Ctr. for Drug Eval. & Research, to Thomas A. Hayes, M.D., Dir. of Regulatory Affairs, Bristol-Myers Squibb Co., Docket No. 90P-0240 (Apr. 6, 1992), at 4 ("FDA considers differences in waters of hydration resulting in polymorphic crystal forms of the same active moiety (*i.e.*, different forms of the same active ingredient) to be the same *when dissolution, solubility, and absorption are shown to be equivalent.*") (emphasis added).

[42] *See Zenith Labs., Inc. v. Abbott Labs.*, No. Civ.A. 96-1661, 1996 WL 33344963, at *10 (D.N.J. Aug. 7, 1996) ("[D]ifferent polymorphic forms containing the same active ingredient may be considered by the FDA as equivalents. However, this is the case only if the dissolution, solubility and absorption of the polymorphs are the same.").

[43] *Zenith Labs., Inc. v. Abbot Labs.*, 1996 WL 33344963, at *10 (D.N.J. Aug. 7, 1996).

[44] 21 U.S.C. § 355(j)(8)(B)(i).

[redacted]

FDA regulations further elucidate the meaning of bioequivalence, defining it as "the absence of a significant difference in the rate and extent to which the active ingredient or active moiety in pharmaceutical equivalents or pharmaceutical alternatives becomes available *at the site of drug action* when administered at the same molar dose under similar conditions in an appropriately designed study."[45]

The definition of bioequivalence provided by FDA's regulation—focusing on availability of the active ingredient at the site of drug action—is broader than the FDCA's statutory definition, which focuses solely on "absorption." Nonetheless, federal courts have upheld FDA's broader regulatory definition as a reasonable interpretation of the FDCA because it is ambiguous as to whether Congress intended the narrower statutory definition to be the exclusive definition of bioequivalence.[46]

FDA's broader regulatory definition of bioequivalence is particularly salient to a low solubility, low permeability drug like Xifaxan® that acts at local sites of action instead of systemically. For such locally acting, non-systemically absorbed drugs, the FDCA permits the Agency to adopt alternative methods of assessing bioequivalence (other than systemic bioavailability), so long as those alternative methods "are expected to detect a significant difference between the drug and the listed drug in safety and therapeutic effect."[47]

The Agency's 2014 Draft BA & BE Studies Guidance has further clarified:

> Documentation of BA [bioavailability] and BE when the drug substance produces its effects by local action in the gastrointestinal tract can be achieved either by using pharmacokinetics, an acceptable PD [pharmacodynamics] end point, clinical efficacy and safety studies, and/or suitably designed and validated in vitro studies, as appropriate.[48]

The Agency's regulations also note that bioequivalence must be shown using evidence obtained by the "most accurate, sensitive, and reproducible approach" among those alternatives identified in FDA regulations.[49]

To aid in assessing bioequivalence, FDA's regulations set forth specific factors to help the Agency identify actual or potential bioequivalence "problems," and direct that FDA "shall consider" those factors in assessing bioequivalence.[50] Among those factors, several are important to approval of any generic version of Xifaxan®, including evidence that the

---

[45] 21 C.F.R. § 320.1(e) (emphasis added).
[46] *Schering Corp. v. Food & Drug Admin.*, 51 F.3d 390, 399-400 (3d Cir. 1995); *Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 217 (D.D.C. 1996).
[47] 21 U.S.C. § 355(j)(8)(C).
[48] *See* FDA, GUIDANCE FOR INDUSTRY, BIOAVAILABILITY AND BIOEQUIVALENCE STUDIES SUBMITTED IN NDAS OR INDS—GENERAL CONSIDERATIONS 21 (2014) (draft guidance) [hereinafter *Draft BA & BE Studies Guidance*].
[49] 21 C.F.R. § 320.24(a).
[50] 21 C.F.R. at § 320.33.

active drug ingredient has a low solubility in water,[51] that certain polymorphs of the drug dissolve poorly and this poor dissolution may affect absorption,[52] evidence that the active ingredient is absorbed in large part in a particular part of the GI tract or is absorbed from a localized site,[53] and evidence that the degree of absorption of the active ingredient is poor.[54]

All of these statutory and regulatory bioequivalence standards compel FDA to grant the Actions Requested by this Petition. In particular, the Agency should require that any Proposed Generic possess the same polymorphic profile as Xifaxan® to ensure "sameness" of active ingredient and strength (potency). In addition, to ensure bioequivalency, the Agency should require that any Proposed Generic undergo the specific types of PK, *in vitro* dissolution, and clinical endpoint testing that are requested.

### C. Technical grounds

#### 1. Technical facts

##### a. Description of Xifaxan®

Xifaxan® may be more particularly described as follows:[55]

- **Product Name:** XIFAXAN® (rifaximin) tablets, for oral administration, 200mg and 550mg, NDA 021361 and NDA 022554.
- **Chemical name:** Rifaximin [USAN, INN; CAS No. 80621-81-4], (2S,16Z,18E,20S,21S,22R,23R,24R,25S,26S,27S,28E)-5,6,21,23,25-Pentahydroxy-27-methoxy-2,4,11,16,20,22,24,26-octamethyl-2,7-(epoxypentadeca-[1,11,13]trienimino)benzofuro[4,5-e]pyrido[1,2,-α]benzimidazole-1,15(2*H*)-dione,25-acetate.
- **Molecular formula:** $C_{43}H_{51}N_3O_{11}$
- **Molecular weight:** 785.89
- **Chemical Structure:**

---

[51] 21 C.F.R. at § 320.33(e)(1).
[52] 21 C.F.R. at § 320.33(e)(4).
[53] 21 C.F.R. at § 320.33(f)(1).
[54] 21 C.F.R. at § 320.33(f)(2).
[55] *See generally, Xifaxan® PI.* Due to an FDA administrative decision, NDA 021361 is the parent file to which submissions for NDA 022554 were filed for review: "[S]alix Pharmaceuticals, Inc. (Salix), on June 24, 2009, submitted as an efficacy supplement to NDA 021361 for XIFAXAN® (rifaximin) tablets [as submission number 010] regarding the proposed orphan drug indication of the maintenance of remission of hepatic encephalopathy (HE) in patients 18 years of age or older. . . . This supplement was a Type 6 NDA, administratively filed under NDA 022554 that provided data for a new strength (550 mg BID) of the currently approved (200 mg) oral tablet dosage form." FDA, Center for Drug Evaluation and Research, Application Number 22-554 – Cross Discipline Team Leader Review 1 (Mar. 8, 2010).

[56]

Generally, Xifaxan® has antimicrobial activity of varying levels against Gram-positive, Gram-negative, aerobic, and anaerobic enteric bacteria similar to its parent compound. It acts primarily by binding to the beta-subunit of bacterial DNA-dependent RNA polymerase ("rpoB"), resulting in inhibition of bacterial RNA synthesis.[57]

**b. Rifaximin crystallizes into different polymorph forms, depending on manufacturing methods and controls.**

Rifaximin is a non-aminoglycoside, semi-synthetic antibiotic derived from rifamycin. It is synthesized by a chemical reaction between rifamycin O and 2-amino-4-methylpyridine in a mixture of ethanol and purified water. A solution of purified water, ascorbic acid and hydrochloric acid at pH 2 is added and the entire mixture is chilled to facilitate the precipitation of crude rifaximin. The crude rifaximin is then purified, crystallized and dried to produce the final drug substance.

---

[56] *Xifaxan® PI* at § 11.

[57] *Xifaxan® PI* at § 12.4, "Microbiology – Mechanism of Action" ("Rifaximin is a semi-synthetic derivative of rifampin and acts by binding to the beta-subunit of bacterial DNA-dependent RNA polymerase blocking one of the steps in transcription. This results in inhibition of bacterial protein synthesis and consequently inhibits the growth of bacteria."); Vishesh Kothary et al., *Rifaximin Resistance in Escherichia coli Associated with Inflammatory Bowel Disease Correlates with Prior Rifaximin Use, Mutations in rpoB, and Activity of Phe-Arg-β-Naphthylamide-Inhibitable Efflux Pumps*, 57(2) ANTIMICROBIAL AGENTS & CHEMOTHER. 811, 812 (2013) [hereinafter *Kothary 2013*] ("Rifaximin, like other rifamycins, exerts its antimicrobial effects by binding to the β-subunit of bacterial DNA-dependent RNA polymerase and blocking the path of the elongating RNA transcript at the 5' end, thus inhibiting transcription."); Jamie S. Huang et al., *Use of Rifamycin Drugs and Development of Infection by Rifamycin-Resistant Strains of* Clostridium difficile, 57(6) ANTIMICROBIAL AGENTS & CHEMOTHER. 2690, 2690 (2013) [hereinafter *Huang 2013*] ("Rifaximin is a nonabsorbed (<0.4%) rifamycin with *in vitro* activity against Gram-positive, Gram-negative, and anaerobic bacteria."); C. G. Viscomi et al., *Crystal Forms of Rifaximin and Their Effect on Pharmaceutical Properties*, 10 CRYST. ENG. COMM. 1074, 1074 (2008) [hereinafter *Viscomi 2008*] ("Both *in-vitro* and clinical pharmacology show that rifaximin is a locally acting antibiotic with a broad spectrum of antibacterial action against Gram-positive and Gram-negative, aerobic and anaerobic organisms."); *see generally*, Elizabeth A. Campbell et al., *Structural Mechanism for Rifampicin Inhibition of Bacterial RNA Polymerase*, 104 CELL 901 (2001) [hereinafter *Campbell 2001*].

[redacted]

Rifaximin crystallizes into several different polymorph forms. The generation of each form is the result of the use of specific purification and crystallizing solvents and specific temperature and timing controls for the crystallization and drying steps of the manufacturing process.[58] Each polymorph form exhibits differing solid-state characteristics as measured by tests such as x-ray powder diffraction ("XRPD"), differential scanning calorimetry, dynamic vapor sorption, hot-stage microscopy, thermogravimetric analysis, Karl-Fischer titration, moisture sorption/desorption, and infrared and Raman spectroscopy. Among many forms, amorphous rifaximin and five distinct polymorph forms have been described in the journal or patent literature as important to drug formulation: alpha ("Form α"), beta ("Form β"), gamma ("Form γ"), delta ("Form δ") and epsilon ("Form ε").[59]

### c. Xifaxan® has a specific polymorph profile.

The active ingredient in both Xifaxan® 200 mg and 550 mg tablets is manufactured from the same drug substance. The drug substance manufacturing process is strictly controlled and fully validated to consistently produce a substance **Redacted** (the "Drug Substance").[60] **Redacted** [61]

---

[58] *Viscomi 2008* at 1074-1075.

[59] Corrado Blandizzi et al., *Impact of Crystal Polymorphism on the Systemic Bioavailability of Rifaximin, an Antibiotic Acting Locally in the Gastrointestinal Tract, in Healthy Volunteers*, 9 DRUG DESIGN, DEV. AND THERAPY 1, 2 (2015) [hereinafter *Blandizzi 2015*] ("According to the European Pharmacopoeia, rifaximin shows crystal polymorphism, and several polymorphs (α, β, γ, δ, ε) have been described."); *Viscomi 2008* at 1074-1075; Forms of Rifaximin and Uses Thereof, U.S. Patent No. 8,067,429 B2 (issued Nov. 29, 2011); Polymorphous Forms of Rifaximin, Processes for Their Production and Use Thereof in Medicinal Preparations, U.S. Patent No. 9,271,968 B2 (issued Mar. 1, 2016).

[60] **Redacted**

[61] **Redacted**



**Redacted**

**Figure 1: Rifaximin Polymorphic Forms in the Drug Substance.** XRPD analysis of six rifaximin API batches (top 6 profiles). **Redacted**

**Redacted**

**Redacted** [62] This polymorph profile of the Xifaxan® finished tablet product is referred to as the "Xifaxan® Polymorph Profile" throughout this Petition. XRPD evaluation is qualitative. As of the date of this Petition, **Redacted** **Redacted**

**Redacted**

62 **Redacted**



**Redacted**

**Redacted**

**Figure 2. Xifaxan® Polymorph Profile Across Multiple Manufacturing Lots of the Xifaxan® 550 mg Finished Tablet Product.** **Redacted**

**d. *In vitro* dissolution results generated in media containing sodium dodecyl sulphate ("SDS") are unsuitable surrogates for *in vivo* solubility performance of Proposed Generics,** **Redacted** **Redacted** **or produce results relevant to *in vivo* performance: bio-relevant media that distinguish between polymorph forms must be used.**

**Redacted**

Redacted

53

Redacted

Redacted

---

63 Redacted

Redacted

**Figure 3:** Xifaxan® 550 mg Tablet Dissolution **Redacted**

**e. Rifaximin polymorphs differ in aqueous solubility, each from the other.**

**Redacted**

64

65

**Redacted**

64 **Redacted**

65 *See Draft Biowaiver Guidance* at 3 (Under the BCS, "[a] drug substance is considered *highly soluble* when the highest strength is soluble in 250 mL or less of aqueous media over the pH range of 1-6.8.") (emphasis in original). **Redacted**



**Table 1:** Aqueous Solubility **Redacted** in Various Media

**Redacted**

Each polymorph form of rifaximin displays unique solubility characteristics.

**Redacted** [66] **Redacted**

**Redacted** [67]

[66] **Redacted** Ekarat Jantratid & Jennifer Dressman, *Biorelevant Dissolution Media Simulating the Proximal Human Gastrointestinal Tract: An Update*, DISSOLUTION TECHNOLOGIES 21 (Aug. 2009) [hereinafter *Jantratid 2009*] ("Together with the medium simulating the preprandial gastric conditions proposed by Vertzoni et al. in 2005, a core group of four biorelevant media simulating both stomach and proximal small intestine of humans in the pre- and postprandial states has been established. These media can be used to investigate the release characteristics of drugs and drug products in the stomach and small intestine, particularly in terms of food effects.") (citations omitted); *see also* Ekarat Jantratid, et al., *Dissolution Media Simulating Conditions in the Proximal Human Gastrointestinal Tract: An Update* 25 PHARMACEUTICAL RESEARCH (Jul. 2008) [hereinafter *Jantratid 2008*].

[67] **Redacted**



**Table 2:** Solubility of Rifaximin Forms in Various Media Under Saturation Conditions

**Redacted**

**Redacted**



**Redacted**

**Figure 4:** Kinetic Solubility of Different Forms of Rifaximin **Redacted**

**Redacted**

**Figure 5:** Kinetic Solubility of Different Forms of Rifaximin **Redacted**



**Redacted**

**Figure 6:** Kinetic Solubility of Different Forms of Rifaximin **Redacted**

**Redacted**

**Figure 7:** Kinetic Solubility of Different Forms of Rifaximin **Redacted**



**Redacted**

**Figure 8:** Kinetic Solubility of Different Forms of Rifaximin **Redacted**

**Redacted**

**Figure 9:** Kinetic Solubility of Different Forms of Rifaximin **Redacted**

f. **The *in vivo* availability of dissolved rifaximin is polymorph driven.**

(i) **Free fluid volumes in the gastric and proximal small intestine affect rifaximin polymorph solubility.**

To understand how rifaximin polymorph dissolution *in vitro* is related to drug product formulation performance *in vivo*, it is necessary to consider the free fluid volumes present in the gastric and proximal small intestine. These volumes recently have been estimated by MRI techniques after oral dosing of a standard fluid volume.[68] The kinetics of fluid distribution after ingestion of 240 mL water is shown below in Figure 10. **Redacted** **Redacted**

[68] Deanna M. Mudie et al., *Quantification of Gastrointestinal Liquid Volumes and Distribution Following a 240 mL Dose of Water in the Fasted State*, 11 MOLECULAR PHARMACEUTICS 3039, 3046 (2014) [hereinafter *Mudie 2014*] ("This study is the first to quantify total volume and distribution of liquid in the stomach and small intestine under conditions representing BA/BE studies using a validated MRI methodology.").

[69] **Redacted** **Redacted**



**Figure 10:** Gastric (A) and Small Bowel (B) Fluid Volumes After Ingestion of 240mL of Water.[70]

**(ii) The soluble concentration of rifaximin in the upper small intestine is a function of the polymorph forms present in the Drug Product.**

**Redacted**

**g. Xifaxan® is poorly soluble *in vivo*.**

Given **Redacted** it is not surprising that Xifaxan® is poorly soluble *in vivo*. As reported in the Xifaxan label, "[i]n a mass balance study, after administration of 400 mg $^{14}$C-rifaximin orally to healthy volunteers, of the 96.94% total recovery, 96.62% of the administered radioactivity was recovered in feces mostly as the unchanged drug and 0.32% was recovered in urine mostly as metabolites with 0.03% as the unchanged drug."[71]

---

[70] *Mudie 2014* at 3042 Fig.2.
[71] *Xifaxan® PI* at § 12.3, "Excretion."



h. **Redacted**

The formation and inter-conversion of five crystalline rifaximin polymorph forms has been established.[72] For polymorph forms considered in this Petition, formation and inter-conversion are shown diagrammatically in Figure 11.

**Redacted**

**Figure 11:** Schematic of Rifaximin Polymorph Formation and Inter-conversion[73]

**Redacted** while formation of amorphous rifaximin can be accomplished by crystallization from non-aqueous solvents. However, regardless of starting polymorph type, under non-sink conditions and once hydrated, all forms will reach an equilibrium between a low concentration of rifaximin in solution and a precipitate **Redacted**

[74]

Kinetic dissolution of these forms in aqueous media containing **Redacted** These

[72] *Viscomi 2008* at 1076 ("Five distinct crystal forms of rifaximin (α, β, γ, δ and ε) have been prepared from the same crystallisation procedure; the distinct forms are obtained by altering the drying conditions or omitting washing. . . . Transformation of the various crystal forms is schematically summarised in Fig. 4.") (citations omitted); *Blandizzi 2015* at 2 ("[S]everal polymorphs (α, β, γ, δ and ε) have been described.") (citing *Viscomi 2008*).

[73] Taken from *Viscomi 2008* at 1079 Fig. 4 **Redacted**

[74] **Redacted**

[redacted]

conditions approach the maximal concentration of aqueous surfactant that may be encountered *in vivo* in the form of bile acids present in the fed state.[75]

**Redacted**

[76]

**Redacted**

**Figure 12.** Kinetic Solubility of Different Forms of Rifaximin **Redacted**

**Redacted** [77]

[78] **Redacted**

---

[75] T.C. Northfield & I. McColl, *Postprandial concentrations of free and conjugated bile acids down the length of the normal human small intestine*, 14 GUT 513, 515 (1973) [hereinafter *Northfield 1973*] ("The mean postprandial concentration of total bile acids was highest (10 mM) in the upper ileum and lowest (2 mM) in the lower ileum (p <0.05 fig 3).").

[76] Neena Washington et al., PHYSIOLOGICAL PHARMACEUTICS: BARRIERS TO DRUG ABSORPTION at 124(2d ed. 2001) [hereinafter *Washington 2001*].

[77] **Redacted**

[78] **Redacted** *Blandizzi 2015* at 8 **Redacted**

Corrado

Redacted

i. **Xifaxan® virtually is unabsorbed into the systemic circulation.**

With Xifaxan®'s poor *in vivo* gut solubility, it is not surprising that Xifaxan® virtually is unabsorbed in the systemic circulation. In fact, less than 0.4% of Xifaxan® is absorbed,[79] leading to extremely low plasma concentrations[80] of dissolved rifaximin. Such has been recognized in the literature.[81]

j. **Rifaximin absorption is solubility-limited,** **Redacted**

*In vivo*, rifaximin absorption is solubility-limited **Redacted**

---

Blandizzi et al., *Is Generic Rifaximin Still a Poorly Absorbed Antibiotic? A Comparison of Branded and Generic Formulations in Healthy Volunteers*, 85 PHARMACOLOGICAL RESEARCH 39, 42 (2014) [hereinafter *Blandizzi 2014*] **Redacted**

[79] **Redacted**

[80] **Redacted**

[81] *See, e.g.*, Herbert L. DuPont, 12(2) *Biologic Properties and Clinical Uses of Rifaximin*, EXPERT OPIN. PHARMACOTHER. 293, 299 (2011) [hereinafter *DuPont 2011*] ("Rifaximin [Xifaxan®] is largely unabsorbed with extremely low systemic concentrations . . . ."); Eric L. Brown et al., *Pretreatment of Epithelial Cells with Rifaximin Alters Bacterial Attachment and Internalization Profiles*, 54(1) ANTIMICROB. AGENTS AND CHEMOTHER. 388, 388 (2010) [hereinafter *Brown 2010*] ("Rifaximin's [Xifaxan®'s] additional pyridoimidazole ring makes it virtually nonabsorbable (0.4%) . . . .").

**Table 3:** Kinetics of Xifaxan® 200 mg Tablet Contents Transit in the Upper GI Tract

**Redacted**

**Redacted**

**Redacted** [82]

[83]

**Redacted**

[82] **Redacted**

[83] **Redacted**

[84] **Redacted**



**Redacted**

**Table 4:** Mean (±SD) Plasma PK Parameters of Rifaximin 550 mg **Redacted**

**Redacted**

**k. Rifaximin absorption is not consistent between polymorphs, Redacted**

Absorption of rifaximin is not consistent between polymorphs or **Redacted**

**Redacted**[86]

[85] **Redacted**

[86] **Redacted**



Redacted

**Table 5:** Dog PK Parameters [87]

Redacted

**Redacted** [88] In a study of 4 beagle dogs,[89] Forms α, β, δ, γ, and ε presented differing PK profiles when administered at 100 mg/kg/day, as shown in Table 6:

**Table 6:** Study of Bioavailability of the Crystalline Forms of Rifaximin in Dogs. Mean ± S.E.M. of the PK Parameters After Oral Administration of 100 mg $kg^{-1}$ (n=4)[90]

| Rifaximin Form | Cmax[a] (ng/mL) | Tmax[b] (h) | $AUC_{0\text{-}24\,h}$[c] | $AUC_{0\text{-}inf}$[d] (ng.h/mL) |
|---|---|---|---|---|
| α | 2.6 ± 0.7 | 4 | 17 ± 7 | 17 ± 7 |
| β | 1.1 ± 0.6 | 4 | 10 ± 7 | 12 ± 8 |
| γ | 1,085.1 ± 78.7 | 2 | 4,795 ± 4,120 | 4,894 ± 4,107 |
| δ | 308.3 ± 224.1 | 2 | 801 ± 517 | 830 ± 515 |
| ε | 6.9 ± 5.1 | 4 | 42 ± 35 | 77 ± 42 |

[a] Maximum observed plasma concentration. [b]Time from administration to obtain $C_{max}$; the values are given as median. [c]Area under the concentration-time curve from time zero up to last sampling (24 h after administration). [d]Area under the concentration-time curve calculating the extrapolation to infinity.

Redacted

87 **Redacted**
88 **Redacted**
89 *Viscomi 2008.*
90 *Viscomi 2008*, Table 7.
91 **Redacted**
92 **Redacted**



Redacted

Figure 13: Redacted

Redacted

---

93 Redacted

94 Redacted



**Redacted**

**Figure 14:** PK Profile of

**Redacted**

Table 7 below summarizes the systemic exposure for varying polymorphs and dosage strengths across multiple clinical PK studies conducted for rifaximin.[95] **Redacted**

**Redacted**

[95] *Blandizzi 2015*; **Redacted**



**Table 7:** Tmax and Cmax for Various Rifaximin Dosage Forms

| Dose (mg) | Subjects (N) | Formulation and Polymorph | Tmax (min) | Cmax (ng/mL) | Ref. |
|---|---|---|---|---|---|
| 200 | NV-12 | (1x) Normix® tablet 200 mg** | 62.4 | 1.59 | 1 |
| 200 | NV-12 | (1x) Amorphous tablet 200 mg | 117.6 | 3.70 | 1 |
| 400 | NV-12 | (2x) Amorphous tablet 200 mg | 72.6 | 15.60 | 1 |
| 400 | NV-12 | (2x) Normix® tablet 200 mg** | 102.6 | 3.54 | 1 |
| | | **Redacted** | | | |

NV- normal volunteers, HE – hepatic encephalopathy patients
** Normix® tablet 200 mg is the rifaximin formulation approved in certain European countries

Ref 1 *Blandizzi 2015*
**Redacted**

**Redacted**



**Redacted**

**Figure 15:** **Redacted**

### I. The site of systemic absorption of Xifaxan® Redacted

**Redacted**

96 **Redacted**

97 **Redacted**

**Redacted**

98 **Redacted**

38

FDA_00086



**Redacted**

**Figure 16:** Plasma PK Profiles [99] **Redacted**

**Table 8:** **Redacted**

[99] **Redacted**



Redacted

[100]

**m. A Proposed Generic formulated with Redacted could meet the *Draft Rifaximin Bioequivalence Guidance Documents'* bioequivalence endpoints, but be less potent at topical sites of action in the GI lumen.**

Redacted

---

100 Redacted



**Redacted**

**Figure 17:**

**Redacted**

41

FDA_00089

**n. Higher Solubility Polymorphs pose the risk of oral contraceptive failure from drug-drug interaction and related teratogenicity, especially in HE and IBS-D patients.**

Consistent with other molecules of the rifamycin class, rifaximin activates the pregnane X receptor ("PXR") *in vitro*[101] and *in vivo*, resulting in the upregulation of Cytochrome P450 3A4 ("CYP3A4") and P-glycoprotein expression.[102] In fact, the upregulation of such detoxification pathways is one putative mechanism of action for rifaximin.[103] PXR-mediated induction of CYP3A4, which is expressed primarily in the intestine and liver, may result in increased rate and extent of metabolism of its substrates.[104]

The induction caused by clinically relevant dosing regimens of Xifaxan® does not appear to result in clinically significant drug-drug interactions with co-administered CYP3A4 substrates, primarily due to Xifaxan®'s low solubility and poor systemic absorption.[105] Use of a more highly soluble and well-absorbed Proposed Generic is expected to result in higher luminal, hepatic, and systemic rifaximin exposure. Such higher exposure is expected to increase the risk of drug-drug interactions, particularly in patient populations with higher than normal intestinal permeability **Redacted** [106].

The increased risk of PXR activation-mediated drug-drug interactions is a public health concern because CYP3A4, one of the gene targets of PXR whose expression and function are upregulated by rifamycins, is the primary metabolic pathway for the majority of

---

101 **Redacted**

*Is a Gut-Specific Human Pregnane X Receptor Activator*, 322(1) J. PHARMACOL. & EXP. THER. 391 (2007) [hereinafter *Ma 2007*].

102 Stacey A. Jones et al., *The Pregnane X Receptor: A Promiscuous Xenobiotic Receptor That Has Diverged During Evolution*, 14 MOL. ENDOCRINOL. 27 (2000) [hereinafter *Jones 2000*]; Virginia E. Carnahan & Matthew R. Redinbo, *Structure and Function of the Human Nuclear Xenobiotic Receptor PXR*, 6 CURRENT DRUG METAB. 357 (2005) [hereinafter *Carnahan 2005*].

103 Jie Cheng et al., *Therapeutic Role of Rifaximin in Inflammatory Bowel Disease: Clinical Implication of Human Pregnane X Receptor Activation*, 335(1) J. PHARMACOL. & EXP. THER. 32, 40 (2010) [hereinafter *Cheng 2010*] ("[T]he [PXR humanized] mice were used to demonstrate the beneficial effects of rifaximin in acute models of colitis through the activation of human PXR, and a critical role for PXR in IBD."); Jie Cheng et al., *Pregnane X Receptor as a Target for Treatment of Inflammatory Bowel Disorders*, 33(6) TRENDS PHARMACOL. SCI. 323 (2012) [hereinafter *Cheng 2012*].

104 *Cheng 2012* at 4 ("[R]ifaximin alone or in combination with other antibiotics appeared to have a significant effect at inducing remission in active IBD. Because rifaximin is a gut-specific agonist of human PXR, one plausible mechanism is that rifaximin induces CYP3A4 leading to clinically significant reductions in the bioavailability of established drugs that are CYP3A4 substrates. Coupled with increased clearance, this induction of CYP3A4 may reduce the possibility of drug-induced hepatic or renal toxicity.") (citations omitted).

105 Javier A. Adachi & Herbert L. DuPont, *Rifaximin: A Novel Nonabsorbed Rifamycin for Gastrointestinal Disorders*, 42 CLINICAL INFECTIOUS DISEASES 541, 545 (2006) [hereinafter *Adachi 2006*] ("Rifaximin is unlikely to have drug interactions with other medications metabolized by the cytochrome P-450 system."); *also*, *see infra*, this section, "Xifaxan® in clinical CYUP3A4 induction drug-drug interaction studies."

106 **Redacted**

marketed drugs. In fact, CYP3A4 induction causes increased metabolism and decreased efficacy for multiple oral contraceptives. Oral contraceptives are one of the most common methods of contraception for women between ages 15 and 44 (female sterilization is the other)[107]; hence, oral contraceptive failure will increase the risk of unplanned pregnancy.[108] That risk is concerning, because it is magnified in patients taking rifaximin, which has been identified by FDA as a dose-dependent teratogen. The remainder of this section discusses this risk in greater detail.

**(i) Rifaximin as a PXR activator**

Investigators at the National Cancer Institute utilized a humanized mouse model of PXR activation to compare the effects of orally-administered Xifaxan® with rifampin (the latter a prototypical PXR activation agent).[109] Results of that study showed that rifaximin-mediated PXR activation was limited to the intestine and was not observed to a significant extent in the liver, a function of Xifaxan®'s high local exposure in the GI tract and extremely limited systemic exposure. In contrast, PXR activation was seen in both intestine and liver with exposure to the more soluble and permeable rifampin. Further, the investigation indicated that localization and extent of PXR activation correlated with tissue exposure. These observations are consistent with the concentration-dependent activation of PXR *in vitro*, and the substantially lower solubility, permeability, and systemic exposure of rifaximin from Xifaxan® as compared to rifampin. In summary, the low cellular and systemic bioavailabilities of Xifaxan® (as compared with rifampin) result in substantially decreased effects on PXR and its primary downstream target gene, CYP3A4.

**(ii) Xifaxan® in clinical CYP3A4 induction drug-drug interaction studies**

The potential for Xifaxan® 550 mg tablets to cause PXR-mediated drug-drug interactions has been evaluated **Redacted**

[107] Jo Jones et al., Ctrs. for Disease Prevention and Control, *Current Contraceptive Use in the United States, 2006–2010, and Changes in Patterns of Use Since 1995*, 60 NAT'L HEALTH STATISTICS REPORTS 1, Abstract (2012) [hereinafter *Jones 2012*].

[108] Barry D. Dickinson et al., *Drug Interactions Between Oral Contraceptives & Antibiotics*, 98 OBSTETRICS & GYNECOLOGY 853 (2001) [hereinafter *Dickinson 2001*].

[109] *Ma 2007*.

[110] FDA, GUIDANCE FOR INDUSTRY – DRUG INTERACTION STUDIES – STUDY DESIGN, DATA ANALYSIS, IMPLICATIONS FOR DOSING, AND LABELING RECOMMENDATIONS (2012) (draft guidance) [hereinafter *Drug Interaction Studies Draft Guidance*].

**Redacted**

**Redacted**

One example of that risk is given by a study conducted by Blode and colleagues.[111] The study characterized the effects of rifampin on the steady-state pharmacokinetics of the components of a new oral contraceptive. Rifampin co-administration resulted in geometric mean $AUC_{0\text{-}24}$ ratios of 56% for estradiol valerate and 17% for dienogest. Based on these findings, the authors concluded: "another type of contraception should be used when coadministration of CYP3A4 inducers like rifampicin is unavoidable." labeling does not include such warnings **Redacted** **Redacted** Given the potential of exposure to Higher Solubility Polymorphs in a Proposed Generic, ANDA applicants must conduct drug interaction studies to evaluate the potential for a Proposed Generic to cause clinically significant drug interactions that could result in oral contraceptive failure. Conduct of this study is particularly crucial given rifaximin's labeling as a teratogen, as described *infra*. In fact, FDA emphasizes the importance of characterizing oral contraceptive drug-drug interaction risk for teratogens in its *Drug Interaction Studies Draft Guidance*.

In addition to the risk of unplanned pregnancy, the risk of teratogenic effects must be considered for any Proposed Generic. Based on the results of animal reproduction studies

---

[111] Hartmut Blode et al., *Evaluation of the Effects of Rifampicin, Ketoconazole and Erythromycin on the Steady-State Pharmacokinetics of the Components of a Novel Oral Contraceptive Containing Estradiol Valerate and Dienogest in healthy Postmenopausal Women*, 86(4) CONTRACEPTION 337 (2012) [hereinafter *Blode 2012*].

[redacted]

conducted with rifaximin, FDA directed the following description of teratogenic risk to be stated in the package insert for Xifaxan®:

8 USE IN SPECIFIC POPULATIONS

8.1 Pregnancy
Risk Summary

There are no available data on XIFAXAN® use in pregnant women to inform any drug associated risks. Teratogenic effects were observed in animal reproduction studies following administration of rifaximin to pregnant rats and rabbits during organogenesis at doses approximately 0.9 to 5 times and 0.7 to 33 times, respectively of the recommended human doses of 600 mg to 1650 mg per day. In rabbits, ocular, oral and maxillofacial, cardiac, and lumbar spine malformations were observed. Ocular malformations were observed in both rats and rabbits at doses that caused reduced maternal body weight gain [see Data]. In the U.S. general population, the estimated background risk of major birth defects and miscarriage in clinically recognized pregnancies is 2 to 4% and 15 to 20%, respectively. Advise pregnant women of the potential risk to a fetus.

Data
*Animal Data*

Rifaximin was teratogenic in rats at doses of 150 to 300 mg/kg (approximately 2.5 to 5 times the recommended dose for TD [600 mg per day], and approximately 1.3 to 2.6 times the recommended dose for HE [1100 mg per day], and approximately 0.9 to 1.8 times the recommended dose for IBS-D [1650 mg per day] adjusted for body surface area). Rifaximin was teratogenic in rabbits at doses of 62.5 to 1000 mg/kg (approximately 2 to 33 times the recommended dose for TD [600 mg per day], and approximately 1.1 to 18 times the recommended dose for HE [1100 mg per day], and approximately 0.7 to 12 times the recommended dose for IBS-D [1650 mg per day] adjusted for body surface area). These effects include cleft palate, agnathia, jaw shortening, hemorrhage, eye partially open, small eyes, brachygnathia, incomplete ossification, and increased thoracolumbar vertebrae.

A pre and postnatal development study in rats showed no evidence of any adverse effect on pre and postnatal development at oral doses of rifaximin up to 300 mg/kg per day (approximately 5 times the recommended dose for TD [600 mg

[redacted]

> per day], and approximately 2.6 times the recommended dose for HE [1100 mg per day], and approximately 1.8 times the recommended dose for IBS-D [1650 mg per day] adjusted for body surface area).[112]

Given FDA's direction that this language be stated in the Xifaxan® PI, it is necessary that the risk of rifaximin-induced contraceptive failure be assessed for any Higher Solubility Polymorph formulation that is planned for use in women of childbearing age.

**o. Different Polymorph Proposed Generics composed of Higher Solubility Polymorphs pose the risk of systemic antibiotic resistance in all users; also, Different Polymorph Proposed Generics composed of Lower Solubility Polymorphs pose the risk of systemic antibiotic resistance in HE patients.**

To date, published studies report low rates of emergence of bacteria resistant to rifaximin, consistent with low systemic exposure and low selective pressure in patients who receive Xifaxan®.[113]

**Redacted**

[116]

Resistance driven by use of more systemically available polymorphs of rifaximin, however, is a public health concern.[117] Rifampin, like rifaximin, is an antibiotic from the rifamycin antibiotic class. Rifampin and rifaximin are similar compounds, but rifampin is much more soluble than rifaximin and is used for the treatment of tuberculosis. Resistance to rifampin is observed during the treatment of patients with that disease. Additionally, there is evidence of cross-resistance between rifaximin and rifampin.

---

[112] *Xifaxan® PI* at § 8.1.

**Redacted**

[113] P. Brigidi et al., *Effects of Rifaximin Administration on the Intestinal Microbiota in Patients with Ulcerative Colitis*, 14(3) J. CHEMOTHER. 290 (2002) [hereinafter *Brigidi 2002*]; Herbert L. DuPont et al., *Antibacterial Chemoprophylaxis in the Prevention of Traveler's Diarrhea: Evaluation of Poorly Absorbed Oral Rifaximin*, 41 (Suppl. 8) CLINICAL INFECTIOUS DISEASES S571 (2005) [hereinafter *DuPont 2005*].

[114] **Redacted**

[115] **Redacted**

[116] **Redacted**

[117] *See, e.g., Blandizzi 2015* **Redacted**

As with other rifamycin-type drugs, resistance to rifaximin occurs primarily through mutations in the rpoB (RNA polymerase subunit B) gene. A wide variety of rpoB mutations have been described to date,[118] and in most cases these mutations reduce the overall competitive fitness of the bacteria such that growth in the absence of the antibiotic is overtaken by the wild-type form. This outcome has been confirmed for patients exposed to rifaximin, where resistant forms can be detected in the stool following treatment, but are not found to persist in the absence of the drug.[119] However, more recent studies have identified rifaximin-resistant strains from rifaximin-treated IBD patients that have mutations in the phe-arg-β-naphthylamide-inhibitable efflux pump, mutations that increase pump activity and therefore decrease intracellular rifaximin concentrations.[120] Unlike mutations in rpoB, these mutations have been shown to remain stable in the bacterial population through greater than 30 generations.

Use of a Proposed Generic composed of a Higher Solubility Polymorph will increase the risk of systemic bacterial resistance over that seen from Xifaxan®, due to increased systemic rifaximin exposure. Depending on the extent of the Proposed Generic's solubility, the risk of bacterial resistance may approach that observed for rifampin.

In contrast, an alternative polymorph mixture of **Redacted**

Under-dosing would be expected to lead to the development of rifaximin-resistant forms. [121] As discussed previously, rifaximin resistance can result in changes in efficacy upon retreatment, but if these resistant forms are confined to the GI tract, they may not present a significant safety issue—in healthy users.

The same is not true for sick users (*e.g.* HE patients) in which bacterial translocation from the intestine to the mesenteric lymph nodes and peritoneal fluid provides a route by which bacteria escape from the GI tract. Under-dosing the small bowel, in comparison to Xifaxan®, would increase the risk of systemic resistance due to such bacterial escape.

Therefore, any Proposed Generic must be studied as extensively as was Xifaxan® for development of systemic antibiotic resistance due to over- or under-dosing.

---

[118] Mary G. Reynolds, *Compensatory Evolution in Rifampin-Resistant* Escherichia coli, 156 GENETICS 1471 (2000) [hereinafter *Reynolds 2000*].

[119] C. De Leo et al., *Rapid Disappearance from the Intestinal Tract of Bacteria Resistant to Rifaximin*, 12(12) DRUGS EXP. CLIN. RES. 979 (1986) [hereinafter *De Leo 1986*].

[120] *Kothary 2013*.

[121] Tawanda Gumbo et al., *Concentration-Dependent* Mycobacterium tuberculosis *Killing and Prevention of Resistance by Rifampin*, 51(11) ANTIMICROBIAL AGENTS AND CHEMOTHER. 3781 (2007) [hereinafter *Gumbo 2007*].

#### p. Different Polymorph Proposed Generics pose the risk of harming diversity of the healthy colonic microbiome.

The integrity of the colonic microbiome is important to maintaining health and fighting disease.[122] The diversity of commensal bacteria in the colon is now thought to influence a variety of physiological processes including diabetes and metabolic syndrome, obesity and susceptibility to pathogenic bacterial species, such as *C. difficile*.[123] The emergence of antibiotic resistance has become a major concern to public health authorities across the world. In fact, "FDA, in cooperation with other Public Health Service Agencies, has been involved in several major initiatives to address what is considered to be a major threat to the Public Health in the new millennium: the emergence of drug-resistant bacteria."[124]

This subject was discussed at length during the FDA Advisory Committee meeting convened to review the efficacy and safety of Xifaxan® on November 16, 2011. The meeting was convened after Salix received a complete response letter concerning its supplemental NDA seeking an indication for treatment of IBS-D with Xifaxan® 550 mg. According to FDA, "[t]he basis for the complete response letter to Salix Pharmaceuticals was [among other issues] . . . the concern with bacterial resistance, particularly to Clostridium difficile and the potential for serious enteric infections, resulting in insufficient proof for product labeling and a chronic disease such as irritable bowel syndrome characterized by recurrence."[125]

FDA participants and Advisory Committee members expressed concern with bacterial resistance during the meeting:

- "Other issues that obviously arise when reviewing an antibiotic application is the possibility of development of resistant bacteria and the long-term impact on the GI flora of repeat uses. The Division of Anti-Infective Products was consulted, and Dr. Purfield will discuss their analysis."[126]

---

[122] H.L. DuPont, *Review Article: The Antimicrobial Effects of Rifaximin on the Gut Microbiota*, 43(Suppl. 1) ALIMENT PHARMACOL. THER. 3, 4 (2016) [hereinafter *DuPont Aliment Pharmacology 2016*] ("[T]he vast diversity of the organisms that comprise the gut microbiota form a complex ecological system that interacts with host and external factors to maintain overall health.").

[123] H.L. DuPont, *Rifaximin: An Antibiotic with Important Biologic Effects*, 15(1) MINI-REVIEWS IN MEDICINAL CHEMISTRY 1. 4 (2016) [hereinafter *DuPont Mini-Reviews 2016*] ("It is known that abnormality in diversity of intestinal flora is associated with a host of disorders including CDI, IBD, irritable bowel syndrome, diabetes and metabolic syndrome and fatty liver disease, chronic neurologic disease, colorectal carcinoma and obesity.").

[124] FDA, *Antimicrobial Resistance Information for Health Professionals and Consumers, available at* http://www fda.gov/Drugs/DrugSafety/InformationbyDrugClass/ucm135344.htm (last accessed Sept. 26, 2016).

[125] FDA, CTR. FOR DRUG EVAL. & RESEARCH, GASTROINTESTINAL DRUGS ADVISORY COMM., Transcript at 19.8-20.8 (Nov. 16, 2011) [hereinafter *ADCOMM Tr.*] (quoting Dr. Mulberg, Deputy Director, Division of Gastroenterology and Inborn Error Products, ODE III, CDER).

[126] *ADCOMM Tr.* at 123.14-20 (quoting Dr. Dimick-Santos, Medical Officer, Division of Gastroenterology and Inborn Error Products, ODE III, CDER).

- "The prevalence of C. difficile isolates with higher relative MIC [minimum inhibitory concentration] values varies by study design and geographic location. Based on my review of the literature, it appears that a larger proportion of C. difficile isolates have higher MIC values in countries were [sic] rifaximin is used in the population more frequently."[127]

- "In the case of rifaximin, we don't have data at this time to predict how the proposed use of rifaximin in the IBS population will affect the emergence of rifaximin resistance. However, **the development of some resistance is probable and likely**."[128]

- "Basically, C. difficile has been associated with every antibiotic and every antimicrobial out there that's ever been used except maybe aminoglycosides. So for this not to increase risk for C. difficile, I would be very, very surprised. And all it's going to take is some rifaximin-resistant strains to get into the population, and I think you'll start to see that. You won't see it until you get the rifaximin-resistant strains of C. difficile into the population. But they're there already, and they will enrich, and you'll get more of them. I mean, I don't think this is totally theoretical. I mean, **the theoretical risk of antibiotics for C. difficile is not theoretical at all, and it's universal across all the antibiotics except maybe aminoglycosides. So that's not quite so theoretical.**[129]

- "My sense, from what I know here, is that **these risks aren't just hypothetical; they're real.** And there are risks within the person and then there are risks across the population."[130]

In sum, they stated that the risk of antibiotic resistance – especially to *C. difficile* – from rifaximin used to treat IBS-D was "real," "probable and likely," and "not theoretical at all." In addition, there was concern of microbiome alteration: "I'll say this again, but I do think the biggest risk here is not rifaximin resistance, but it's altering the microbiota in a way to make people more susceptible to colonization with multi-drug-resistant Gram-negatives that are carbapenem-resistant, and all these other things out there."[131]

Dr. DuPont echoes those concerns for rifaximin polymorphs that differ **Redacted**

> Resistance acquisition after administration of different rifaximin polymorphs needs adequate study to determine the potential for inducing

---

[127] *ADCOMM Tr.* at 136.18-137.2 (quoting Dr. Purfield, Clinical Microbiology Reviewer).
[128] *ADCOMM Tr.* at 139.3-139.8 (quoting Dr. Purfield) (emphasis added).
[129] *ADCOMM Tr.* at 331.11-332.7 (quoting Dr. McDonald, Chief, Prevention and Response Branch Division of Healthcare Quality Promotion National Center for Infectious Diseases Centers for Disease Control and Prevention) (emphasis added).
[130] *ADCOMM Tr.* at 372.18-21 (quoting Dr. Fleming, Professor and Chair Department of Biostatistics University of Washington) (emphasis added).
[131] *ADCOMM Tr.* at 311.3-311.9 (quoting Dr. McDonald).

> resistance among both the systemic bacterial microbiota and local gut microbiota. The organisms of greatest worry for post-antibiotic superinfection include *Enterococcus* spp. and *C. difficile*. In one study, a short-course use of Xifaxan® did not increase the likelihood of acquisition of enterococci. Prolonged or intermittent exposure to Xifaxan® in patients with hepatic encephalopathy or diarrhea-predominant irritable bowel syndrome is associated with fecal acquisition of *C. difficile* only rarely but has not been seen in most trials. This probably relates to the very low rifaximin minimal inhibitory concentration for strains of *C. difficile* and the fact that sufficiently high levels of the drug in the colon further prevent the selection of mutant strains with resistance.[132]
>
> ***
>
> Different polymorphs of rifaximin with higher absorption, by contrast, may not reach the same level of drug in the colon. With a more absorbed drug, the intraluminal concentrations may be reduced with different polymorphs of rifaximin and insufficient to inhibit the emergence of *C. difficile* infection to the same degree as Xifaxan®, particularly during prolonged use as with therapy of HE or IBS-D. These patients take intermittent Xifaxan® over long periods of time for IBS-D, and for life in the case of HE.[133]
>
> ***
>
> In contrast, a polymorph of rifaximin that is *less* water soluble may not provide the levels of biologically active drug to inhibit *C. difficile* and may therefore may not only promote superinfection, but also reduce the drug's efficacy when compared to Xifaxan.[134]

At the recommendation of the Committee,

**Redacted**

[132] Affidavit of Herbert L. DuPont, M.D. [hereinafter *DuPont Affidavit*] ¶ 30 (internal citations omitted).
[133] *DuPont Affidavit* ¶ 31.
[134] *DuPont Affidavit* ¶ 32.

**Table 9:** **Redacted**

**Table 10:** **Redacted**

51

FDA_00099

**Redacted**

**Redacted** there is no reason to assume that a Different Polymorph Proposed Generic will behave in a manner bioequivalent to Xifaxan® with respect to the intestinal microbiome. **Redacted**

Thus, if a Proposed Generic is not an Identical Polymorph Proposed Generic that satisfies all of the bioequivalence testing requested in this Petition, it must undergo the same degree of resistance and alteration study that was completed for Xifaxan®.

For HE patients who receive Xifaxan® on a chronic basis, no significant changes in the luminal intestinal microbiome have been observed.[135] However, recent evidence has documented changes in the mucosal microbiome of HE patients treated with Xifaxan® that are not seen in the luminal microbiome.[136] As discussed in that publication, such changes could reflect events associated with the efficacy of Xifaxan® in this patient population. Clearly, rifaximin concentrations at the mucosal level will be in equilibrium with and dependent on the total pool of soluble rifaximin present. For a Different Polymorph Proposed Generic, there can be no assurance of bioequivalence to Xifaxan®.

**2. Application of technical facts**

**a. For approved Xifaxan® indications, potency of a finished rifaximin drug product depends on the polymorph of which its active ingredient is composed, because the bioavailability of dissolved rifaximin is polymorph-specific.**

It is obvious that the extent of biological activity (*i.e.*, potency) of the drug substance is influenced by the local concentration of soluble drug. For rifaximin, the targets of action

---

[135] Jasmohan S. Bajaj et al., *Linkage of Gut Microbiome with Cognition in Hepatic Encephalopathy*, 302 AM. J. PHYSIOL. GASTROINTEST. LIVER PHYSIOL. G168 (2011) [hereinafter *Bajaj 2011*].

[136] Jasmohan S. Bajaj et al., *Colonic Mucosal Microbiome Differs from Stool Microbiome in Cirrhosis and Hepatic Encephalopathy and Is Linked to Cognition and Inflammation*, 303 AM. J. PHYSIOL. GASTROINTEST. LIVER PHYSIOL. G675 (2012) [hereinafter *Bajaj 2012*].

include bacteria residing in various intestinal locations as well as the PXR localized to the intestinal epithelium.[137] Rifaximin acts against bacteria[138] and is anti-virulent,[139] depending on the bacterial species. In addition, these two activities have specific dose response relationships[140] and are, therefore, dependent on the concentration of soluble rifaximin present within the intestinal lumen or at the mucosal interface.

The solubility of rifaximin influences its antibacterial efficacy: Individual bile acids as well as human bile significantly enhance both rifaximin solubility and its antibacterial potency, as shown in Figures 18 and 19.[141]

---

[137] *Ma 2007*.

[138] S.M. Finegold et al., *Study of the In Vitro Activities of Rifaximin and Comparator Agents Against 536 Anaerobic Intestinal Bacteria from the Perspective of Potential Utility in Pathology Involving Bowel Flora*, 53(1) ANTIMICROBIAL AGENTS & CHEMOTHER. 281 (2009) [hereinafter *Finegold 2009*].

[139] Zhi-Dong Jiang et al., *Rifaximin-Induced Alteration of Virulence of Diarrhoea-Producing* Escherichia coli *and* Shigella sonnei, 35(3) INT. J. ANTIMICROB. AGENTS 278 (2010) [hereinafter *Jiang 2010*].

[140] E.A. Debbia et al., *Effects of Rifaximin on Bacterial Virulence Mechanisms at Supra- and Sub-Inhibitory Concentrations*, 20(2) J. CHEMOTHER. 186 (2008) [hereinafter *Debbia 2008*].

[141] Charles Darkoh et al., *Bile Acids Improve the Antimicrobial Effect of Rifaximin*, (54)9 ANTIMICROBIAL AGENTS & CHEMOTHER. 3618 (2010) [hereinafter *Darkoh 2010*]; B.W. Van Deest et al., *Bile Salt and Micellar Fat Concentration in Proximal Small Bowel Contents of Ileectomy Patients*, 47 J. CLINICAL INVESTIGATION 1314 (1968) [hereinafter *Van Deest 1968*].



**Figure 18:** Solubility of Rifaximin in the Presence of Increasing Concentrations of a Mixture of Synthetic Bile Acids[142]

**Figure 19:** Growth of ETEC Strain H10407 in the Presence of and Absence of 16 ug/mL Rifaximin and the Indicated Bile Acids at a Concentration of 4 mM [143]

At a bile acid concentration of 10-15 mM, the concentration of soluble rifaximin plateaus at about 12 μg/mL, **Redacted** *In vivo*, the bile acid concentration is highest in the proximal small bowel and is significantly increased post-prandial to about 10-15mM. [144] This

[142] This Figure 19 is taken from data reported in *Darkoh 2010*.
[143] This Figure 20 is taken from data reported in *Darkoh 2010*.
[144] Yvonne Meier et al., *Regional Distribution of Solute Carrier mRNA Expression Along the Human Intestinal Tract*, 35(4) DRUG METAB. DISPOS. 590 (2007) [hereinafter *Meier 2007*].

concentration then drops by an order of magnitude when the ascending colon is reached due to IBAT-mediated bile acid re-uptake in the terminal ileum.[145] This would favor higher antibacterial activity of rifaximin in the small bowel than in the colon and may indeed be the reason for minimal quantitative changes in the luminal colonic flora post-rifaximin treatment.[146]

**Redacted**

drug potency in the small intestine is expected to be influenced by the polymorph type in the final drug product. The efficacy and safety databases established for Xifaxan® are, therefore, specific to a drug product containing the Xifaxan® Polymorph Profile. It cannot be assumed that a Proposed Generic will match the established efficacy and safety profile of Xifaxan® unless its polymorph profile is the same as the Xifaxan® Polymorph Profile. These issues are discussed below for the 3 individual indications for which the Xifaxan® is approved.

**(i) Polymorph-specific differences in drug potency are expected to affect efficacy in the treatment of TD.**

Travelers' diarrhea is caused by the presence of an infectious pathogen in the intestine. Depending on the pathogen, the infected region may be the small intestine (enterotoxigenic *E. coli*), large intestine (*Campylobacter*, *Shigella*) or both. The effectiveness of Xifaxan® 200 mg in treating TD is a function of the pathogen encountered and the polymorph form present in the formulation. The efficacy of Xifaxan® in the treatment of invasive pathogens (*i.e.*, those causing fever with blood in stool) has not been established, as pointed out in the package insert:

---

[145] A. Gupta, et al., *Role of small intestinal bacterial overgrowth and delayed gastrointestinal transit time in cirrhotic patients with minimal hepatic encephalopathy*, 849 53(5) j. Hepatol (2010) [hereinafter *Gupta 2010*]; DW Jun, et al, *Association between small intestinal bacterial overgrowth and peripheral bacterial DNA in cirrhotic patients*, 55(5) Dig Dis Sci. 1465 (2010) [hereinafter *Jun 2010*]; C Pande, et al., *Small-intestinal bacterial overgrowth in cirrhosis is related to the severity of liver disease*, 29(12) Aliment Pharmacol Ther. 1273 (2009) [hereinafter *Pande 2009*].

[146] David N. Taylor et al., *A Randomized, Double-Blind, Multicenter Study of Rifaximin Compared with Placebo and with Ciprofloxacin in the Treatment of Travelers' Diarrhea*, 74(6) AM. J. TROP. MED. & HYG. 1060 (2006) [hereinafter *Taylor 2006*].

**5.0 WARNINGS AND PRECAUTIONS**
**5 1 Travelers' Diarrhea Not Caused by Escherichia coli**

XIFAXAN® was not found to be effective in patients with diarrhea complicated by fever and/or blood in the stool or diarrhea due to pathogens other than Escherichia coli.

Discontinue XIFAXAN® if diarrhea symptoms get worse or persist more than 24 to 48 hours and alternative antibiotic therapy should be considered.

XIFAXAN® is not effective in cases of travelers' diarrhea due to Campylobacter jejuni. The effectiveness of XIFAXAN® in travelers' diarrhea caused by Shigella spp. and Salmonella spp. has not been proven. XIFAXAN® should not be used in patients where Campylobacter jejuni, Shigella spp., or Salmonella spp. may be suspected as causative pathogens [see Indications and Usage (1.1)].

This label restriction is due to the longer TLUS values observed in patients harboring these pathogens and may be due to solubility limitations on rifaximin once delivered to the large intestine (Table 11).[147]

**Table 11:** Summary of Efficacy Results of All Patients Enrolled in the Traveler's Diarrhea Study Comparing Xifaxan® 200 mg, Ciprofloxacin and Placebo[148]

| | Rifaximin 200 mg three times a day x 3 days | Placebo | Cipro 500 mg two times a day x 3 days |
|---|---|---|---|
| Intention-to-treat population | *n* = 197 | *n* = 101 | *n* = 101 |
| Median TLUS (hours) | 32.0 | 65.5 | 28.8 |
| Clinical wellness | 76.6% | 61.4% | 78.2% |
| Treatment failure | 14.7% | 26.7% | 6.9% |
| Efficacy evaluable population | *n* = 186 | *n* = 91 | *n* = 94 |
| Median TLUS (hours) | 30.6 | 48.3 | 28.4 |
| Clinical wellness | 78.5% | 65.9% | 81.9% |
| Treatment failure | 13.4% | 26.4% | 7.4% |
| Subgroups | | | |
| Patients with diarrheagenic *E. coli** | *n* = 73 | *n* = 38 | *n* = 40 |
| Median TLUS (hours) | 24.0 | 38.0 | 23.4 |
| Clinical wellness | 65/73 (89.0%) | 28/38 (73.7%) | 33/40 (82.5%) |
| Microbial eradication | 56/73 (76.7%) | 24/38 (63.2%) | 37/40 (92.5%) |
| Patients with invasive pathogens+ | *n* = 22 | *n* = 9 | *n* = 7 |
| Median TLUS (hours) | 43.7 | 58.3 | 24.4 |
| Clinical wellness | 15/22 (68.2%) | 5/9 (55.6%) | 6/7 (85.7%) |
| Microbial eradication | 16/22 (72.7%) | 4/9 (44.4%) | 5/7 (71.4%) |
| Patients with no detectable pathogen | *n* = 67 | *n* = 38 | *n* = 37 |
| Median TLUS (hours) | 23.5 | 71.6 | 29.7 |
| Clinical wellness | 56/67 (83.6%) | 22/38 (57.9%) | 30/37 (81.1%) |

For the subgroup analyses, median TLUS and clinical wellness were calculated for the intent-to-intent population, and microbiological eradication was calculated for the modified intent-to-treat population, defined as all patients in the intent-to-treat population with positive pretreatment stool samples and a posttreatment sample.

*This subgroup excludes subjects with concurrent invasive pathogens defined as *Campylobacter jejuni, Shigella* species, and *Salmonella* species.

+ The analysis of invasive pathogens was performed excluding data from the Goa site so that TLUS could be calculated. TLUS could not be calculated for the Goa site because over half the subjects were lost to follow-up.

---

[147] *Taylor 2006.*
[148] *Taylor 2006*, Table 3.

It is therefore concluded that polymorph type, through its influence on rifaximin luminal solubility, will influence the efficacy of the Proposed Generic for this indication of Xifaxan®.

**(ii) Polymorph-specific differences in drug potency are expected to affect efficacy in the treatment of HE.**

Hepatic encephalopathy is effectively treated by Xifaxan® 550 mg, but it is unclear where in the GI tract the drug exerts its primary effectiveness. One primary target for alleviating HE symptoms is the amount of ammonia produced by bacteria in the intestine.[149] Under normal circumstances, the majority of intestinal bacteria reside in the colon. It would follow that the primary site of ammonia production, and hence Xifaxan®'s effectiveness, would be the colon.

**Redacted**

In addition to the reduction in intestinal ammonia production as a contributing factor in the mechanism of Xifaxan® in HE, recent evidence shows that HE patients may harbor specific bacterial populations in the mucosal layer (the mucosal microbiome), which are distinct from the lumenal microbiome population.[153] While Xifaxan® 550 mg does not produce major alterations in the lumenal microbiome, it does alter the diversity of the mucosal microbiome, coincident with the resolution of HE symptoms.[154] Therefore, penetration of soluble rifaximin into the mucosal layer is also considered an important

---

[149] *Bajaj 2011* at G168 ("There is evidence that pathogenic abnormalities in HE are related to the gut flora and their byproducts such as ammonia and endotoxin in the setting of intestinal barrier dysfunction and systemic inflammation.") (citations omitted).

[150] Rahul Rai et al., *Gut Microbiota: Its Role in Hepatic Encephalopathy*, 5 J. Clinical and Experimental Hepatology, S29-36 (March 2015) [hereinafter *Rai 2015*] ; Reiner Wiest et al., *Pathological Bacterial Translocation in Liver Cirrhosis*, 60 J. of Hepatology 197-209 (Jan. 2014) [hereinafter *Wiest 2014*]; *Gupta 2010* at 849-855.

[151] D. Huglo et al., *Simultaneous Determination of Pulmonary and Intestinal Permeability in Patients with Alcoholic Liver Cirrhosis*, 28(10) Eur. J. Nucl. Med. 1505 (2001) [hereinafter *Huglo 2001*] ; M.J. Zuckerman et al., *Assessment of Intestinal Permeability and Absorption in Cirrhotic Patients with Ascites Using Combined Sugar Probes*, 49(4) Dig. Dis. Sci. 621 (2004) [hereinafter *Zuckerman 2004*].

[152] Urmila Khettry et al., *Impact of Model for End-Stage Liver Disease (MELD) Scoring System on Pathological Findings at and after Liver Transplantation*, 12 LIVER TRANSPLANTATION 958 (2006) [hereinafter *Khettry 2006*].

[153] *Bajaj 2012.*

[154] *Bajaj 2012.*

determinant of efficacy. Clearly, differences in solubility due to differences in rifaximin polymorph forms can influence such penetration, hence the potency in treating HE.

**(iii) Polymorph-specific differences in drug potency are expected to affect efficacy in the treatment of IBS-D.**

Irritable bowel syndrome affects between 25 and 45 million people in the United States (10 to 15% of the population); 50% of IBS patients suffer from IBS-D. Approximately 60% to 65% of individuals who report IBS in the community are female. IBS is a major women's health issue and a majority of affected women are of child-bearing age. As discussed in earlier sections, this raises additional safety concerns if systemic exposure to rifaximin changes upon approval of a Proposed Generic.

Xifaxan® 550 mg is approved for the treatment of diarrhea-predominant IBS. A normal course of treatment is 550 mg TID for 10 days. A durable response is observed for 24 weeks on average following the treatment regimen. The mechanism of action proposed to be responsible for the clinical activity of Xifaxan® in this indication is related to effects on SIBO.[155] This mechanism points to the small bowel as the important site of action; the activity of a rifaximin formulation would be dependent on achieving soluble drug levels in the small intestine that are comparable to those achieved with Xifaxan®. As discussed previously, the concentration of soluble rifaximin delivered to the small bowel is in turn dependent on the polymorph profile of the drug product.

**Redacted**

[155] Mark Pimentel et al., *The Effect of a Nonabsorbed Oral Antibiotic (Rifaximin) on the Symptoms of the Irritable Bowel Syndrome, a Randomized Trial*, 145 ANNALS OF INTERNAL MEDICINE 557 (Oct. 17, 2006) [hereinafter *Pimentel 2006*].

[156] **Redacted**



**b. Potency of the finished rifaximin drug product also depends on fasted/fed conditions Redacted because bile acids in the proximal small bowel affect solubility, Redacted**

Potency of a finished rifaximin drug product depends on fasted/fed conditions, because the solubility of rifaximin is affected by bile acids in the proximal small bowel. **Redacted**

**c. PK parameters are unsuitable surrogates for prediction of a Different Polymorph Proposed Generic's topical bioequivalence to Xifaxan®, because Xifaxan® acts topically, is poorly soluble and poorly absorbed, Redacted Redacted**

**Redacted**

**d. *In vitro* dissolution results generated in media containing SDS are unsuitable surrogates for *in vivo* solubility performance of Proposed Generics, because that methodology cannot Redacted produce results relevant to *in vivo* performance: biologically relevant conditions that distinguish between polymorph forms must be tested.**

**Redacted**

As FDA pointed out in its August 23, 2016 final response letter to the May 7, 2015 citizen petition by Cubist Pharmaceuticals ("Cubist FRL"):[157]

> In the GI tract, stability of the [topically acting GI] drug substance varies depending on pH, and solubility of the drug substance varies depending on lipid content/surfactant level. Therefore, to simulate in vivo drug release in different portions of the GI tract, we recommend that an applicant use multiple dissolution media at different pH values and with different surfactant levels. The dissolution method should be validated and discriminate against formulation differences.[158]

Such testing should also be required for approval of Proposed Generics.

**D. Application of legal and technical facts**

**1. FDA can lawfully approve ANDAs for Identical Polymorph Proposed Generics, but only if the criteria requested in this Petition are satisfied.**

FDA can approve ANDAs for Identical Polymorph Proposed Generics; however, at a minimum, the Requested Actions must be granted in order for ANDA approval to be lawful.

**2. Different Polymorph Proposed Generics cannot be demonstrated to meet the sameness of active ingredient, sameness of strength or bioequivalence criteria, because testing technology needed to make those demonstrations does not exist.**

For many drugs, polymorph form of the active ingredient does not affect potency. For Xifaxan®, polymorph form matters, greatly. As discussed *supra*, FDA recognizes that, in reviewing an ANDA for approval, it must assess active ingredient "sameness" on a case-by-case basis, and may need to prescribe standards—including specification of crystalline structure—when necessary to ensure sameness. This is one of those cases: Different Polymorph Proposed Generics are expected to have topical and systemic drug potencies different from those of Xifaxan®. Thus, such Proposed Generics cannot meet the sameness of active ingredient criterion.

Additionally, a Different Polymorph Proposed Generic cannot be demonstrated to have sameness of strength to, or be bioequivalent to, Xifaxan®. Testing technology needed to make those demonstrations for an ANDA does not exist. **Redacted**

Second, *in vitro* dissolution

---

[157] Letter from Janet Woodcock, M.D. (FDA) to Pamela Sears (Cubist Pharmaceuticals) (Aug. 23, 2016), Docket No. FDA-2015-P-1595 (hereinafter *Cubist FRL*).
[158] *Cubist FRL* at 9.

results are unsuitable surrogates for *in vivo* solubility performance of Different Polymorph Proposed Generics. Third, PK parameters are unsuitable surrogates for prediction of Different Polymorph Proposed Generics' topical or systemic bioavailability.

Fourth, results of a bioequivalence study with clinical endpoints cannot demonstrate sameness of systemic bioavailability/potency, because a rifaximin polymorph different from Xifaxan® could appear to have efficacy non-inferior to Xifaxan®, yet have systemic or topical bioavailability/potency different than Xifaxan®. In fact, FDA has recognized the limitations to bioequivalence studies with clinical endpoints in situations with facts and conditions similar to those addressed in this Petition:

> However, we recommend that the use of comparative clinical trials as an approach to demonstrate BE generally be considered insensitive and be avoided where possible (21 CFR 320.24). The use of BE [bioequivalence] studies with clinical trial endpoints can be appropriate to demonstrate BE for orally administered drug products when measurement of the active ingredients or active moieties in an accessible biological fluid (pharmacokinetic approach) or pharmacodynamic approach is infeasible.[159]

Further, even if non-inferiority is indicated by a bioequivalence study, safety for any indications (between which systemic absorption levels of rifaximin differ) cannot be assessed given the small numbers of subjects used.

**3. FDA cannot lawfully approve ANDAs for Different Polymorph Proposed Generics, because they cannot meet the sameness or bioequivalence criteria.**

As discussed *supra*, FDA cannot lawfully approve an ANDA unless the sameness and bioequivalence criteria are satisfied. Because Different Polymorph Proposed Generics cannot be demonstrated to meet those criteria, the ANDA approval pathway currently is not available for such Proposed Generics.

**4. FDA can lawfully approve ANDAs for Non-Q1/Q2 Identical Polymorph Proposed Generics, but only where appropriately designed bioequivalence studies with clinical endpoints are successfully completed.**

This section addresses additional criteria that must be met to approve an ANDA for a Proposed Generic that has a polymorph profile identical to the Xifaxan® Polymorph

[159] FDA, GUIDANCE FOR INDUSTRY, BIOAVAILABILITY AND BIOEQUIVALENCE STUDIES FOR ORALLY ADMINISTERED DRUG PRODUCTS—GENERAL CONSIDERATIONS, 9-10 (2003) (hereinafter *Draft BA & BE Studies Guidance 2003*).

Profile, but is not qualitatively and quantitatively the same (*i.e.*, "Q1/Q2") as Xifaxan.®[160] The points made in this section draw from the points made by FDA in the Cubist FRL.

For such a Proposed Generic ("Non-Q1/Q2 Identical Polymorph Proposed Generic"), differences in the type and amount of excipients may affect the absorption and antibacterial activity of the rifaximin active ingredient at the sites of action. Clearly, for Xifaxan® approved indications, sameness in the *in vitro* dissolution profile and sameness in plasma PK cannot ensure the Non-Q1/Q2 Identical Polymorph Proposed Generic will deliver the same amount of available drug to sites of action in the GI tract. If rifaximin dissolution were increased, the Proposed Generic could have increased systemic potency. Such would lead to concerns raised by the use of Higher Solubility Polymorphs.[161] If rifaximin dissolution were decreased, the Proposed Generic could have less potency at topical sites of action, but a difference in PK profile might not be seen.[162] Such would lead to concerns of antibiotic resistance and microbiome alteration. Thus, a bioequivalence study with clinical endpoints is needed to demonstrate that any Non-Q1/Q2 Identical Polymorph Proposed Generic is bioequivalent to Xifaxan®.

As FDA explained in the Cubist FRL:

> When an in vivo bioequivalence study with clinical endpoints is recommended, the clinical endpoints for bioequivalence evaluation should be selected based on an evaluation of the approach that is most sensitive and reproducible in the context of demonstrating bioequivalence. The amount of supportive clinical data as well as the design of the clinical studies, including endpoints, will depend on the specifics of the application.[163]

**a. Clinical endpoints studies for non-Q1/Q2 Identical Polymorph Proposed Generics to Xifaxan® 200 mg indicated for treatment of TD[164].**

In the context of demonstrating bioequivalence to Xifaxan® 200 mg tablets, FDA's *200mg Draft Bioequivalence Guidance* recommends a bioequivalence study with clinical endpoints. However, the primary endpoint listed in the *200mg Draft Bioequivalence Guidance* differs in kind from the primary endpoint on which approval of the RLD was based. Such difference renders the recommended study incapable of generating evidence of bioequivalence between the Proposed Generic and Xifaxan® 200 mg.

---

[160] That is, the Identical Polymorph Proposed Generic contains excipients that differ in amount or type from those in the Xifaxan® RLD.

[161] *See supra* §§ II.C.1 n, o, p.

[162] Such would be analogous to use of a Proposed Generic with **Redacted**

[163] *Cubist FRL* at 10.

[164] FDA, GUIDANCE FOR INDUSTRY – NON-INFERIORITY CLINICAL TRIALS (2010) (draft guidance) [hereinafter *Non-Inferiority Draft Guidance*].

The primary endpoint in the *200mg Draft Bioequivalence Guidance* would evaluate the proportion of subjects in which TD symptoms would abate after a specific length of treatment (5 days). Abatement would be assessed on the number unformed (soft and watery) stools per subject. In comparison, the pivotal Xifaxan® studies evaluated whether the duration of diarrhea was shortened.[165] This duration was determined by calculation of the TLUS which was defined as the time to the last unformed stool passed, **after which the subject was declared to be clinically well** (*i.e.* resolution of diarrhea and other non-diarrhea symptoms). The treatment groups were compared in terms of survival distribution functions. Therefore, the pivotal study endpoints were measures of the rate at which patients achieved symptom resolution and clinical wellness.

These distinctions from FDA's recommended bioequivalence clinical endpoints study are important: it is well documented that certain sequelae of TD are correlated with the extent and duration of symptoms. The rate at which clinical symptoms resolve will be directly related to the concentration of soluble drug substance at the site of pathogen invasion. Since TD is a self-limiting disease it is possible that a 5-day endpoint recommended by *200mg Draft Bioequivalence Guidance* could very well yield an observed "bioequivalent" outcome for both groups, even though the time at which clinical cure was achieved was not statistically bioequivalent. Thus, the pivotal study endpoints should be recommended for any Non-Q1/Q2 Identical Polymorph Proposed Generic seeking approval for the TD indication.

Additionally, the non-inferiority margin recommended by the *200mg Draft Bioequivalence Guidance* is unacceptably wide,[166] when consideration is given to data from the pivotal TD studies, displayed below in Table 12.

**Table 12:** Clinical Response in Study 1 (ITT population)

| | Xifaxan® (n= 125) | Placebo (n = 129) | Estimate (97.5% CI) |
|---|---|---|---|
| Median TLUS (hours) | 32.5 | 58.6 | 2[a] (1.26, 2.5) |
| Clinical cure, n (%) | 99 (79) | 78 (60) | 19[b] (5.3, 32.1) |

[a] Hazard Ratio (p-value <0.001)
[b] Difference in rates (p-value <0.01)

The region should be established based on non-inferiority principles. The principles involve retention of certain fraction of the treatment effect, for example 50%, of RLD over placebo. Pivotal studies of Xifaxan® estimated the treatment effect to be 19%. The non-inferiority margin should be set to ensure that there would be no more than a 50% loss of efficacy based on this effect estimate: a difference between the Proposed Generic and Xifaxan® of 9.5%. Thus, the proposed bioequivalence region of [-20%, +20%] in the *200mg Draft Bioequivalence* Guidance is not reasonable.

---

[165] *Xifaxan® PI* § 14.1.
[166] That is, the 90% confidence interval of the Proposed Generic to Xifaxan® contained within [-20%, +20%].

Two approaches could be taken to set the non-inferiority margin, $\partial$ :

$$\partial \leq r\Delta_{R\text{-}P,}\ 0 < r \leq 0.5$$

or

$$\partial < \text{Lower Limit of 95\% CI on } \Delta_{R\text{-}P}$$

Where:

- $\Delta_{R\text{-}P}$ is the overall difference in clinical cure rates (rifaximin minus placebo) from pivotal TD studies, and
- r is the fraction of treatment effect to be preserved; for example r = 0.5 means 50% retention of treatment effect of RLD to placebo.

The first approach gives a non-inferiority margin of 9.5% (equivalence region of [-9.5%, +9.5%]), and the second a non-inferiority margin of 5.3% (equivalence region of [-5.3%, +5.3%]). This demonstrates that a non-inferiority margin between 5.3% to 9.5% is reasonable to establish bioequivalence between a Non-Q1/Q2 Identical Polymorph Proposed Generic and Xifaxan®.

Therefore, for a Non-Q1/Q2 Identical Polymorph Proposed Generic to Xifaxan® 200 mg indicated for treatment of TD, the following is needed for ANDA approval: bioequivalence studies that include TLUS and *declaration of cure* clinical endpoints and appropriate non-inferiority margins based on non-inferiority principles.

**b. Clinical endpoints studies for non-Q1/Q2 Identical Polymorph Proposed Generics to Xifaxan® 550 mg indicated for treatment of HE.**

In the context of demonstrating bioequivalence to Xifaxan® 550 mg tablets, FDA's *550mg Draft Bioequivalence Guidance* failed to recommend a bioequivalence study with clinical endpoints for the 550 mg strength. FDA was willing to rely on the results of the above-mentioned TD bioequivalence study with clinical endpoints as adequate evidence of bioequivalence between a Proposed Generic and Xifaxan® 550 mg. FDA's approach will not provide adequate evidence of such bioequivalence. For the following reasons, a clinical endpoint study is needed to demonstrate bioequivalence between a Non-Q1/Q2 Identical Polymorph Proposed Generic and Xifaxan® 550 mg in patients with HE:

**Redacted**

**Redacted** Third, TD and HE are fundamentally different diseases caused by different physiological mechanisms. Further, TD is self-limiting and usually

experienced by otherwise healthy people, whereas HE is not self-limiting and often is experienced by people who are not otherwise healthy. Fourth, there is no evidence that the mechanisms by which Xifaxan® 200 mg acts to treat TD and Xifaxan® 550 mg acts to treat HE are the same.

Therefore, for a Non-Q1/Q2 Identical Polymorph Proposed Generic to Xifaxan® 550 mg indicated for treatment of HE, the following is needed as part of testing for ANDA approval: bioequivalence studies with inclusion criteria and endpoints comparable to those used for the approval of the Xifaxan® 550 mg for the HE indication and appropriate non-inferiority margins based on non-inferiority principles.

**c. Clinical endpoints studies for non-Q1/Q2 Identical Polymorph Proposed Generics to Xifaxan® 550 mg indicated for treatment of IBS-D.**

Additionally, if the Proposed Generic is intended to treat IBS-D and the above-mentioned bioequivalence studies are not completed for the HE indication, such studies must be done in IBS-D patients. This is for the following reasons:

**Redacted**

Third, TD and IBS-D are fundamentally different diseases caused by different physiological mechanisms. Further, TD is self-limiting and usually experienced by otherwise healthy people, whereas IBS-D is not self-limiting. Fourth, there is no evidence that the mechanisms by which Xifaxan® 200 mg acts to treat TD and Xifaxan® 550 mg acts to treat IBS-D are the same.

Therefore, for a Non-Q1/Q2 Identical Polymorph Proposed Generic to Xifaxan® 550 mg indicated for treatment of IBS-D, the following is needed as part of testing for ANDA approval if the above-mentioned clinical endpoint study of Xifaxan® 550 mg was not done for the HE indication: bioequivalence studies with inclusion criteria and endpoints comparable to those used for the approval of the Xifaxan® 550 mg for the IBS-D indication and appropriate non-inferiority margins based on non-inferiority principles.

**5. Failure to grant the actions requested in this Petition will pose substantial public health risks.**

As discussed *supra*, approval of ANDAs for Different Polymorph Proposed Generics poses risks of efficacy differences, toxicity in HE patients, oral contraceptive failure and subsequent related teratogenicity, the risk of systemic antibiotic resistance, and the risk of *C. difficile* resistance and harming diversity of the healthy colonic microbiome.[167] These

[167] *See supra* §§ II.C.1 n, o, p.

public health risks are not merely theoretical, but real. Indeed, FDA itself has identified antibiotic resistance as a significant risk.

As discussed in Section II.C.1.n, rifaximin belongs to the same class of antibiotics as rifampin. Thus, the public health concern posed by a Higher Solubility Polymorph is heightened due to potential for drug-drug interaction with oral contraceptives in the user populations for which Xifaxan® is indicated. Such a Proposed Generic, if approved, would by definition have labeling identical to that of Xifaxan®. Yet based on the results of Xifaxan® clinical trials, Xifaxan's® labeling does not include warnings of drug-drug interaction with oral contraceptives because clinically significant risk was not seen. Because of the potential for unplanned pregnancy and its associated impact on reproductive rights, as well as FDA's view of potential teratogenicity, the risk of contraceptive failure posed by such a Proposed Generic must be carefully assessed.[168]

Granting the Requested Actions will help ensure that these risks are addressed in the approval process for any Proposed Generics.

### E. Conclusion

Based on the legal and technical grounds stated *supra*, Salix requests that FDA require, at a minimum, the actions requested in this Petition.

---

[168] Under both the Constitution and the Administrative Procedure Act ("APA"), Agencies may not act in ways that are arbitrary and capricious or irrational. *See Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 215-16 (D.C. Cir. 2013). *See also City of Cleburne, Tex. v. Cleburne*, 473 U.S. 432, 439 (1985) (the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike."); *Washington v. Davis*, 426 U.S. 229, 239 (1976) (Due Process Clause of the Fifth Amendment contains an equal protection component).

### III. Environmental Impact

The petitioner requests a categorical exclusion from the requirement of preparing an environmental assessment. As provided in 21 C.F.R. § 25.31, neither an environmental assessment nor an environmental impact statement is required. To the best of the petitioner's knowledge, no extraordinary circumstances exist that may significantly affect the human environment as discussed under 21 C.F.R. § 25.21.

### IV. Economic Impact

As provided in 21 C.F.R. §10.30(b), the petitioner agrees to submit economic impact information only if requested by the Commissioner of Food and Drugs following review of the Petition.

### V. Certification

I certify that, to my best knowledge and belief: (a) this petition includes all information and views upon which the petition relies; (b) this petition includes representative data and/or information known to the petitioner which are unfavorable to the petition; and (c) I have taken reasonable steps to ensure that any representative data and/or information which are unfavorable to the petition were disclosed to me. I further certify that the information upon which I have based the action requested herein first became known to the party on whose behalf this petition is submitted on or about the following date:

- **Information contained in the executive summary of Petition (Petition § II.A):** The statements in the finalized *Xifaxan® PI* became available to Salix on the date that each version of that document was approved by FDA, the most recent being "Rev. 11/2015" (Nov. 1, 2015). The following study became available to Salix its date of finalization or initial publication: **Redacted** The final information in the following guidance became available to Salix on the date it was released: *200mg Draft Bioequivalence Guidance* (Nov. 1, 2011); *550mg Draft Bioequivalence Guidance* (Feb. 7, 2012); *Draft Biowaiver Guidance* (May 4, 2015). The following Federal Register notices on the dates they were released: *Watson Laboratories Withdrawal* (Apr. 9, 2014); *Impax Laboratories Withdrawal* (March 18, 2013). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding legal grounds of Petition (Petition § II.B):** Each version of the Orange Book became available to Salix on the date of its publication by FDA (most recently July 1, 2016). The final information in the following guidance became available to Salix on the date it was released: *Polymorphism Guidance* (July 9, 2007); *Draft BA & BE Studies Guidance* (March 12, 2014). The following correspondence became available to Salix on the date of their transmission: Holcombe letter (April 8, 2002); Woodcock letter (June 17, 1997); Peck letter (Apr. 6, 1992); *FDA Lovenox CP Response* (July 23, 2010). The following published article became available to Salix on its date of initial publications, except as otherwise noted: *Lee 2014* (published ahead of print on

May 16, 2014). The following became available on the date of its initial publication: *ANDA Regulations* (Apr. 28, 1992). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the description of Xifaxan® (Petition § II.C.1.a):** Some of the information included in the Petition became available to Salix prior to submission of that information to FDA in NDA 21-361 (Xifaxan® 200 mg; TD indication) on December 21, 2001. Such information was developed over a several year time period directly preceding said submission, and further developed for submissions of NDA 21-361/22-554 on June 24, 2009 (Xifaxan® 550 mg; HE indication) and NDA 21-361 on June 7, 2010 (Xifaxan® 550 mg; IBS-D indication). The statements in the finalized *Xifaxan® PI* became available to Salix on the date that each version of that document was approved by FDA, the most recent being "Rev. 11/2015" (Nov. 1, 2015). The following became available to Salix upon its submission to FDA: Cross Discipline Team Leader Review (March 8, 2010). The following published articles became available to Salix on their dates of initial publications, except as otherwise noted: *Kothary 2013* (published ahead of print on Nov. 26, 2012); *Huang 2013* (published ahead of print on April 1, 2013); *Viscomi 2008* (published ahead of print on May 28, 2008); *Campbell 2001* (March 23, 2001). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that rifaximin crystallizes into different polymorph forms, depending on manufacturing methods and controls (Petition § II.C.1.b):** Some of the information included in the Petition became available to Salix in 2001 and was submitted in NDA 21-361 (Xifaxan® 200 mg; TD indication) on December 21, 2001. Such information was developed over a several year time period directly preceding said submission, and further developed for submissions of NDA 21-361/22-554 on June 24, 2009 (Xifaxan® 550 mg; HE indication) and NDA 21-361 on June 7, 2010 (Xifaxan® 550 mg; IBS-D indication). The following published articles became available to Salix on their dates of initial publications, except as otherwise noted: *Viscomi 2008* published ahead of print on May 28, 2008); *Blandizzi 2015* (published ahead of print on Dec. 14, 2014). The following patents became available to Salix on their dates of publication: Karen S. Gushurst et al., Forms of Rifaximin and Uses Thereof, United States Patent US 8,067,429 B2 (Nov. 29, 2011); Guiseppe Claudio Viscomi et al., Polymorphous Forms of Rifaximin, Processes for Their Production and Use thereof in Medicinal Preparations, United States Patent US 9,271,968 B2 (March 1, 2016). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that Xifaxan® has a specific polymorph profile (Petition § II.C.1.c):** Some of the information included in the Petition became available to Salix in 2001 and was submitted in NDA 21-361 (Xifaxan®

[redacted]

200 mg; TD indication) on December 21, 2001. Such information was developed over a several year time period directly preceding said submission, and further developed for submissions of NDA 21-361/22-554 on June 24, 2009 (Xifaxan® 550 mg; HE indication) and NDA 21-0361 on June 7, 2010 (Xifaxan® 550 mg; IBS-D indication). The following became available to Salix upon its submission to FDA: **Redacted** The following study became available to Salix on its date of finalization: **Redacted** **Redacted** All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that *in vitro* dissolution results generated in media containing sodium dodecyl sulphate ("SDS") are unsuitable surrogates for *in vivo* solubility performance of Proposed Generics, Redacted or produce results relevant to *in vivo* performance: bio-relevant media that distinguish between polymorph forms must be used (Petition § II.C.1.d):** The following became available to Salix on the date of its submission to FDA: **Redacted** All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that rifaximin polymorphs differ in aqueous solubility, each from the other (Petition § II.C.1.e):** Some of the information included in the Petition became available to Salix in 2001 and was submitted in NDA 21-361 (Xifaxan® 200 mg; TD indication) on December 21, 2001. Such information was developed over a several year time period directly preceding said submission, and further developed for submissions of NDA 21-361/22-554 on June 24, 2009 (Xifaxan® 550 mg; HE indication) and NDA 21-361 on June 7, 2010 (Xifaxan® 550 mg; IBS-D indication). The following studies became available to Salix on the dates they were finalized: **Redacted**

  The final information in the following draft guidance became available to Salix on the date it was released: *Draft Biowaiver Guidance* (May 4, 2015). The following published articles became available to Salix on their dates of initial publication, except as otherwise noted: *Jantratid 2009* (Aug. 1, 2009); *Jantratid 2008* (published ahead of print on April 11, 2008). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that the *in vivo* availability of dissolved rifaximin is polymorph driven (Petition § II.C.1.f):** The following published article became available to Salix on its date of initial publication: *Mudie 2014* (Aug. 12, 2014). The final information in the following comments to draft guidance became available to Salix on the date that they were finalized: **Redacted**

**Redacted**

**Redacted** All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that Xifaxan® is poorly soluble *in vivo* (Petition § II.C.1.g):** The statements in the finalized *Xifaxan® PI* became available to Salix on the date that each version of that document was approved by FDA, the most recent being "Rev. 11/2015" (Nov. 1, 2015). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that** **Redacted** **(Petition § II.C.1.h):** The following published articles became available to Salix on their dates of initial publication, except as otherwise noted: *Viscomi 2008* (published ahead of print on May 28, 2008); *Blandizzi 2015* (published ahead of print on Dec. 14, 2014); *Northfield 1973* (published July 1, 1973, but not known to Salix until first NDA 21-361 (Xifaxan® 200 mg; TD indication) was submitted on December 21, 2001, and the data were collected over a several year time period in the years preceding publication); *Washington 2001* (Dec. 21, 2000); Blandizzi 2014 (July 1, 2014). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that Xifaxan® virtually is unabsorbed into the systemic circulation (Petition § II.C.1.i)**: The following published articles and studies became available to Salix on their dates of finalization or initial publication, except as otherwise noted: **Redacted** *DuPont 2011* (published ahead of print on Jan. 13, 2011); *Brown 2010* (published ahead of print on Oct. 26, 2009). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that rifaximin absorption is solubility-limited,** **Redacted** **(Petition § II.C.1.j):** The following published articles and studies became available to Salix on their dates of finalization or initial publication, except as otherwise noted: **Redacted** *Blandizzi 2014* (July 1, 2014); **Redacted** All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that rifaximin absorption is not consistent between polymorphs,** **Redacted** **(Petition § II.C.1.k):** The following published articles and studies became available to Salix on their dates of finalization or initial publication, except as otherwise noted: **Redacted**

Redacted ; *Viscomi 2008* (published ahead of print on May 28, 2008); *Blandizzi 2015* (published ahead of print on Dec. 14, 2014); Redacted

All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that the site of systemic absorption of Xifaxan® Redacted (Petition § II.C.1.*l*)**: The following published article and study became available to Salix on their dates of initial publication or finalization: Redacted ; *Wilding 2000* (Nov. 1, 2000). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that a Proposed Generic formulated Redacted Redacted could meet the *Draft Rifaximin Bioequivalence Guidance Documents*' Bioequivalence endpoints, but be less potent at topical sites of action in the GI lumen (Petition § II.C.1.m)**:. All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that Higher Solubility Polymorphs pose the risk of oral contraceptive failure from drug-drug interaction and related teratogenicity, especially in HE and IBS-D patients (Petition § II.C.1.n):** The following published articles and studies became available to Salix on their dates of finalization or initial publication, except as otherwise noted: Redacted Redacted ; *Ma 2007* (published ahead of print on April 18, 2007); *Jones 2000* (Jan. 1, 2000); *Carnahan 2005* (Aug. 1, 2005); *Cheng 2010* (published ahead of print on July 13, 2010); *Cheng 2012* (June 1, 2012); *Adachi 2006* (Feb. 15, 2006); *Jones 2012* (Oct. 18, 2012); *Dickinson 2001* (Nov. 1, 2001); *Blode 2012* (Oct. 1, 2012); Redacted . The final information in the following guidance became available to Salix on the date it was released: *Drug Interaction Studies Draft Guidance* (Feb. 15, 2012). The statements in the finalized *Xifaxan® PI* became available to Salix on the date that each version of that document was approved by FDA, the most recent being "Rev. 11/2015" (Nov. 1, 2015). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that Different Polymorph Proposed Generics composed of Higher Solubility Polymorphs pose the risk of systemic antibiotic resistance in all users; also, Different Polymorph Proposed Generics composed of Lower Solubility Polymorphs pose the risk of systemic antibiotic resistance in HE patients (Petition § II.C.1.o):** The following published articles and studies became available to Salix on their dates of finalization or initial publication, except as otherwise noted: *Brigidi 2002* (June 1,

2002); *DuPont 2005* (Dec. 1, 2005); **Redacted** ; *Blandizzi 2015* (published ahead of print on Dec. 14, 2014); *Reynolds 2000* (Dec. 1, 2000); *De Leo 1986* (published Dec. 1, 1986, but known to Salix upon the filing of NDA 21-361 (Xifaxan® 200 mg; TD indication) on December 21, 2001); *Kothary 2013* (published ahead of print on Nov. 26, 2012); *Gumbo 2007* (published ahead of print Aug. 27, 2007). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that Different Polymorph Proposed Generics pose the risk of harming diversity of the healthy colonic microbiome (Petition § II.C.1.p)**: The following published articles, studies and other sources became available to Salix on their dates of initial publication, except as otherwise noted: *DuPont Aliment Pharmacology 2016* (Jan. 1, 2016); *DuPont Mini-Reviews 2016* (Feb. 1, 2016); *FDA, Antimicrobial Resistance Information for Health Professionals and Consumers (last updated Feb. 19, 2016)*; ADCOMM Tr. (Nov. 16, 2011); *DuPont Affidavit* (Oct. 13, 2016); *Bajaj 2011* (published ahead of print on Sept. 22, 2011); *Bajaj 2012* (published ahead of print on July 19, 2012). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that for approved Xifaxan® indications, potency of a finished rifaximin drug product depends on the polymorph of which its active ingredient is composed, because the bioavailability of dissolved rifaximin is polymorph-specific (Petition § II.C.2.a):** The following published articles and studies became available to Salix on their dates of initial publication, except as otherwise noted: *Ma 2007* (published ahead of print on April 18, 2007); *Finegold 2009* (published ahead of print on Oct. 27, 2008); *Jiang 2010* (published ahead of print on Jan. 4, 2010); *Debbia 2008* (April 1, 2008); *Darkoh 2010* (published ahead of print on June 14, 2010); *Van Deest 1968* (published June 1, 1968, but not known to Salix until Salix was formed on November 1, 1989); *Meier 2007* (published ahead of print on January 12, 2007); *Gupta 2010* (published ahead of print on July 17, 2010); *Jun 2010* (published ahead of print on June 11, 2009); *Pande 2009* (June 15, 2009); *Taylor 2006* (June 1, 2006); *Bajaj 2011* (published ahead of print on Sept. 22, 2011); *Rai 2015* (published ahead of print on Jan. 6, 2015); *Wiest 2014* (published ahead of print on Aug. 29, 2013); *Huglo 2001* (published ahead of print on Aug. 23, 2001); *Zuckerman 2004* (April 1, 2004); *Khettry 2006* (published ahead of print on April 5, 2006); *Bajaj 2012* (published ahead of print on July 19, 2011); *Pimentel 2006* (Oct. 17, 2006); **Redacted** . All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that potency of the finished rifaximin drug product also depends on fasted/fed conditions Redacted because bile acids in the proximal small bowel affect solubility, Redacted (Petition § II.C.2.b)**: All

final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that PK parameters are unsuitable surrogates for prediction of a Different Polymorph Proposed Generic's topical bioequivalence to Xifaxan®, because Xifaxan® acts topically, is poorly soluble and poorly absorbed, Redacted Redacted (Petition § II.C.2.c)**: All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that *in vitro* dissolution results generated in media containing SDS are unsuitable surrogates for *in vivo* solubility performance of Proposed Generics, because that methodology cannot Redacted produce results relevant to *in vivo* performance: biologically relevant conditions that distinguish between polymorph forms must be tested (Petition § II.C.2.d):** The following correspondence became available to Salix on the date of its transmission: *Cubist FRL* (Aug. 23, 2016). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that FDA can lawfully approve ANDAs for Identical Polymorph Proposed Generics, but only if the criteria requested in this Petition are satisfied (Petition § II.D.1):** All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that Different Polymorph Proposed Generics cannot be demonstrated to meet the sameness of active ingredient, sameness of strength or bioequivalence criteria, because testing technology needed to make those demonstrations does not exist (Petition § II.D.2):** The following guidance became available to Salix on its dates of initial publication: *Draft BA & BE Studies Guidance* 2003 (March 19, 2003); *Non-Inferiority Draft Guidance* (March 1, 2010). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that FDA cannot lawfully approve ANDAs for Different Polymorph Proposed Generics, because they cannot meet the sameness or bioequivalence criteria (Petition § II.D.3):** All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that FDA can lawfully approve ANDAs for Non-Q1/Q2 Identical Polymorph Proposed Generics, but only where appropriately designed bioequivalence studies with clinical endpoints are successfully completed (Petition § II.D.4):** The following correspondence

[redacted]

became available to Salix on the date of its transmission: *Cubist FRL* (Aug. 23, 2016). The following guidance became available to Salix on its dates of initial publication: *Non-Inferiority Draft Guidance* (March 1, 2010). The statements in the finalized *Xifaxan® PI* became available to Salix on the date that each version of that document was approved by FDA, the most recent being "Rev. 11/2015" (Nov. 1, 2015). All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

- **Information regarding the point that failure to grant the actions requested in this Petition will pose substantial public health risks (Petition § II.D.5)**: All final opinions developed for purposes of the Petition became available to Salix on the date that this Petition was signed.

If I received or expect to receive payments, including cash and other forms of consideration, to file this information or its contents, I received or expect to receive those payments from the following persons or organizations: Salix Pharmaceuticals, Inc. I verify under penalty of perjury that the foregoing is true and correct as of the date of the submission of this petition.

October 17, 2016

Respectfully submitted

Lance L. Shea

Counsel to Salix Pharmaceuticals, Inc.

## Draft Guidance on Rifaximin

This draft guidance, when finalized, will represent the current thinking of the Food and Drug Administration (FDA, or the Agency) on this topic. It does not establish any rights for any person and is not binding on FDA or the public. You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations. To discuss an alternative approach, contact the Office of Generic Drugs.

**Active Ingredient:** Rifaximin

**Dosage Form; Route:** Tablet; oral

**Recommended Studies:** Two options

**Option 1:**
If the test product formulations are qualitatively and quantitatively (Q1/Q2) the same as the Reference Listed Drug (RLD) with respect to inactive ingredients, bioequivalence (BE) may be established by conducting both in vivo BE studies with pharmacokinetic (PK) endpoints and in vitro comparative dissolution studies.

In vivo BE study with PK endpoints:

1. Type of study: Fasting
   Design: Single-dose, two-treatment, two-period crossover in vivo
   Strength: 200 mg
   Subjects: Healthy males and nonpregnant/nonlactating females, general population.
   Additional Comments: Applicants may consider using a reference-scaled average bioequivalence approach for this drug product. Please refer to the Progesterone Capsule Guidance for additional information regarding the reference-scaled average bioequivalence approach.

2. Type of study: Fed
   Design: Single-dose, two-treatment, two-period crossover in vivo
   Strength: 200 mg
   Subjects: Healthy males and nonpregnant/nonlactating females, general population.
   Additional Comments: Same as comments above

In vitro dissolution study:

3. Type of study: Comparative dissolution study
   Strength: 200 mg
   Apparatus: U.S. Pharmacopeia (USP) Apparatus 2 (paddle)
   Media: pH 4.5, 0.125% and 0.375% SDS
   pH 6.8, 0.125% and 0.375% SDS
   Volume: 1000 mL
   Temperature: 37°C
   Rotation speed: 75 rpm
   Sampling times: 10, 20, 30, 45, 60, 90, and 120 minutes

4. Type of study: Comparative dissolution study
   Strength: 550 mg

Apparatus: U.S. Pharmacopeia (USP) Apparatus 2 (paddle)
Media: pH 4.5, 0.25% and 0.5% SDS
pH 6.8, 0.25% and 0.5% SDS
Volume: 1000 mL
Temperature: 37°C
Rotation speed: 75 rpm
Sampling times: 10, 20, 30, 45, 60, 90, and 120 minutes

**Analytes to measure (in appropriate biological fluid):** Rifaximin in plasma

**Bioequivalence based on (90% CI)**: Rifaximin

**Waiver request of in vivo testing:** 550 mg strength based on (i) acceptable bioequivalence studies on the 200 mg strength, (ii) proportional similarity of the formulations between both strengths, and (iii) acceptable in vitro dissolution testing of both strengths.

**Dissolution test method and sampling times:** The dissolution information for this drug product can be found on the FDA-Recommended Dissolution Methods web site, available to the public at the following location: http://www.accessdata.fda.gov/scripts/cder/dissolution/. Conduct comparative dissolution testing on 12 dosage units each of both strengths of the test and reference products. Specifications will be determined upon review of the abbreviated new drug application (ANDA).

---

**Option 2:**
If the test product formulations are not Q1/Q2 the same as the RLD with respect to inactive ingredients, BE should be established by conducting an in vivo study with clinical endpoints, in vivo study with PK endpoints, and in vitro comparative dissolution testing.

In vivo BE study with PK endpoints:

The same studies as recommended under Option 1.

In vitro dissolution study:

The same studies as recommended under Option 1.

In vivo BE study with clinical endpoints:

Type of study: BE Study with Clinical Endpoints
Design: Three-arm, randomized, double blind, parallel, placebo controlled in vivo
Strength: 200 mg (dosed: three times daily for 3 days)
Subjects: Male and nonpregnant/nonlactating female subjects with travelers' diarrhea
Additional comments: Specific recommendations are provided below.

**Additional comments regarding the BE study with clinical endpoints (200 mg):**

1. The Office of Generic Drugs (OGD) recommends conducting a BE study with clinical endpoints in the treatment of travelers' diarrhea. After three unformed stools are recorded within the 24 hours immediately preceding randomization, subjects are to be randomized to receive the generic rifaximin 200 mg oral tablet, the reference listed drug (RLD) 200 mg oral tablet or placebo three times daily for 3 days (i.e., on study Days 1, 2, and 3). The primary endpoint is clinical cure at the test of cure (TOC) visit on study Day 5.

2. A placebo control arm is recommended to demonstrate that the test product and RLD are active and as a parameter to establish that the study is sufficiently sensitive to detect differences between products.

3. Inclusion Criteria (the sponsor may add additional criteria)
   a. Adult male or nonpregnant and non-lactating female aged ≥ 18 years non-indigenous travelers (e.g., visiting students/faculty or international tourists) affected by naturally acquired acute diarrhea. Diarrhea is defined as the passage of at least three unformed stools in a 24-hour period. Stools are classified as formed (retains shape), soft (assumes shape of container), or watery (can be poured). When using this classification, both soft and watery stools are unformed and abnormal.
   b. At least three unformed stools recorded within the 24 hours immediately preceding randomization.
   c. At least one of the following signs and symptoms of enteric infection:
      - abdominal pain or cramps
      - nausea
      - vomiting
      - fecal urgency
      - excessive gas/flatulence
      - tenesmus
   d. Women of child-bearing potential with a negative pregnancy test prior to beginning therapy and who agree to use effective contraceptive methods during the study.

4. Exclusion Criteria (the sponsor may add additional criteria)
   a. Pregnant, breast feeding, or planning a pregnancy.
   b. Immediately prior to randomization, acute diarrhea for > 72 hours.
   c. Presence of:
      - fever (≥ 100 °F or ≥ 37.8 °C), or
      - hematochezia (blood in stool), or
      - clinical findings suggesting moderate or severe dehydration.
   d. Active, uncontrolled, or clinically significant diseases or disorders of the heart, lung, kidney, GI tract (other than infectious diarrhea in travelers), or central nervous system.
   e. Administration of any of the following:
      - any antimicrobial agents with an expected activity against enteric bacterial pathogens within 7 days preceding randomization

- more than two doses of a symptomatic antidiarrheal compound such as antimotility agents, absorbent agents, and antisecretory agents within 8 hours preceding randomization

f. Use of any drug such as aspirin or ibuprofen (Advil), which can cause GI bleeding. Acetaminophen (Tylenol) or paracetamol is acceptable.
g. If required during the study antimalarial prophylactic treatment, including doxycycline, is permitted prior to and during the study

5. Stools at subject screening (Day 0) and end of study (Day 5) should be cultured for pathogenic organisms, but microbiological cure rates will be considered as supportive of the similarity of populations in each arm of the study and not considered as evidence of bioequivalence.

6. Possible patient subgroups with travelers' diarrhea that should be considered in planning for the populations size required for this study include:
   - inflammatory/invasive pathogens,
   - diarrheagenic *E. coli* without evidence of inflammatory/invasive pathogens,
   - other agents without evidence of inflammatory/invasive pathogens.

7. The protocol should include a list of the prescription and over-the-counter drug products, procedures, and activities that are prohibited during the study, such as:
   a. Prescription and over-the-counter (OTC) anti-diarrheal drug product other than study product.
   b. Opioid analgesics.

8. The recommended primary endpoint is clinical cure at the TOC visit (study Day 5). Clinical cure is defined as either:
   a. No stools or only formed stools within a 48 hour period and no fever, with or without other enteric symptoms, OR
   b. No watery stools or no more than two soft stools passed within a 24 hour period with no fever and no other enteric symptoms except for mild excess gas/flatulence.

9. In addition, clinical deterioration by study Day 5 or failure to achieve formed stool in ≤ 3 days is a clinical failure.

10. The recommended secondary endpoint is Time to Last Unformed Stool (TLUS) defined as the interval beginning with the first dose of study drug and ending with the last unformed stool passed.

11. The protocol should clearly define the per-protocol (PP), modified intent-to-treat (mITT) and safety populations:
    a. The accepted PP population used for bioequivalence evaluation includes all randomized subjects who met all inclusion/exclusion criteria, were dosed a pre-specified proportion of the scheduled administrations (e.g., 75% to 125%) of the assigned product for the specified duration of the study, do not miss a pre-specified number of scheduled doses for more than pre-specified number of days (e.g. 1 consecutive day), and complete the evaluation within the

       designated visit window (+/- 1 day) with no protocol violations that would affect the treatment evaluation. The protocol should specify how compliance will be verified, e.g., by the use of subject diaries.

b. The mITT population includes all randomized subjects who dose at least one dose of assigned product.
c. The safety population includes all randomized subjects who receive study product.

12. Subjects who are discontinued early from the study due to lack of treatment effect after completing 3 days of treatment should be included in the PP population using Last Observation Carried Forward (LOCF). Subjects whose condition worsens and who require alternate or supplemental therapy for the treatment of travelers' diarrhea should be discontinued, included in the PP population analysis using LOCF, and provided with effective treatment. Subjects discontinued early for other reasons should be excluded from the PP population, but included in the mITT population, using LOCF.

13. The start and stop date of concomitant medication use during the study should be provided in the data set in addition to the reason for the medication use.

14. All adverse events (AEs) should be reported, whether or not they are considered to be related to the treatment. The report of AEs should include date of onset, description of the AE, severity, relation to study medication, action taken, outcome and date of resolution. This information is needed to determine if the incidence and severity of adverse reactions is different between the test product and RLD.

15. The method of randomization should be described in the protocol and the randomization schedule should be provided. It is recommended that an independent third party generate and hold the randomization code throughout the conduct of the study in order to minimize bias. The sponsor may generate the randomization code if not involved in the packaging and labeling of the study medication. A sealed copy of the randomization scheme should be retained at the study site and should be available to FDA investigators at the time of site inspection to allow for verification of the treatment identity of each subject.

16. A detailed description of the blinding procedure is to be provided in the protocol. The packaging of the test, reference and placebo products should be similar in appearance to make differences in treatment less obvious to the subjects and to maintain adequate blinding of evaluators. When possible, neither the subject nor the investigator should be able to identify the treatment. The containers should not be opened by the subject at the study center.

17. Please refer to 21 CFR 320.38, 320.63 and the Guidance for Industry, "Handling and Retention of BA and BE Testing Samples", regarding retention of study drug samples and 21 CFR 320.36 for requirements for maintenance of records of bioequivalence testing. In addition, the investigators should follow the procedures of 21 CFR 58 and ICH E6, "Good Clinical Practice: Consolidated Guideline", for retention of study records and data in order to conduct their studies in compliance with Good Laboratory Practices (GLP) and Good Clinical Practices (GCP). Retention samples

should be randomly selected from the drug supplies received prior to dispensing to subjects. Retention samples should not be returned to the sponsor at any time.

18. It is the sponsor's responsibility to enroll sufficient subjects for the study to demonstrate bioequivalence between the products.

19. To establish bioequivalence for a dichotomous endpoint, it is recommended the following compound hypotheses be tested using the per protocol population:

$$H_O: \pi_T - \pi_R \leq \Delta_1 \text{ or } \pi_T - \pi_R \geq \Delta_2 \quad \text{versus} \quad H_A: \Delta_1 < \pi_T - \pi_R < \Delta_2$$

where $\pi_T$ = the success rate of the primary endpoint for the treatment group, and
$\pi_R$ = the success rate of the primary endpoint for the reference group.

The null hypothesis, $H_O$, is rejected with a type I error ($\alpha$) of 0.05 (two one-sided tests) if the estimated 90% confidence interval for the difference of the success rates between test and reference products ($\pi_T - \pi_R$) is contained within the interval [$\Delta_1$, $\Delta_2$], where $\Delta_1$ = -0.20 and $\Delta_2$ = 0.20. Rejection of the null hypothesis supports the conclusion of equivalence of the two products.

20. To establish sensitivity within the study for either a dichotomous or continuous primary endpoint, the test and reference product should both be statistically superior to the placebo. Conduct an appropriate inferential test with a type I error ($\alpha$) of 0.05, using the mITT population and the primary endpoint.

21. Study data should be submitted to the OGD in electronic format.
    a. Include a list of file names, a description of the content of each file, an explanation of the variables within each file, and a description of all variable codes (for example, for the treatment variable, A = RLD and B = TEST).
    b. Provide two primary data sets, one with No Last Observation Carried Forward (NO-LOCF - pure data set) and one with the Last Observation Carried Forward (LOCF - modified data set).
    c. Provide a separate data set for demographic, vital sign, adverse event, disposition (including reason for discontinuation of treatment), concomitant medication, medical history, compliance, and comment variables.

22. Please provide a summary dataset containing a separate line listing for each subject (if data exist) using the following headings, if applicable:
    a. Study identifier
    b. Subject identifier
    c. Site identifier: study center
    d. Age
    e. Age units (years)
    f. Sex
    g. Race
    h. Name of Actual Treatment (exposure): test product, RLD, placebo control
    i. Duration of Treatment (total exposure in days)
    j. Completed the study (yes/no)

k. Protocol Violations (yes/no)
l. Reason for premature discontinuation of subject
m. Subject required additional treatment for diarrhea due to unsatisfactory treatment response (yes/no)
n. Per Protocol (PP) population inclusion (yes/no)
o. Reason for exclusion from PP population
p. Modified Intent to Treat (mITT) population inclusion (yes/no)
q. Reason for exclusion from mITT population
r. Safety population inclusion (yes/no)
s. Reason for exclusion from Safety population
t. Number of unformed bowel movements during 24 hours immediately prior to randomization
u. Number of formed bowel movements during 24 hours immediately prior to randomization
v. Number of unformed bowel movements during study Day 1
w. Number of formed bowel movements during study Day 1
x. Number of unformed bowel movements during study Day 2
y. Number of formed bowel movements during study Day 2
z. Number of unformed bowel movements during study Day 3
aa. Number of formed bowel movements during study Day 3
bb. Number of unformed bowel movements during study Day 4
cc. Number of formed bowel movements during study Day 4
dd. Number of unformed bowel movements during study Day 5
ee. Number of formed bowel movements during 2 study Day 5
ff. After randomization, no stools or only formed stools within a 48 hour period (yes/no)
gg. After randomization, no watery stools or no more than two soft stools passed within a 24 hour period (yes/no)
hh. After randomization, clinical deterioration (yes/no)
ii. Achieved formed stool in ≤ 3 days after randomization (yes/no)
jj. At TOC visit, any enteric symptom except for mild excess gas/flatulence (yes/no)
kk. Clinical cure at TOC visit (yes/no)
ll. Time to Last Unformed Stool (hours)
mm. Treatment compliance: number of missed doses per subject
nn. Concomitant medication (yes/no)
oo. Adverse event(s) reported (yes/no)

Please refer to Table 1 as an example. This sample table may contain additional information not applicable to your study and/or it may not contain all information applicable to your study.

**Table 1: Example of a summary dataset containing one line listing for each subject**

| STUDYID | SUBJID | SITEID | AGE | AGEU | SEX | RACE | EXTRT | EXDUR | completd | prot_vio | disc_rs | add_trt | pp | pp_rs | mitt | mitt_rs | safety | safe_rs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 101 | 1 | 01 | 21 | YEARS | F | 1 | A | 14 | Y | N | | N | Y | | Y | | Y | |
| 101 | 2 | 01 | 30 | YEARS | F | 1 | B | 14 | Y | N | | N | Y | | Y | | Y | |

| bas_ubm | bas_fbm | day1_ubm | day1_fbm | day2_ubm | day2_fbm | day3_ubm | day3_fbm | day4_ubm | day4_fbm | day5_ubm | day5_fbm | 48hrcure | 24hrcure | cl_deter | fstool | ent_sx | cl_cure | tlus | complian | CM | AE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6 | 0 | | | | | | | | | | | Y | Y | N | Y | N | Y | 70 | 0 | Y | Y |
| 7 | 0 | | | | | | | | | | | N | Y | N | Y | N | Y | 48 | 0 | N | N |

Note: Capitalized headings are from Clinical Data Interchange Standards Consortium (CDISC) Study Data Tabulation Model (SDTM) Implementation Guide (IG) for Human Clinical Trials V3.1.2 Final dated 11/12/08.

STUDYID: Study Identifier
SUBJID: Subject Identifier for the Study
SITEID: Study Site Identifier
AGE: Age
AGEU: Age units (years)
SEX: Sex, e.g., M=Male, F=Female, U=Unknown
RACE: Race, e.g., 1=White, 2=Black or African American, 3=Asian, 4=American Indian or Alaska Native, 5=Native Hawaiian or Other Pacific Islanders
EXTRT: Name of Actual Treatment (exposure), e.g., A=test product, B= RLD, C=placebo control
EXDUR: Duration of Treatment (total exposure in days)
completd: Subject completed the study, e.g., Y=Yes, N=No
prot_vio: Protocol Violations, e.g., Y=Yes, N=No
disc_rs: Reason for premature discontinuation from the study, e.g., A=adverse event, B=death, C=lost to follow-up, D=non-compliance with treatment, E=treatment unblinded, F=subject moved out of area, G=unsatisfactory treatment response, H=withdrew consent, I=protocol violation, K=other event
add_trt: Subject required additional treatment for diarrhea due to unsatisfactory treatment response, e.g., Y=Yes, N=No
pp: Per Protocol (PP) population inclusion, e.g., Y=Yes, N=No
pp_rs: Reason for exclusion from PP population, e.g., A=prematurely discontinued, B=lost to follow-up, C=subject moved out of the area, D=noncompliant, etc.
mitt: Modified Intent to Treat (mITT) population inclusion, e.g., Y=Yes, N=No
mitt_rs: Reason for exclusion from mITT population, e.g., A=never treated, etc.
safety: Safety population inclusion, e.g., Y=Yes, N=No
safe_rs: Reason for exclusion from Safety population, e.g., A=never treated, etc.

| | |
|---|---|
| bas_ubm: | Number of unformed bowel movements during 24 hours immediately prior to randomization |
| bas_fbm: | Number of formed bowel movements during 24 hours immediately prior to randomization |
| day1_ubm: | Number of unformed bowel movements during study Day 1 |
| day1_fbm: | Number of formed bowel movements during study Day 1 |
| day2_ubm: | Number of unformed bowel movements during study Day 2 |
| day2_fbm: | Number of formed bowel movements during study Day 2 |
| day3_ubm: | Number of unformed bowel movements during study Day 3 |
| day3_fbm: | Number of formed bowel movements during study Day 3 |
| day4_ubm: | Number of unformed bowel movements during study Day 4 |
| day4_fbm: | Number of formed bowel movements during study Day 4 |
| day5_ubm: | Number of unformed bowel movements during study Day 5 |
| day5_fbm: | Number of formed bowel movements during study Day 5 |
| 48hrcure: | After randomization, no stools or only formed stools within a 48 hour period, e.g., Y=Yes, N=No |
| 24hrcure: | After randomization, no watery stools or no more than two soft stools passed within a 24 hour period, e.g., Y=Yes, N=No |
| cl_deter: | After randomization, clinical deterioration, e.g., Y=Yes, N=No |
| fstool: | Achieved formed stool in ≤ 3 days after randomization, e.g., Y=Yes, N=No |
| ent_sx: | At TOC visit, any enteric symptom except for mild excess gas/flatulence, e.g., Y=Yes, N=No |
| cl_cure: | Clinical cure at TOC visit, e.g., Y=Yes, N=No |
| tlus: | Time to Last Unformed Stool (hours) |
| complian: | Treatment compliance, e.g., number of missed doses per subject |
| CM: | Concomitant medication, e.g., Y=Yes, N=No |
| AE: | Adverse event(s) reported, e.g., Y=Yes, N=No |

23. Please provide a dataset containing a separate line listing for each visit per subject (if data exist) using the following headers, if applicable:
    a. Study identifier
    b. Subject identifier
    c. Name of Actual Treatment (exposure): test product, RLD, placebo control
    d. Visit number
    e. Visit date
    f. Study day; i.e., day of randomization is study day 1
    g. Fever (yes/no)
    h. Moderate or severe dehydration (yes/no)
    i. Hematochezia (blood in stool) (yes/no)
    j. Abdominal pain or cramps (yes/no)
    k. Nausea (yes/no)
    l. Vomiting (yes/no)
    m. Fecal urgency (yes/no)
    n. Excessive gas/flatulence (yes/no)
    o. Tenesmus (yes/no)
    p. Use of anti-diarrheal drug product, other than study product, or opioid analgesic reported during this visit (yes/no)
    q. If reported during this visit, provide date(s) of use of anti-diarrheal drug product, other than study product, or opioid analgesic.
    r. Concomitant medication reported during this visit (yes/no)
    s. Adverse event reported during this visit (yes/no)

t. Laboratory testing during this visit (yes/no)

Please refer to Table 2 as an example. This sample table may contain additional information not applicable to your study and/or it may not contain all information applicable to your study.

**Table 2: Example of dataset containing one line listing for each visit per subject**

| STUDYID | SUBJID | EXTRT | VISITNUM | SVSTDTC | ELTMBS | fever | dehydrat | hematoc | abd_pain | nausea | vomiting | fec_urg | ex_gas | tenesmus | proh_med | proh_m_d | CMrpt | AErpt | LBtest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 101 | 1 | A | 1 | 2004-07-01 | 1 | | | | | | | | | | N | | Y | Y | N |

Note: Capitalized headings are from Clinical Data Interchange Standards Consortium (CDISC) Study Data Tabulation Model (SDTM) Implementation Guide (IG) for Human Clinical Trials V3.1.2 Final dated 11/12/08.

| | |
|---|---|
| STUDYID: | Study Identifier |
| SUBJID: | Subject Identifier for the Study |
| EXTRT: | Name of Actual Treatment (exposure), e.g., A=test product, B=RLD, C= placebo control |
| VISITNUM: | Visit Sequence Number |
| SVSTDTC: | Visit date: (SVSTDTC=Subject Visit Start Date Time-Character) |
| ELTMBL: | Elapsed Time since Baseline (days) |
| fever: | Fever , e.g., Y=Yes, N=No |
| dehydrate: | Moderate or severe dehydration, e.g., Y=Yes, N=No |
| hematoc: | Hematochezia (blood in stool), e.g., Y=Yes, N=No |
| abd_pain: | Abdominal pain or cramps e.g., Y=Yes, N=No |
| nausea: | Nausea, e.g., Y=Yes, N=No |
| vomiting: | Vomiting, e.g., Y=Yes, N=No |
| fec_urg: | Fecal urgency, e.g., Y=Yes, N=No |
| ex_gas: | Excessive gas/flatulence, e.g., Y=Yes, N=No |
| tenesmus: | Tenesmus, e.g., Y=Yes, N=No |
| proh_med: | Use of anti-diarrheal drug product, other than study product, or opioid analgesic reported during this visit, e.g., Y=Yes, N=No |
| proh_m_d: | If reported during this visit, provide date(s) of use of anti-diarrheal drug product, other than study product, or opioid analgesic. |
| CMrpt: | Concomitant Medication reported during this visit, e.g., Y=Yes, N=No |
| AErpt: | Adverse Event reported during this visit, e.g., Y=Yes, N=No |
| LBtest: | Laboratory Testing performed during this visit, e.g., Y=Yes, N=No |

24. The study data should be submitted in standardized format. Please refer to more details at http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/ElectronicSubmissions/ucm248635.htm.

25. These recommendations are specific to this product and may not be appropriate for bioequivalence studies of any other product, including any other dosage forms or strengths of rifaximin.

---

Type of study: BE Study with Clinical Endpoints
Design: Three–arm, randomized, double blind, parallel, placebo-controlled in vivo
Strength: 550 mg (dosed: three times a day for 14 days)
Subjects: Male and nonpregnant/non-lactating female subjects with irritable bowel syndrome with diarrhea (IBS-D)

**Additional comments regarding the BE study with clinical endpoints (550 mg):**

1. The Office of Generic Drugs (OGD) recommends conducting a BE study with clinical endpoints in the treatment of irritable bowel syndrome with diarrhea (IBS-D). After a 1-2-week screening period, subjects are to be randomized to receive the generic rifaximin 550 mg tablet, the reference listed drug (RLD) 550 mg tablet or placebo tablet three times a day for 14 days. Subjects are then to be followed for an additional 4 weeks. Rifaximin may be taken with or without food.

2. A placebo control arm is recommended to demonstrate that the test product and RLD are active and as a parameter to establish that the study is sufficiently sensitive to detect differences between products.

3. Inclusion Criteria (the sponsor may add additional criteria)

   a. Male or nonpregnant/non-lactating female aged ≥ 18 years with a clinical diagnosis of irritable bowel syndrome with diarrhea (IBS-D) confirmed by the Rome III diagnostic criteria. At least 12 weeks, which need not be consecutive, in the preceding 12 months of abdominal discomfort or pain associated with 2 or more of the following:
      i. Relieved with defecation
      ii. Onset associated with a change in frequency of stool
      iii. Onset associated with a change in form(appearance) of stool
   b. **Abdominal Pain Intensity**: weekly average of *worst daily (in past 24 hours) abdominal pain* score of > 3.0 on a 0 to 10 point scale

      and

      **Stool Consistency**: at least one stool with a consistency of Type 6 or Type 7 Bristol stool score (BSS) on at least 2 days per week
   c. Subject has undergone a colonoscopy within the last 2 years as part of an evaluation for IBS or IBS symptoms (which excluded inflammatory or neoplastic disease). The subject has a colonoscopy scheduled and completed within 30 days of signing the informed consent.

    d. Subject required to maintain a stable diet for the duration of the study.
e. Subjects on stable treatment with a daily dietary fiber supplementation or bulking agents may be enrolled provided that the administration schedule is intended to be maintained throughout the study and the subject has been on therapy for at least 30 days prior to signing the informed consent.
f. Women of child-bearing potential have a negative pregnancy test prior to beginning therapy and agree to use effective contraceptive methods during the study.

4. Exclusion Criteria: (the sponsor may add additional)
   a. Subjects presenting with the following symptoms of constipation IBS (during the diary eligibility phase of ≥ 7 days immediately prior to the first dose of study drug):
      i. Less than 3 bowel movements a week
      ii. Hard or lumpy stools
      iii. Straining during a bowel movement
   b. Subject fails to record at least 7 days of daily diary assessments during the screening phase.
   c. Subject had current evidence of duodenal ulcer, gastric ulcer, diverticulitis, gastroesophageal reflux disease (GERD), or infectious gastroenteritis. **Note:** Subjects with GERD controlled by stable doses of medication or diet are eligible to participate in the study.
   d. Subject has a history of inflammatory bowel disease (e.g., Crohn's disease, ulcerative colitis, and celiac disease), GI malignancy, GI obstruction, gastroparesis, carcinoid syndrome, pancreatitis, amyloidosis, ileus, or cholelithiasis. Subjects may participate if they have a cholecystectomy.
   e. Subject has diabetes (Type 1 or Type 2).
   f. Subject is a candidate for GI surgery or has a history of GI surgery (exceptions appendectomy, cholecystectomy, benign polypectomy, and inguinal hernia).
   g. Subject has lactose intolerance not controlled by a lactose-free diet.
   h. Subject had a positive stool test for Yersinia enterocolitica, Campylobacter jejuni, Salmonella, Shigella, ovum and parasites, and/or Clostridium difficile. (Note: Stool sample was not required if a negative test was obtained within 14 days of randomization).
   i. Subject has psychiatric disorder not controlled with current therapy.
   j. Subject has current or recent (within 12 months) history of drug or alcohol abuse.
   k. Subject is pregnant, breast feeding, or planning a pregnancy.
   l. Subject has a history of HIV, Hepatitis (B or C), abnormal thyroid function not controlled by medication, hepatic disease manifested by twice the ULN for AST, ALT, alkaline phosphatase or total bilirubin (except an isolated elevation of unconjugated bilirubin).
   m. Subject has renal disease manifested by 1.5 times the ULN of serum creatinine or blood urea nitrogen levels.
   n. Subject has unstable cardiovascular or pulmonary disease, categorized by a worsening in the disease condition that requires a change in treatment or medical care within one month of randomization.
   o. Subject has any condition or circumstance that could cause noncompliance with treatment or visits.
   p. Subject has known allergy to rifaximin or rifampin or excipients.
   q. Subject has had an active malignancy except for basal cell carcinoma or in situ cervical carcinoma that has been excised within the last 5 years.
   r. Subject has participated in an investigational drug or device study within the 30 days prior to signing the informed consent.

s. Subject has taken rifaximin within 60 days of signing the ICF.
t. Subject has taken any experimental drugs within 30 days of signing the ICF and subjects who have taken probiotics after initiation of the diary eligibility phase (yogurt and standard food products are allowed).
u. Subject has taken any antibiotics within 14 days prior to signing the ICF.
v. Subject has taken antipsychotic drugs, antispasmodics, antidiarrheals (e.g. loperamide, lubiprostone, and bismuth subsalicylate), narcotics, prokinetic drugs, drugs indicated for IBS (e.g. Alosetron), or warfarin after the initiation of the diary eligibility phase.

5. The protocol should include a list of the prescription and over-the-counter drug products, procedures, and activities that are prohibited during the study. This may include over-the-counter anti-diarrheals or a significant change in diet.

6. The study should include a 1- to 2- week screening period. The 1- to 2-week screening period can be used to establish the presence and persistence of trial entry criteria and train patients in the mode of data collection selected for the trial. The screening period can also be used to select patients with specified levels of severity of signs and symptoms.[1] Baseline should be defined from the diary data collected during seven days immediately preceding the beginning of the treatment period.

7. The recommended primary endpoint is responder rate at week 6 and should measure the effect of treatment on two major IBS signs and symptoms (i.e. abnormal defecation and abdominal pain). A patient should be categorized as an overall responder if the patient is weekly responder for at least two weeks during the four-week follow-up period. A patient is categorized as a weekly responder if the patient achieves the following improvement in both pain intensity and stool consistency for a week as described below:

   - ≥30% improvement from the baseline in the weekly average abdominal pain score based on the daily question: "In regards to your specific IBS symptoms of abdominal pain, on a scale of 0-10, what was your worst IBS-related abdominal pain over the last 24 hours? 'Zero' means you have no pain at all; 'ten' means the worst possible pain you can imagine"
   - At least a 50% reduction in the number of days in a week with a daily stool consistency of Bristol Stool Scale type 6 or 7 compared with the baseline where 6=fluffy pieces with ragged edges, a mushy stool; 7=watery stool, no solid pieces; entirely liquid.

8. Sponsors should choose a format for daily sign or symptom assessment (e.g., interactive voice response or personal digital assistant) so that patients can evaluate IBS signs or symptoms on a daily basis throughout the trial. Daily questionnaire should be answered at approximately same time each day. Appropriate questions to evaluate IBS signs and symptoms include (sponsor may add additional):
   a. How many bowel movements did you have in the last 24 hours?
   b. On a scale of 1-7, what was the score of your least formed bowel movement in the last 24 hours (Bristol Stool Scale)?
      1 = Separate hard lumps, like nuts (hard to pass)
      2 = Sausage-shaped but lumpy
      3 = Like a sausage but with cracks on its surface
      4 = Like a sausage or snake, smooth and soft

[1] Guidance for Industry Irritable Bowel Syndrome-Clinical Evaluation of Drugs for Treatment, May 2012.

      5 = Soft blobs with clear cut edges (passed easily)
      6 = Fluffy pieces with ragged edges, a mushy stool
      7 = Watery stool, no solid pieces; entirely liquid.

  c.  Have you felt or experienced a sense of urgency in the last 24 hours with any of your bowel movements?  (Yes/No)

  d.  In regards to your specific IBS symptom of abdominal pain, on a scale of 0-10, what was your worst IBS-related abdominal pain over the last 24 hours?  'Zero' means you have no pain at all; 'Ten' means the worst possible pain you can imagine.

  e.  In regards to your specific IBS symptom of bloating, on a scale of 0-6, how bothersome was your IBS-related bloating in the last 24 hours?

      0 = not at all
      1 = hardly
      2 = somewhat
      3 = moderately
      4 = a good deal
      5 = a great deal
      6 = a very great deal

  f.  In regards to all your symptoms of IBS, on a scale of 0-6, how bothersome were your symptoms of IBS in the last 24 hours?

      0 = not at all
      1 = hardly
      2 = somewhat
      3 = moderately
      4 = a good deal
      5 = a great deal
      6 = a very great deal

9.  The protocol should clearly define the PP, mITT and safety populations.

  a.  The accepted PP population used for bioequivalence evaluation includes all randomized subjects who meet all inclusion/exclusion criteria, dose a pre-specified proportion of the scheduled doses (e.g., 75% to 125%) of the assigned product for the specified duration of the study, do not miss a pre-specified number of scheduled doses for more than pre-specified number of days (e.g. 1 consecutive day), and complete the evaluation within the designated visit window with no protocol violations that would affect the treatment evaluation. The protocol should specify how compliance will be verified (e.g., by the use of subject diaries).

  b.  The mITT population includes all randomized subjects who dose at least one dose of assigned product.

  c.  The safety population includes all randomized subjects who receive study product.

10. Subjects who are discontinued early (any time before end of week 6) from the study due to lack of treatment effect should be included in the PP population.  Subjects whose condition worsens and who require alternate or supplemental therapy for the treatment of diarrhea during the treatment phase of the study should be discontinued, included in the PP population analysis using LOCF, and provided with effective treatment.  Subjects discontinued early for other reasons should be excluded from the PP population, but included in the mITT population.

11. The start and stop date of concomitant medication use during the study should be provided in the data set in addition to the reason for the medication use.

FDA_00223

12. All AEs should be reported, whether or not they are considered to be related to the treatment. The report of AEs should include date of onset, description of the AE, severity, relation to study medication, action taken, outcome and date of resolution. This information is needed to determine if the incidence and severity of adverse reactions is different between the test product and RLD.

13. The method of randomization should be described in the protocol and the randomization schedule should be provided. It is recommended that an independent third party generate and hold the randomization code throughout the conduct of the study in order to minimize bias. The sponsor may generate the randomization code if not involved in the packaging and labeling of the study medication. A sealed copy of the randomization scheme should be retained at the study site and should be available to FDA investigators at the time of site inspection to allow for verification of the treatment identity of each subject.

14. A detailed description of the blinding procedure is to be provided in the protocol. The packaging of the test, reference and placebo products should be similar in appearance to make differences in treatment less obvious to the subjects and to maintain adequate blinding of evaluators. When possible, neither the subject nor the investigator should be able to identify the treatment. The containers should not be opened by the subject at the study center.

15. Please refer to 21 CFR 320.38, 320.63 and the Guidance for Industry, "Handling and Retention of BA and BE Testing Samples", regarding retention of study drug samples and 21 CFR 320.36 for requirements for maintenance of records of bioequivalence testing. In addition, the investigators should follow the procedures of 21 CFR 58 and ICH E6, "Good Clinical Practice: Consolidated Guideline", for retention of study records and data in order to conduct their studies in compliance with Good Laboratory Practices (GLP) and Good Clinical Practices (GCP). Retention samples should be randomly selected from the drug supplies received prior to dispensing to subjects. Retention samples should not be returned to the sponsor at any time.

16. It is the sponsor's responsibility to enroll sufficient subjects for the study to demonstrate bioequivalence between the products.

17. To establish bioequivalence for a dichotomous endpoint, it is recommended the following compound hypotheses be tested using the per protocol population:

    $H_O$: $\pi_T - \pi_R \leq \Delta_1$ or $\pi_T - \pi_R \geq \Delta_2$ versus $H_A$: $\Delta_1 \leq \pi_T - \pi_R \leq \Delta_2$

    where $\pi_T$ = the success rate of the primary endpoint for the treatment group, and
    $\pi_R$ = the success rate of the primary endpoint for the reference group.

    The null hypothesis, $H_O$, is rejected with a type I error rate ($\alpha$) of 0.05 (two one-sided tests) if the estimated 90% confidence interval for the difference of the success rates between test and reference products ($\pi_T - \pi_R$) is contained within the interval [$\Delta_1$, $\Delta_2$], where $\Delta_1$ = -0.20 and $\Delta_2$ = 0.20. Rejection of the null hypothesis supports the conclusion of equivalence of the two products.

18. To establish sensitivity within the study for either a dichotomous or continuous primary endpoint, the test and reference product should both be statistically superior to the placebo. Conduct an appropriate inferential test with a type I error rate ($\alpha$) of 0.05, using the mITT population and the primary endpoint.

19. Study data should be submitted to the OGD in electronic format.
    a. Include a list of file names, a description of the content of each file, an explanation of the variables within each file, and a description of all variable codes (for example, for the treatment variable, A = test, B = RLD, C = placebo).
    b. Provide two summary data sets, one without missing data imputation (pure data set) and one with missing data imputation (modified data set).
    c. Provide daily diary data of each subject in a separate dataset.
    d. Provide a separate data set for demographic, vital sign, adverse event, disposition (including reason for discontinuation of treatment), concomitant medication, medical history, compliance, and comment variables.

20. Please provide a summary dataset containing a separate line listing for each subject (if data exist) using the following headings, if applicable:
    a. Study identifier
    b. Subject identifier
    c. Site identifier: study center
    d. Age
    e. Age units (years)
    f. Sex
    g. Race
    h. Name of planned treatment based on randomization
    i. Name of Actual Treatment (exposure): test product, RLD, placebo control
    j. Duration of Treatment (total exposure in days)
    k. Completed the study (yes/no)
    l. Reason for premature discontinuation of subject
    m. Subject required additional treatment for diarrhea due to unsatisfactory treatment response (yes/no)
    n. Per Protocol (PP) population inclusion (yes/no)
    o. Reason for exclusion from PP population
    p. Modified Intent to Treat (mITT) population inclusion (yes/no)
    q. Reason for exclusion from mITT population
    r. Safety population inclusion (yes/no)
    s. Reason for exclusion from Safety population
    t. Mean abdominal pain score at baseline
    u. Number of days with daily stool consistency of Bristol Stool Scale type 6 or 7 at baseline
    v. Mean abdominal pain score at Week 1
    w. Number of days with daily stool consistency of Bristol Stool Scale type 6 or 7 during Week 1
    x. Mean abdominal pain score at Week 2
    y. Number of days with daily stool consistency of Bristol Stool Scale type 6 or 7 during Week 2
    z. Mean abdominal pain score at Week 3
    aa. Number of days with daily stool consistency of Bristol Stool Scale type 6 or 7 during Week 3
    bb. Mean abdominal pain score at Week 4
    cc. Number of days with daily stool consistency of Bristol Stool Scale type 6 or 7 during Week 4
    dd. Mean abdominal pain score at Week 5
    ee. Number of days with daily stool consistency of Bristol Stool Scale type 6 or 7 during Week 5
    ff. Mean abdominal pain score at week 6
    gg. Number of days with daily stool consistency of Bristol Stool Scale type 6 or 7 during Week 6
    hh. Weekly responder in abdominal pain intensity for Week 3 (yes/no)
    ii. Weekly responder in stool consistency for Week 3 (yes/no)
    jj. Weekly responder for Week 3 (yes/no)
    kk. Weekly responder in abdominal pain intensity for Week 4 (yes/no)

ll. Weekly responder in stool consistency for Week 4 (yes/no)
mm. Weekly responder for Week 4 (yes/no)
nn. Weekly responder in abdominal pain intensity for Week 5 (yes/no)
oo. Weekly responder in stool consistency for Week 5 (yes/no)
pp. Weekly responder for Week 5 (yes/no)
qq. Weekly responder in abdominal pain intensity for Week 6 (yes/no)
rr. Weekly responder in stool consistency for Week 6 (yes/no)
ss. Weekly responder for Week 6 (yes/no)
tt. Overall responder (yes/no)
uu. Treatment compliance: number of missed doses per subject
vv. Concomitant medication (yes/no)
ww. Adverse event(s) reported (yes/no)

Please refer to Table 1 as an example. This sample table may contain additional information not applicable to your study and/or it may not contain all information applicable to your study.

**Table 1: Example of a summary dataset containing one line listing for each subject**

| STUDYID | SUBJID | SITEID | AGE | AGEU | SEX | RACE | ARM | EXTRT | EXDUR | completd | disc_rs | add_trt | pp | pp_rs | mitt | mitt_rs | safety | safe_rs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 101 | 1 | 01 | 21 | YEARS | F | 1 | A | A | 14 | Y | | N | Y | | Y | | Y | |
| 101 | 2 | 01 | 30 | YEARS | F | 1 | B | B | 14 | Y | | N | Y | | Y | | Y | |

| pain_0 | stool_0 | pain_1 | stool_1 | pain_2 | stool_2 | pain_3 | stool_3 | pain_4 | stool_4 | pain_5 | stool_5 | pain_6 | stool_6 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5.4286 | 4 | 4.5714 | 4 | 3.8571 | 3 | 3.1429 | 3 | 2.4286 | 2 | 1.5714 | 1 | 0.8571 | 1 |
| 3.5714 | 3 | 3.1429 | 3 | 2.7143 | 2 | 2.1429 | 2 | 1.7143 | 2 | 1.2857 | 1 | 0.4286 | 0 |

| presp_3 | sresp_3 | resp_3 | presp_4 | sresp_4 | resp_4 | presp_5 | sresp_5 | resp_5 | presp_6 | sresp_6 | resp_6 | resp | complian | CM | AE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Y | N | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | 0 | Y | Y |
| Y | N | N | Y | N | N | Y | Y | Y | Y | Y | Y | Y | 0 | N | N |

Note: Capitalized headings are from Clinical Data Interchange Standards Consortium (CDISC) Study Data Tabulation Model (SDTM) Implementation Guide (IG) for Human Clinical Trials V3.1.2

| | |
|---|---|
| STUDYID: | Study Identifier |
| SUBJID: | Subject Identifier for the Study |
| SITEID: | Study Site Identifier |
| AGE: | Age |
| AGEU: | Age units (years) |
| SEX: | Sex, e.g., M=Male, F=Female, U=Unknown |
| RACE: | Race, e.g., 1=White, 2=Black or African American, 3=Asian, 4=American Indian or Alaska Native, 5=Native Hawaiian or Other Pacific Islanders |
| ARM: | Name of planned treatment based on randomization |
| EXTRT: | Name of Actual Treatment (exposure), e.g., A=test product, B= RLD, C=placebo control |
| EXDUR: | Duration of Treatment (total exposure in days) |
| completd: | Subject completed the study, e.g., Y=Yes, N=No |
| disc_rs: | Reason for premature discontinuation from the study, e.g., A=adverse event, B=death, C=lost to follow-up, D=non-compliance with treatment, E=treatment unblinded, F=subject moved out of area, G=unsatisfactory treatment response, H=withdrew consent, I=protocol violation, K=other event |
| add_trt: | Subject required additional treatment for constipation due to unsatisfactory treatment response, e.g., Y=Yes, N=No |
| pp: | Per Protocol (PP) population inclusion, e.g., Y=Yes, N=No |
| pp_rs: | Reason for exclusion from PP population, e.g., A=prematurely discontinued, B=lost to follow-up, C=subject moved out of the area, D=noncompliant, etc. |
| mitt: | Modified Intent to Treat (mITT) population inclusion, e.g., Y=Yes, N=No |
| mitt_rs: | Reason for exclusion from mITT population, e.g., A=never treated, etc. |
| safety: | Safety population inclusion, e.g., Y=Yes, N=No |
| safe_rs: | Reason for exclusion from Safety population, e.g., A=never treated, etc. |
| pain_0: | Mean abdominal pain score at baseline |
| stool_0: | Number of days with daily stool consistency of Bristol Stool Scale type 6 or 7 at baseline |
| pain_1: | Mean abdominal pain score during Week 1 |
| stool_1: | Number of days with daily stool consistency of Bristol Stool Scale type 6 or 7 during Week 1 |
| pain_2: | Mean abdominal pain score at during Week 2 |
| stool_2: | Number of days with daily stool consistency of Bristol Stool Scale type 6 or 7 during Week 2 |
| pain_3: | Mean abdominal pain score during Week 3 |
| stool_3: | Number of days with daily stool consistency of Bristol Stool Scale type 6 or 7 during Week 3 |
| pain_4: | Mean abdominal pain score during Week 4 |
| stool_4: | Number of days with daily stool consistency of Bristol Stool Scale type 6 or 7 during Week 4 |
| pain_5: | Mean abdominal pain score during Week 5 |

| | |
|---|---|
| stool_5: | Number of days with daily stool consistency of Bristol Stool Scale type 6 or 7 during Week 5 |
| pain_6: | Mean abdominal pain score during Week 6 |
| stool_6: | Number of days with daily stool consistency of Bristol Stool Scale type 6 or 7 during Week 6 |
| presp_3: | Weekly responder in abdominal pain intensity for Week 3 |
| sresp_3: | Weekly responder in stool consistency for Week 3 |
| resp_3: | Weekly responder for Week 3 |
| presp_4: | Weekly responder in abdominal pain intensity for Week 4 |
| sresp_4: | Weekly responder in stool consistency for Week 4 |
| resp_4: | Weekly responder for Week 4 |
| presp_5: | Weekly responder in abdominal pain intensity for Week 5 |
| sresp_5: | Weekly responder in stool consistency for Week 5 |
| resp_5: | Weekly responder for Week 5 |
| presp_6: | Weekly responder in abdominal pain intensity for Week 6 |
| sresp_6: | Weekly responder in stool consistency for Week 6 |
| resp_6: | Weekly responder for Week 6 |
| resp: | Overall responder |
| complian: | Treatment compliance, e.g., number of missed doses per subject |
| CM: | Concomitant medication, e.g., Y=Yes, N=No |
| AE: | Adverse event(s) reported, e.g., Y=Yes, N=No |

21. Please provide a dataset containing a separate line listing of diary data for each study day (including the screening, treatment and follow-up periods) per subject (if data exist) using the following headers, if applicable:
    a. Study identifier
    b. Subject identifier
    c. Study Site Identifier
    d. Name of Actual Treatment (exposure): test product, RLD, placebo control
    e. Date/time of answer to daily IBS sign and symptom questionnaire
    f. Number of days since treatment start date
    g. Worst abdominal pain score on a scale of 0-10 in the past 24 hours
    h. Bristol Stool Scale score of the least formed bowel movement in the past 24 hours
    i. Rescue medication (e.g. anti-diarrheal) use reported during the past 24 hours (yes/no)
    j. Concomitant medication reported during this visit (yes/no)
    k. Adverse event reported during this visit (yes/no)
    l. Laboratory testing during this visit (yes/no)

Please refer to Table 2 as an example. This sample table may contain additional information not applicable to your study and/or it may not contain all information applicable to your study.

**Table 2: Example of dataset containing one line listing for each study dayper subject**

| STUDYID | SUBJID | SITEID | EXTRT | QSDTC | QSDY | pain | bss | RSCrpt | CMrpt | Aerpt | LBtest |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 101 | 1 | 01 | A | 2004-07-01 | 1 | 3 | 6 | N | Y | Y | N |

Note: Capitalized headings are from Clinical Data Interchange Standards Consortium (CDISC) Study Data Tabulation Model (SDTM) Implementation Guide (IG) for Human Clinical Trials V3.1.2.

STUDYID: Study Identifier
SUBJID: Subject Identifier for the Study
SITEID: Study Site Identifier
EXTRT: Name of Actual Treatment (exposure), e.g., A=test product, B=RLD, C= placebo control
QSDTC: Date/time of answer to daily IBS sign and symptom questionnaire
QSDY: Actual study day of answer to IBS sign and symptom questionnaire expressed in integer days relative to RFSTDTC (date/time of first exposure to study treatment)
pain: Worst abdominal pain score on a scale of 0-10 in the past 24 hours
bss: Bristol Stool Scale score of the least formed bowel movement in the past 24 hours
RSCrpt: Rescue medication (e.g. anti-diarrheal) use reported during the past 24 hours, e.g., Y=Yes, N=No
CMrpt: Concomitant Medication reported during this visit, e.g., Y=Yes, N=No
AErpt: Adverse Event reported during this visit, e.g., Y=Yes, N=No
LBtest: Laboratory Testing performed during this visit, e.g., Y=Yes, N=No

22. The study data should be submitted in standardized format. Consider the implementation and use of data standards as early as possible in the product development lifecycle, so that standards are accounted for in the design, conduct, and analysis of clinical studies. For more details, please refer to http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/ElectronicSubmissions/ucm248635.htm.

23. The protocol should include a complete and detailed statistical analysis plan and describe how missing data (both daily missing data and weekly missing data), if present, will be handled.

24. These recommendations are specific to this product and may not be appropriate for bioequivalence studies of any other product, including any other dosage form or strength of rifaximin.

**Waiver request of in vivo testing:** clinical endpoint BE studies on the 200 mg strength and PK studies on the 550 mg strength based on (i) proportional similarity of the formulations between both strengths, (ii) acceptable BE studies with clinical endpoints on the 550 mg strength, (iii) acceptable BE studies with PK endpoints on the 200 mg strength, and (iv) acceptable comparative in vitro dissolution tests on both 200 mg and 550 mg strengths.

**Dissolution test method and sampling times:** The dissolution information for this drug product can be found on the FDA-Recommended Dissolution Methods web site, available to the public at the following location: http://www.accessdata.fda.gov/scripts/cder/dissolution/. Conduct comparative dissolution testing on 12 dosage units each of both strengths of the test and reference products. Specifications will be determined upon review of the abbreviated new drug application (ANDA).



MAR 1 6 2017

Lance L. Shea
Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304

Vice President, Research & Development and Chief Development Officer
Salix Pharmaceuticals, Inc.
8510 Colonnade Center Drive
Raleigh, NC 27615

RE: Docket Nos. FDA-2016-P-3418 and FDA-2008-P-0300

Dear Mr. Shea and Sir or Madam:

This letter responds to your citizen petitions dated May 14, 2008 (2008 Petition), submitted by Salix Pharmaceuticals, Inc. (Salix), and October 17, 2016 (2016 Petition), submitted by Baker & Hostetler LLP on behalf of Salix.[1] In the 2016 and 2008 Petitions, you request that the Food and Drug Administration (FDA, the Agency, or we) refuse to approve any abbreviated new drug application (ANDA) referencing any strength of Salix's Xifaxan (rifaximin) tablets that does not contain scientifically appropriate data demonstrating bioequivalence (BE).[2]

Specifically, in the 2016 Petition you request that FDA take the following actions:

(1) Refuse to approve any ANDA referencing any strength and indication of Xifaxan unless the application includes characterization studies that demonstrate that the active ingredient of the proposed generic product has the same polymorph profile as Xifaxan.

(2) Refuse to approve any ANDA for a proposed generic with excipients that are qualitatively (Q1) the same and quantitatively (Q2) the same as those in Xifaxan unless the application includes:

[1] The version of the 2016 Petition that Salix submitted on October 17, 2016 was redacted and accompanied by publicly-available references only. On October 19, 2016, Salix submitted a version of the 2016 Petition that was unredacted and accompanied by a full set of references. In determining what information to include in this response, we have independently evaluated whether the information in the 2016 Petition is confidential.

[2] You also request that we apply these requirements to applications submitted pursuant to section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act (FD&C Act) that rely on Xifaxan as the listed drug. We note, however, that 505(b)(2) applications are not required to demonstrate BE to a listed drug. In addition, because 505(b)(2) applications can differ from the listed drugs in a variety of ways, we cannot address hypothetical requests for what demonstrations would be needed for a 505(b)(2) application. Therefore, this response focuses solely on your request with respect to ANDAs submitted pursuant to section 505(j) of the FD&C Act.

(a) in vitro dissolution testing that uses multiple dissolution media at different pH values and with different surfactant levels to simulate in vivo drug release and that demonstrates that the dissolution rate of the proposed generic is the same as the dissolution rate of Xifaxan; and

(b) BE studies with pharmacokinetic (PK) endpoints conducted under both fed and fasted conditions that demonstrate that the systemic absorption of the active ingredient from the proposed generic is not greater than the systemic absorption of Xifaxan, and that the proposed generic does not have a clinically significant interaction with oral contraceptives.

(3) Refuse to approve any ANDA for a proposed generic that is not Q1 and Q2 the same as Xifaxan unless the application includes:

(a) in vitro dissolution testing that uses multiple dissolution media at different pH values and with different surfactant levels to simulate in vivo drug release and that demonstrates that the dissolution rate of the proposed generic is the same as the dissolution rate of Xifaxan;

(b) BE studies with PK endpoints conducted under both fed and fasted conditions that demonstrate that the systemic absorption of the proposed generic is not greater than the systemic absorption of Xifaxan, and that the proposed generic does not have a clinically significant interaction with oral contraceptives; and

(c) the following BE studies with clinical endpoints:

i. for a proposed generic referencing the 200 milligrams (mg) strength of Xifaxan, which is indicated for the treatment of Traveler's Diarrhea (TD), a BE study with Time to Last Unformed Stool (TLUS) as a primary endpoint, and with non-inferiority margins set in accordance with non-inferiority principles;

ii. for a proposed generic referencing the 550 mg strength of Xifaxan, which is indicated for treatment of hepatic encephalopathy (HE), BE studies with inclusion criteria and clinical endpoints comparable to those used for the approval of the Xifaxan 500 mg for the HE indication, and non-inferiority margins set in accordance with non-inferiority principles; and

iii. for a proposed generic referencing the 550 mg strength of Xifaxan, which is indicated for treatment of irritable bowel syndrome with diarrhea (IBS-D), if the above-mentioned clinical endpoint studies of Xifaxan 550 mg were not done for the HE indication: BE studies with inclusion criteria and clinical endpoints comparable to those used for the approval of Xifaxan 550 mg for, and non-inferiority margins set in accordance with non-inferiority principles.

(4) Revise the "*Draft Rifaximin Bioequivalence Documents*" to incorporate the above-listed criteria, at a minimum.

In the 2008 Petition, you request that FDA take the following actions:

(1) Refuse to receive for substantive review, and refrain from approving, an ANDA for a proposed product referencing the 200 mg strength of Xifaxan unless the application includes:

(a) a BE study with appropriate validated clinical endpoints conducted in patients with TD in locations where travelers are exposed to a range of organisms similar to those encountered by patients participating in the pivotal studies described in the approved labeling for Xifaxan;

(b) a BE study with PK endpoints conducted under both fed and fasted conditions that demonstrates that the systemic absorption and PK profile of the active ingredient of the proposed generic is the same as Xifaxan; and

(c) in vitro dissolution data that demonstrate that the proposed generic's dissolution is comparable to Xifaxan's dissolution under artificial conditions in which one aspect of the solubility of the product can be induced and measured.[3]

(2) If FDA considers providing BE guidance permitting, or accepting for review or approving, an ANDA based on BE data other than that set forth in the 2008 Petition, that the Agency, before doing so, initiate a public process through which interested persons may present their views, including presentation of the matter to the Advisory Committee for Pharmaceutical Science and to the Advisory Committee for Gastrointestinal Drugs and/or the Antimicrobial Drugs Advisory Committee.

FDA has carefully considered your Petitions. For the reasons described below, the 2016 and 2008 Petitions are granted in part and denied in part.

# I. BACKGROUND

## A. Xifaxan (rifaximin)

Rifaximin is a locally-acting gastrointestinal (GI) broad-spectrum antibacterial agent. Rifaximin

[3] With respect to your requests to refuse to receive ANDAs that do not meet certain BE criteria, we note that FDA's guidance for industry on *ANDA Submissions – Refuse-to-Receive Standards* (Dec. 2016), available at https://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/guidances/ucm370352.pdf, recommends that, as a general matter, ANDA applicants should refer to FDA's "Product Specific Recommendations for Generic Drug Development" website for guidances regarding recommended in vivo and/or in vitro BE and other recommended studies. While you have made assertions in your Petitions regarding the BE information necessary to approve an ANDA, you have made no assertions as to why an ANDA could not be received without such information. Therefore, your requests that FDA refuse to receive ANDAs that do not meet the BE recommendations contained in your Petitions are denied.

is a semi-synthetic derivative of rifampin and acts by binding to the beta-subunit of bacterial DNA-dependent RNA polymerase, blocking one of the steps in transcription. This results in inhibition of bacterial protein synthesis and consequently inhibits the growth of bacteria.[4]

Xifaxan (rifaximin) tablets, 200 mg (new drug application (NDA) 021361) was approved on May 25, 2004, for the treatment of patients 12 years of age or older with travelers' diarrhea (TD) caused by noninvasive strains of *Escherichia coli*. Xifaxan (rifaximin) tablets, 550 mg (NDA 022554) was approved on March 24, 2010, for reduction in risk of overt hepatic encephalopathy (HE) recurrence in adults. Xifaxan (rifaximin) tablets, 550 mg (NDA 021361/S-012) was approved on May 27, 2015, for the treatment of IBS-D in adults.

### B. Applicable Statutory and Regulatory Framework

#### *1. ANDAs*

The Drug Price Competition and Patent Term Restoration Act of 1984 (Public Law 98-417) (the Hatch-Waxman Amendments) amended the FD&C Act to, among other things, add section 505(j) (21 U.S.C. 355(j)), which established an abbreviated approval pathway for generic drugs.[5] The Hatch-Waxman Amendments reflect Congress's efforts to balance the need to "make available more low cost generic drugs by establishing a generic drug approval procedure" with new incentives for drug development in the form of marketing exclusivity and patent term extensions.[6]

To obtain approval, an ANDA applicant is not required to provide evidence to establish the safety and effectiveness of the proposed drug product, as is required for an NDA. Instead, an ANDA relies on FDA's previous finding that the reference listed drug (RLD) is safe and effective.[7] To rely on this finding, an ANDA applicant must provide sufficient information to show that its drug product is bioequivalent to the RLD.[8] An ANDA applicant generally must also demonstrate, among other things, that it has the same active ingredient(s), route of

---

[4] *See* labeling for Xifaxan (rifaximin) (NDA 021361 and 022554), available at http://www.accessdata.fda.gov/drugsatfda_docs/label/2015/021361s012lbledt.pdf.

[5] For purposes of this response, the term generic drug refers to a new drug product for which approval is sought in an ANDA submitted under section 505(j) of the FD&C Act.

[6] *See* House Report No. 98-857, part 1, at 14-15 (1984), reprinted in 1984 U.S.C.C.A.N. 2647 at 2647-2648.

[7] A reference listed drug or RLD is "the listed drug identified by FDA as the drug product upon which an applicant relies in seeking approval of its ANDA." 21 CFR 314.3(b). RLDs are identified in FDA's *Approved Drug Products with Therapeutic Evaluations* (Orange Book), available at http://www.accessdata.fda.gov/scripts/cder/ob/.

[8] *See, e.g.*, section 505(j)(2)(A)(iv) of the FD&C Act (requiring "information to show that the new drug is bioequivalent to the listed drug"); 21 CFR 314.3 (defining *reference listed drug*); 21 CFR 314.94(a)(7) (requiring, as part of ANDA content and format, information to show that the drug product is bioequivalent to the reference listed drug); and 21 CFR 314.127(a)(6)(i) (stating that FDA will refuse to approve an ANDA if information submitted is insufficient to show that the drug product is bioequivalent to the listed drug referred to in the ANDA).

administration, dosage form, strength, and (with certain permissible differences) labeling as the RLD.[9] FDA must approve an ANDA unless it finds that, among other things, the ANDA applicant has not provided sufficient evidence of the foregoing, or if the methods used in, or the facilities and controls used for, the manufacture, processing, and packing of the drug are inadequate to assure and preserve its identity, strength, quality, and purity.[10]

The scientific premise underlying the Hatch-Waxman Amendments is that bioequivalent drug products with the same active ingredient(s), route of administration, dosage form, and strength are therapeutically equivalent and may be substituted for each other.[11]

### 2. *The Sameness of Active Ingredient and of Strength Requirements*

Section 505(j)(2)(A) of the FD&C Act states that for a single active ingredient drug product, an ANDA must contain information to show that the active ingredient[12] of the generic drug and the strength[13] of the generic drug is each the "same as" that of the listed drug. Under section 505(j)(4) of the FD&C Act, FDA must approve an ANDA referencing a listed drug unless the ANDA contains insufficient information to show that the active ingredient is the same as that of the listed drug[14], that the strength is the same as that of the listed drug[15], or otherwise does not meet the requirements for approval. Thus, the applicant bears the burden of providing sufficient information to show the proposed generic drug product is the "same as" the RLD with respect to active ingredient and strength.

FDA's regulations in Title 21 of the Code of Federal Regulations (CFR) provide that the term "same as" means, among other things, "identical in active ingredient(s) [and] strength."[16] FDA's regulations on Applications for FDA Approval to Market a New Drug establish definitions for active ingredient and for drug strength. Specifically, section 314.3(b) defines "active ingredient" as follows:

> *Active ingredient* is any component that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or

---

[9] Section 505(j)(2)(A), (j)(2)(C), and (j)(4) of the FD&C Act; *see also* 21 CFR 314.94(a).

[10] Section 505(j)(4) of the FD&C Act.

[11] Therapeutic equivalents are approved drug products that are pharmaceutical equivalents for which BE has been demonstrated, and that can be expected to have the same clinical effect and safety profile when administered to patients under the conditions specified in the labeling. 21 CFR 314.3(b).

[12] Section 505(j)(2)(A)(ii)(I) of the FD&C Act.

[13] Section 505(j)(2)(A)(iii) of the FD&C Act.

[14] Section 505(j)(4)(C)(i) of the FD&C Act.

[15] Section 505(j)(4)(D)(i) of the FD&C Act.

[16] 21 CFR 314.92(a)(1).

> prevention of disease, or to affect the structure or any function of the body of man or other animals. The term includes those components that may undergo chemical change in the manufacture of the drug product and be present in the drug product in a modified form intended to furnish the specified activity or effect.

Section 314.3(b) defines "strength" as:

> the amount of drug substance contained in, delivered, or deliverable from a drug product, which includes:
>
> (1)
>
> > (i) The total quantity of drug substance in mass or units of activity in a dosage unit or container closure (*e.g.*, weight/unit dose, weight/volume or weight/weight in a container closure, or units/volume or units/weight in a container closure); and/or, as applicable.
> >
> > (ii) The concentration of the drug substance in mass or units of activity per unit volume or mass (*e.g.*, weight/weight, weight/volume, or units/volume); or
>
> (2) Such other criteria the Agency establishes for determining the amount of drug substance contained in, delivered, or deliverable from a drug product if the weights and measures described in paragraph (i) of this definition do not apply (*e.g.*, certain drug-device combination products for which the amount of drug substance is emitted per use or unit time).[17]

Section 314.3(b) defines "drug substance" as "an active ingredient that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease or to affect the structure or any function of the human body..." Thus, "drug strength" is defined in terms of the quantity or concentration of active ingredient(s) in a drug product.

With respect to the sameness of active ingredients, in the preamble to the 1992 final rule implementing the generic drug approval provisions of the Hatch-Waxman Amendments, FDA specifically rejected the notion that an ANDA applicant must demonstrate that the active ingredient in its proposed generic drug product and the active ingredient in the RLD "exhibit the same physical and chemical characteristics, that no additional residues or impurities can result from different manufacture or synthesis process[,] and that the stereochemistry characteristics

---

[17] The 2016 Petition relies on a different definition of strength that is found at 21 CFR § 210.3(b)(16) in the Part of the regulations on Current Good Manufacturing Practices in Manufacturing, Processing, Packing, or Holding of Drugs; General. The correct definition to use in interpreting the meaning of strength as used in the Part of the regulations addressing Applications for FDA Approval to Market a New Drug is the definition contained in the Part addressing Applications for FDA Approval to Market a New Drug.

and solid state forms of the drug have not been altered."[18] Instead, FDA adopted a more flexible approach, stating that it would "consider an active ingredient [in a generic drug product] to be the same as that of the reference listed drug if it meets the same standards for identity."[19] In most cases, standards of identity are tests or specifications described in the *United States Pharmacopeia* (USP), although FDA may prescribe "additional standards that are material to the ingredient's sameness."[20]

As FDA's regulations preamble reflect, FDA has broad discretion in determining whether an ANDA applicant has submitted sufficient information upon which the Agency can reasonably conclude that the generic drug product's active ingredient is the "same as" that of the RLD. This flexible, science-based approach to determining active ingredient sameness has been sustained by the courts. Specifically, in *Serono Laboratories, Inc. v. Shalala*, 158 F.3d 1313 (D.C. Cir. 1998) (*Serono*), the United States Court of Appeals for the District of Columbia Circuit considered the ANDA approval requirements regarding active ingredients described in the FD&C Act and FDA's regulations and supported FDA's approach to determining the sameness of active ingredient.[21]

The D.C. Circuit upheld as reasonable the Agency's interpretation of the "sameness" statutory requirement, as well as the Agency's interpretation of the word "identical" in section 314.92(a)(1).[22] The court noted that the statute says nothing at all about the type of information an applicant must submit to demonstrate "sameness" or about the type of information upon which FDA may rely.[23] The court characterized the sameness provision as a "broad grant of discretion" to the Agency with respect to the information it may consider and noted that the phrase "must be read in the context of the kind of drug at issue."[24]

In a 2007 guidance for industry, FDA provided recommendations on applying its science-based approach to determining "sameness" to drug substances that exist in polymorphic forms when in

---

[18] 1992 Final Rule, 57 FR at 17958-17959.

[19] 1992 Final Rule, 57 FR at 17959.

[20] *Id.*

[21] *Serono* involved a legal challenge to FDA's approval of a generic version of Pergonal, a menotropin product used to treat infertility. This product contains two active ingredients: follicle-stimulating hormone (FSH) and luteinizing hormone (LH). As the court noted, FDA concluded that to be the same, the generic drug product's active ingredients and Pergonal's active ingredients were expected to have the same primary structure, potency, and degree of batch-to-batch uniformity. One of the active ingredients included natural variations known as microheterogeneity. FDA maintained that an isoform variation in the active ingredient of the generic drug product did not preclude a finding of active ingredient "sameness" for purposes of ANDA approval.

[22] *Serono*, 158 F.3d at 1321.

[23] *Id.* at 1319.

[24] *Id.*

their solid state (Polymorph Guidance).[25] The Polymorph Guidance defines "polymorphic forms" to include crystalline forms, which are "different arrangements and/or conformations of the molecules in the crystal lattice," amorphous forms, which are "disordered arrangements of molecules that do not possess a distinguishable crystal lattice," and solvates, which are "crystal forms containing either stoichiometric or nonstoichiometric amounts of a solvent."[26] The Polymorph Guidance provides that "differences in drug substance polymorphic forms do not render drug substances different active ingredients for the purposes of ANDA approvals within the meaning of the [FD&C] Act and FDA regulations."[27]

While differences in drug substance polymorphic forms do not render drugs substances different active ingredients, applicants are required to demonstrate that, among other things, their drug products exhibit sufficient stability and are bioequivalent to the RLD.[28] Although the polymorphic form of the drug substance can affect drug product stability and BE, these performance characteristics are also dependent on the formulation, the manufacturing process, and other physicochemical properties (e.g., particle size, moisture) of both the drug substance and formulation excipients.[29] Thus, the polymorphic form is only one of a multitude of variables that has the potential to affect drug product stability and BE. Using a drug substance with a polymorphic form that is different from that of the RLD may not preclude an ANDA applicant from formulating a generic drug product that exhibits sufficient stability and is bioequivalent to the RLD, and the drug substance in the generic drug product need not have the same polymorphic form as the drug substance in the RLD.[30] Over the years, FDA has approved a number of ANDAs for which the drug substance in the generic drug product had a different polymorphic form from the drug substance in the respective RLD (e.g., warfarin sodium, famotidine, and ranitidine).[31]

### 3. *The Bioequivalence Requirement*

An ANDA applicant must also demonstrate that its proposed generic drug is bioequivalent to the RLD.[32] Section 505(j)(8)(B)(i) of the FD&C Act states that a generic drug is bioequivalent to

---

[25] FDA guidance for industry *ANDAs: Pharmaceutical Solid Polymorphism Chemistry, Manufacturing, and Controls Information* (Polymorph Guidance), at 5, available at https://www.fda.gov/downloads/Drugs/Guidances/UCM072866.pdf.

[26] Polymorph Guidance at 2.

[27] *Id.* at 5.

[28] *Id.* at 6 (citing section 505(j)(4) of the FD&C Act and 21 CFR 314.127).

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *See, e.g.*, section 505(j)(2)(A)(iv) of the FD&C Act (requiring "information to show that the new drug is bioequivalent to the listed drug"); 21 CFR 314.94(a)(7) (requiring, as part of the ANDA content and format,

the listed drug if:

> the rate and extent of absorption of the drug do not show a significant difference from the rate and extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses . . . .[33]

Congress also recognized that some drugs do not reach their site of action through absorption into the bloodstream. Thus, section 505(j)(8)(C) states the following:

> For a drug that is not intended to be absorbed into the bloodstream, the Secretary may establish alternative, scientifically valid methods to show bioequivalence if the alternative methods are expected to detect a significant difference between the drug and the listed drug in safety and therapeutic effect.

In 21 CFR 314.3(b), FDA defines BE (in pertinent part) as:

> . . . the absence of a significant difference in the rate and extent to which the active ingredient or active moiety . . . becomes available at the site of drug action when administered at the same molar dose under similar conditions in an appropriately designed study.

A showing that the active ingredient or therapeutic ingredient in the proposed generic drug reaches the site of drug action at a rate and to an extent not significantly different from that of the RLD, along with other information required for approval, permits FDA to conclude that the proposed generic drug can be expected to perform the same way in the body as the RLD. BE testing determines whether differences in formulation (e.g., differences in inactive ingredients) between a proposed generic drug and the RLD have an impact on the rate and extent to which the active ingredient becomes available at the site of action.

#### 4. *Types of Evidence of Bioequivalence*

The statute, regulations, and case law give FDA considerable flexibility in determining how the BE requirement is met. The testing methods may include in vivo data (data from a study on human subjects) or in vitro data (data from laboratory studies) or a combination of in vivo and in vitro data.[34]

---

information to show that the drug product is bioequivalent to the RLD); 21 CFR 314.127(a)(6)(i) (providing that FDA will refuse to approve an ANDA if information submitted is insufficient to show that the drug product is bioequivalent to the RLD referred to in the ANDA).

[33] See also 21 CFR 320.1(e) and 320.23(b).

[34] *See* section 505(j)(7)(A)(i)(III) of the FD&C Act; see also *Schering Corp. v. FDA*, 51 F.3d 390, 398 (3d Cir. 1995) (noting that this provision "vests the FDA with the discretion to determine whether *in vivo* or *in vitro* bioequivalence studies, or both, will be required for the approval of generic drugs under the abbreviated approval

FDA's regulations describe the types of evidence that may be used to establish BE:

> FDA may require *in vivo or in vitro testing, or both,* to measure the bioavailability of a drug product or establish the bioequivalence of specific drug products . . . . The selection of the method used to meet an in vivo or in vitro testing requirement depends upon the purpose of the study, the analytical methods available, and the nature of the drug product. Applicants shall conduct bioavailability and bioequivalence testing using the most accurate, sensitive, and reproducible approach available among those set forth in paragraph (b) of this section. The method used must be capable of measuring bioavailability or establishing bioequivalence, as appropriate, for the product being tested.[35]

Section 320.24(b) (21 CFR 320.24(b)) of FDA regulations describes acceptable BE methods in general descending order of accuracy, sensitivity, and reproducibility.[36] The BE methods include (1) in vivo PK studies in whole blood, plasma, serum, or other appropriate biological fluid, or an in vitro test that has been correlated with and is predictive of in vivo bioavailability data, (2) in vivo studies in which urinary excretion of the active moiety, and when appropriate, its active metabolite(s), are measured, (3) in vivo pharmacodynamic (PD) effect studies, (4) clinical endpoint studies, and (5) in vitro studies acceptable to FDA that ensure human in vivo bioavailability.[37] In addition, consistent with section 505(j)(8)(C) of the FD&C Act, section 320.24(b)(6) of the regulations states that FDA has the flexibility to use "[a]ny other approach deemed adequate by FDA to . . . establish bioequivalence." The Agency's authority to make BE determinations on a case-by-case basis using in vivo, in vitro, or both types of data enables FDA to effectuate several long-recognized policies that protect the public health: (1) refraining from unnecessary human research when other methods of demonstrating BE meet the statutory and regulatory standards for approval;[38] (2) permitting the Agency to use the latest scientific

---

processes").

[35] 21 CFR 320.24(a)(emphasis added). In the preamble to the final rule setting forth FDA's regulations for ANDAs, the Agency explained that, depending upon the drug, it would determine the appropriate BE methodology on a case-by-case basis:

> Bioequivalence can be established by pharmacodynamic measurement as well as by in vitro techniques and bioequivalence studies with clinical endpoints. The preferred method for establishment of bioequivalence . . . *is determined on a case-by-case basis*, depending on the drug under study ("Abbreviated New Drug Application Regulations" final rule, 57 FR 17950, 17972 (Apr 28, 1992) (emphasis added)).

[36] This general descending order of methodologies is not applicable to many locally acting drug products due to characteristics of those products that differ from most systemically acting drug products.

[37] *See* 21 CFR 320.24(b). Whereas a PK study measures the rate and the extent to which the drug is delivered to biological fluids (generally the bloodstream), a PD study measures effects associated with the delivery of the active ingredient to the site of action.

[38] *See* 21 CFR 320.25(a) (stating that a "guiding principle" for the conduct of an in vivo bioavailability study is that "that no unnecessary human research should be done"); *Abbreviated New Drug Application Regulations, Proposed Rule,* 54 FR 28872, 28883 (July 10, 1989) (in discussing section 320.22, stating that "the agency does not believe that Congress intended that unnecessary human research be conducted ... if the agency concludes that

advances in approving drug products;[39] (3) protecting the public by ensuring only safe and effective generic drugs are approved for marketing;[40] and (4) making more safe and effective generic drugs available.[41]

### 5. *Establishing Bioequivalence of Locally Acting Drugs*

For systemically acting drug products, the rate and extent of systemic absorption of the drug is usually the most sensitive, accurate, and reliable indicator of the rate and extent to which the active ingredient becomes available at the site of drug action. The determination of BE of drug products whose primary mechanism of action depends on systemic absorption generally rests on a comparison of drug and/or metabolite concentrations in an accessible biological fluid, such as blood or urine, after administration of a single dose or multiple doses of each drug product to healthy volunteers.[42]

By contrast, a traditional in vivo BE study comparing the rate and extent of absorption of the active ingredient into the blood stream is usually of limited utility for locally acting, non-systemically absorbed drug products. Some locally acting products may not produce measurable concentrations of drug or metabolite in an accessible biologic fluid. For those that do, there may be a lack of evidence of a correlation between the systemic concentrations and concentrations at the site of drug action for the drug or metabolite. For some of these drug products, FDA can review data from PD effect studies to assess BE.[43] For others, FDA often relies on data from

---

bioequivalence can be demonstrated by in vitro tests, the agency proposes to require only such tests rather than in vivo studies.").

[39] *See Bioavailability and Bioequivalence Requirements: Procedures for Establishing a Bioequivalence Requirement,* 42 FR 1624, 1629 (Jan. 7, 1977) ("As with all new regulations relating to an evolving science, the Commissioner reserves the right to consider other factors that may indicate the need to establish a bioequivalence requirement.").

[40] *See Schering Corp. v. Sullivan,* 782 F. Supp. 645, 650 (D.D.C. 1992) (noting that one underlying policy of the Hatch-Waxman Amendments is to "ensure the safety of these drugs before they are substituted for their name-brand counterparts").

[41] *See id.* (finding that the purposes of Hatch-Waxman Amendments are "to make more inexpensive generic drugs available" and "to ensure the safety of these drugs"); *Fisons Corp. v. Shalala,* 860 F. Supp. 859, 866-67 (D.D.C. 1994) (finding that the BE waiver provision "comports with the structure and broader policy objectives of the Hatch-Waxman Act," including making safe and affordable generic drugs available).

[42] *See* section 505(j)(8)(B) of the FD&C Act; FDA guidance for industry *Bioavailability and Bioequivalence Studies for Orally Administered Drug Products — General Considerations,* at 6, available at http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm. *See generally*, the draft guidance for industry *BE Studies with Pharmacokinetic Endpoints for Drugs Submitted Under an ANDA*, available at http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm.

[43] *See* 21 CFR § 320.24(b)(3). For example, FDA recommends PD effect BE studies for generic versions of corticosteroids. Studies evaluating blanching or vasoconstriction of the skin microvasculature can provide evidence for the amount of drug entering the skin and thus serve as the basis for comparing drug delivery from two potentially equivalent topical corticosteroid formulations. *See* FDA's guidance for industry on *Topical Dermatologic Corticosteroids: In Vivo Bioequivalence* (June 1995), available at

"appropriately designed comparative clinical trials" or from in vitro studies to assess BE.[44]

The choice of appropriate BE study design is based on the ability of the study to compare the drug delivered by the two products at the particular site of action of the drug, and Congress assigned this decision to FDA. Congress intended to grant FDA wide discretion to establish BE standards on a drug-by-drug basis when it enacted the Hatch-Waxman Amendments, and courts have recognized FDA's discretion to determine how the BE requirement should be met for a product or class of products, as long as its determination is not contrary to the governing statute and regulations and is based on a "reasonable and scientifically supported criterion."[45]

FDA has issued a draft guidance for industry recommending that when it is not possible to use in vivo PK studies, in vivo PD effect studies, or in vitro studies, well-controlled comparative clinical endpoint studies may be used to establish BE.[46] FDA also publishes product-specific recommendations describing the Agency's current thinking and expectations about how to develop generic drug products that are therapeutically equivalent to specific RLDs.

*6. Bioequivalence Guidance*

Our guidance for industry on *Bioequivalence Recommendations for Specific Products* (June 2010)[47] (BE Specific Product Guidance) describes FDA's process for making available to the public FDA guidance on the design of BE studies for specific drug products. Prior to establishing the product-specific BE guidance mechanism outlined in the BE Specific Product Guidance, the Agency provided recommendations on the design of BE studies for specific products on an individual basis to parties who expressly requested such information.

Currently, the Agency periodically publishes notices in the *Federal Register* announcing the availability of draft, revised draft, and final versions of product-specific BE recommendations.

---

https://www.fda.gov/ohrms/dockets/dockets/04p0206/04p-0206-ref0001-08-FDA-Guidance-for-Industry-06-1995-vol3.pdf).

[44] 21 CFR § 320.24(b)(4)-(5); *see also* FDA's draft guidance for industry on *Bioequivalence Studies with Pharmacokinetic Endpoints for Drugs Submitted Under an ANDA* (Dec. 2013) at 7-8, available at http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM377465.pdf. When final, this guidance will represent FDA's current thinking on this topic.

[45] *Fisons Corp. v. Shalala*, 860 F. Supp. 859, 865 (D.D.C. 1994) (quoting *Schering Corp. v. Sullivan*, 782 F. Supp. 645, 651 (D.D.C. 1992), *vacated as moot*, 955 F.2d 1103, 1106 (D.C. Cir. 1993)); *see also Fisons,* 860 F. Supp. at 866-67 ("[T]he factual determination of how bioequivalence is determined properly rests within the FDA's discretion."); *Schering Corp. v. FDA*, 51 F.3d 390, 397-400 (3d Cir. 1995).

[46] *See* FDA's draft guidance for industry on *Bioequivalence Studies with Pharmacokinetic Endpoints for Drugs Submitted Under an ANDA* (Dec. 2013) at 8, available at http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM377465.pdf. When final, this guidance will represent FDA's current thinking on this topic.

[47] Available at http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/ucm072872.pdf.

These notices identify a comment period for draft BE recommendations. The draft and final recommendations are available on the FDA's Web site.[48]

The Agency considers comments received on product-specific BE recommendations in developing its final recommendations. As with Agency guidance in general, these recommendations describe the Agency's current thinking and should be viewed only as recommendations unless specific regulatory or statutory requirements are cited. However, applicants may confer with the Agency on use of different approaches for establishing BE. Recommendations described in a draft or final guidance do not bind the Agency or the public. Further, even in the absence of a product-specific BE guidance, FDA has the authority to approve a product supported by BE data that meet the statutory and regulatory requirements.

## II. DISCUSSION

The 2016 Petition contends that "FDA should approve a generic version of Xifaxan only where it has a polymorph profile identical to the Xifaxan polymorph profile" (2016 Petition at 5) because a proposed generic with a different polymorph profile of rifaximin could not "satisfy either the sameness or the bioequivalence requirements" for ANDA approval (2016 Petition at 6-7). In particular, the 2016 Petition contends that different polymorph forms of rifaximin should be considered different active ingredients because they are expected to have "different potencies at topical sites of action in the GI tract (raising efficacy differences) and in the systemic circulation (raising safety concerns)" (2016 Petition at 5, 60). Further, the 2016 Petition asserts that a proposed generic with a different polymorph form of rifaximin cannot meet the sameness of strength or BE requirements for ANDA approval because testing technology to make those demonstrations does not exist (2016 Petition at 60-61). The 2008 Petition likewise "assumes that any abbreviated new drug application submitted under 21 U.S.C. §355(j) referencing Xifaxan will include data establishing that the proposed generic product contains the same active ingredient as Xifaxan (i.e. the same polymorph of rifaximin)" (2008 Petition at 2, n. 2).

For proposed generics that have the same polymorph profile and are Q1 and Q2 the same as Xifaxan, the 2016 Petition asks that FDA require that applicants demonstrate BE through in vitro dissolution testing using multiple dissolution media at different pH values and surfactant levels and through BE studies with PK endpoints conducted under both fed and fasted conditions (2016 Petition at 1). For proposed generics that have the same polymorph profile but are not Q1 and Q2 the same as Xifaxan, the 2016 Petition asks that FDA require that applicants demonstrate BE through in vitro dissolution testing, BE studies with PK endpoints conducted under both fed and fasted conditions, and certain BE studies with clinical endpoints (2016 Petition at 1-2). The 2016 Petition also requests that FDA revise the *Draft Guidance on Rifaximin (200 mg)* and *Draft Guidance on Rifaxmin (550 mg)* to incorporate the above-listed criteria, at a minimum (2016 Petition at 2).

[48] Product-specific BE recommendation guidances are available on FDA's Web site at http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/ucm075207.htm.

The 2008 Petition argues that FDA should require that an ANDA for a proposed product referencing the 200 mg strength of Xifaxan include a BE study with clinical endpoints conducted in patients with TD in locations where travelers are exposed to a range of organisms similar to those encountered by patients participating in the pivotal studies described in the approved labeling for Xifaxan, a BE study with PK endpoints conducted under both fed and fasted conditions, and in vitro dissolution data that demonstrate that the proposed generic's dissolution is comparable to Xifaxan's dissolution under artificial conditions. The 2008 Petition also asks that, if FDA considers allowing approaches to demonstrating BE other than those set forth in the Petition, that FDA initiate a public process through which interested persons may present their views, including presenting the issues to certain advisory committees.

We discuss each of these issues in greater detail below.

### A. FDA's Revised Draft Product-Specific Guidance for Rifaximin

According to the 2016 Petition, rifaximin is a Biopharmaceutics Classification System (BCS) Class IV drug (2016 Petition at 3), which means that it has low solubility and low permeability.[49] In the body, the drug is mainly confined to the GI tract, where it acts locally (2016 Petition at 3). Systemic exposure is low (2016 Petition at 30). For these reasons, the 2016 Petition explains, traditional BE studies with PK endpoints that measure the concentration of rifaximin in the blood over time would not establish, without more, that a proposed generic rifaximin product was bioequivalent to Xifaxin (2016 Petition at 3). In addition, the 2016 Petition notes that it is not currently possible to measure the concentration of rifaximin at its topical sites of action in the GI tract (2016 Petition at 5).

On November 29, 2011, FDA published a draft product-specific BE guidance for ANDAs referencing the 200 mg strength of Xifaxan. The 2011 draft product-specific guidance, when final, would recommend conducting a randomized, double blind, parallel, placebo-controlled in vivo clinical endpoint study in patients with TD. On February 13, 2012, FDA published a draft product-specific guidance for ANDAs referencing the 550 mg strength of Xifaxan. The 2012 draft product-specific guidance also would recommend, when final, conducting a clinical endpoint BE study using the 200 mg strength in patients with TD.[50] The 2012 draft product-specific guidance for the 550 mg strength also recommended conducting fasting and fed PK BE studies using the 550 mg strength in healthy adults.

---

[49] FDA's draft guidance for industry on *Waiver of In Vivo Bioavailability and Bioequivalence Studies for Immediate-Release Solid Oral Dosage Forms Based on a Biopharmaceutics Classification System* (May 2015) at 2, available at https://www.fda.gov/downloads/Drugs/Guidances/ucm070246.pdf. When final, this guidance will represent FDA's current thinking on this topic.

[50] At the time the draft product-specific guidance was published in 2012, the 550 mg strength of Xifaxan was approved only for reduction in risk of overt HE recurrence in adults (the 550 mg strength was not approved for the treatment of IBS-D in adults until May 27, 2015). As discussed in more detail below, FDA does not consider a clinical endpoint BE study in patients with HE to be the most accurate, sensitive, and reproducible approach available; therefore, the previous draft product-specific guidance for the 550 mg strength, when final, would have recommended that applicants conduct a clinical endpoint BE study using the 200 mg strength in patients with TD.

Since the publication of the draft product-specific guidances in 2011 and 2012, the sensitivity of bioanalytical assays for rifaximin have improved significantly. As a result, we have revised the draft product-specific recommendations for both strengths of rifaximin tablets to include an option[51] for demonstrating BE with in vitro dissolution studies and BE studies with PK endpoints for proposed generic rifaximin drug products that are Q1 and Q2 the same as Xifaxan.[52] We no longer believe that it is necessary that a BE study with clinical endpoints be conducted to establish BE if the formulation of a proposed rifaximin generic product is Q1 and Q2 the same as Xifaxan.

For both the 200 mg and the 550 mg strength Xifaxan tablets, generally, we now believe, for proposed generics that are Q1 and Q2 the same, that applicants should conduct two two-treatment, two-period, crossover PK studies, one fasting and one fed.[53] We also believe that comparative in vitro dissolution studies of the 200 mg strength should be done in pH 4.5 buffer and in pH 6.8 buffer, with 0.125% and 0.375% sodium dodecyl sulfate (SDS), and that comparative dissolution studies of the 550 mg strength should be done in pH 4.5 buffer and in pH 6.8 buffer, with 0.25% and 0.5% SDS. In this case, under our current thinking, the aim of these studies with two SDS levels per strength is to generate dissolution curves with a full and a partial drug release, which are intended to cover a range of possible in vivo drug release behaviors in the GI tract.

If an applicant intends to develop both the 200 mg and the 550 mg strengths, and if the 200 mg and 550 mg strengths are Q1 and Q2 the same and there is proportional similarity of the formulations between both strengths, we currently believe, in general, that the applicant should conduct in vitro dissolution studies of the 200 mg and 550 mg strengths. Fasting and fed PK BE studies of the 200 mg strength alone would be sufficient if there is proportional similarity of formulations, under our current thinking.

For proposed generics of the 200 mg strength of Xifaxan that are not Q1 and Q2 the same, we currently believe that applicants in general should conduct a BE study with clinical endpoints in patients with TD. For proposed generics of the 550 mg strength of Xifaxan that are not Q1 and Q2 the same, under our current thinking, firms in general should conduct a BE study of the 550

---

[51] Applicants can choose to use an approach to demonstrating BE other than those set forth in a guidance document, as long as the alternative approach satisfies the relevant statutory and regulatory requirements. *See* 21 CFR 10.115(d)(2). The acceptability of a given alternative approach will be evaluated during the review of a specific ANDA.

[52] Q1 (qualitative sameness) means that the test product uses the same inactive ingredient(s) as the reference product. Q2 (quantitative sameness) means that the concentrations of the inactive ingredient(s) used in the test product are within ±5% of those used in the reference product. *See* FDA's guidance for industry on *ANDA Submissions – Refuse-to-Receive Standards* (Dec. 2016), at 9, available at http://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/guidances/ucm370352.pdf.

[53] *See* FDA's revised draft guidance for industry on Rifaximin (Mar. 2017). We note that the revised draft product-specific guidance contains recommendations for both the 200 mg and 550 mg strength products.

mg strength with clinical endpoints in patients with IBS-D. Presently, we also believe that these applicants should conduct BE studies with PK endpoints and in vitro dissolution studies.

For applicants that intend to develop both the 200 mg and the 550 mg strengths that are not Q1 and Q2 the same, if there is proportional similarity of the formulations between the strengths, we presently believe that in vitro dissolution studies of both strengths, fasting and fed BE studies with PK endpoints of the 200 mg strength, and a BE study of the 550 mg strength with clinical endpoints in patients with IBS-D should be conducted.

If the 200 mg and 550 mg strengths are not Q1 and Q2 the same and there is not proportional similarity of the formulations between both strengths, we currently believe that in vitro dissolution studies of both strengths, fasting and fed BE studies with PK endpoints for both strengths, a BE study of the 200 mg strength with clinical endpoints in patients with TD, and a BE study of the 550 mg strength with clinical endpoints in patients with IBS-D should be conducted.[54]

### B. Proposed Generics Need Not Have the Same Polymorphic Form as Xifaxan to Satisfy the Sameness of Active Ingredient or Sameness of Strength Requirements

The 2016 Petition states that there are several polymorphic forms of rifaximin, each with different solubility characteristics (2016 Petition at 4). These differences in solubility characteristics, the 2016 Petition contends, translate into "different drug potencies at topical sites of action and in the systemic circulation" (2016 Petition at 4). As a result, "[f]or Xifaxan indications, different rifaximin polymorph profiles are different drugs" (2016 Petition at 4). The 2008 Petition similarly asserts an assumption that each of the different polymorphs of rifaximin should be treated as a different active ingredient (2008 Petition at 2, n. 2).

As the term is used in the Petitions, polymorphism is the ability of the same chemical compound, when in its solid state, to exist in more than one crystal form. At least five distinct crystal forms of rifaximin have been identified and characterized by solid-state analytical techniques.[55] There is also an amorphous form of rifaximin, which does not have three-dimensional crystalline lattices.[56]

---

[54] We note that our discussion in this response is limited to the issues raised in your petition and does not constitute a finalization of the draft product-specific guidance for rifaximin. The revised draft product-specific guidance is a science-based document that is subject to change as new data and information on rifaxamin become available. We will continue to evaluate the draft product-specific guidance to determine whether it should be further revised if new data or information becomes available that changes our scientific thinking.

[55] Viscomi, GC, M Campana, M Barbanti, et al., 2008, Crystal Forms of Rifaximin and Their Effect on Pharmaceutical Properties, CrystEngComm, 10:1074-1081.

[56] Blandizzi, C, GC Viscomi, and C Scarpignato, 2015, Impact of Crystal Polymorphism on the Systemic Bioavailability of Rifaximin, an Antibiotic Acting Locally in the Gastrointestinal Tract, in Healthy Volunteers, Drug Design, Development and Therapy, 9: 1-11.

We do not agree that different polymorphic forms of rifaximin will necessarily fail to satisfy the sameness of active ingredient or sameness of strength requirements for ANDA approval. As noted above, FDA's position, reflected in the Polymorph Guidance, is that "differences in drug substance polymorphic forms do not render drug substances different active ingredients for the purposes of ANDA approvals within the meaning of the [FD&C] Act and FDA regulations."[57]

With regard to the sameness of strength requirement, "drug strength" is defined in terms of the quantity or concentration of active ingredient(s) in a drug product. Therefore, a proposed generic product that refers to Xifaxan as the RLD will have the same strength as Xifaxan if it has the same amount of rifaximin, regardless of polymorphic form.

### C. Demonstrating BE of Proposed Rifaximin Generics

#### *1. Polymorphic Form and Demonstrating BE*

The 2016 Petition argues that the polymorphic form of rifaximin could affect systemic exposure and the fraction of ingested rifaximin that is dissolved in GI fluids when the drug arrives at the sites of action in the GI tract. The Petitioner contends that differences in intrinsic dissolution rate and solubility between polymorphic forms could translate into differences in both systemic exposure and in the amount of rifaximin that is available to act locally. The 2016 Petition asserts that "[i]f rifaximin dissolution were increased, the Proposed Generic could have increased systemic potency," whereas "[i]f rifaximin dissolution were decreased, the Proposed Generic could have less potency at topical sites of action" (2016 Petition at 62). Similarly, the 2016 Petition claims that "[u]se of a more highly soluble and well-absorbed Proposed Generic is expected to result in higher luminal, hepatic, and systemic rifaximin exposure" (2016 Petition at 42).

As a general matter, we agree that polymorphic form may affect intrinsic dissolution rate and solubility. We understand the 2016 Petition to be referring to kinetic solubility, which is a kinetic property, and not equilibrium solubility, which is a thermodynamic property. As explained by Sun and Lee:

> …[t]he equilibrium solubility of a drug is defined as the maximum quantity of that drug which can be completely dissolved under given temperature, pressure, and solvent conditions (e.g., pH and chemical composition). The equilibrium solubility of a drug is determined from the drug concentration in a saturated solution in thermodynamic equilibrium with excess drug solids (i.e., crystalline). On the other hand, the kinetic (metastable) solubility refers to the maximum achievable drug concentration in a supersaturated state (i.e., above the equilibrium solubility) and is typically determined from the maximum of a kinetic

[57] Polymorph Guidance at 5.

solubility profile.[58]

The equilibrium solubility of rifaximin is a function of solvent composition (e.g., pH and surfactant levels) and environment (e.g., pressure and temperature) and is independent of polymorphic form. As the 2016 Petition acknowledges, "regardless of starting polymorph type, under non-sink conditions and once hydrated, all forms of rifaximin will reach an equilibrium between a low concentration of rifaximin in solution and a precipitate" (2016 Petition at 28).[59] The kinetic solubility of rifaximin, however, can be affected by its polymorphic form.

We also agree with the 2016 Petition that rifaximin's polymorphic form could affect its intrinsic dissolution rate, which is how quickly the solid drug substance dissolves into a liquid solution. As a result of its effects on intrinsic dissolution rate and kinetic solubility, polymorphic form could affect systemic exposure and the fraction of ingested rifaximin that is dissolved in GI fluids when the drug arrives at the sites of action in the GI tract. Polymorphic form is not the only determinant of a rifaximin tablet's performance in the body, however. For example, formulation design, excipients and the specific manufacturing process could also have an effect.

The studies that we believe should be done to demonstrate BE are designed to confirm that there is no significant difference in performance between a proposed generic tablet and Xifaxan, whether the difference is caused by polymorphic form, by manufacturing differences, or by other factors. Specifically, the BE studies with PK endpoints that we refer to in section II.A. and that we describe in more detail in the revised draft product specific guidance reflect our current thinking regarding how to help ensure that proposed generic tablets do not differ from Xifaxan with regard to in vivo drug release along the upper GI tract. We designed the BE studies with PK endpoints to capture the effects of any differences in processing or manufacturing on initial absorption and help ensure that a proposed generic does not differ from Xifaxan with regard to systemic exposure. Further, the in vitro dissolution testing under physiologically relevant pH conditions and surfactant levels that we refer to in section II.A. reflects our current thinking regarding providing information on the availability of rifaximin at local sites of action in the GI tract over time for both the proposed generic and Xifaxan. Together, we currently believe that, in general, the BE studies with PK endpoints and the in vitro dissolution testing referred to above in section II.A. should serve as an accurate surrogate of in vivo drug release.

Furthermore, we note that the extent to which polymorph-specific variances persist once rifaximin is made into a tablet with multiple excipients is not known. The 2016 Petition discusses two published studies of pure rifaximin that found that PK parameters, such as the maximum or "peak" drug concentration ($C_{max}$) and the area under the plasma concentration

---

[58] Sun, DD, and PI Lee, 2015, Haste Makes Waste: The Interplay between Dissolution and Precipitation of Supersaturating Formulations, The AAPS Journal, 17.6: 1317-1326.

[59] As described more fully below, "sink conditions" are defined by the United States Pharmacopeia as the volume of dissolution medium at least three times that required to form a saturated solution of a drug substance. *See* United States Pharmacopeia and National Formulary (USP 38/NF 33), The Dissolution Procedure: Development and Validation ⟨1092⟩ (2015): 1090-1097.

versus time curve (AUC) vary from polymorph to polymorph (2016 Petition at 33-36).[60] The 2016 Petition also describes in vitro testing performed by Salix in various dissolution media, the results of which, the 2016 Petition asserts, support the conclusion that such testing can discriminate between polymorphs of rifaximin (2016 Petition at 22). The evidence from the studies cited by the Petitioner that in vitro dissolution testing and in vivo PK testing can detect polymorph-specific variability in pure rifaximin supports our decision to propose recommending such testing in support of demonstrating BE to Xifaxan in the revised draft product-specific guidance.

Thus, under our current thinking, the BE studies with PK endpoints and in vitro dissolution testing referred to above in section II.A. address the issues related to intrinsic dissolution rate and kinetic solubility raised by the Petitioner as they are designed to confirm that there is no significant difference in performance in the body between a proposed generic tablet and Xifaxan.

*2. Certain Safety Concerns*

The 2016 Petition claims that solubility differences between the rifaximin polymorph in a proposed generic and that in Xifaxan could raise several safety concerns related to differences in local availability and systemic exposure, including "(1) toxicity in HE and IBS-D patients; (2) drug-drug interactions with oral contraceptives resulting in unwanted pregnancies, especially in IBS-D patients because many are women of childbearing age; and (3) development of antibiotic-resistant bacteria in body systems beyond the GI tract" (2016 Petition at 4). The 2008 Petition contends that if a proposed generic product has increased systemic exposure it could affect "hepatic safety" and raise the risk of drug-drug interactions, including with oral contraceptives (2008 Petition at 20).[61]

An ANDA applicant is not required to demonstrate safety or effectiveness to obtain approval of a proposed generic drug. Instead, an ANDA applicant must provide sufficient information to show

---

[60] *See* Blandizzi, C, GC Viscomi, and C Scarpignato, 2015, Impact of Crystal Polymorphism on the Systemic Bioavailability of Rifaximin, an Antibiotic Acting Locally in the Gastrointestinal Tract, in Healthy Volunteers, Drug Design, Development and Therapy, 9: 1-11 *and* Viscomi, GC, M Campana, M Barbanti, et al., 2008, Crystal Forms of Rifaximin and Their Effect on Pharmaceutical Properties, CrystEngComm, 10:1074-1081. The 2016 Petition also makes the contradictory claim that a proposed generic product formulated with rifaximin with a lower solubility polymorph profile than Xifaxan could "giv[e] PK values similar to those for Xifaxan" (2016 Petition at 40, 46). The 2016 Petition does not provide any evidence to support the claim that a proposed generic rifaximin product could differ from Xifaxan in kinetic solubility but have the same PK profile as Xifaxan.

[61] The 2008 Petition assumes that any ANDA referencing Xifaxin would include data establishing that the proposed generic product contained the same polymorph of rifaximin as Xifaxin (2008 Petition at 2, n. 2). The 2008 Petition's argument that a proposed generic product with increased systemic exposure could affect "hepatic safety" and raise the risk of drug-drug interactions, including with oral contraceptives, was not limited to proposed generic products with polymorphic forms different from Xifaxan (2008 Petition at 20). We nonetheless address it here for completeness.

that its drug product is bioequivalent to the RLD[62] and to demonstrate, among other things, that its drug product has the same active ingredient(s) and strength as the RLD.[63] If an ANDA applicant meets the statutory requirements for approval, an ANDA relies on FDA's previous finding that the RLD is safe and effective.

At present, we do not agree that proposed generic rifaximin drug products need to have the same polymorphic form as Xifaxan to ensure "hepatic safety" or to guard against toxicity in HE and IBS-D patients. Neither Petition provides evidence to support the conclusion that rifaximin could cause abnormalities in liver tests or any other laboratory or clinical signs of hepatic injury. It is noteworthy that although the $C_{max}$ and AUC of rifaximin are increased in patients with hepatic impairment, no specific dosing adjustments are recommended in the labeling for Xifaxan, because of the drug's low solubility, low permeability, low systemic exposure, and relatively wide margin of safety. Nonetheless, we believe that, if the systemic rifaximin exposure from a proposed generic product is greater than the exposure from Xifaxan, whether because its active ingredient is a more soluble polymorphic form of rifaximin than that in Xifaxan, because of a difference in formulation, or for some other reason, this should be captured by the fasted and fed PK BE studies that we refer to above in section II.A. and would be reviewed by FDA in the context of a particular ANDA.

The 2016 Petition contends that drug interaction studies are needed to ensure that the proposed generic does not "cause clinically significant drug interactions that could result in oral contraceptive failure" (2016 Petition at 44). According to the 2016 Petition, the potential for interaction arises from the fact that rifaximin upregulates certain "detoxification pathways," including "Cytochrome P450 3A4 ('CYP3A4') and P-glycoprotein expression" (2016 Petition at 42). In vitro studies of rifaximin at concentrations much higher than those observed in patients at clinical doses show that the drug is a CYP3A inducer that increases CYP3A metabolism.[64] Given the minimal effect of rifaximin on CYP3A4 metabolism at clinically-relevant doses, however, and the fact that oral contraceptives are not sensitive CYP3A substrates, we currently believe that clinically significant interaction between rifaximin and oral contraceptives is unlikely at the very low concentrations resulting from a 550 mg dose of rifaximin. To the extent that oral contraceptive failure were a concern, we believe that drug interaction studies would still not be needed, because the BE studies with PK endpoints that we refer to above in section II.A. should reveal any increase in systemic exposure to rifaximin and would be reviewed by FDA in the context of a particular ANDA.

---

[62] *See, e.g.*, section 505(j)(2)(A)(iv) of the FD&C Act (requiring "information to show that the new drug is bioequivalent to the listed drug"); 21 CFR 314.3 (defining *reference listed drug*); 21 CFR 314.94(a)(7) (requiring, as part of ANDA content and format, information to show that the drug product is bioequivalent to the reference listed drug); and 21 CFR 314.127(a)(6)(i) (stating that FDA will refuse to approve an ANDA if information submitted is insufficient to show that the drug product is bioequivalent to the listed drug referred to in the ANDA).

[63] Section 505(j)(2)(A), (j)(2)(C), and (j)(4) of the FD&C Act; *see also* 21 CFR 314.94(a).

[64] *See* labeling for Xifaxan (rifaximin) (NDA 021361 and 022554) at 11, available at http://www.accessdata.fda.gov/drugsatfda_docs/label/2015/021361s012lbledt.pdf.

The 2016 Petition also contends that if a proposed generic contains a higher or lower solubility polymorph of rifaximin than Xifaxan does, it "must be studied as extensively as was Xifaxan for development of systemic antibiotic resistance due to over- or under-dosing" (2016 Petition at 47). The 2016 Petition claims that if a proposed generic contains a higher solubility polymorph of rifaximin that is more systemically available than Xifaxan, it could increase the risk of systemic antibiotic resistance in all users (2016 Petition at 46). The 2016 Petition further asserts that if a proposed generic contains a lower solubility polymorph, it could under-dose the small bowel and increase the risk of local antibiotic resistance and that in patients with HE, underdosing the small bowel could also increase the risk of systemic resistance due to bacterial escape from the GI tract (2016 Petition at 47). In addition, the 2016 Petition argues that a proposed generic with a higher or lower solubility polymorph of rifaximin could pose a "risk of harming diversity of the healthy colonic microbiome" (2016 Petition at 48).

Under our current thinking, we generally agree that a more soluble rifaximin product could potentially result in low, sub-inhibitory systemic exposure to rifaximin and in development of antibacterial drug resistance in bacteria outside the gastrointestinal tract; it is also possible that a less soluble rifaximin product could lead to the development of antibacterial resistance in the GI tract, and that, in some patients, resistant bacteria could then translocate from the intestine to the mesenteric lymph nodes or other sites. Under our current thinking, however, a study of antibacterial resistance or alterations in the colonic microbiome would be unnecessary, because any differences in solubility from Xifaxan should be captured by the BE studies with PK endpoints that we refer to above in section II.A. and would be reviewed by FDA in the context of a particular ANDA.

Based upon the foregoing, the 2016 Petition's request that FDA require that proposed generic rifaximin drug products have the same polymorph profile as Xifaxan because of safety concerns, including a risk of toxicity in patients with hepatic impairment, a risk of drug-drug interactions, particularly with oral contraceptives, and a risk of antibacterial resistance, is denied.[65]

#### 3. *Demonstrating BE of Proposed Rifaximin Generics That Are Q1 and Q2 the Same as Xifaxan*

The 2016 Petition asks that FDA refuse to approve any ANDA for a proposed generic that is Q1 and Q2 the same as Xifaxan unless the application includes in vitro dissolution testing, using multiple dissolution media at different pH values and with different surfactant levels, and PK BE studies conducted under both fed and fasted conditions (2016 Petition at 1-2). The 2008 Petition argues that BE studies with clinical endpoints are necessary to ensure that a proposed generic

---

[65] To the extent that the assumption stated in the 2008 Petition that "any ANDA referencing Xifaxan will include data establishing that the proposed generic product contains the same active ingredient as Xifaxan (ie., the same polymorph of rifaximin)" is interpreted as a request that FDA deny an ANDA that fails to include such data, that request is denied, as well.

rifaximin product is bioequivalent to Xifaxan (2008 Petition at 1).[66]

As discussed in section II.A.2 of this response, we continue to believe that applicants referring to Xifaxan should conduct BE studies with clinical endpoints for proposed generic rifaximin products that are not Q1 and Q2 the same as Xifaxan. If the formulation of a proposed generic product referencing Xifaxan is Q1 and Q2 the same as Xifaxan, however, we currently do not believe that a comparative clinical endpoint study is generally necessary to establish BE. If a product is Q1 and Q2 the same as Xifaxan, the excipients in the generic product would not affect the release, absorption, metabolism, or antibacterial activity of the active ingredient at the site of action in a different manner from those in Xifaxan. We generally believe that applicants with proposed products that are Q1 and Q2 the same can establish BE by demonstrating that the products have the same in vitro dissolution profile and the same plasma pharmacokinetics as Xifaxan, as discussed in greater detail below.

a. In Vitro Dissolution Testing

As discussed above in section II.A., we presently generally believe that applicants should conduct in vitro dissolution testing of proposed generics of Xifaxan under multiple physiologically relevant pH conditions and surfactant levels. We agree with the 2016 Petition that the in vitro dissolution testing method that was included in the 2011 and 2012 draft product-specific guidances for the 200 mg and 550 mg strengths of Xifaxan should be able to assess a tablet's stability and release characteristics, but could not discriminate between tablets containing different polymorph forms (2016 Petition at 19). This is because the in vitro dissolution testing that was included in the 2011 and 2012 draft product-specific guidances was designed primarily to assess product quality, not to demonstrate BE. The 2011 draft product-specific guidance, if finalized as written, would recommend establishing BE by conducting a comparative clinical endpoint study of the 200 mg strength, while the 2012 draft product specific guidance, if finalized as written, would recommend establishing BE by conducting a comparative clinical endpoint study of the 200 mg strength and fasting and fed PK endpoint studies of the 550 mg strength.

We also generally agree with the 2016 Petition that dissolution under sink conditions would not be a suitable predictor of in vivo drug release of locally acting GI rifaximin for the purpose of establishing BE (2016 Petition at 19). "Sink conditions" are defined by the United States Pharmacopeia as the volume of dissolution medium at least three times that required to form a saturated solution of a drug substance.[67] Non-sink conditions provide a more accurate picture of in vivo rifaximin release, because they allow the concentration of the drug in the dissolution medium to build up such that the solution becomes supersaturated. This is what commonly

[66] The 2008 Petition's request that FDA not approve an ANDA seeking to rely on Xifaxan as the RLD unless certain tests established BE did not assert that the tests should vary based on whether the proposed generic drug product was Q1 and Q2 the same as Xifaxan.

[67] United States Pharmacopeia and National Formulary (USP 38/NF 33), The Dissolution Procedure: Development and Validation (1092) (2015): 1090-1097.

occurs under finite volume conditions in the GI tract. In addition, rifaximin does not dissolve under sink conditions without the addition of a large quantity of surfactant to the dissolution media. Such a large quantity of surfactant does not reflect in vivo conditions and would mask differences in the intrinsic solubility of the various rifaximin polymorphic forms.

Under our current thinking, we believe that comparative dissolution studies should be conducted under multiple non-sink conditions, that is, at multiple pH levels, to reflect the range of pH levels found along the GI tract, and at multiple surfactant levels, to reflect the varying levels of surfactants, such as bile acid, found there. There is no validated in vitro dissolution study under a single artificial condition that correlates with in vivo drug release; presently, we believe that conducting testing at multiple pH conditions and at multiple surfactant levels, however, allows for the simulation of in vivo drug release in different portions of the GI tract.

The in vitro dissolution testing that we currently believe should be conducted is designed to be sufficiently sensitive to discriminate between two rifaximin formulations with different in vivo drug release rates. We note that in vivo drug release along the GI tract may or may not be a function of polymorphism. For both formulation development and quality control reasons, in vitro dissolution testing needs to be sufficiently sensitive to discriminate between two rifaximin formulations, rather than simply between two active ingredients with different polymorphic forms.

For these reasons, the 2016 Petition's request that FDA require in vitro dissolution testing of proposed generics of Xifaxan under multiple physiologically relevant pH conditions and surfactant levels is granted to the extent that FDA will recommend such testing in the revised draft product-specific guidance, while the 2008 Petition's request that we require in vitro dissolution testing under artificial conditions that demonstrates one aspect of the solubility of proposed generics is denied.

b. PK BE Studies

The 2016 Petition contends that PK BE studies "are unsuitable surrogates for prediction of a Different Polymorph Proposed Generic's topical bioequivalence to Xifaxan," for the following reasons: rifaximin is poorly soluble and poorly absorbed and acts topically rather than systemically; rifaximin does not exhibit dose-proportional pharmacokinetics; and rifaximin exhibits different pharmacokinetics and different potency across indications (2016 Petition at 59). Both the 2016 and the 2008 Petitions argue that PK BE studies should be done under both fasted and fed conditions, "because the solubility of rifaximin is affected by bile acids in the proximal small bowel" (2016 Petition at 59; *see also* 2008 Petition at 19-20).

We agree that rifaximin is poorly soluble and poorly absorbed and that it acts topically. This is why we currently believe that applicants should conduct in vitro dissolution testing in addition to PK BE studies, and why, for proposed generic products that are not Q1 and Q2 the same as Xifaxan, we additionally believe, under our current thinking, that comparative BE studies with clinical endpoints should be conducted. We also generally agree based on our current thinking that PK BE studies comparing proposed generic rifaximin products to Xifaxan should be done

under both fasted and fed conditions, since there is a known food effect on the solubility of rifaximin.

With regard to the claim in the 2016 Petition that rifaximin does not exhibit dose-proportional pharmacokinetics, data were not submitted that would definitively establish this. While we presently believe that a single study in the same research subjects should be conducted to support the claim that rifaximin does not exhibit dose-proportional pharmacokinetics (because variability in the drug's clearance across test populations may confound a cross-study comparison of rifaximin's dose-exposure relationship), we agree that, based on the currently available data from clinical studies, rifaximin does not appear to exhibit dose-proportional pharmacokinetics. For this reason, we currently believe that applicants that develop proposed generic products in both strengths should conduct BE studies with PK endpoints using the lower 200 mg strength rather than the higher 550 mg strength. We are not aware of any evidence to suggest that rifaximin's pharmacokinetics are not dose-proportional at the 200 mg strength.

The 2016 Petition also claims that BE studies with PK endpoints cannot predict "topical bioequivalence" because rifaximin exhibits different pharmacokinetics and different potency across disease states (2016 Petition at 59). We agree that systemic exposure to rifaximin is increased in patients with hepatic impairment, including patients with HE. There is some evidence that systemic exposure is also increased in patients with IBS-D. There are insufficient data to conclude that rifaximin absorption is increased in patients with HE or IBS-D, however. It may be that systemic exposure is increased in patients with hepatic impairment not due to increased absorption but to reduced elimination. Regardless, we generally believe at present that applicants should conduct in vitro dissolution testing in addition to BE studies with PK endpoints because this should allow discrimination between formulations based on differences in both in vivo drug release in the GI tract and systemic exposure. When assessed in combination, in general, our current thinking is that these studies should provide sufficient information to conclude whether differences between a Q1/Q2 generic rifaximin drug product and Xifaxan are likely to result in a significant difference in the rate and extent to which rifaximin becomes available at the site of drug action.

For these reasons, the 2016 and 2008 Petitions' request that FDA require PK BE studies under fasted and fed conditions is granted to the extent that FDA proposes recommending such studies in the revised draft product-specific guidance.

#### *4. Demonstrating BE of Proposed Rifaximin Generics That Are Not Q1 and Q2 the Same as Xifaxan*

The 2016 Petition asks that FDA refuse to approve, any ANDA for a proposed generic that is not Q1 and Q2 the same as Xifaxan unless the application includes (1) in vitro dissolution testing, (2) BE studies with PK endpoints, and (3) BE studies with clinical endpoints (2016 Petition at 1-2). The 2016 Petition also asks FDA to require that BE studies with clinical endpoints employ certain inclusion criteria, certain clinical endpoints for certain indications, and non-inferiority margins set in accordance with non-inferiority principles (2016 Petition at 2).

Under our current thinking, we believe that a comparative clinical endpoint BE study should be conducted to demonstrate that a proposed generic rifaximin product that is not Q1 and Q2 the same as Xifaxan is BE to Xifaxan. For a formulation that is not Q1 or Q2, we currently believe that, in general, differences in the type or amount of excipients may affect the metabolism, absorption, and antibacterial activity of the drug substance at the site of action. As a result, even if such a formulation had the same in vitro dissolution profile and plasma PK as Xifaxan, depending on the circumstances, this might not ensure that the same amount of drug was available in the GI tract or that the drug would have the same activity against bacteria.

The Petitioners misconstrue FDA's stance on the potential limitations of comparative BE studies with clinical endpoints when they state that the "results of a bioequivalence study with clinical endpoints cannot demonstrate sameness of systemic bioavailability/potency" (2016 Petition at 61). The selection of the method used to demonstrate BE depends upon the purpose of the study, the analytical methods available, and the nature of the drug product.[68] Applicants are required to use the most accurate, sensitive, and reproducible approach available among those set forth in our regulations.[69] A clinical endpoint study is one in vivo method by which a generic applicant may be able to demonstrate BE of its product to a reference product.[70] When it is not possible to rely on PK studies to demonstrate BE, well-controlled BE studies with clinical endpoints in patients can be used.[71] In this case, at present, we generally believe that applicants with proposed generics whose formulations are not Q1 and Q2 the same as Xifaxan should conduct BE studies with clinical endpoints, because we believe other methods generally would not ensure that the same amount of drug was available in the GI tract, or that the drug would have the same activity against bacteria. We also presently believe that PK BE studies should be conducted, in general, because of the information they could provide about drug release in the upper GI tract and systemic exposure.

Finally, under our current thinking, we generally disagree with the 2016 Petition that BE studies with clinical endpoints of proposed rifaximin generics must incorporate "non-inferiority margins set in accordance with non-inferiority principles" (2016 Petition at 2, 63).[72] The objective of the clinical endpoint studies described in the revised draft product-specific guidance is to establish BE, not efficacy. Generally, a non-inferiority trial has the primary objective of showing that the

---

[68] 21 CFR 320.24.

[69] *Id.*

[70] *Id.*

[71] *Id.; see also* FDA's guidance for industry on *Bioavailability and Bioequivalence for Orally Administered Drug Products – General Considerations* (Mar. 2003), available at http://www.fda.gov/ohrms/dockets/ac/03/briefing/3995B1_07_GFI-BioAvail-BioEquiv.pdf.

[72] FDA also disagrees with the 2016 Petition's claim that the non-inferiority margins recommended by the 2011 draft BE guidance are unacceptably wide when consideration is given to data from the pivotal TD studies (2016 Petition at p. 63). The 2011 draft BE guidance did not recommend non-inferiority margins.

response to an investigational product is not clinically inferior to a comparative agent.[73] For a non-inferiority trial, only a lower margin is specified and only a one-sided confidence interval is used for the analysis. By contrast, for a BE study, both an upper and lower margin are specified and two-sided confidence intervals are used for the analysis. BE is demonstrated when the entire confidence interval falls within the specified upper and lower margins. Because the purpose of a non-inferiority trial is different than the purpose of a BE study, we believe that it is inappropriate to use non-inferiority margins to demonstrate BE in a clinical endpoint study.

With regard to proposed generics that are not Q1 and Q2 the same as Xifaxan, the 2016 and 2008 Petition's request that we require BE studies with clinical endpoints is granted to the extent that we presently believe that in general certain BE studies with clinical endpoints should be conducted, while the 2016 Petition's request that we require BE studies with clinical endpoints to use non-inferiority margins set in accordance with non-inferiority principles is denied.

a. Demonstrating BE of Proposed Rifaximin Generics of the 200 mg Strength That Are Not Q1 and Q2 the Same

For a proposed generic to Xifaxan 200 mg, which is indicated for treatment of TD, the 2016 Petition argues that clinical endpoint BE studies should be done with the 200 mg strength in patients with TD, and that TLUS should be the primary endpoint (2016 Petition at 63-64). The 2008 Petition argues that the clinical endpoint BE studies should use appropriate, validated clinical endpoints and be done in patients naturally infected with TD in locations where travelers are exposed to a range of organisms similar to those encountered by patients participating in the pivotal studies described in the approved labeling for Xifaxan (2008 Petition at 1, 18-19).

Currently, we generally agree that clinical endpoint BE studies of the 200 mg strength of rifaximin should be done on a naturally-infected population. Both the 2011 draft product-specific guidance and the revised draft product-specific guidance include "affected by naturally acquired acute diarrhea" as one of the inclusion criteria for the clinical endpoint study. Artificially-induced infection poorly imitates naturally-occurring TD in the nature of the acquisition and the size of the inoculum, and it does not account for exposure to a variety of infectious pathogens. The clinical endpoint BE studies do not necessarily need to be done in the same regions of the world as the pivotal studies described in the approved labeling.

Under our current thinking, we generally do not agree with the 2016 Petition that clinical endpoint BE studies done in patients with TD should have TLUS as their primary endpoint. For the following reasons, we believe that declaration of clinical cure should be the primary endpoint and that TLUS should be a secondary endpoint. For the purpose of demonstrating BE, declaration of clinical cure is preferable to TLUS because declaration of clinical cure allows for the determination of the proportion of patients who have responded to the test product, which can then be compared (using standard BE statistical methods) to the proportion of patients who have responded to the reference product. Declaration of clinical cure is also a more accurate endpoint

[73] *See* FDA's guidance for industry on *E9 Statistical Principles for Clinical Trials* (Sept. 1998), available at http://www.fda.gov/downloads/drugs//guidances/ucm073137.pdf.

for comparing test and reference products. Clinical cure is determined objectively at the test-of-cure visit on the fifth day of the study, 48 hours after the end of antimicrobial treatment. With TLUS, a subject could be recorded as having a last unformed stool on the third day of the study, but then regress by the fifth day of the study. It is not accurate to count research subjects who regress as treatment successes.

The 2016 Petition contends that TLUS is the preferred endpoint because it measures the rate at which patients achieve symptom resolution and clinical wellness (2016 Petition at 63). This is important, the 2016 Petition argues, because certain sequelae of TD are correlated with the extent and duration of symptoms. Although most TD is self-limited, prolonged diarrhea resulting in sequelae such as dehydration with subsequent electrolyte loss or imbalance may develop if the TD persists for many days with little to no improvement in the passage of loose watery stools. The 2016 Petition suggests that using the declaration of clinical cure endpoint could result in a finding that two products are bioequivalent, even though one of the products has a faster treatment response time. We currently agree that TLUS has the advantage of characterizing response time to treatment, but under our current thinking we believe that this advantage is outweighed by the advantages of declaration of clinical cure.

With regard to a 200 mg strength proposed generic that is not Q1 and Q2 the same as Xifaxan, the 2008 Petition's request that we require clinical endpoint BE studies in patients who are naturally infected with TD is granted in part to the extent that under our current thinking we generally believe that the population of a clinical endpoint study of a 200 mg strength proposed generic that is not Q1 and Q2 the same as Xifaxan should be naturally-infected patients. However, if an applicant were to develop both the 200 mg strength and the 550 mg strength, and if there were proportional similarity of the formulations between strengths, FDA generally does not think a clinical endpoint BE study of the 200 mg strength in patients with TD should be done, if the applicant conducted a clinical endpoint BE study of the 550 mg strength in patients with IBS-D. In addition, the 2016 Petition's request that we recommend that TLUS be the primary endpoint for clinical endpoint BE studies done in patients with TD is denied for the reasons stated above.

b. Demonstrating BE of Proposed Rifaximin Generics of the 550 mg Strength That Are Not Q1 and Q2 the Same

For a proposed generic to Xifaxan 550 mg, which is indicated for the treatment of HE and IBS-D, the 2016 Petition argues that clinical endpoint BE studies should be done in patients with HE, with inclusion criteria and clinical endpoints comparable to those used for the approval of Xifaxan 550 mg for HE, or, if such studies are not done in patients with HE, in patients with IBS-D, with inclusion criteria and clinical endpoints comparable to those used for the approval of Xifaxan 550 mg for IBS-D (2016 Petition at 2).

Under our current thinking, we generally believe that the most accurate, sensitive, and reproducible method for demonstrating that a proposed generic product in the 550 mg strength that is not Q1 and Q2 the same as Xifaxan should include a clinical endpoint BE study in patients with IBS-D. Notably, compared to clinical endpoint BE study in HE patients, a clinical endpoint

BE study in IBS-D patients would include entry criteria and endpoints that contain more objective clinical response indicators. For instance, the Bristol Stool Scale (BSS) used to describe stool consistency is a validated tool used widely in GI disease studies. Subjects can accurately describe stool consistency because the BSS is pictorial with accompanying descriptions. This is a sensitive scale because changes in stool consistency on the scale represent a clinically meaningful change. Also, as part of the study, patients count the number of stools passed per day and record the data. Stool consistency and stool count are reproducible variables that can be used to inform the primary endpoint in IBS-D studies.

We currently generally disagree with the 2016 Petition that FDA should require that such a study use inclusion criteria and clinical endpoints comparable to those used for the approval of Xifaxan to treat IBS-D. Applicants should conduct a study that is accurate, sensitive, and reproducible for demonstrating BE, consistent with our regulations. We generally believe at present that such a study could be in a different population and could have a different design from the pivotal safety and efficacy studies conducted to support approval of an RLD. The purpose of the pivotal clinical studies to support an NDA approval is to establish safety and efficacy of the RLD. The objective of a BE study is different. A BE study evaluates whether the test product is BE to the RLD. The pivotal NDA studies that form the basis for the approvals of Xifaxan can serve as models for a BE study, but certain differences may be appropriate to ensure an accurate, sensitive, and reproducible study design. To give one notable example, while the pivotal clinical trials for Xifaxan compared the RLD to a placebo, we currently believe that, in general, a clinical endpoint BE study for rifaximin should be a three-arm study comparing the test product, the RLD, and a placebo.

Under our current thinking, we do not think, in general, that clinical endpoint BE studies should be done in patients with HE. We believe that such studies are unlikely to be part of the most accurate, sensitive, and reproducible method for demonstrating BE for a number of reasons. Recruitment of a sufficient number of HE patients for a BE study would be problematic because of the subjective nature of the clinical indicators and scales used to evaluate the stages of the condition. In addition, methods for evaluating changes in HE patients' neurological status (e.g., the West Haven Criteria (also known as the Conn score)) are typically imprecise (not quantitative), lacking in validation, and ultimately subject to clinical judgment. It is also difficult to test whether two products given to two research subjects with HE are bioequivalent because the products' effects depend on each person's degree of encephalopathy. Due to both the nature of the disease and the low specificity of psychometric instruments used to identify relapse of HE, we currently do not believe that a clinical endpoint study in HE would be adequately sensitive to detect differences between a proposed generic rifaximin product and Xifaxan.

With regard to a 550 mg strength generic that is not Q1 and Q2 the same as Xifaxan, the 2016 Petition's request that we require BE studies with clinical endpoints in patients with IBS-D is granted to the extent that we presently believe that such a study should generally be conducted. The 2016 Petition's request that FDA refuse to approve an application for a generic drug product that refers to Xifaxan as the RLD unless the applicants conducted BE studies with clinical endpoints in patients with HE is denied, as are the requests that FDA refuse to approve an application for a generic drug product that refers to Xifaxan as the RLD unless BE studies with

clinical endpoints in patients with HE or IBS-D use the same inclusion criteria and clinical endpoints as those used for the approval of Xifaxan for HE or IBS-D treatment.

### III. Request for a Public Process for Bioequivalence Guidance, Including Presentation at Advisory Committee Meetings

The 2008 Petition asks that if FDA "considers providing [BE] guidance suggesting that [FDA] would be willing to accept and approve an ANDA based on [BE] data other than" that set forth in the 2008 Petition, that the Agency, before doing so, initiate a public process through which interested persons may present their views, including presentation of the matter to the Advisory Committee for Pharmaceutical Science and to the Advisory Committee for Gastrointestinal Drugs and/or the Antimicrobial Drugs Advisory Committee (2008 Petition at 2, 24-25).

As an initial matter, we note that product-specific guidances are issued in accordance with FDA's good guidance practices, which are designed to give stakeholders and the public an opportunity to participate in the process through which the Agency announces its current thinking on various matters.[74] Thus, by issuing a revised draft product-specific guidance for rifaximin, FDA is providing stakeholders a process to present their views on BE and related matters for generic rifaximin products.

At this time, however, FDA does not think it necessary to present matters raised in the Petitions to an advisory committee. In most instances, FDA has discretion to determine whether to refer a matter to an advisory committee.[75] The Agency considers the following three questions when exercising this discretion:

(1) Is the matter at issue of such significant public interest that it would be highly beneficial to obtain the advice of an advisory committee as part of the Agency's regulatory decision-making process?
(2) Is the matter at issue so controversial that it would be highly beneficial to obtain the advice of an advisory committee as part of the Agency's regulatory process?
(3) Is there a special type of expertise that an advisory committee could provide that is needed for the Agency to fully consider the matter?

FDA advisory committees provide independent expert advice to the Agency, and committee meetings facilitate public discussion of important scientific, technical, and policy issues. However, advisory committee meetings demand significant time and resource commitments from committee members, stakeholders, and the Agency itself. FDA must prioritize the matters it refers to advisory committees to help ensure that the finite resources of the advisory committee program are devoted to the consideration of those matters in which FDA would benefit most from the advice of outside experts.

---

[74] *See* 21 CFR 10.115.

[75] In some circumstances, the FD&C Act calls for FDA to refer matters to advisory committees for recommendations. *See, e.g.,* 21 U.S.C. §§ 353a(c)(1) and 355a(i)(2)(A)(ii).

At this time, we believe FDA's Center for Drug Evaluation and Research (CDER) has adequate information and sufficient past experience to develop BE recommendations for generic rifaximin tablets and to help ensure the therapeutic equivalence of generic rifaximin tablet products without presenting this matter to an advisory committee. Furthermore, the Petitions fail to identify any issues related to rifaximin BE that are sufficiently controversial or scientifically novel to warrant input from an advisory committee at this time, and, as noted above, the public will have the opportunity to comment on the revised draft product-specific guidance.

The 2008 Petition's request that FDA seek input from an advisory committee on our product-specific BE recommendations for Xifaxan is therefore denied. With respect to the 2008 Petition's request to initiate a public process through which interested persons may present their views, we note that anyone can comment on any guidance at any time.[76]

## IV. Request for Revision of the *Draft Guidance on Rifaximin (200 mg)* and the *Draft Guidance on Rifaximin* (550 mg)

The 2016 Petition requests that FDA revise the 2011 and 2012 draft BE guidances to incorporate the criteria listed in the Petition, at a minimum. For the reasons stated above, this request is granted in part and denied in part.

## V. Conclusion

We have reviewed the 2016 and 2008 Petitions and other relevant information available to us. For the reasons discussed above, the Petitions are granted in part and denied in part.

Sincerely,

for

Janet Woodcock, M.D.
Director
Center for Drug Evaluation and Research

[76] *See* 21 CFR 10.115(g)(5).

statutory schemes to a single group of applications with a common RLD could result in conflict between the MMA and pre-MMA provisions. The eligibility, triggering, and forfeiture features of the different 180-day exclusivity schemes could render one applicant ineligible for exclusivity while another applicant could retain its eligibility. To avoid these inequitable outcomes, all ANDAs submitted referencing the same RLD will be subject to one statutory scheme.

## B. First Applicants

### Q2. How does an ANDA applicant qualify as a "first applicant"?

A *first applicant* is an ANDA "applicant that, on the first day on which a substantially complete application containing a [paragraph IV] certification … is submitted for approval of a drug, submits a substantially complete application that contains and lawfully maintains a [paragraph IV] certification … for the drug."[23]

An applicant that previously submitted a substantially complete ANDA that did not contain a paragraph IV certification may become eligible for 180-day exclusivity by amending its ANDA to contain a paragraph IV certification to a listed patent for the RLD on the first day that an ANDA or amendment containing a paragraph IV certification is submitted.

The listed patent or patents to which an ANDA applicant submitted a paragraph IV certification that gives rise to the eligibility for 180-day exclusivity is referred to in this draft guidance as the *qualifying patent(s)*.

### Q3. What constitutes a substantially complete application?

A *substantially complete application* is an ANDA that on its face is sufficiently complete to permit a substantive review. Sufficiently complete means that the ANDA contains all the information required under section 505(j)(2)(A) of the FD&C Act and does not contain a deficiency described in 21 CFR 314.101(d) and (e).[24] FDA indicates its determination that an ANDA is substantially complete when the Agency *receives* the ANDA for review under 21 CFR 314.101. If FDA determines, after an initial evaluation, that an ANDA was substantially complete as of the date it was submitted to FDA, FDA will consider the ANDA to have been received as of the date of submission.[25]

### Q4. Does an ANDA applicant have to be the first to submit a paragraph IV certification to all of the RLD's listed patents to be a first applicant?

No. The statute requires "a" paragraph IV certification;[26] it does not require a first applicant to be the first to submit a paragraph IV certification to more than a single patent (or all of the patents), even if multiple patents are listed for the RLD.

[23] Section 505(j)(5)(B)(iv)(II)(bb) of the FD&C Act; see also 21 CFR 314.3(b).
[24] 21 CFR 314.3(b); see also section 505(j)(5)(B)(iv)(II)(cc) of the FD&C Act.
[25] 21 CFR 314.101(b)(2).
[26] Section 505(j)(5)(B)(iv)(II)(bb) of the FD&C Act.

There can be multiple patents that could qualify a single ANDA applicant as a first applicant, so long as they are certified to on that same first day that the first paragraph IV certification in an ANDA for that RLD is submitted. As a result, each qualifying patent separately can affect exclusivity. For example, if an ANDA applicant submitted paragraph IV certifications to two separate patents on the same first day and the first patent expires prior to triggering of 180-day exclusivity, the paragraph IV certification to the second patent can remain a basis for first-applicant status and for 180-day exclusivity.

**Q5. Can an ANDA applicant qualify as a first applicant when it includes both a paragraph IV certification and a section viii statement to a single listed patent?**

Yes. FDA has determined that when both drug product or drug substance claims and method-of-use claims are contained within the same patent, an applicant may file a paragraph IV certification with respect to the drug product or drug substance patent claim(s) and a section viii statement with respect to the method-of-use claim(s) in the patent. This type of certification is commonly referred to as a *split certification*. This approach preserves the NDA holder's statutory right to assert its patent rights regarding the drug substance or drug product claims before ANDA approval while permitting the ANDA applicant to exercise its statutory right to avoid infringing a method-of-use claim by seeking approval for fewer than all of the approved conditions of use for the RLD. Consistent with this principle, the paragraph IV certification in a split certification can qualify an applicant for first applicant eligibility.

**Q6. Can an ANDA applicant be a first applicant if the applicant includes a paragraph III certification to a patent that expires after the patent to which a paragraph IV certification was submitted?**

Yes. The statutory definition of "first applicant" requires "a" paragraph IV certification. The statute does not require that the paragraph IV certification be to the latest expiring patent. For example, a first applicant could have a paragraph IV certification to a patent expiring on January 1, 2020 (the only qualifying patent) and a paragraph III certification to a patent expiring on June 1, 2030.

**Q7. Could the timing of sending notice of paragraph IV certification affect first applicant status?**

Yes. For original ANDAs, notice of paragraph IV certification must be provided on or after the date on which the applicant receives a paragraph IV acknowledgment letter from FDA, but not later than 20 days after the date of the postmark on the paragraph IV acknowledgment letter.[27] The paragraph IV acknowledgment letter is a written, postmarked communication from FDA to an applicant stating that the Agency has determined that an ANDA containing a paragraph IV certification is sufficiently complete to permit a substantive review and has been received for

[27] 21 CFR 314.95(b)(1).

review.[28] Any notice sent before the ANDA applicant's receipt of a paragraph IV acknowledgment letter is invalid.[29]

For amendments containing a paragraph IV certification submitted before the ANDA has been received for review (i.e., before receipt of a paragraph IV acknowledgment letter), the ANDA applicant must send notice according to the timeframe described above for original ANDAs. If an ANDA applicant's notice of its paragraph IV certification is timely provided and the applicant has not submitted a previous paragraph IV certification, FDA will base its determination of whether the ANDA applicant is a first applicant on the date of submission of the amendment containing the paragraph IV certification.[30]

For amendments submitted after the ANDA has been received for review (i.e., after receipt of an acknowledgment letter or a paragraph IV acknowledgment letter) and supplements, notice of paragraph IV certification must be provided at the same time that the amendment or supplement is submitted to FDA. If notice is not sent simultaneously with an amendment or supplement, FDA considers the paragraph IV certification not to be effective until notice is provided.[31] For example, if an ANDA applicant submitted a supplement containing a paragraph IV certification, but notice of the paragraph IV certification was not provided until 30 days after the submission of the supplement, FDA would evaluate whether the applicant was a first applicant based on the date notice was provided, rather than the date of submission of the supplement. Thus, a delay in giving notice of certain amendments or supplements could mean a later date for the paragraph IV certification to become effective which could result in failure to obtain first applicant status (if another applicant submits a certification that becomes effective in the interim).

Regardless of whether it is an original ANDA, an amendment, or a supplement, a paragraph IV certification must not be submitted earlier than the first working day after the day the patent is published in the Orange Book.[32] Any notice sent before the first working day after the day the patent is published in the Orange Book is invalid.[33]

### Q8. What does it mean to "lawfully maintain" a paragraph IV certification?

The definition of first applicant requires that the applicant "lawfully maintain[] a [paragraph IV] certification."[34] This requires an uninterrupted paragraph IV certification to the qualifying patent or patent claim. For example, an applicant has not lawfully maintained its paragraph IV certification if the applicant initially submits a paragraph IV certification to a patent or patent claim, and then later amends its ANDA to include a paragraph III certification or a section viii statement to the qualifying patent or patent claim, and then amends its ANDA again to include a paragraph IV certification to the same patent or patent claim. However, if the applicant initially submits a paragraph IV certification to a qualifying patent or patent claim and subsequently

---

[28] See 21 CFR 314.3(b).
[29] 21 CFR 314.95(b)(2).
[30] 21 CFR 314.95(d)(2). See also 21 CFR 314.94(a)(12)(viii)(C)(*1*)(*ii*).
[31] Cf. *Purepac Pharmaceutical Co. v. Thompson*, 354 F. 3d 877 (D.C. Cir. 2004).
[32] See 21 CFR 314.94(a)(12)(viii)(C)(*1*)(*ii*).
[33] See 21 CFR 314.95(b)(2).
[34] Section 505(j)(5)(B)(iv)(II)(bb) of the FD&C Act and 21 CFR 314.3(b).

submits an amendment that contains a paragraph IV certification to the same qualifying patent or patent claim (and notice of the paragraph IV certification is sent in accordance with 21 CFR 314.95(d)), the first applicant has lawfully maintained the paragraph IV certification to the patent or patent claim upon which eligibility for 180-day exclusivity is based.[35]

In addition, if a district court decides that the qualifying patent has been infringed (and the patent is valid), and the judgment of the district court is not appealed or is affirmed, the ANDA applicant's paragraph IV certification that the patent was invalid, unenforceable, or not infringed is no longer accurate. The applicant would be required to amend its ANDA to change its paragraph IV certification to a paragraph III certification, which acknowledges the date the patent expires.[36]

**Q9. Can there be more than one first applicant for a single drug product?**

Yes. The 180-day exclusivity provisions contemplate that there can be multiple first applicants.[37] Multiple ANDAs that include paragraph IV certifications to one or more patents listed for an RLD often will be submitted to FDA on the day the first such application (or the first paragraph IV certification) is submitted. If multiple applicants submit paragraph IV certifications on the first day that paragraph IV certifications for that RLD are submitted, all will be considered first applicants. In addition, different ANDA applicants each can qualify as first applicants by certifying to different listed patents on the same first day.

**Q10. Do multiple first applicants for a single drug product each get their own 180-day exclusivity period?**

No. There is one 180-day exclusivity period for each drug product. Accordingly, whether multiple first applicants enjoy the full 180-day exclusivity period depends on when those ANDAs are approved in relation to when the 180-day exclusivity period is triggered.[38]

**Q11. Can there be different first applicants for different strengths of a drug product?**

Yes. Separate 180-day exclusivity periods are available for each strength of the same drug product, because each strength is a distinct drug product. Thus, it is possible for there to be different first applicants for different strengths of the RLD. For example, assume ANDA A applicant submitted the first substantially complete application that contained a paragraph IV certification for a 30 mg strength RLD and lawfully maintained that certification. A few days later, ANDA B applicant submitted its ANDA containing a paragraph IV certification for the 30 mg strength RLD. The Agency then approves a 60 mg strength RLD, and lists a patent in the Orange Book submitted by the NDA holder for that strength. ANDA B applicant amends its ANDA to include the 60 mg strength and includes the first paragraph IV certification to the patent listed for the 60 mg strength and lawfully maintains that certification. ANDA A applicant

---

[35] 81 FR 69580, 69617 (Oct. 6, 2016).

[36] See 21 CFR 314.94(a)(12)(viii)(A).

[37] See, e.g., section 505(j)(5)(D)(iii) of the FD&C Act (refers to "first applicants").

[38] See Question 17 below.

similarly amends its ANDA to include the 60 mg strength, but three days later. In these circumstances, ANDA A applicant is the first applicant for the 30 mg strength, and ANDA B applicant is the first applicant for the 60 mg strength.

C. 180-day Exclusivity and Patents

**Q12. Does an ANDA applicant need to win its patent litigation to be considered a first applicant that retains eligibility for 180-day exclusivity?**

No. An applicant potentially may retain eligibility for 180-day exclusivity even if it is not sued as a result of its qualifying paragraph IV certification or, if sued, the case is resolved, for example, through settlement that allows the applicant to enter the market before the patent expires.[39]

**Q13. Can a patent that an NDA holder requests to remove from the Orange Book still give rise to 180-day exclusivity?**

Yes. An NDA holder can request that FDA remove a patent from the Orange Book in certain circumstances: for example, if a court declared the patent invalid. However, if an NDA holder requests that a patent be removed from the Orange Book and one or more first applicants are already eligible for 180-day exclusivity based on a paragraph IV certification to that patent, FDA will not remove the patent until any 180-day exclusivity stemming from the listed patent has expired, or has been extinguished or relinquished.[40] Until the patent is removed from the Orange Book—after any associated 180-day exclusivity has expired or has been extinguished or relinquished—ANDA applicants must submit or maintain appropriate certifications to the patent notwithstanding the NDA holder's request to remove the patent. This practice ensures that NDA holders cannot unilaterally extinguish an ANDA applicant's eligibility for 180-day exclusivity by requesting removal of the patent from the Orange Book prior to ANDA approval.[41] In such circumstances, FDA will indicate in the Orange Book that the NDA holder has requested removal of the patent.[42]

**Q14. Does an ANDA applicant retain 180-day exclusivity after the qualifying patent expires?**

No. In keeping with the statutory language and purpose of 180-day exclusivity, FDA has construed the statute such that 180-day exclusivity attaches based only on paragraph IV certifications to unexpired patents. A paragraph IV certification does not survive the expiry of a listed patent. Upon patent expiry, the statute and FDA's regulations require ANDA applicants to

---

[39] Cf. *Mova Pharms. Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998).

[40] See 21 CFR 314.94(a)(12)(viii)(B); see also discussion in sections E and F of this guidance.

[41] See *Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303 (D.C. Cir. 2010); see also 21 CFR 314.53(f)(2)(i).

[42] See FDA's website on *Orange Book Data Files*, at http://www.fda.gov/drugs/informationondrugs/ucm129689.htm (describing use of the *patent delist request flag* as indicating that the "[s]ponsor has requested [that the] patent be delisted [but the] patent has remained listed because, under [s]ection 505(j)(5)(D)(i) of the [FD&C] Act, a first applicant may retain eligibility for 180-day exclusivity based on a paragraph IV certification to this patent for a certain period").

amend their certifications from a paragraph IV certification to a paragraph II certification, which states that the patent has expired.[43] If an applicant neglects to amend its certification to a paragraph II certification after a patent expires, FDA will construe the application as including a paragraph II certification.[44] As noted above, applications with only paragraph II certifications are eligible for immediate effective approval.[45] Therefore, once the only qualifying patent expires, there are no longer any ANDAs blocked by 180-day exclusivity.

This interpretation of the statute effectuates the goals of the Hatch-Waxman Amendments. The 180-day exclusivity provisions were drafted to give ANDA applicants an incentive to be the first to challenge a listed patent, potentially removing that patent as a barrier to approval. Once a listed patent expires and is no longer a barrier to ANDA approval, there is no longer a need to provide an incentive to challenge it in court. Thus, an expired patent does not serve as the basis for a 180-day exclusivity award, and 180-day exclusivity does not extend beyond the life of the patent.

D. 180-day Exclusivity Trigger and Scope of 180-Day Exclusivity

**Q15. How is 180-day exclusivity triggered?**

The FD&C Act provides that the 180-day exclusivity period is triggered by "first commercial marketing of the drug (including the commercial marketing of the listed drug) by any first applicant."[46] FDA has interpreted the statutory phrase "including the commercial marketing of the listed drug" to provide that exclusivity can be triggered by the marketing of an authorized generic[47] by a first applicant, even if that first applicant's ANDA has not yet been approved.

Concluding that 180-day exclusivity is triggered upon the first applicant's commercial marketing of an authorized generic or the RLD prevents potential subversion of the statutory scheme through collusion between NDA holders and first applicants. If 180-day exclusivity were triggered only by commercially marketing the first applicant's ANDA product, a first applicant that struck a deal with the NDA holder to commercially market the authorized generic or RLD

---

[43] Section 505(j)(2)(A)(vii)(II), (IV); 21 CFR 314.94(a)(12)(viii)(C)*(1)(i)* ("An applicant must amend a submitted certification or statement if, at any time before the date of approval of the ANDA, the applicant learns that the submitted certification or statement is no longer accurate").

[44] 81 FR 69580, 69615 (Oct. 6, 2016).

[45] Section 505(j)(2)(A)(vii)(II); (j)(5)(B)(i) (when an applicant submits only a paragraph II certification, approval of the applicant's ANDA "may be made effective immediately"); 21 CFR 314.94(a)(12)(viii).

[46] Section 505(j)(5)(B)(iv)(I) of the FD&C Act; see also 21 CFR 314.3(b) ("*Commercial marketing* is the introduction or delivery for introduction into interstate commerce of a drug product described in an ANDA, outside the control of the ANDA applicant, except that the term does not include transfer of the drug product for investigational use under part 312 of this chapter or transfer of the drug product to parties identified in the ANDA for reasons other than sale. Commercial marketing includes the introduction or delivery for introduction into interstate commerce of the reference listed drug by the ANDA applicant.").

[47] Section 505(t)(3) of the FD&C Act defines an authorized generic as "a listed drug (as that term is used in subsection (j)) that: (A) has been approved under subsection (c); and (B) is marketed, sold, or distributed directly or indirectly to retail class of trade under a different labeling, packaging (other than repackaging as the listed drug in blister packs, unit doses, or similar packaging for use in institutions), product code, labeler code, trade name, or trade mark than the listed drug." See also 21 CFR 314.3(b).

instead of marketing the product described in its ANDA potentially could block approval of subsequent ANDAs until patent expiration.

**Q16. Once triggered, can 180-day exclusivity be suspended or postponed?**

Once triggered, the 180-day period runs without interruption.

**Q17. How does the trigger of the 180-day exclusivity period by one first applicant affect other first applicants?**

The effect of one first applicant's trigger of the 180-day exclusivity period on other first applicants flows from the fact that there is only one exclusivity period available for each drug product (see Question 10 above). Any first applicant's trigger of the exclusivity period triggers the 180-day exclusivity period for all first applicants for that drug product and exclusivity for all first applicants ends 180 days after the initial trigger. Other first applicants will benefit from exclusivity only to the extent they commercially market during this exclusivity period. The following examples illustrate how shared 180-day exclusivity might operate. Assume ANDA A, ANDA B, and ANDA C all qualified as first applicants.

- If all three ANDAs are approved on the same day, and if all three first commercially market that same day, triggering the exclusivity period, all three applicants benefit from the full 180-day exclusivity period.
- If all three ANDAs are approved on the same day, but only ANDA A is commercially marketed on that first day triggering the exclusivity period, it is triggered for all three ANDAs. Thus, if ANDA B is not commercially marketed until day 30, that applicant will benefit from exclusivity only for the remainder of the 180-day period (i.e., 150 days). If ANDA C is not commercially marketed until day 179, it will benefit from only one day of exclusivity.
- If one or more ANDAs are approved on the same day, but one or more applicants first commercially market the drug product 60 days after approval, the 180-day exclusivity period is triggered upon commercial marketing and runs for 180 days.

**Q18. Does 180-day exclusivity block approval of all ANDAs that reference the same RLD?**

No. 180-day exclusivity blocks only the approval of subsequent ANDAs that also contain a paragraph IV certification.[48] There are several examples in which 180-day exclusivity does not block approval of another ANDA referencing the same RLD:

- If an ANDA was approved before the NDA holder submitted a patent that provides the basis for first applicant status for a pending ANDA, any related 180-day exclusivity would not affect the previously approved ANDA.

[48] See section 505(j)(5)(B)(iv)(I) of the FD&C Act.

FD&C Act[70] such that the time it took FDA to respond to the 505(q) petition prevented approval within 30 months from the date of submission, the 30-month deadline for obtaining a tentative or final approval will be extended by the amount of time the 505(q) petition was under review.

Second, section 1133(a) of FDASIA extended the 30-month period for certain ANDAs. Under FDA's interpretation of these provisions, for applications submitted between January 9, 2010, and July 9, 2012, containing a paragraph IV certification (or amended to first contain a paragraph IV certification during that period of time), and approved or tentatively approved during the period of time beginning on July 9, 2012, and ending on September 30, 2015, section 1133(a) of FDASIA extended this period to 40 months. For applications submitted between January 9, 2010, and July 9, 2012 (or amended to first contain a paragraph IV certification during that period of time), and approved or tentatively approved during the period of time beginning on October 1, 2015, and ending on September 30, 2016, section 1133(a) of FDASIA extended this period to 36 months. In addition, if an application was submitted between January 9, 2010, and July 9, 2012 containing a paragraph IV certification (or amended to first contain a paragraph IV certification during that period of time), and FDA had not approved or tentatively approved the application but must consider whether the applicant had forfeited exclusivity because a potentially blocked application is ready for approval, FDA applied the 36-month period if it made the forfeiture determination between the period of time beginning on October 1, 2015, and ending on September 30, 2016. For all other applications, the 30-month period set forth in section 505(j)(5)(D)(i)(IV) of the FD&C Act applies.

**Q33. Does the "failure to obtain tentative approval" forfeiture provision apply to circumstances in which the first applicant was not eligible for tentative approval but failed to obtain final approval by the 30-month forfeiture date?**

Yes. Unless the 30-month period is extended for one of the reasons described above,[71] a first applicant that fails to obtain either tentative approval or final approval of its ANDA by the 30-month forfeiture date generally will forfeit eligibility for 180-day exclusivity. Viewed in isolation, the phrase *tentative approval* in section 505(j)(5)(D)(i)(IV) of the FD&C Act might suggest that this section applies only when an ANDA is eligible for a tentative approval due to a patent, 30-month stay, or exclusivity blocking final approval. Such a reading of the statute would result in incongruous circumstances in which first applicants that are eligible for tentative approval can forfeit under this provision, but first applicants that only are eligible for final approval (and arguably closer to marketing) cannot forfeit under this provision. Other references to this forfeiture provision in the statute make clear that the provision has a broader scope. For example, section 505(q)(1)(G) of the FD&C Act expressly states that if "approval" of the first applicant's application was delayed because of a petition, the 30-month period described in section 505(j)(5)(D)(i)(IV) of the FD&C Act will be extended. In light of this language, FDA has concluded that section 505(j)(5)(D)(i)(IV) establishes a 30-month period within which a first applicant generally must obtain either tentative approval or final approval of its ANDA. This interpretation squares both with the statutory language and with the statutory purpose of

[70] In general, section 505(q) of the FD&C Act pertains, in relevant part, to petitions that request an action that could delay approval of a pending ANDA or 505(b)(2) application.

[71] See Question 32.

preventing first applicants' ANDAs that do not meet the substantive requirements for approval from delaying approval of subsequent applicants' ANDAs.

**Q34. How does a first applicant qualify for the exception in the "failure to obtain tentative approval" forfeiture provision?**

To qualify for the exception to this forfeiture provision, the failure to obtain tentative or final approval must be "caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed."[72] In other words, two conditions must both be met: (1) FDA changed or reviewed (i.e., considered whether to change) the requirements for approval while the application was under review and (2) this change in, or review of, approval requirements was a cause of the failure to obtain tentative approval or final approval by the 30-month forfeiture date. However, FDA has determined that "but-for" causation is not required to qualify for this exception. In other words, if one of the causes of failure to obtain tentative or final approval by the 30-month forfeiture date was a change in or review of the requirements for approval imposed after the application was filed, an applicant will not forfeit eligibility for exclusivity notwithstanding that there may have been other causes for failure to obtain tentative approval or final approval by the 30-month forfeiture date. Consequently, to qualify for the exception, the record must show that acceptability of at least one aspect of the ANDA (e.g., bioequivalence) was delayed and, irrespective of what other review issues may have been outstanding at the 30-month date, that this delay was caused, at least in part, by a change in, or review of, the requirements for approval. FDA has determined that this interpretation of the statute best effectuates the policy underlying the exception. It does not penalize applicants for FDA's reviews of, or changes in, approval requirements imposed on applicants after their ANDAs are filed that are a cause of the failure to obtain final approval or tentative approval within 30 months. This interpretation also continues to incentivize ANDA applicants to challenge patents by preserving in many instances the opportunity to obtain 180-day exclusivity.

**Q35. Can a first applicant qualify for the exception if, at the 30-month forfeiture date, FDA is reviewing an ANDA amendment submitted to address a change in the requirements for approval?**

Yes. FDA generally will presume that failure to obtain tentative approval or final approval was caused by a change in, or review of, approval requirements if, at the 30 month date, the evidence demonstrates that there was a change in, or review of, the requirements for approval and that the applicant was actively addressing issues related to the change in, or review of, approval requirements (or FDA was considering such efforts), and these efforts precluded tentative approval or final approval at that time. When the evidence fails to demonstrate that the applicant was actively addressing the change in, or review of, approval requirements, and that these activities precluded tentative approval or final approval at the 30-month date, FDA generally does not presume that the failure was caused by a change in, or review of, approval requirements. If FDA were to hold otherwise, an applicant that receives one or more deficiencies resulting from a change in approval requirements could avoid forfeiture by a delay

[72] Section 505(j)(5)(D)(i)(IV) of the FD&C Act.

in addressing those deficiencies. When evaluating causation for purposes of determining forfeiture under this provision, FDA will take into account how close the change in or review of the requirement for approval occurred to the 30-month date as well as the amount of effort needed to respond to the change. Further, if the applicant's response is submitted after the 30-month date, FDA will consider, among other factors, how close the response is submitted to the 30-month date.

**Q36. Does the exception to the "failure to obtain tentative approval" forfeiture provision apply if FDA's review of an ANDA takes longer than 30 months in the absence of a change in or review of the approval requirements?**

No. Under this forfeiture provision, exclusivity is forfeited "unless" there is a review of or change in the approval requirements that has delayed final approval or tentative approval of the ANDA. The statute does not permit FDA to consider an exception based on whether the application could have received tentative approval or final approval before the 30-month forfeiture date had FDA's review been conducted differently. Section 1133 of FDASIA (referenced in Question 32), which, among other things, extended the 30-month forfeiture period to 40 months for certain ANDAs and to 36 months for certain other ANDAs, reflects Congress's understanding that, even in the absence of a change in or review of the requirements for approval, FDA's review of an ANDA might take more than 30 months and might contribute to a first applicant's failure to obtain tentative approval or final approval by the 30-month forfeiture date and result in forfeiture of exclusivity.

**Q37. What are examples of changes in the requirements for approval that formed the basis of an exception to the "failure to obtain tentative approval" forfeiture provision?**

The following are examples of changes in the requirements for approval imposed after ANDA submission that FDA has determined were a cause of failure to obtain tentative or final approval in 30 months and therefore formed the basis of an exception to this forfeiture provision:

- FDA's change in approval requirements related to drug quality that required an applicant to conduct additional testing and include an additional new drug substance specification;
- FDA's change in approval requirements for demonstrating bioequivalence for a drug product;
- Changes in the RLD labeling that required changes in the ANDA applicant's generic drug labeling;
- Changes in an RLD's formulation that required an ANDA applicant to respond (for example, by seeking approval for a change in formulation); and
- The publication in the *United States Pharmacopeia-National Formulary* of a final monograph for a drug product making it necessary for applicants to demonstrate compliance with the new compendial standards.[73]

[73] This list is intended to be illustrative and not exhaustive.

United States. Pursuant to these agreements, Salix Pharmaceuticals, Inc. is the sole distributor in the United States of Xifaxan® tablets.

**CLAIMS FOR RELIEF – PATENT INFRINGEMENT**

45. By a letter dated February 14, 2020 (the "Norwich Notice Letter"), Alvogen, as the regulatory agent for Norwich, advised Plaintiffs that Norwich had submitted ANDA No. 214369 to the FDA seeking approval to manufacture, use, or sell Norwich's ANDA Product prior to the expiration of the Xifaxan® patents.

46. On information and belief, Defendants, acting jointly, submitted ANDA No. 214369 to the FDA under § 505(j) of the Federal Food, Drug, and Cosmetic Act, seeking approval to engage in the commercial manufacture, use, and sale of Norwich's ANDA Product as a generic version of Xifaxan® 550 mg tablets.

47. On information and belief, ANDA No. 214369 seeks FDA approval of Norwich's ANDA Product for the indications of reduction in risk of overt hepatic encephalopathy (HE) recurrence in adults and treatment of irritable bowel syndrome with diarrhea (IBS-D) in adults.

48. The Norwich Notice Letter also advised Plaintiffs that Defendants' ANDA submission included certifications under 21 U.S.C. § 355(j)(2)(B)(iv)(II) that, in Defendants' opinion, certain claims of the Xifaxan® patents are invalid, unenforceable, and/or not infringed.

49. The Norwich Notice Letter does not allege non-infringement of certain claims of the '199, '206, '452, and '231 patents. By not identifying non-infringement defenses for certain claims of the '199, '206, '452, and '231 patents in the Norwich Notice Letter, Defendants admit Norwich's ANDA Product meets all limitations of those claims.

50. The Norwich Notice Letter does not allege invalidity or unenforceability of certain claims of the '620 patent. By not identifying invalidity and unenforceability defenses for

certain claims of the ’620 patent in the Norwich Notice Letter, Defendants admit those claims of the ’620 patent are valid and enforceable.

51. There is an actual, real, immediate, and justiciable controversy between Plaintiffs and Defendants regarding the infringement, validity, and enforceability of the Xifaxan® patents.

**COUNT I**
**Infringement of the ’620 Patent**

52. Plaintiffs incorporate each of the preceding paragraphs 1 to 51 as if fully set forth herein.

53. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich’s ANDA Product throughout the United States, including Delaware, prior to expiration of the ’620 patent, Defendants committed an act of infringement of the ’620 patent under 35 U.S.C. § 271(e)(2)(A).

54. The ’620 patent claims, *inter alia*, crystalline forms of rifaximin and processes for the production of crystalline forms of rifaximin.

55. Defendants’ manufacture, use, sale, offer for sale, or importation into the United States of Norwich’s ANDA Product prior to the expiration of the ’620 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the ’620 patent under 35 U.S.C. §§ 271(a), (b), (c), and/or (g).

56. On information and belief, Defendants were aware of the existence of the ’620 patent and its listing in the Orange Book as demonstrated by Defendants’ reference to the ’620 patent in the Norwich Notice Letter.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SALIX PHARMACEUTICALS, LTD.; SALIX PHARMACEUTICALS, INC.; BAUSCH HEALTH IRELAND LTD.; ALFASIGMA S.P.A.,

Plaintiffs,

v.

NORWICH PHARMACEUTICALS, INC.,

Defendant.

C.A. No. 20-430 (RGA)

**FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiffs Salix Pharmaceuticals, Ltd. and Salix Pharmaceuticals, Inc. (collectively, "Salix"), Bausch Health Ireland Ltd. ("Bausch"), and Alfasigma S.p.A. ("Alfasigma") (collectively, "Plaintiffs") for their First Amended Complaint against Defendant Norwich Pharmaceuticals, Inc. ("Norwich" or "Defendant"), hereby allege as follows:

**THE PARTIES**

1. Plaintiff Salix Pharmaceuticals, Ltd. is a corporation organized and existing under the laws of Delaware having its principal place of business at 400 Somerset Corporate Blvd., Bridgewater, New Jersey 08807.

2. Plaintiff Salix Pharmaceuticals, Inc. is a corporation organized and existing under the laws of California having its principal place of business at 400 Somerset Blvd., Bridgewater, New Jersey 08807.

3. Plaintiff Bausch is a company organized and existing under the laws of Ireland having an office at 3013 Lake Drive, Citywest Business Campus, Dublin 24, Ireland.

4. Plaintiff Alfasigma is a corporation organized and existing under the laws of Italy having a principal place of business at Via Ragazzi del '99, 5 Bologna, Italy.

5. On information and belief, Norwich is a corporation organized and existing under the laws of Delaware, having a principal place of business at 6826 Highway 12, Norwich, New York 13815.

6. On information and belief, Norwich is in the business of, among other things, manufacturing and packaging pharmaceutical products that it distributes in the State of Delaware and throughout the United States.

7. On information and belief, Alvogen PB Research and Development LLC ("Alvogen") is the regulatory agent for Norwich. According to Alvogen's website, Norwich is a subsidiary of Alvogen that provides, *inter alia*, manufacturing and packaging services. (Exhibit A [screen printout of https://alvogen.com/what-we-do)]).

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

9. This Court has personal jurisdiction over the Defendant by virtue of the fact that, *inter alia*, it has committed the tortious act of patent infringement pursuant to 35 U.S.C. § 271(e)(2)(A) that has led to foreseeable harm and injury to Plaintiffs in the State of Delaware and throughout the United States.

10. This Court also has personal jurisdiction over Norwich by virtue of the fact that Norwich is at home in Delaware as reflected by the fact that it is incorporated in Delaware, regularly does or solicits business in Delaware, engages in other persistent courses of conduct in Delaware, and/or derives substantial revenue from services or things used or consumed in

Delaware, including by distributing its pharmaceutical products in Delaware and, therefore, can reasonably expect to be subject to jurisdiction in the Delaware courts. Among other things, on information and belief, Norwich conducts marketing and sales activities in the State of Delaware, including, but not limited to, distribution, marketing, and/or sales of pharmaceutical products to Delaware residents that are continuous and systematic.

11. Venue is proper in this Judicial District pursuant to 28 U.S.C. §§ 1391 and 1400(b).

## NATURE OF THE ACTION

12. This is an action for infringement of United States Patent Nos. 7,045,620 (the "'620 patent"); 7,612,199 (the "'199 patent"); 7,902,206 (the "'206 patent"); 7,906,542 (the "'542 patent"); 7,915,275 (the "'275 patent"); 8,158,644 (the "'644 patent"); 8,158,781 (the "'781 patent"); 8,193,196 (the "'196 patent"); 8,309,569 (the "'569 patent"); 8,518,949 (the "'949 patent"); 8,642,573 (the "'573 patent"); 8,741,904 (the "'904 patent"); 8,829,017 (the "'017 patent"); 8,835,452 (the "'452 patent"); 8,853,231 (the "'231 patent"); 8,946,252 (the "'252 patent"); 8,969,398 (the "'398 patent"); 9,271,968 (the "'968 patent"); 9,421,195 (the "'195 patent"); 9,629,828 (the "'9,828 patent"); 10,314,828 (the "'4,828 patent"); 10,335,397 (the "'397 patent"); 10,456,384 (the "'384 patent"); 10,703,763 (the "'763 patent"); 10,709,694 (the "'694 patent"); and 10,765,667 (the "'667 patent") (collectively, the "Xifaxan® patents") under the Food and Drug Laws and the Patent Laws of the United States, Titles 21 and 35 of the United States code, respectively. This action involves the 550 mg dosage form of Plaintiffs' drug product Xifaxan®, indicated for reduction in risk of overt hepatic encephalopathy (HE) recurrence in adults and treatment of irritable bowel syndrome with diarrhea (IBS-D) in adults.

## THE XIFAXAN® NDA

13. Salix Pharmaceuticals, Inc. is the holder of approved New Drug Application ("NDA") Nos. 021361 and 022554 (a supplement to NDA No. 021361 that was granted a new NDA number) for Xifaxan® (rifaximin) 550 mg tablets.

14. The FDA approved NDA No. 021361 for Xifaxan® 200 mg tablets on May 25, 2004 and approved NDA No. 022554 for Xifaxan® 550 mg tablets on March 24, 2010. Xifaxan® 550 mg tablets are indicated for reduction in risk of overt hepatic encephalopathy (HE) recurrence in adults and treatment of irritable bowel syndrome with diarrhea (IBS-D) in adults.

## THE PATENTS-IN-SUIT

15. On May 16, 2006, the '620 patent, entitled "Polymorphous forms of rifaximin, processes for their production and use thereof in medicinal preparations," was duly and legally issued. The '620 patent is assigned to and owned by Alfasigma. A true and correct copy of the '620 patent is attached hereto as Exhibit B.

16. On November 3, 2009, the '199 patent, entitled "Polymorphic forms α, β, and γ of rifaximin," was duly and legally issued. The '199 patent is assigned to and owned by Alfasigma. A true and correct copy of the '199 patent is attached hereto as Exhibit C.

17. On March 8, 2011, the '206 patent, entitled "Polymorphic forms α, β and γ of rifaximin," was duly and legally issued. The '206 patent is assigned to and owned by Alfasigma. A true and correct copy of the '206 patent is attached hereto as Exhibit D.

18. On March 15, 2011, the '542 patent, entitled "Pharmaceutical compositions comprising polymorphic forms α, β, and γ of rifaximin," was duly and legally issued. The '542 patent is assigned to and owned by Alfasigma. A true and correct copy of the '542 patent is attached hereto as Exhibit E.

19. On March 29, 2011, the ’275 patent, entitled “Use of polymorphic forms of rifaximin for medical preparations,” was duly and legally issued. The ’275 patent is assigned to and owned by Alfasigma. A true and correct copy of the ’275 patent is attached hereto as Exhibit F.

20. On April 17, 2012, the ’644 patent, entitled “Pharmaceutical compositions comprising polymorphic forms α, β, and γ of rifaximin,” was duly and legally issued. The ’644 patent is assigned to and owned by Alfasigma. A true and correct copy of the ’644 patent is attached hereto as Exhibit G.

21. On April 17, 2012, the ’781 patent, entitled “Polymorphic forms α, β and γ of rifaximin,” was duly and legally issued. The ’781 patent is assigned to and owned by Alfasigma. A true and correct copy of the ’781 patent is attached hereto as Exhibit H.

22. On June 5, 2012, the ’196 patent, entitled “Polymorphous forms of rifaximin, processes for their production and use thereof in the medicinal preparations,” was duly and legally issued. The ’196 patent is assigned to and owned by Alfasigma. A true and correct copy of the ’196 patent is attached hereto as Exhibit I.

23. On November 13, 2012, the ’569 patent, entitled “Methods for treating diarrhea-associated irritable bowel syndrome,” was duly and legally issued. The ’569 patent is assigned to and owned by Salix Pharmaceuticals, Inc. A true and correct copy of the ’569 patent is attached hereto as Exhibit J.

24. On August 27, 2013, the ’949 patent, entitled “Polymorphous forms of rifaximin, processes for their production and use thereof in the medicinal preparations,” was duly and legally issued. The ’949 patent is assigned to and owned by Alfasigma. A true and correct copy of the ’949 patent is attached hereto as Exhibit K.

25. On February 4, 2014, the ’573 patent, entitled “Methods of treating hepatic encephalopathy,” was duly and legally issued. The ’573 patent is assigned to and owned by Salix Pharmaceuticals, Inc. A true and correct copy of the ’573 patent is attached hereto as Exhibit L.

26. On June 3, 2014, the ’904 patent, entitled “Polymorphous forms of rifaximin, processes for their production and use thereof in the medicinal preparations,” was duly and legally issued. The ’904 patent is assigned to and owned by Alfasigma. A true and correct copy of the ’904 patent is attached hereto as Exhibit M.

27. On September 9, 2014, the ’017 patent, entitled “Methods of treating traveler’s diarrhea and hepatic encephalopathy,” was duly and legally issued. The ’017 patent is assigned to and owned by Salix Pharmaceuticals, Inc. A true and correct copy of the ’017 patent is attached hereto as Exhibit N.

28. On September 16, 2014, the ’452 patent, entitled “Polymorphic forms α, β and γ of rifaximin,” was duly and legally issued. The ’452 patent is assigned to and owned by Alfasigma. A true and correct copy of the ’452 patent is attached hereto as Exhibit O.

29. On October 7, 2014, the ’231 patent, entitled “Pharmaceutical compositions comprising polymorphic forms α, β, and γ of rifaximin,” was duly and legally issued. The ’231 patent is assigned to and owned by Alfasigma. A true and correct copy of the ’231 patent is attached hereto as Exhibit P.

30. On February 3, 2015, the ’252 patent, entitled “Methods of treating traveler’s diarrhea and hepatic encephalopathy,” was duly and legally issued. The ’252 patent is assigned to and owned by Salix Pharmaceuticals, Inc. A true and correct copy of the ’252 patent is attached hereto as Exhibit Q.

31. On March 3, 2015, the ’398 patent, entitled “Methods of treating hepatic encephalopathy,” was duly and legally issued. The ’398 patent is assigned to and owned by Salix Pharmaceuticals, Inc. A true and correct copy of the ’398 patent is attached hereto as Exhibit R.

32. On March 1, 2016, the ’968 patent, entitled “Polymorphous forms of rifaximin, processes for their production and use thereof in the medicinal preparations,” was duly and legally issued. The ’968 patent is assigned to and owned by Alfasigma. A true and correct copy of the ’968 patent is attached hereto as Exhibit S.

33. On August 23, 2016, the ’195 patent, entitled “Methods of treating hepatic encephalopathy,” was duly and legally issued. The ’195 patent is assigned to and owned by Salix Pharmaceuticals, Inc. A true and correct copy of the ’195 patent is attached hereto as Exhibit T.

34. On April 25, 2017, the ’9,828 patent, entitled “Methods of treating traveler’s diarrhea and hepatic encephalopathy,” was duly and legally issued. The ’9,828 patent is assigned to and owned by Salix Pharmaceuticals, Inc. A true and correct copy of the ’9,828 patent is attached hereto as Exhibit U.

35. On June 11, 2019, the ’4,828 patent, entitled “Methods of treating hepatic encephalopathy,” was duly and legally issued. The ’4,828 patent is assigned to and owned by Salix Pharmaceuticals, Inc. A true and correct copy of the ’4,828 patent is attached hereto as Exhibit V.

36. On July 2, 2019, the ’397 patent, entitled “Methods of treating hepatic encephalopathy,” was duly and legally issued. The ’397 patent is assigned to and owned by Salix Pharmaceuticals, Inc. A true and correct copy of the ’397 patent is attached hereto as Exhibit W.

37. On October 29, 2019, the '384 patent, entitled "Methods of treating irritable bowel syndrome (IBS)," was duly and legally issued. The '384 patent is assigned to and owned by Salix Pharmaceuticals, Inc. A true and correct copy of the '384 patent is attached hereto as Exhibit X.

38. On July 7, 2020, the '763 patent, entitled "Polymorphous forms of rifaximin, processes for their production and use thereof in the medicinal preparations," was duly and legally issued. The '763 patent is assigned to and owned by Alfasigma. A true and correct copy of the '763 patent is attached hereto as Exhibit Y.

39. On July 14, 2020, the '694 patent, entitled "Methods of treating hepatic encephalopathy," was duly and legally issued. The '694 patent is assigned to and owned by Salix Pharmaceuticals, Inc. A true and correct copy of the '694 patent is attached hereto as Exhibit Z.

40. On September 8, 2020, the '667 patent, entitled "Methods for treating irritable bowel syndrome (IBS)," was duly and legally issued. The '667 patent is assigned to and owned by Salix Pharmaceuticals, Inc. A true and correct copy of the '667 patent is attached hereto as Exhibit AA.

41. In accordance with 21 U.S.C. § 355(b)(1) and 21 C.F.R. § 314.53, and in conjunction with NDA No. 022554, the Xifaxan® patents are listed in the FDA's APPROVED DRUG PRODUCTS WITH THERAPEUTIC EQUIVALENCE EVALUATIONS (also known as the "Orange Book") for Xifaxan® 550 mg tablets.

42. Pursuant to agreements entered into between Bausch, Salix Pharmaceuticals, Ltd., and Salix Pharmaceuticals, Inc., Bausch has substantial rights in the '569, '573, '017, '252, '398, '195, '9,828, '4,828, '397, '384,'694, and '667 patents (collectively, the "Salix patents") including, but not limited to, an exclusive license to the Salix patents in the United States, and the right to sue for infringement of the Salix patents in the United States.

43. Pursuant to agreements entered into between Bausch, Salix Pharmaceuticals, Inc. and Alfasigma, Bausch and Salix Pharmaceuticals, Inc. have substantial rights in the ’620, ’199, ’206, ’542, ’275, ’644, ’781, ’196, ’949, ’904, ’452, ’231, ’968, and ’763 patents (collectively, the “Alfasigma patents”) including, but not limited to, an exclusive license to the Alfasigma patents in the United States, and the right to sue for infringement of the Alfasigma patents in the United States. Pursuant to these agreements, Salix Pharmaceuticals, Inc. is the sole distributor in the United States of Xifaxan® tablets.

## CLAIMS FOR RELIEF – PATENT INFRINGEMENT

44. By a letter dated February 14, 2020 (the “Norwich Notice Letter”), Alvogen, as the regulatory agent for Norwich, advised Plaintiffs that Norwich had submitted ANDA No. 214369 to the FDA seeking approval to manufacture, use, or sell Norwich’s ANDA Product prior to the expiration of the Xifaxan® patents.

45. On information and belief, Defendant submitted ANDA No. 214369 to the FDA under § 505(j) of the Federal Food, Drug, and Cosmetic Act, seeking approval to engage in the commercial manufacture, use, and sale of Norwich’s ANDA Product as a generic version of Xifaxan® 550 mg tablets.

46. On information and belief, ANDA No. 214369 seeks FDA approval of Norwich’s ANDA Product for the indications of reduction in risk of overt hepatic encephalopathy (HE) recurrence in adults and treatment of irritable bowel syndrome with diarrhea (IBS-D) in adults.

47. The Norwich Notice Letter also advised Plaintiffs that Defendant’s ANDA submission included certifications under 21 U.S.C. § 355(j)(2)(B)(iv)(II) that, in Defendant’s opinion, certain claims of the Xifaxan® patents are invalid, unenforceable, and/or not infringed.

48. The Norwich Notice Letter does not allege non-infringement of certain claims of the '199, '206, '452, and '231 patents. By not identifying non-infringement defenses for certain claims of the '199, '206, '452, and '231 patents in the Norwich Notice Letter, Defendant admits Norwich's ANDA Product meets all limitations of those claims.

49. The Norwich Notice Letter does not allege invalidity or unenforceability of certain claims of the '620 patent. By not identifying invalidity and unenforceability defenses for certain claims of the '620 patent in the Norwich Notice Letter, Defendant admits those claims of the '620 patent are valid and enforceable.

50. By a letter dated October 6, 2020 (the "Second Norwich Notice Letter"), Alvogen, as the regulatory agent for Norwich, advised Plaintiffs that Norwich had amended ANDA No. 214369 to include a certification under 21 U.S.C. § 355(j)(2)(B)(iv)(II) that, in Defendant's opinion, the claims of the '763 and '694 patents are invalid, unenforceable, and/or not infringed.

51. On information and belief, Defendant's statements of the factual and legal bases for its opinions regarding non-infringement and invalidity of the Xifaxan® patents are devoid of an objective good faith basis in either the facts or the law. This case is exceptional.

52. There is an actual, real, immediate, and justiciable controversy between Plaintiffs and Defendant regarding the infringement, validity, and enforceability of the Xifaxan® patents.

**COUNT I**
**Infringement of the '620 Patent**

53. Plaintiffs incorporate each of the preceding paragraphs 1 to 52 as if fully set forth herein.

54. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including

Delaware, prior to expiration of the ’620 patent, Defendant committed an act of infringement of the ’620 patent under 35 U.S.C. § 271(e)(2)(A).

55. The ’620 patent claims, *inter alia*, crystalline forms of rifaximin and processes for the production of crystalline forms of rifaximin.

56. Defendant’s manufacture, use, sale, offer for sale, or importation into the United States of Norwich’s ANDA Product prior to the expiration of the ’620 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the ’620 patent under 35 U.S.C. §§ 271(a), (b), (c), and/or (g).

57. On information and belief, Defendant was aware of the existence of the ’620 patent and its listing in the Orange Book as demonstrated by Defendant’s reference to the ’620 patent in the Norwich Notice Letter.

58. Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

**COUNT II**
**Infringement of the ’199 Patent**

59. Plaintiffs incorporate each of the preceding paragraphs 1 to 58 as if fully set forth herein.

60. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich’s ANDA Product throughout the United States, including Delaware, prior to expiration of the ’199 patent, Defendant committed an act of infringement of the ’199 patent under 35 U.S.C. § 271(e)(2)(A).

61. The ’199 patent claims, *inter alia*, crystalline forms of rifaximin.

62. Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '199 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '199 patent under 35 U.S.C. § 271(a).

63. On information and belief, Defendant was aware of the existence of the '199 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '199 patent in the Norwich Notice Letter.

64. Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

**COUNT III**
**Infringement of the '206 Patent**

65. Plaintiffs incorporate each of the preceding paragraphs 1 to 64 as if fully set forth herein.

66. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '206 patent, Defendant committed an act of infringement of the '206 patent under 35 U.S.C. § 271(e)(2)(A).

67. The '206 patent claims, *inter alia*, crystalline forms of rifaximin, crystalline forms of rifaximin prepared by specified processes, and solid pharmaceutical compositions comprising crystalline forms of rifaximin.

68. Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '206 patent, including

any applicable exclusivities or extensions, will infringe one or more claims of the ’206 patent under 35 U.S.C. §§ 271(a), (b), (c), and/or (g).

69. On information and belief, Defendant was aware of the existence of the ’206 patent and its listing in the Orange Book as demonstrated by Defendant’s reference to the ’206 patent in the Norwich Notice Letter.

70. Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

**COUNT IV**
**Infringement of the ’542 Patent**

71. Plaintiffs incorporate each of the preceding paragraphs 1 to 70 as if fully set forth herein.

72. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich’s ANDA Product throughout the United States, including Delaware, prior to expiration of the ’542 patent, Defendant committed an act of infringement of the ’542 patent under 35 U.S.C. § 271(e)(2)(A).

73. The ’542 patent claims, *inter alia*, pharmaceutical compositions comprising crystalline forms of rifaximin.

74. Defendant’s manufacture, use, sale, offer for sale, or importation into the United States of Norwich’s ANDA Product prior to the expiration of the ’542 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the ’542 patent under 35 U.S.C. § 271(a).

75. On information and belief, Defendant was aware of the existence of the '542 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '542 patent in the Norwich Notice Letter.

76. Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

**COUNT V**
**Infringement of the '275 Patent**

77. Plaintiffs incorporate each of the preceding paragraphs 1 to 76 as if fully set forth herein.

78. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '275 patent, Defendant committed an act of infringement of the '275 patent under 35 U.S.C. § 271(e)(2)(A).

79. The '275 patent claims, *inter alia*, methods of treating bacterial infections in patients suffering from bowel related disorders with crystalline forms of rifaximin.

80. Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '275 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '275 patent under 35 U.S.C. §§ 271(b) and/or (c).

81. On information and belief, Norwich's ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome

with diarrhea in patients, which uses will constitute direct infringement of claims of the '275 patent.

82.     On information and belief, these directly infringing uses will occur with Defendant's specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

83.     On information and belief, Defendant will actively induce, encourage, aid, and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs' rights under the '275 patent.

84.     On information and belief, Defendant knows or should know Norwich's ANDA Product will be especially made or especially adapted for use in infringing the '275 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

85.     On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to the '275 patent's expiry will contribute to the direct infringement of one or more claims of the '275 patent.

86.     On information and belief, Defendant's acts will be performed with knowledge of the '275 patent and with intent to encourage infringement prior to the '275 patent's expiry.

87.     On information and belief, Defendant was aware of the existence of the '275 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '275 patent in the Norwich Notice Letter.

88.     Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court.  Plaintiffs have no adequate remedy at law.

FDA_00534

Case 1:20-cv-00430-RGA Document 59 Filed 11/13/20 Page 16 of 52 PageID #: 1870

**COUNT VI**
**Infringement of the '644 Patent**

89. Plaintiffs incorporate each of the preceding paragraphs 1 to 88 as if fully set forth herein.

90. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '644 patent, Defendant committed an act of infringement of the '644 patent under 35 U.S.C. § 271(e)(2)(A).

91. The '644 patent claims, *inter alia*, solid pharmaceutical compositions comprising crystalline forms of rifaximin.

92. Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '644 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '644 patent under 35 U.S.C. § 271(a).

93. On information and belief, Defendant was aware of the existence of the '644 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '644 patent in the Norwich Notice Letter.

94. Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

FDA_00535

## COUNT VII
**Infringement of the '781 Patent**

95. Plaintiffs incorporate each of the preceding paragraphs 1 to 94 as if fully set forth herein.

96. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '781 patent, Defendant committed an act of infringement of the '781 patent under 35 U.S.C. § 271(e)(2)(A).

97. The '781 patent claims, *inter alia*, crystalline forms of rifaximin.

98. Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '781 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '781 patent under 35 U.S.C. § 271(a).

99. On information and belief, Defendant was aware of the existence of the '781 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '781 patent in the Norwich Notice Letter.

100. Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

## COUNT VIII
**Infringement of the '196 Patent**

101. Plaintiffs incorporate each of the preceding paragraphs 1 to 100 as if fully set forth herein.

102. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '196 patent, Defendant committed an act of infringement of the '196 patent under 35 U.S.C. § 271(e)(2)(A).

103. The '196 patent claims, *inter alia*, crystalline forms of rifaximin, solid pharmaceutical compositions comprising crystalline forms of rifaximin, methods of treating bacterial activity in the gastrointestinal tract of subjects with crystalline forms of rifaximin, and processes for the production of crystalline forms of rifaximin.

104. Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '196 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '196 patent under 35 U.S.C. §§ 271(a), (b), (c), and/or (g).

105. On information and belief, Norwich's ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome with diarrhea in patients, which uses will constitute direct infringement of claims of the '196 patent.

106. On information and belief, these directly infringing uses will occur with Defendant's specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

107. On information and belief, Defendant will actively induce, encourage, aid, and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs' rights under the '196 patent.

108. On information and belief, Defendant knows or should know Norwich's ANDA Product will be especially made or especially adapted for use in infringing the '196 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

109. On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to the '196 patent's expiry will contribute to the direct infringement of one or more claims of the '196 patent.

110. On information and belief, Defendant's acts will be performed with knowledge of the '196 patent and with intent to encourage infringement prior to the '196 patent's expiry.

111. On information and belief, Defendant was aware of the existence of the '196 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '196 patent in the Norwich Notice Letter.

112. Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

**COUNT IX**
**Infringement of the '569 Patent**

113. Plaintiffs incorporate each of the preceding paragraphs 1 to 112 as if fully set forth herein.

114. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale,

and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '569 patent, Defendant committed an act of infringement of the '569 patent under 35 U.S.C. § 271(e)(2)(A).

115.   The '569 patent claims, *inter alia*, methods of treating diarrhea-associated irritable bowel syndrome with rifaximin.

116.   Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '569 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '569 patent under 35 U.S.C. §§ 271(b) and/or (c).

117.   On information and belief, Norwich's ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome with diarrhea in patients, which uses will constitute direct infringement of claims of the '569 patent.

118.   On information and belief, these directly infringing uses will occur with Defendant's specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

119.   On information and belief, Defendant will actively induce, encourage, aid, and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs' rights under the '569 patent.

120.   On information and belief, Defendant knows or should know Norwich's ANDA Product will be especially made or especially adapted for use in infringing the '569 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

FDA_00539

121. On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to the '569 patent's expiry will contribute to the direct infringement of one or more claims of the '569 patent.

122. On information and belief, Defendant's acts will be performed with knowledge of the '569 patent and with intent to encourage infringement prior to the '569 patent's expiry.

123. On information and belief, Defendant was aware of the existence of the '569 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '569 patent in the Norwich Notice Letter.

124. Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

**COUNT X**
**Infringement of the '949 Patent**

125. Plaintiffs incorporate each of the preceding paragraphs 1 to 124 as if fully set forth herein.

126. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '949 patent, Defendant committed an act of infringement of the '949 patent under 35 U.S.C. § 271(e)(2)(A).

127. The '949 patent claims, *inter alia*, solid pharmaceutical compositions comprising crystalline forms of rifaximin and crystalline forms of rifaximin prepared by specified processes.

128. Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '949 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '949 patent under 35 U.S.C. §§ 271(a), (b), (c), and/or (g).

129. On information and belief, Defendant was aware of the existence of the '949 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '949 patent in the Norwich Notice Letter.

130. Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

**COUNT XI**
**Infringement of the '573 Patent**

131. Plaintiffs incorporate each of the preceding paragraphs 1 to 130 as if fully set forth herein.

132. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '573 patent, Defendant committed an act of infringement of the '573 patent under 35 U.S.C. § 271(e)(2)(A).

133. The '573 claims, *inter alia*, methods of maintaining remission of hepatic encephalopathy with rifaximin.

134. Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '573 patent, including any

applicable exclusivities or extensions, will infringe one or more claims of the ’573 patent under 35 U.S.C. §§ 271(b) and/or (c).

135. On information and belief, Norwich’s ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome with diarrhea in patients, which uses will constitute direct infringement of claims of the ’573 patent.

136. On information and belief, these directly infringing uses will occur with Defendant’s specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

137. On information and belief, Defendant will actively, induce, encourage, aid and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs’ rights under the ’573 patent.

138. On information and belief, Defendant knows or should know Norwich’s ANDA Product will be especially made or especially adapted for use in infringing the ’573 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

139. On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich’s ANDA Product prior to patent expiry will contribute to the direct infringement of one or more claims of the ’573 patent.

140. On information and belief, Defendant’s acts will be performed with knowledge of the ’573 patent and with intent to encourage infringement prior to patent expiry.

141. On information and belief, Defendant was aware of the existence of the ’573 patent and its listing in the Orange Book as demonstrated by Defendant’s reference to the ’573 patent in the Norwich Notice Letter.

142. Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

## COUNT XII
## Infringement of the ’904 Patent

143. Plaintiffs incorporate each of the preceding paragraphs 1 to 142 as if fully set forth herein.

144. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich’s ANDA Product throughout the United States, including Delaware, prior to expiration of the ’904 patent, Defendant committed an act of infringement of the ’904 patent under 35 U.S.C. § 271(e)(2)(A).

145. The ’904 patent claims, *inter alia*, crystalline forms of rifaximin, methods of treating bacterial activity in the gastrointestinal tract of subjects with crystalline forms of rifaximin, and medicinal preparations comprising crystalline forms of rifaximin.

146. Defendant’s manufacture, use, sale, offer for sale, or importation into the United States of Norwich’s ANDA Product prior to the expiration of the ’904 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the ’904 patent under 35 U.S.C. §§ 271(a), (b), and/or (c).

147. On information and belief, Norwich’s ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic

FDA_00543

encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome with diarrhea in patients, which uses will constitute direct infringement of claims of the ’904 patent.

148. On information and belief, these directly infringing uses will occur with Defendant’s specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

149. On information and belief, Defendant will actively induce, encourage, aid, and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs’ rights under the ’904 patent.

150. On information and belief, Defendant knows or should know Norwich’s ANDA Product will be especially made or especially adapted for use in infringing the ’904 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

151. On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich’s ANDA Product prior to the ’904 patent’s expiry will contribute to the direct infringement of one or more claims of the ’904 patent.

152. On information and belief, Defendant’s acts will be performed with knowledge of the ’904 patent and with intent to encourage infringement prior to the ’904 patent’s expiry.

153. On information and belief, Defendant was aware of the existence of the ’904 patent and its listing in the Orange Book as demonstrated by Defendant’s reference to the ’904 patent in the Norwich Notice Letter.

154. Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

**COUNT XIII**
**Infringement of the ’017 Patent**

155. Plaintiffs incorporate each of the preceding paragraphs 1 to 154 as if fully set forth herein.

156. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich’s ANDA Product throughout the United States, including Delaware, prior to expiration of the ’017 patent, Defendant committed an act of infringement of the ’017 patent under 35 U.S.C. § 271(e)(2)(A).

157. The ’017 patent claims, *inter alia*, methods of treating patients having hepatic encephalopathy with rifaximin and methods of treating patients suffering from hepatic encephalopathy with rifaximin.

158. Defendant’s manufacture, use, sale, offer for sale, or importation into the United States Norwich’s ANDA Product prior to the expiration of the ’017 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the ’017 patent under 35 U.S.C. §§ 271(b) and/or (c).

159. On information and belief, Norwich’s ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome

with diarrhea in patients, which uses will constitute direct infringement of claims of the '017 patent.

160.    On information and belief, these directly infringing uses will occur with Defendant's specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

161.    On information and belief, Defendant will actively, induce, encourage, aid and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs' rights under the '017 patent.

162.    On information and belief, Defendant knows or should know Norwich's ANDA Product will be especially made or especially adapted for use in infringing the '017 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

163.    On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to patent expiry will contribute to the direct infringement of one or more claims of the '017 patent.

164.    On information and belief, Defendant's acts will be performed with knowledge of the '017 patent and with intent to encourage infringement prior to patent expiry.

165.    On information and belief, Defendant was aware of the existence of the '017 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '017 patent in the Norwich Notice Letter.

166.    Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court.  Plaintiffs have no adequate remedy at law.

FDA_00546

Case 1:20-cv-00430-RGA Document 59 Filed 03/28/25 Page 28 of 52 PageID #: 1882

## COUNT XIV
## Infringement of the '452 Patent

167. Plaintiffs incorporate each of the preceding paragraphs 1 to 166 as if fully set forth herein.

168. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '452 patent, Defendant committed an act of infringement of the '452 patent under 35 U.S.C. § 271(e)(2)(A).

169. The '452 patent claims, *inter alia*, crystalline forms of rifaximin and pharmaceutical compositions comprising crystalline forms of rifaximin.

170. Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '452 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '452 patent under 35 U.S.C. § 271(a).

171. On information and belief, Defendant was aware of the existence of the '452 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '452 patent in the Norwich Notice Letter.

172. Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

**COUNT XV**
**Infringement of the '231 Patent**

173. Plaintiffs incorporate each of the preceding paragraphs 1 to 172 as if fully set forth herein.

174. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '231 patent, Defendant committed an act of infringement of the '231 patent under 35 U.S.C. § 271(e)(2)(A).

175. The '231 patent claims, *inter alia*, pharmaceutical compositions comprising crystalline forms of rifaximin.

176. Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '231 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '231 patent under 35 U.S.C. § 271(a).

177. On information and belief, Defendant was aware of the existence of the '231 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '231 patent in the Norwich Notice Letter.

178. Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

FDA_00548

**COUNT XVI**
**Infringement of the '252 Patent**

179. Plaintiffs incorporate each of the preceding paragraphs 1 to 178 as if fully set forth herein.

180. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '252 patent, Defendant committed an act of infringement of the '252 patent under 35 U.S.C. § 271(e)(2)(A).

181. The '252 patent claims, *inter alia*, methods of reducing the risk of overt hepatic encephalopathy recurrence in subjects with rifaximin.

182. Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '252 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '252 patent under 35 U.S.C. §§ 271(b) and/or (c).

183. On information and belief, Norwich's ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome with diarrhea in patients, which uses will constitute direct infringement of claims of the '252 patent.

184. On information and belief, these directly infringing uses will occur with Defendant's specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

185. On information and belief, Defendant will actively, induce, encourage, aid and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs' rights under the '252 patent.

186. On information and belief, Defendant knows or should know Norwich's ANDA Product will be especially made or especially adapted for use in infringing the '252 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

187. On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to patent expiry will contribute to the direct infringement of one or more claims of the '252 patent.

188. On information and belief, Defendant's acts will be performed with knowledge of the '252 patent and with intent to encourage infringement prior to patent expiry.

189. On information and belief, Defendant was aware of the existence of the '252 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '252 patent in the Norwich Notice Letter.

190. Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

**COUNT XVII**
**Infringement of the '398 Patent**

191. Plaintiffs incorporate each of the preceding paragraphs 1 to 190 as if fully set forth herein.

192. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including

Delaware, prior to expiration of the ’398 patent, Defendant committed an act of infringement of the ’398 patent under 35 U.S.C. § 271(e)(2)(A).

193. The ’398 patent claims, *inter alia*, methods of decreasing the risk of a hepatic encephalopathy breakthrough episode with rifaximin.

194. Defendant’s manufacture, use, sale, offer for sale, or importation into the United States of Norwich’s ANDA Product prior to the expiration of the ’398 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the ’398 patent under 35 U.S.C. §§ 271(b) and/or (c).

195. On information and belief, Norwich’s ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome with diarrhea in patients, which uses will constitute direct infringement of claims of the ’398 patent.

196. On information and belief, these directly infringing uses will occur with Defendant’s specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

197. On information and belief, Defendant will actively, induce, encourage, aid and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs’ rights under the ’398 patent.

198. On information and belief, Defendant knows or should know Norwich’s ANDA Product will be especially made or especially adapted for use in infringing the ’398 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

199. On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to patent expiry will contribute to the direct infringement of one or more claims of the '398 patent.

200. On information and belief, Defendant's acts will be performed with knowledge of the '398 patent and with intent to encourage infringement prior to patent expiry.

201. On information and belief, Defendant was aware of the existence of the '398 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '398 patent in the Norwich Notice Letter.

202. Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

## COUNT XVIII
## Infringement of the '968 Patent

203. Plaintiffs incorporate each of the preceding paragraphs 1 to 202 as if fully set forth herein.

204. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '968 patent, Defendant committed an act of infringement of the '968 patent under 35 U.S.C. § 271(e)(2)(A).

205. The '968 patent claims, *inter alia*, pharmaceutical compositions comprising crystalline forms of rifaximin.

206. Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '968 patent, including

any applicable exclusivities or extensions, will infringe one or more claims of the ’968 patent under 35 U.S.C. § 271(a).

207. On information and belief, Defendant was aware of the existence of the ’968 patent and its listing in the Orange Book as demonstrated by Defendant’s reference to the ’968 patent in the Norwich Notice Letter.

208. Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

**COUNT XIX**
**Infringement of the ’195 Patent**

209. Plaintiffs incorporate each of the preceding paragraphs 1 to 208 as if fully set forth herein.

210. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich’s ANDA Product throughout the United States, including Delaware, prior to expiration of the ’195 patent, Defendant committed an act of infringement of the ’195 patent under 35 U.S.C. § 271(e)(2)(A).

211. The ’195 patent claims, *inter alia*, methods of reducing the risk of hepatic encephalopathy recurrence with rifaximin.

212. Defendant’s manufacture, use, sale, offer for sale, or importation into the United States of Norwich’s ANDA Product prior to the expiration of the ’195 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the ’195 patent under 35 U.S.C. §§ 271(b) and/or (c).

213. On information and belief, Norwich's ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome with diarrhea in patients, which uses will constitute direct infringement of claims of the '195 patent.

214. On information and belief, these directly infringing uses will occur with Defendant's specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

215. On information and belief, Defendant will actively, induce, encourage, aid and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs' rights under the '195 patent.

216. On information and belief, Defendant knows or should know Norwich's ANDA Product will be especially made or especially adapted for use in infringing the '195 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

217. On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to patent expiry will contribute to the direct infringement of one or more claims of the '195 patent.

218. On information and belief, Defendant's acts will be performed with knowledge of the '195 patent and with intent to encourage infringement prior to patent expiry.

219. On information and belief, Defendant was aware of the existence of the '195 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '195 patent in the Norwich Notice Letter.

220. Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

**COUNT XX**
**Infringement of the '9,828 Patent**

221. Plaintiffs incorporate each of the preceding paragraphs 1 to 220 as if fully set forth herein.

222. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '9,828 patent, Defendant committed an act of infringement of the '9,828 patent under 35 U.S.C. § 271(e)(2)(A).

223. The '9,828 patent claims, *inter alia*, methods of reducing the risk of overt hepatic encephalopathy recurrence with rifaximin.

224. Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '9,828 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '9,828 patent under 35 U.S.C. §§ 271(b) and/or (c).

225. On information and belief, Norwich's ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome with diarrhea in patients, which uses will constitute direct infringement of claims of the '9,828 patent.

226. On information and belief, these directly infringing uses will occur with Defendant's specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

227. On information and belief, Defendant will actively, induce, encourage, aid and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs' rights under the '9,828 patent.

228. On information and belief, Defendant knows or should know Norwich's ANDA Product will be especially made or especially adapted for use in infringing the '9,828 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

229. On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to patent expiry will contribute to the direct infringement of one or more claims of the '9,828 patent.

230. On information and belief, Defendant's acts will be performed with knowledge of the '9,828 patent and with intent to encourage infringement prior to patent expiry.

231. On information and belief, Defendant was aware of the existence of the '9,828 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '9,828 patent in the Norwich Notice Letter.

232. Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

## COUNT XXI
## Infringement of the '4,828 Patent

233. Plaintiffs incorporate each of the preceding paragraphs 1 to 232 as if fully set forth herein.

234. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '4,828 patent, Defendant committed an act of infringement of the '4,828 patent under 35 U.S.C. § 271(e)(2)(A).

235. The '4,828 patent claims, *inter alia*, methods of maintaining remission of hepatic encephalopathy with rifaximin.

236. Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '4,828 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '4,828 patent under 35 U.S.C. §§ 271(b) and/or (c).

237. On information and belief, Norwich's ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome with diarrhea in patients, which uses will constitute direct infringement of claims of the '4,828 patent.

238. On information and belief, these directly infringing uses will occur with Defendant's specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

239. On information and belief, Defendant will actively, induce, encourage, aid and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs' rights under the '4,828 patent.

240. On information and belief, Defendant knows or should know Norwich's ANDA Product will be especially made or especially adapted for use in infringing the '4,828 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

241. On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to patent expiry will contribute to the direct infringement of one or more claims of the '4,828 patent.

242. On information and belief, Defendant's acts will be performed with knowledge of the '4,828 patent and with intent to encourage infringement prior to patent expiry.

243. On information and belief, Defendant was aware of the existence of the '4,828 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '4,828 patent in the Norwich Notice Letter.

244. Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

**COUNT XXII**
**Infringement of the '397 Patent**

245. Plaintiffs incorporate each of the preceding paragraphs 1 to 244 as if fully set forth herein.

246. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '397 patent, Defendant committed an act of infringement of the '397 patent under 35 U.S.C. § 271(e)(2)(A).

247. The ’397 patent claims, *inter alia*, methods of reducing the risk of experiencing a breakthrough overt hepatic encephalopathy episode with rifaximin.

248. Defendant’s manufacture, use, sale, offer for sale, or importation into the United States of Norwich’s ANDA Product prior to the expiration of the ’397 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the ’397 patent under 35 U.S.C. §§ 271(b) and/or (c).

249. On information and belief, Norwich’s ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome with diarrhea in patients, which uses will constitute direct infringement of claims of the ’397 patent.

250. On information and belief, these directly infringing uses will occur with Defendant’s specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

251. On information and belief, Defendant will actively, induce, encourage, aid and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs’ rights under the ’397 patent.

252. On information and belief, Defendant knows or should know Norwich’s ANDA Product will be especially made or especially adapted for use in infringing the ’397 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

253. On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich’s ANDA Product prior to patent expiry will contribute to the direct infringement of one or more claims of the ’397 patent.

FDA_00559

254. On information and belief, Defendant's acts will be performed with knowledge of the '397 patent and with intent to encourage infringement prior to patent expiry.

255. On information and belief, Defendant was aware of the existence of the '397 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '397 patent in the Norwich Notice Letter.

256. Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

**COUNT XXIII**
**Infringement of the '384 Patent**

257. Plaintiffs incorporate each of the preceding paragraphs 1 to 256 as if fully set forth herein.

258. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '384 patent, Defendant committed an act of infringement of the '384 patent under 35 U.S.C. § 271(e)(2)(A).

259. The '384 patent claims, *inter alia*, methods of treating symptoms of irritable bowel syndrome in subjects 65 years of age or older with rifaximin.

260. Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '384 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '384 patent under 35 U.S.C. §§ 271(b) and/or (c).

FDA_00560

261. On information and belief, Norwich's ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome with diarrhea in patients, which uses will constitute direct infringement of claims of the '384 patent.

262. On information and belief, these directly infringing uses will occur with Defendant's specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

263. On information and belief, Defendant will actively, induce, encourage, aid and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs' rights under the '384 patent.

264. On information and belief, Defendant knows or should know Norwich's ANDA Product will be especially made or especially adapted for use in infringing the '384 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

265. On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to patent expiry will contribute to the direct infringement of one or more claims of the '384 patent.

266. On information and belief, Defendant's acts will be performed with knowledge of the '384 patent and with intent to encourage infringement prior to patent expiry.

267. On information and belief, Defendant was aware of the existence of the '384 patent and its listing in the Orange Book as demonstrated by Defendant's reference to the '384 patent in the Norwich Notice Letter.

268. Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

**COUNT XXIV**
**Infringement of the '763 Patent**

269. Plaintiffs incorporate each of the preceding paragraphs 1 to 268 as if fully set forth herein.

270. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '763 patent, Defendant committed an act of infringement of the '763 patent under 35 U.S.C. § 271(e)(2)(A).

271. The '763 patent claims, *inter alia*, methods of treating bacterial activity in the gastrointestinal tract of subjects with crystalline forms of rifaximin.

272. Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '763 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '763 patent under 35 U.S.C. §§ 271(b) and/or (c).

273. On information and belief, Norwich's ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome with diarrhea in patients, which uses will constitute direct infringement of claims of the '763 patent.

274. On information and belief, these directly infringing uses will occur with Defendant's specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

275. On information and belief, Defendant will actively, induce, encourage, aid and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs' rights under the '763 patent.

276. On information and belief, Defendant knows or should know Norwich's ANDA Product will be especially made or especially adapted for use in infringing the '763 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

277. On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to patent expiry will contribute to the direct infringement of one or more claims of the '763 patent.

278. On information and belief, Defendant's acts will be performed with knowledge of the '763 patent and with intent to encourage infringement prior to patent expiry.

279. The '763 patent issued after the Norwich Notice Letter dated February 14, 2020 was mailed.

280. The '763 patent was listed in the Orange Book for Xifaxan® 550 mg tablets (NDA No. 022554) on or about July 14, 2020.

281. On information and belief, Defendant was aware of the existence of the '763 patent and its listing in the Orange Book prior to the filing date of this First Amended Complaint as demonstrated by Defendant's reference to the '763 patent in the Second Norwich Notice Letter.

282. Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

**COUNT XXV**
**Infringement of the '694 Patent**

283. Plaintiffs incorporate each of the preceding paragraphs 1 to 282 as if fully set forth herein.

284. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '694 patent, Defendant committed an act of infringement of the '694 patent under 35 U.S.C. § 271(e)(2)(A).

285. The '694 patent claims, *inter alia*, methods of reducing the risk of experiencing a breakthrough overt hepatic encephalopathy episode with rifaximin.

286. Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '694 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '694 patent under 35 U.S.C. §§ 271(b) and/or (c).

287. On information and belief, Norwich's ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome with diarrhea in patients, which uses will constitute direct infringement of claims of the '694 patent.

FDA_00564

288. On information and belief, these directly infringing uses will occur with Defendant's specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

289. On information and belief, Defendant will actively, induce, encourage, aid and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs' rights under the '694 patent.

290. On information and belief, Defendant knows or should know Norwich's ANDA Product will be especially made or especially adapted for use in infringing the '694 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

291. On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to patent expiry will contribute to the direct infringement of one or more claims of the '694 patent.

292. On information and belief, Defendant's acts will be performed with knowledge of the '694 patent and with intent to encourage infringement prior to patent expiry.

293. The '694 patent issued after the Norwich Notice Letter dated February 14, 2020 was mailed.

294. The '694 patent was listed in the Orange Book for Xifaxan® 550 mg tablets (NDA No. 022554) on or about July 23, 2020.

295. On information and belief, Defendant was aware of the existence of the '694 patent and its listing in the Orange Book prior to the filing date of this First Amended Complaint as demonstrated by Defendant's reference to the '694 patent in the Second Norwich Notice Letter.

Case 1:25-cv-03006-TJK Document 77-1 Filed 03/28/25 Page 200 of 342

296. Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

**COUNT XXVI**
**Infringement of the '667 Patent**

297. Plaintiffs incorporate each of the preceding paragraphs 1 to 296 as if fully set forth herein.

298. By submitting ANDA No. 214369 to the FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product throughout the United States, including Delaware, prior to expiration of the '667 patent, Defendant committed an act of infringement of the '667 patent under 35 U.S.C. § 271(e)(2)(A).

299. The '667 patent claims, *inter alia*, methods of treating symptoms of irritable bowel syndrome in subjects 65 years of age or older with rifaximin.

300. Defendant's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product prior to the expiration of the '667 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '667 patent under 35 U.S.C. §§ 271(b) and/or (c).

301. On information and belief, Norwich's ANDA Product, if approved by the FDA, will be prescribed and administered to human patients to reduce the risk of overt hepatic encephalopathy recurrence and/or to relieve the signs and symptoms of irritable bowel syndrome with diarrhea in patients, which uses will constitute direct infringement of claims of the '667 patent.

302. On information and belief, these directly infringing uses will occur with Defendant's specific intent and encouragement, and will be uses that Defendant knows or should know will occur.

303. On information and belief, Defendant will actively, induce, encourage, aid and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Plaintiffs' rights under the '667 patent.

304. On information and belief, Defendant knows or should know Norwich's ANDA Product will be especially made or especially adapted for use in infringing the '667 patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use.

305. On information and belief, Defendant knows or should know that its commercial manufacture, use, offer for sale, sale, and/or importation of Norwich's ANDA Product prior to patent expiry will contribute to the direct infringement of one or more claims of the '667 patent.

306. On information and belief, Defendant's acts will be performed with knowledge of the '667 patent and with intent to encourage infringement prior to patent expiry.

307. The '667 patent issued after the Norwich Notice Letter dated February 14, 2020 was mailed.

308. The '667 patent was listed in the Orange Book for Xifaxan® 550 mg tablets (NDA No. 022554) on or about October 19, 2020, after the Second Norwich Notice Letter dated October 6, 2020 was mailed.

309. On information and belief, Defendant was aware of the existence of the '667 patent and its listing in the Orange Book prior to the filing date of this First Amended Complaint as demonstrated by Plaintiffs' November 3, 2020 email correspondence to Defendant notifying Defendant that the '667 patent issued and was listed in the Orange Book after Plaintiffs filed their

original Complaint and that Plaintiffs sought to amend their Complaint to add claims of infringement of the ’667 patent.

310. Plaintiffs will be substantially and irreparably harmed by the infringing activities described above unless those activities are precluded by this Court. Plaintiffs have no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the following relief:

A. A judgment that Defendant has infringed one or more claims of United States Patent Nos. 7,045,620; 7,612,199; 7,902,206; 7,906,542; 7,915,275; 8,158,644; 8,158,781; 8,193,196; 8,309,569; 8,518,949; 8,642,573; 8,741,904; 8,829,017; 8,835,452; 8,853,231; 8,946,252; 8,969,398; 9,271,968; 9,421,195; 9,629,828; 10,314,828; 10,335,397; 10,456,384; 10,703,763; 10,706,694; and 10,765,667 by submitting ANDA No. 214369 seeking FDA approval for the commercial manufacture, use, offer for sale, sale, and/or importation of Norwich’s ANDA Product before the expiration of the Xifaxan® patents, inclusive of any exclusivities and extensions, under 35 U.S.C. § 271(e)(2)(A);

B. A judgment that Defendant’s commercial manufacture, use, offer for sale, sale in, and/or importation into the United States of Norwich’s ANDA Product will infringe one or more claims of United States Patent Nos. 7,045,620; 7,612,199; 7,902,206; 7,906,542; 7,915,275; 8,158,644; 8,158,781; 8,193,196; 8,309,569; 8,518,949; 8,642,573; 8,741,904; 8,829,017; 8,835,452; 8,853,231; 8,946,252; 8,969,398; 9,271,968; 9,421,195; 9,629,828; 10,314,828; 10,335,397; 10,456,384; 10,703,763; 10,706,694; and 10,765,667 under 35 U.S.C. §§ 271(a), (b), (c), and/or (g);

FDA_00568

C. A judgment that United States Patent Nos. 7,045,620; 7,612,199; 7,902,206; 7,906,542; 7,915,275; 8,158,644; 8,158,781; 8,193,196; 8,309,569; 8,518,949; 8,642,573; 8,741,904; 8,829,017; 8,835,452; 8,853,231; 8,946,252; 8,969,398; 9,271,968; 9,421,195; 9,629,828; 10,314,828; 10,335,397; 10,456,384; 10,703,763; 10,706,694; and 10,765,667 remain valid and enforceable;

D. A permanent injunction under 35 U.S.C. §§ 271(e)(4)(B) and/or 283 restraining and enjoining Defendant, its officers, agents, servants, and employees, and those persons in active concert or participation with any of them, from engaging in the commercial manufacture, use, offer for sale, sale in, and/or importation into the United States of Norwich's ANDA Product prior to the expiration date of United States Patent Nos. 7,045,620; 7,612,199; 7,902,206; 7,906,542; 7,915,275; 8,158,644; 8,158,781; 8,193,196; 8,309,569; 8,518,949; 8,642,573; 8,741,904; 8,829,017; 8,835,452; 8,853,231; 8,946,252; 8,969,398; 9,271,968; 9,421,195; 9,629,828; 10,314,828; 10,335,397; 10,456,384; 10,703,763; 10,706,694; and 10,765,667, inclusive of any exclusivities and extensions;

E. An order under 35 U.S.C. § 271(e)(4)(A) that the effective date of any FDA approval of ANDA No. 214369 under Section 505(j) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 355(j)) shall be a date that is not earlier than the expiration date of United States Patent Nos. 7,045,620; 7,612,199; 7,902,206; 7,906,542; 7,915,275; 8,158,644; 8,158,781; 8,193,196; 8,309,569; 8,518,949; 8,642,573; 8,741,904; 8,829,017; 8,835,452; 8,853,231; 8,946,252; 8,969,398; 9,271,968; 9,421,195; 9,629,828; 10,314,828; 10,335,397; 10,456,384; 10,703,763; 10,706,694; and 10,765,667, inclusive of any exclusivities and extensions;

F. A declaration that this case is "exceptional" under 35 U.S.C. § 285 and an award of attorneys' fees;

G. Costs and expenses in this action; and

H. Such other and further relief as the Court may deem just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Cameron P. Clark*

Jack B. Blumenfeld (#1014)
Karen Jacobs (#2881)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
kjacobs@mnat.com
cclark@mnat.com

*Attorneys for Plaintiffs*

OF COUNSEL:

Scott K. Reed
Steven C. Kline
Shannon K. Clark
VENABLE LLP
1290 Avenue of the Americas
New York, NY 10104-3800
(212) 218-2100

November 13, 2020

FDA_00570

**CERTIFICATE OF SERVICE**

I hereby certify that on November 13, 2020, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on November 13, 2020, upon the following in the manner indicated:

Karen E. Keller *VIA ELECTRONIC MAIL*
David M. Fry
SHAW KELLER LLP
I.M. Pei Building
1105 N. Market St., 12th Floor
Wilmington, DE 19801
*Attorneys for Defendant*

Matthew J. Becker *VIA ELECTRONIC MAIL*
Stacie L. Ropka
Matthew S. Murphy
Chad A. Landmon
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
*Attorneys for Defendant*

/s/ Cameron P. Clark
Cameron P. Clark (#6647)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SALIX PHARMACEUTICALS, LTD.; SALIX PHARMACEUTICALS, INC.; BAUSCH HEALTH IRELAND LTD.; ALFASIGMA S.P.A.,

Plaintiffs,

v.

NORWICH PHARMACEUTICALS, INC.,

Defendant.

C.A. No. 20-430 (RGA)

**STIPULATION AND [PROPOSED] ORDER**

WHEREAS Plaintiff Salix Pharmaceuticals, Inc. is the holder of New Drug Application ("NDA") Nos. 021361 and 022554 (a supplement to NDA No. 021361) for Xifaxan (rifaximin) 550 mg tablets that were approved by the U.S. Food and Drug Administration ("FDA");

WHEREAS Defendant Norwich Pharmaceuticals, Inc. ("Norwich" or "Defendant") filed Abbreviated New Drug Application ("ANDA") No. 214369 for approval to manufacture and sell rifaximin 550 mg tablets ("ANDA Product");

WHEREAS Plaintiffs Salix Pharmaceuticals, Ltd., Salix Pharmaceuticals, Inc., Bausch Health Ireland Ltd., and Alfasigma S.p.A. (collectively, "Plaintiffs") filed a First Amended Complaint on November 13, 2020 (D.I. 59) alleging infringement of U.S. Patent Nos. 7,045,620 (the "'620 Patent"); 7,612,199 (the "'199 Patent"); 7,902,206 (the "'206 Patent"); 7,906,542 (the "'542 Patent"); 7,915,275 (the "'275 Patent"); 8,158,644 (the "'644 Patent"); 8,158,781 (the "'781 Patent"); 8,193,196 (the "'196 Patent"); 8,309,569 (the "'569 Patent"); 8,518,949 (the "'949 Patent"); 8,642,573 (the "'573 Patent"); 8,741,904 (the "'904 Patent"); 8,829,017 (the "'017 Patent"); 8,835,452 (the "'452 Patent"); 8,853,231 (the "'231 Patent"); 8,946,252 (the "'252

Patent"); 8,969,398 (the "'398 Patent"); 9,271,968 (the "'968 Patent"); 9,421,195 (the "'195 Patent"); 9,629,828 (the "'9,828 Patent"); 10,314,828 (the "'4,828 Patent"); 10,335,397 (the "'397 Patent"); 10,456,384 (the "'384 Patent"); 10,703,763 (the "'763 Patent"); 10,709,694 (the "'694 Patent"); and 10,765,667 (the "'667 Patent");

WHEREAS the parties jointly submitted a proposed scheduling order requiring the parties to reduce the number of asserted patent claims and prior art-based invalidity positions (D.I. 23, paragraph 3(g)(iv)), which the Court entered;

WHEREAS Plaintiffs did not present evidence of infringement of any patent claim of the following patents at trial: the '620 patent; '542 Patent; the '275 Patent; '644 Patent; the '781 Patent; the '196 Patent; the '949 Patent; the '904 Patent; the '017 Patent; the '452 Patent; the '231 Patent; the '252 Patent; the '398 Patent; the '968 Patent; the '9,828 Patent; the '4,828 Patent; the '384 Patent; the '763 Patent; and the '694 Patent; and

WHEREAS the parties completed the evidentiary phase of trial on March 21-24, 2022;

WHEREAS Plaintiffs presented alleged evidence of infringement of claim 2 of the '569 Patent, claim 3 of the '667 Patent, claim 4 of the '199 Patent, claim 36 of the '206 Patent, claim 8 of the '573 Patent, claim 6 of the '195 Patent, and claims 11-12 of the '397 Patent at trial (collectively, the "Asserted Trial Patent Claims");

NOW THEREFORE, the parties hereby stipulate and agree as follows, subject to the approval of the Court:

1. A final judgment of noninfringement be entered with respect to Norwich's current ANDA No. 214369, including the current ANDA Product[1] and any use of the current ANDA

[1] For the sake of clarity, "Norwich's current ANDA No. 214369" and "current ANDA Product" as used in this Stipulation includes any amendments or supplements to the ANDA that do not change the indications of use, the polymorph forms, or the formulation, and includes any

Product, concerning each claim of the ’620 patent; the ’542 Patent; the ’275 Patent; ’644 Patent; the ’781 Patent; the ’196 Patent; the ’949 Patent; the ’904 Patent; the ’017 Patent; the ’452 Patent; the ’231 Patent; the ’252 Patent; the ’398 Patent; the ’968 Patent; the ’9,828 Patent; the ’4,828 Patent; the ’384 Patent; the ’763 Patent; and the ’694 Patent;

2. Norwich’s counterclaims of invalidity with respect to each claim of the ’620 patent; the ’542 Patent; the ’275 Patent; ’644 Patent; the ’781 Patent; the ’196 Patent; the ’949 Patent; the ’904 Patent; the ’017 Patent; the ’452 Patent; the ’231 Patent; the ’252 Patent; the ’398 Patent; the ’968 Patent; the ’9,828 Patent; the ’4,828 Patent; the ’384 Patent; the ’763 Patent; and the ’694 Patent, shall be dismissed without prejudice;

3. A final judgment of non-infringement be entered with respect to Norwich’s current ANDA No. 214369, including the current ANDA Product and any use of the current ANDA Product, concerning claims 2 and 4-16 of the ’667 Patent, claims 1-3 and 5-7 of the ’199 Patent, claims 1-33, 35, and 37-57 of the ’206 Patent, claims 2-5 of the ’573 Patent, claims 2-4 and 7-12 of the ’195 Patent, and claims 2-8 and 13 of the ’397 Patent;

4. Norwich’s counterclaims of invalidity with respect to claims 2 and 4-16 of the ’667 Patent, claims 1-3 and 5-7 of the ’199 Patent, claims 1-33, 35, and 37-57 of the ’206 Patent, claims 2-5 of the ’573 Patent, claims 2-4 and 7-12 of the ’195 Patent, and claims 2-8 and 13 of the ’397 Patent, shall be dismissed without prejudice;

5. The parties will not rely on any final judgment or dismissal regarding any patent claim entered pursuant to Paragraphs 2, 3, 4, and 5 with respect to Plaintiffs’ assertion of each of

---

amendments or supplements to the label that are required due to an amendment or supplement to the Xifaxan® label.

the Asserted Trial Patent Claims or Norwich's counterclaims and defenses to each of the Asserted Trial Patent Claims in post-trial briefing;

6. Plaintiffs and Norwich agree that any judgment concerning the validity, invalidity, infringement, and/or non-infringement regarding each Asserted Trial Patent Claim shall apply to each patent claim from which that Asserted Trial Patent Claim depends. For avoidance of doubt, this Paragraph shall apply to claim 1 of the '569 Patent, claim 1 of the '667 Patent, claim 34 of the '206 Patent, claims 1 and 6-7 of the '573 Patent, claims 1 and 5 of the '195 Patent, or claims 1 and 9 of the '397 Patent.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Cameron P. Clark*

Jack B. Blumenfeld (#1014)
Karen Jacobs (#2881)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@morrisnichols.com
kjacobs@morrisnichols.com
cclark@morrisnichols.com

*Attorneys for Plaintiffs Salix Pharmaceuticals, Ltd., Salix Pharmaceuticals, Inc., Bausch Health Ireland Ltd., and Alfasigma S.p.A.*

OF COUNSEL:

Scott K. Reed
Steven C. Kline
Shannon K. Clark
Daniel A. Apgar
Alexis M. McJoynt
VENABLE LLP
1290 Avenue of the Americas
New York, NY 10104
(212) 218-2100

SHAW KELLER LLP

*/s/ Karen E. Keller*

Karen E. Keller (#4489)
1105 N. Market St., 12th Floor
Wilmington, DE 19801
(302) 298-0702
kkeller@shawkeller.com

*Attorneys for Defendant Norwich Pharmaceuticals, Inc.*

OF COUNSEL:

Matthew S. Murphy
Chad A. Landmon
Matthew J. Becker
Stacie L. Ropka
Rebecca L. Clegg
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
(860) 275-8100

Damien N. Dombrowski
Becky E. Steephenson
VENABLE LLP
1270 Avenue of the Americas, 24th Floor
New York, NY 10020
(212) 307-5500

May 12, 2022

**SO ORDERED** this 12 day of May, 2022.

/s/ Richard G. Andrews
The Honorable Richard G. Andrews
United States District Court Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SALIX PHARMACEUTICALS, LTD.; SALIX PHARMACEUTICALS, INC.; BAUSCH HEALTH IRELAND LTD.; ALFASIGMA S.P.A., | ) | |
| Plaintiffs, | ) | C.A. No. 20-430 (RGA) |
| v. | ) | |
| NORWICH PHARMACEUTICALS, INC., | ) | |
| Defendant. | ) | |

**FINAL JUDGMENT**

This action, having been tried before the Court from March 21 through March 25, 2022, and the Court having issued an opinion after trial (D.I. 191):

IT IS HEREBY ORDERED and ADJUDGED:

1. Judgment is entered in favor of Plaintiffs Salix Pharmaceuticals, Ltd., Salix Pharmaceuticals, Inc., Bausch Health Ireland Ltd., and Alfasigma S.p.A. (collectively, "Plaintiffs") and against Defendant Norwich Pharmaceuticals, Inc. ("Norwich") on Plaintiffs' claim that Norwich will induce infringement of claim 8 of U.S. Patent No. 8,642,573 (the "'573 Patent"), claim 6 of U.S. Patent No. 9,421,195 (the "'195 Patent"), and claims 11-12 of U.S. Patent No. 10,335,397 (the "'397 Patent").in connection with Norwich's proposed generic rifaximin 550 mg tablets ("ANDA Product") that are the subject of Norwich's Abbreviated New Drug Application ("ANDA") No. 214369.

2. Judgment is entered in favor of Plaintiffs and against Norwich on Norwich's counterclaims for non-infringement and invalidity of claim 8 of the '573 Patent, claim 6 of the '195 Patent, and claims 11-12 the '397 Patent.

3. Judgment is entered in favor of Plaintiffs and against Norwich that pursuant to 35 U.S.C. § 271(e)(2), Norwich's submission of Norwich's ANDA No. 214369 was an act of infringement of claim 8 of the '573 Patent, claim 6 of the '195 Patent, and claims 11-12 the '397 Patent.

4. Judgment is entered in favor of Norwich and against Plaintiffs on Norwich's counterclaims for invalidity of claim 2 of U.S. Patent No. 8,309,569, claim 3 of U.S. Patent No. 10,765,667, claim 4 of U.S. Patent No. 7,612,199, and claim 36 of U.S. Patent No. 7,902,206.

5. Pursuant to 35 U.S.C. § 271(e)(4)(A), it is hereby ordered that the effective date of any final approval by the Food and Drug Administration ("FDA") of Norwich's ANDA No. 214369 is to be a date not earlier than the date of expiration of the last to expire of the '573, '195, and '397 Patents (currently October 2, 2029), plus any regulatory exclusivity to which Plaintiffs are or become entitled. Norwich shall notify the FDA of this judgment within two (2) business days of its entry (with a copy of such notice given simultaneously to Plaintiffs).

6. In the event that a party appeals this Final Judgment, any motion for attorneys' fees and/or costs under Fed. R. Civ. P. 54 and/or Local Rules 54.1 or 54.3, or any motion that this case is exceptional under 35 U.S.C. § 285, shall be considered timely if filed and served within thirty (30) days after final disposition of any such appeal.

SO ORDERED this 10th day of August, 2022.

Richard G. Andrews
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

SALIX PHARMACEUTICALS, LTD.; SALIX PHARMACEUTICALS, INC.; BAUSCH HEALTH IRELAND LTD.; ALFASIGMA S.P.A.,,

Plaintiffs,

v.

NORWICH PHARMACEUTICALS, INC.,

Defendant.

Civil Action No. 20-430-RGA

**MEMORANDUM ORDER**

I filed a final judgment in this case. (D.I. 193). Shortly thereafter, Defendant filed a motion to modify that judgment pursuant to Federal Rule of Civil Procedure 60(b). (D.I. 205). Subsequent briefing made clear that Defendant was primarily relying upon Rule 60(b)(5), which provides: "On motion and just terms, the court may relieve a party . . . from a final judgment, order, or proceeding for the following reasons: . . . (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." Plaintiffs oppose the motion. (D.I. 213).

The background to the pending motion is that Defendant filed an ANDA seeking to make and market a drug for two different methods of treatment—the IBS-D indication and the HE indication. I had a bench trial. After trial, I ruled in Defendant's favor on the IBS-D indication (as well as the composition claims), finding all patent claims asserted in relation to those two issues

FDA_00607

to be invalid. I ruled in Plaintiffs' favor only on the HE indication, finding all claims asserted in relation to that issue to be infringed and not invalid. In the final judgment, I ordered the FDA not to approve the ANDA before the latest expiration (in about 2029) of the patents on which Plaintiffs won. About a month after entry of the final judgment, Defendant filed an amended ANDA that purports to carve out everything relating to the HE indication. Defendant says, if the FDA approves the amended ANDA, Defendant would not be inducing infringement by marketing the pharmaceutical with the amended label. Other than providing the proposed label, Defendant has refused to provide any other information about the amended ANDA, including its status with the FDA or anything else.

I do not think Defendant's request fits in comfortably with the requirements of Rule 60(b)(5), and I do not think, even if it did, that it could be resolved in the summary fashion that Defendant seems to think it should be.

First, the Rule. Defendant says the judgment has been "satisfied," but I think it is pretty clear that the "satisfied, released, or discharged" language is talking about money, and is therefore inapplicable. Defendant says the injunction prohibiting FDA approval before 2029 is "no longer equitable" because Defendant no longer seeks to do the act that was the basis for the injunction. The case law says that Rule 60(b)(5) is for a significant change in circumstances. *See Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992). While such a change in circumstances does not have to be entirely unforeseeable, a "modification should not be granted where a party relies upon events that actually were anticipated at the time" the final judgment was entered. *Id.* at 385. I do not think "changed circumstances" applies here. The case was tried as essentially three independent up-or-down decisions. In my experience with ANDAs, it is common, and certainly not rare, to have split decisions. ANDA practitioners and pharmaceutical companies

FDA_00608

surely know this. Thus, there were a limited number of possible outcomes at trial. But, of course, the trial results are not the changed circumstances, as the actual outcomes were previewed two weeks before the final judgment (D.I. 189) and disclosed at the same time as the final judgment. The only changed circumstance is that Defendant decided to amend its ANDA, which it filed on September 6, 2022 (D.I. 206 at 2), nearly one month after the final judgment. The changed circumstance is simply a voluntary decision of the trial loser to change course, which is neither unanticipated nor unforeseeable.

I also wonder about "equitableness" generally. Defendant made various strategic choices along the way, but now does not want to live with the consequences of those choices.[1] Defendant says that it is now worse off than other generics that settled with Plaintiffs and apparently can launch in 2028. While true, Defendant does not argue that it could not have settled and gotten the same deal as the other generics. Defendant says that it has gone to the effort of proving the asserted composition and IBS-D patent claims invalid, so other generics will be able to enter the market a lot sooner than 2028 by taking advantage of Defendant's accomplishments.[2] Defendant suggests this is inequitable (and perhaps it is), but the inequity does not exist between Plaintiffs and Defendant. To the extent there is inequity, it is between Defendant and other generics. Defendant says that the public will be harmed because Plaintiffs will not have any generic competition (with attendant lower costs) on the IBS-D treatment method for some period of time, even though

---

[1] I was assigned one related ANDA, where Defendant was only seeking approval to market the IBS-D indication, and not the HE indication. *Salix Pharms., Ltd. v. Sun Pharms. Inds., LTD*, No. 19-734-RGA (D.Del. filed April 24, 2019). That Defendant quickly resolved its case with Plaintiffs.

[2] This may be a bit speculative too, because Plaintiffs have lots of relevant patents and patent claims, and, while presumably they advanced their best claims at the trial in this case, I would expect they have more listed in the Orange Book to assert against the next generic to file an ANDA.

FDA_00609

Plaintiffs have no right to a monopoly on that treatment method. This is a bit speculative, since there is no information about if or when the FDA might approve the amended ANDA.

Second, the record. It is not a simple matter to determine whether an ANDA applicant has successfully carved out language from a label to turn infringement into non-infringement.[3] Defendant, other than saying it has successfully carved out the HE indication, and providing me the label, has presented no evidence in support of its assertion. Further, Rule 60(b) "does not allow relitigation of issues that have been resolved by the judgment." 11 WRIGHT, MILLER, & KANE, FEDERAL PRACTICE AND PROCEDURE § 2863, at 459 (3d ed. 2012). Defendant presents no facts indicating that it could not have litigated the carve-out or that it was denied a full and fair opportunity to do so. *Allergan, Inc. v. Sandoz Inc.*, 2013 WL 6253669, at *3 (E.D. Tex. Dec. 3, 2013), *aff'd*, 587 F. App'x 657 (Fed. Cir. 2014). As in *Allergan*, Defendant fully litigated the merits of its non-infringement and invalidity case, lost, and now seeks a way around the final judgment through Rule 60(b) that "is tantamount to seeking summary judgment premised on new allegations that only came to exist after the final judgment was rendered . . . ." *Id.*

Defendant states that Plaintiffs have not tried to state a claim against the carve out, and therefore, they cannot. I am unpersuaded that Plaintiffs have some duty now to state a claim on something that Defendant never raised as an issue before entry of final judgment. It is not surprising that Defendant has cited no case that requires a plaintiff to be able to state a claim on a new issue after judgment. What Defendant wants would essentially be a second litigation.

[3] I had an ANDA trial in January 2023 where one of the issues is whether the carve out has been successful. The issue is hotly disputed. *See Sanofi-Aventis U.S. LLC v. Sandoz, Inc.*, No. 20-804-RGA, D.I. 355 at 2 (D.Del. Feb. 17, 2023) (arguing non-infringement because Sandoz removed certain information from its proposed label).

Third, the law. Plaintiffs say, and Defendant does not present any argument to the contrary, that what Defendant seeks is unprecedented in an ANDA case. I am hesitant to be the first, because it just seems wrong to me that Defendant can litigate a case through trial and final judgment based on a particular ANDA, and then, after final judgment, change the ANDA to what it wishes it had started with, and win in a summary proceeding.

Thus, I DENY Defendant's Rule 60(b) motion. (D.I. 205).

IT IS SO ORDERED this 17th day of May, 2023.

Richard G. Andrews
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NORWICH PHARMACEUTICALS, INC.,

*Plaintiff*,

v.

XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services,

ROBERT M. CALIFF, M.D., in his official capacity as Commissioner of Food and Drugs,

and

UNITED STATES FOOD AND DRUG ADMINISTRATION,

*Defendants*.

Civil Action No. 23-1611

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

I. NEW AND ABBREVIATED DRUG APPLICATION REQUIREMENTS .......................... 4

II. TENTATIVE APPROVAL ............................................................................................ 6

I. SALIX'S XIFAXAN AND ORANGE BOOK PATENTS.................................................... 7

II. OTHER ANDA FILERS FOR RIFAXIMIN ...................................................................... 9

III. NORWICH'S ANDA AND FDA'S REFUSAL TO GRANT IT FINAL APPROVAL... 10

I. NORWICH IS LIKELY TO SUCCEED ON THE MERITS . ............................................ 15

A. FDA Refused Approval of Norwich's Carved Out Label in Contravention of its Regulations, Prior Position Statements, and Case Law Discussing the Policy Interests of Granting Approval for Carved Out Labels............................................... 15

*1. FDA Should Have Approved Norwich's Amended ANDA "Immediately" upon Submitting a Section viii Statement under FDA's Regulations. ........................................... 15*

*2. FDA's Guidance and Case Law Both Provide that Norwich's Amended ANDA with a Carved Out Indication is Proper and Satisfies Congress's Purpose of the Hatch-Waxman Act. 19*

B. FDA's Decision is Not Entitled to Deference. ...................................................... 22

II. NORWICH WILL SUFFER IRREPARABLE HARM ABSENT IMMEDIATE RELIEF FROM THIS COURT. ................................................................................................ 24

A. Norwich Will Incur Substantial and Irrecoverable Economic Loss............... 24

B. Norwich Will Be Irreparably Harmed by the Impairment of Its *De Facto* First-Mover Advantage. ........................................................................................ 25

III. GRANTING THE PRELIMINARY INJUNCTION WILL NOT SUBSTANTIALLY INJURE ANY INTERESTED PARTY. ........................................................................ 29

IV. PRELIMINARY RELIEF WILL FURTHER THE PUBLIC INTEREST........................ 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Sandoz, Inc.*,
500 F. Supp. 2d 846 (N.D. Ill. 2007) ....................26, 30

*Abbott Labs. v. Sandoz, Inc.*,
544 F.3d 1341 (Fed. Cir. 2008)....................27

*Albany Molecular Research, Inc. v. Dr. Reddy's Labs., Ltd.*,
No. 09-cv-4638, 2010 WL 2516465 (D.N.J. June 14, 2010)....................27

*Am. Hosp. Ass'n v. Becerra*,
142 S. Ct. 1896 (2022)....................23

*AstraZeneca v. Apotex*,
669 F.3d 1370 (Fed. Cir. 2012)....................20

*Auer v. Robbins*,
519 U.S. 452 (1997)....................22, 23

*In re Barr Labs., Inc.*,
930 F.2d 72 (D.C. Cir. 1991)....................21, 32

*Biovail Corp. v. U.S. Food & Drug Admin*,
519 F. Supp. 2d 39 (D.D.C. 2007)....................30

*Bowles v. Seminole Rock & Sand Co.*,
325 U.S. 410 (1945)....................22

*Bracco Diagnostics, Inc. v. Shalala*,
963 F. Supp. 20 (D.D.C. 1997)....................25, 26, 29, 32

*Bristol-Myers Squibb Co. v. Shalala*,
91 F.3d 1493 (D.C. Cir. 1996)....................20

*Bristol-Myers Squibb Co. v. Shalala*,
923 F. Supp. 212 (D.D.C. 1996)....................30

*Butamax Advanced Biofuels LLC v. Gevo, Inc.*,
868 F. Supp. 2d 359 (D. Del. 2012)....................26, 30, 31

*Capitol Hill Baptist Church v. Bowser*,
496 F. Supp. 3d 284 (D.D.C. 2020)....................14, 15

*Caraco Pharm. Lab'ys, Ltd. v. Forest Lab'ys, Inc.*,
527 F.3d 1278 (Fed. Cir. 2008)....................21

*Feinerman v. Bernardi*,
558 F. Supp. 2d 36 (D.D.C. 2008)....................25

*Georgia v. Brooks-La Sure*,
No. 2:22-cv-6, 2022 WL 3581859 (S.D. Ga. Aug. 19, 2022)....................21

*Glaxo Grp. Ltd. v. Apotex, Inc.*,
376 F.3d 1339 (Fed. Cir. 2004)....................5

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
45 F.4th 306 (D.C. Cir. 2022)....................23

*Illinois Tool Works, Inc. v. Grip-Pak, Inc.*,
906 F.2d 679 (Fed. Cir. 1990)....................31

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019)....................22, 23

*Loper Bright Enterprises v. Raimondo*,
No. 22-451, 2023 WL 3158352 (May 1, 2023)....................23

*Mova Pharm. Corp. v. Shalala*,
140 F.3d 1060 (D.C. Cir. 1998)....................25

*Mova Pharm. Corp. v. Shalala*,
955 F. Supp. 128 (D.D.C. 1997)....................24, 25

*Mylan Pharm., Inc. v. Shalala*,
81 F. Supp. 2d 30 (D.D.C. 2000)....................1

*Mylan Pharms., Inc. v. Sebelius*,
856 F. Supp. 2d 196 (D.D.C. 2012)....................30

*Mylan Pharms., Inc. v. Thompson*,
268 F.3d 1323 (Fed. Cir. 2001) *superseded by statute on other grounds*,
*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399 (2012)....................24

*Pantoja v. Martinez*,
No. 21-7118, 2022 WL 893017 (D.C. Cir. Mar. 25, 2022)....................15

*Pearson v. Shalala*,
130 F. Supp. 2d 105 (D.D.C. 2001)....................14

*Pharmacia & Upjohn Co. v. Ranbaxy Pharms., Inc.*,
274 F. Supp. 2d 597 (D.N.J. 2003), *aff'd in relevant part*, 85 F. App'x 205 (Fed. Cir. 2003) ....27, 32

*Purepac Pharm. Co. v. Thompson*,
238 F. Supp. 2d 191 (D.D.C. 2002), *aff'd*, 354 F.3d 877 (D.C. Cir. 2004) ....21

*Teva Pharms., USA, Inc. v. FDA*,
182 F.3d 1003 (D.C. Cir. 1999) ....26

*Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*,
482 F.3d 1330 (Fed. Cir. 2007) ....3, 21

*TorPharm, Inc. v. Shalala*,
No. Civ. A. 97–1925(JR), 1997 WL 33472411 (D.D.C. Sep. 15, 1997) ....26, 28, 32

*TorPharm, Inc. v. Thompson*,
260 F. Supp. 2d 69 (D.D.C. 2003), *aff'd sub nom. Purepac Pharm. Co. v. Thompson*, 354 F.3d 877 (D.C. Cir. 2004) ....5

*Trebro Mfg., Inc. v. Firefly Equip., LLC*,
748 F.3d 1159 (Fed. Cir. 2014) ....27

*Warner–Lambert Co. v. Apotex Corp.*,
316 F.3d 1348 (Fed. Cir. 2003) ....5, 13, 20

*Whitaker v. Thompson*,
248 F. Supp. 2d 1 (D.D.C. 2002) ....29, 32

**Statutes**

21 U.S.C. § 355 .... *passim*

21 U.S.C. § 393 ....29

35 U.S.C. § 271 .... *passim*

FD&C Act section 505(j)(2)(A)(viii) ....20

FD&C Act section 505(j)(5)(B)(iv) ....14

**Other Authorities**

21 C.F.R. § 314.3(b) ....7

21 C.F.R. § 314.53 ....4, 12

*21 C.F.R. § 314.94 .... *passim*

*21 C.F.R. § 314.107 ........ *passim*

59 Fed. Reg. 50338, 50347 (Oct. 3, 1994) ........ 5, 16

59 Fed. Reg. 50338, 50364-65 ........ 18

65 Fed. Reg. 67012, 67013 ........ 29

80 Fed. Reg. 6802, 6803 (Feb. 6, 2015) ........ 18

81 Fed. Reg. 69580, 69624 (Oct. 6, 2016) ........ 6, 17

81 Fed. Reg. 69580, 69649-51 (Oct. 6, 2016) ........ 18

**INTRODUCTION**

When an Abbreviated New Drug Application ("ANDA") applicant converts its Paragraph IV certification to a section viii statement, the unambiguous regulations of the Food and Drug Administration ("FDA") contemplate *immediate* approval of the amended application. 21 C.F.R. § 314.94(a)(12)(viii)(A); 21 C.F.R. § 314.107(b)(1)(ii). Yet, on June 2, 2023, FDA refused to grant Norwich Pharmaceuticals, Inc.'s ("Norwich") ANDA final approval until the expiration of three method of use patents, and only granted tentative approval despite acknowledging Norwich's properly-filed section viii statements to those same patents. Norwich now seeks mandatory preliminary injunctive relief, finding that FDA's decision to grant tentative approval rather than final approval is arbitrary, capricious, and contrary to law and altering the *status quo* by requiring FDA to approve Norwich's ANDA immediately. *See, e.g.*, *Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 36 (D.D.C. 2000).

In August 2022, the Delaware District Court held that the proposed labeling in Norwich's Original ANDA for the reduction of the risk of overt hepatic encephalopathy recurrence in adults (the "HE Indication") would induce the infringement of four claims from three asserted method of use patents ("the Asserted HE Patents"), and that Norwich's ANDA should not be approved until October 2, 2029, the date the Asserted HE Patents expired. Thereafter, Norwich amended its ANDA to carve out the HE Indication from its ANDA label and submit a section viii statement to each of the Asserted HE Patents in accordance with Section 314.94(a)(12)(viii)(A). Norwich's ANDA, as amended ("Norwich's Amended ANDA"), does not seek approval of its generic rifaximin 550 mg tablets for the HE Indication. Nor does it contain a Paragraph IV patent certification to any patent held to have been infringed under 35 U.S.C. § 271(e)(2). FDA's decision to nevertheless withhold final approval of Norwich's Amended ANDA for the

treatment of irritable bowel syndrome with diarrhea ("IBS-D") based on the Delaware District Court's order is contrary to FDA's own unambiguous regulations, as well as the stated policy objectives behind carve outs and the Hatch-Waxman Act. It appears that FDA's decision to not grant final approval is because of the Delaware District Court's decision that Norwich's ANDA could not be granted final approval due to the Asserted HE Patents. But that decision is irrelevant because Norwich's Amended ANDA does not seek approval for the HE Indication, and therefore FDA should have granted final approval. FDA's decision is arbitrary, capricious, and contrary to law, and should thus be set aside by this Court.

Further, FDA's decision is causing Norwich to suffer irreparable harm. Norwich has an immediately-approvable generic product, has succeeded in its patent invalidity challenges regarding patents directed to the drug compound and the IBS-D indication, and has a path to market the first generic 550 mg rifaximin tablet for IBS-D. Each day that Norwich is delayed from obtaining FDA clearance is a day closer to another ANDA filer exploiting the pathway that Norwich has blazed and eliminating any first-mover advantages.

FDA's refusal to grant final approval also goes against the public interest by blocking consumer access to less-expensive generic alternatives. Despite the millions of IBS-D patients in the U.S. in need of generic 550 mg rifaximin tablets for treatment, only the brand version is currently available on the market, even though the patents covering the drug product and the IBS-D indication have been invalidated by the Delaware District Court. FDA's continued insistence that Norwich should not be approved prevents consumers from accessing a cheaper generic alternative that, once approved, Norwich is ready and able to launch its ANDA Product in a short amount of time. Zaku Decl. at ¶ 7. In a time of great uncertainty with an overburdened healthcare system and patient budgets stretched thin by inflation, it is now more

important than ever to get generic products into the market as quickly as possible. FDA's arbitrary, capricious, and unlawful refusal to grant final approval will wrongfully delay the launch of Norwich's ANDA product. Each passing day diminishes Norwich's opportunity to exploit its anticipated first-mover advantage. Norwich is entitled to a preliminary injunction, setting aside FDA's decision to grant only tentative approval as arbitrary, capricious, and contrary to law, and ordering FDA to grant final approval to Norwich's Amended ANDA.

## THE STATUTORY FRAMEWORK FOR GENERIC DRUG ENTRY

The Federal Food Drug & Cosmetic Act ("FDCA") establishes the requirements for marketing drugs in the United States. In 1984, Congress amended the FDCA to provide an abbreviated pathway for manufacturers to obtain approval for generic drugs by relying on FDA's finding that the previously approved brand drug (i.e., reference listed drug, or "RLD") is safe and effective. The central purpose of the 1984 FDCA amendments (commonly referred to as the "Hatch-Waxman Amendments" or the "Hatch-Waxman Act"), codified at 21 U.S.C. § 355 and 35 U.S.C. §§ 156, 271(e) and 282, is "'to enable competitors to bring cheaper, generic . . . drugs to market as quickly as possible.'" *Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*, 482 F.3d 1330, 1344 (Fed. Cir. 2007) (citing 149 Cong. Rec. S15885 (Nov. 25, 2003)).

## I. NEW AND ABBREVIATED DRUG APPLICATION REQUIREMENTS

Before marketing a new drug in the United States, the FDCA requires a drug company to submit a New Drug Application ("NDA") to FDA, and FDA must approve it. *See* 21 U.S.C. § 355(a), (b).[1]

The NDA applicant must identify each patent that claims the drug or a method of using the drug that is the subject of the NDA and that could reasonably be asserted in a patent infringement action. *See* 21 U.S.C. § 355(b)(1)(A)(viii); 21 C.F.R. § 314.53. The NDA applicant must also submit, under penalty of perjury, information on each approved method of use covered by patent – known as a "use code." Use codes "assist . . . ANDA applicants in determining whether a listed method-of-use patent claims a use for which the . . . ANDA applicant is not seeking approval[.]" 21 C.F.R. § 314.53(c)(2)(i)(O), (c)(2)(ii)(P)(3). Once FDA approves an NDA, FDA publishes the patent information submitted by the brand name drug company – including any use codes for method-of-use patents – in the Approved Drug Products with Therapeutic Equivalence Evaluations (known as the "Orange Book"). *See* 21 U.S.C. § 355(b)(1)(A)(viii); 21 C.F.R. § 314.53(e). For approved NDAs, the NDA applicant's use code "must describe only the approved method(s) of use claimed by the patent for which a claim of patent infringement could reasonably be asserted[.]" 21 C.F.R. § 314.53(b).

A company seeking FDA approval for a generic version of an RLD must file, in addition to technical data, one of four patent certifications with FDA; the relevant patent certification here being (IV) the patent is invalid, unenforceable, or will not be infringed by the manufacture, use, or sale of the generic drug for which the ANDA is submitted. *See* 21 U.S.C.

[1] New drugs generally are referred to as "brand name" drugs because they are marketed under a trademark for the drug product rather than the chemical name for the active ingredient in the drug product.

§ 355(j)(2)(A)(vii); 21 C.F.R. § 314.94(a)(12)(i)(A)(4)(i). This is known as a "Paragraph IV certification." *See* 21 C.F.R. § 314.94(a)(12)(i)(A)(4)(i).

If an ANDA applicant submits a Paragraph IV certification to FDA, it must provide notice of such certification – or a "Notice Letter" – to the patent owner and the NDA holder, which then triggers when a patent infringement suit must be filed, and creates a 30-month stay. *See* 21 U.S.C. § 355(j)(2)(B)(iii), 355(j)(5)(B)(iii).[2] The effective date of approval of an ANDA with any patent certification is governed by 21 U.S.C. § 355(j)(5)(B).

An alternative to filing a Paragraph IV or other patent certification is a statement filed under 21 U.S.C. § 355(j)(2)(A)(viii) that the applicant is not seeking FDA approval for a patented method of use (a "section viii statement"). *See Warner–Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1360–61 (Fed. Cir. 2003). Paragraph IV certifications and section viii statements are "mutually exclusive alternatives," and the "factor that determines which is proper is whether the use patent at issue actually claims a use for which the generic applicant is seeking approval. If it does, a paragraph IV certification is required; if not, the ANDA should include a section viii statement." *TorPharm, Inc. v. Thompson*, 260 F. Supp. 2d 69, 74 (D.D.C. 2003), *aff'd sub nom. Purepac Pharm. Co. v. Thompson*, 354 F.3d 877 (D.C. Cir. 2004). According to FDA, "if a patent claims a method of using the listed drug, and labeling for the ANDA applicant's proposed drug product does not contain any indications covered by the method of use patent, the ANDA applicant" should submit a section viii statement, not a Paragraph IV certification. ANDA Regulations, Patent and Exclusivity Provisions, 59 Fed. Reg. 50338, 50347 (Oct. 3, 1994).

[2] Filing an ANDA with a Paragraph IV certification constitutes an artificial act of infringement. *See Glaxo Grp. Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1349 (Fed. Cir. 2004) (citing *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 678 (1990)).

Following a final court decision of infringement from which no appeal is or can be taken, an ANDA applicant for a method of use may, pursuant to FDA regulation: (1) forego approval for the patented method of use until the relevant patent expires by changing its Paragraph IV certification to a Paragraph III certification[3]; or (2) "amend[] its ANDA such that the applicant is no longer seeking approval for a method of use claimed by the patent" (i.e., convert the Paragraph IV certification to a section viii statement). 21 C.F.R. § 314.94(a)(12)(viii)(A). If a Paragraph IV certification is converted to a section viii statement "explaining that [the] method-of-use patent does not claim an indication or other condition of use for which the applicant is seeking approval and submits proposed labeling that appropriately carves out information related to the patented method of use," then FDA may approve the amended ANDA "immediately." 81 Fed. Reg. 69580, 69624 (Oct. 6, 2016); 21 C.F.R. § 314.107(b)(1)(ii). Thus, once the Paragraph IV certification has been converted to a section viii statement, the approval is governed by 21 U.S.C. § 355(j)(5)(A), wherein FDA shall approve the application "[w]ithin one hundred and eighty days" of the initial receipt of an application, rather than 21 U.S.C. § 355(j)(5)(B), which regulates approval when there is a patent certification.

## II. TENTATIVE APPROVAL

When an ANDA is deemed safe and effective by FDA and otherwise would be eligible for final approval but for unexpired patents or exclusivities, FDA will instead grant the application tentative approval. *See* ANDA Submissions – Amendments and Requests for Final

---

[3] A Paragraph III certification states that the patent will expire on a particular date, until such time the generic company is not seeking approval to market its generic product. 21 U.S.C. § 355(j)(2)(A)(vii)

Approval to Tentatively Approved ANDAs, at 4 (Sept. 2020).[4] But, "[a] drug product that is granted tentative approval is not an approved drug and will not be approved until FDA issues an approval letter[.]" 21 C.F.R. § 314.3(b). As such, "tentative approval does not allow the applicant to market [its] generic drug product." Drugs@FDA Glossary of Terms, U.S. Food and Drug Admin. (Nov. 14, 2017).[5] Tentative approval therefore "delays final approval of the generic drug product until all patent or exclusivity issues have been resolved." *Id.*

## STATEMENT OF FACTS

### I. SALIX'S XIFAXAN AND ORANGE BOOK PATENTS

Salix Pharmaceuticals, Inc. ("Salix") is the holder of NDA No. 021361 ("Salix's NDA") for rifaximin tablets under the brand name Xifaxan, which is currently the only rifaximin product available on the market. *See* Orange Book, 43rd Edition, at 3-397 (Jan. 2023).[6] Xifaxan 550 mg rifaximin tablets are indicated for the treatment of IBS-D in adults and for the reduction of the risk of overt hepatic encephalopathy ("HE") recurrence in adults. Each of these indications for Xifaxan has a different dosing regimen. *See* Label for XIFAXAN® (rifaximin) tablets, for oral use, Bridgewater, NJ: Valeant Pharmaceuticals North America LLC, Initial U.S. Approval: 2004

---

[4] *Available at* https://www.fda.gov/media/119718/download (last visited June 4, 2023).

[5] *Available at* https://www.fda.gov/drugs/drug-approvals-and-databases/drugsfda-glossary-terms. (last visited June 4, 2023).

[6] *Available at* https://www.fda.gov/media/71474/download (last visited June 4, 2023).

at 1.2, 1.3, 2.2, and 2.3.[7] Norwich currently seeks FDA approval to market generic rifaximin 550 mg tablets only for the treatment of IBS-D.[8]

The cost of Xifaxan is astounding. Salix's parent company reported domestic annual sales for all of Xifaxan's uses, including its substantial use for the treatment of IBS-D, of over $1.69 billion in 2022. *See* Bausch Health Companies Inc. 2022 Annual Report at 83.[9] According to GoodRx, a 14-day course of treatment (totaling 42 Xifaxan 550 mg tablets) for IBS-D retails for around $2,300.[10]

By 2019, Salix listed 23 patents[11] in the Orange Book with various Use Codes. These Use Codes include:[12]

- U-2643: Treatment Of Irritable Bowel Syndrome With Diarrhea (IBS-D) In Adults 65 Years Of Age Or Older And Symptoms Thereof

---

[7] *Available at* https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/021361s023lbl.pdf (last visited June 4, 2023).

[8] A 200 mg strength of rifaximin is indicated for the treatment of travelers' diarrhea. The issues involved in this litigation, however, relate solely to the 550 mg strength of rifaximin.

[9] https://ir.bauschhealth.com/~/media/Files/V/Valeant-IR/reports-and-presentations/ny20007033x3-ars-bausch-health-edgar-asfiled.pdf (last visited June 4, 2023). Salix reported $2.09 billion in sales and 81% of those were due to Xifaxan, which results in $1.69 billion for Xifaxan.

[10] GOODRX: XIFAXAN, https://www.goodrx.com/xifaxan?form=tablet&dosage=550mg&quantity=42&label_override=xifaxan (last visited June 4, 2023)

[11] U.S. Patent Nos. 10,314,828; 10,335,397; 10,456,384; 7,045,620; 7,612,199; 7,902,206; 7,906,542; 7,915,275; 8,158,644; 8,158,781; 8,193,196; 8,309,569; 8,518,949; 8,642,573; 8,741,904; 8,829,017; 8,835,452; 8,853,231; 8,946,252; 8,969,398; 9,271,968; 9,421,195; and 9,629,828. https://thefdalawblog.com/wp-content/uploads/2020/06/OB-Annual-2020-40th-Ed.pdf at ADA 231 (last visited June 4, 2023).

[12] *See id.* at ADA 231, ADB 101, 103-04, 108, 118, 142, 144.

- U-2644: Treatment Of Irritable Bowel Syndrome With Diarrhea (IBS-D) In Adults 65 Years Of Age Or Older
- U-1707: Treatment Of Irritable Bowel Syndrome With Diarrhea (IBS-D) In Adults And Symptoms Thereof
- U-1708: Treatment Of Irritable Bowel Syndrome With Diarrhea (IBS-D) In Adults
- U-1526: The Treatment Of Patients With Travelers' Diarrhea (TD) Or The Reduction In Risk Of Overt Hepatic Encephalopathy (HE) Recurrence
- U-1481: Reduction In Risk Of Overt Hepatic Encephalopathy (HE) Recurrence
- U-2579: Reduction In A Subject's Risk Of Experiencing A Breakthrough Overt Hepatic Encephalopathy (HE) Episode
- U-1562: Treatment Of Patients With Hepatic Encephalopathy (HE)
- U-1994: Reduction In Risk Of Overt Hepatic Encephalopathy (HE) In Adults.

## II. OTHER ANDA FILERS FOR RIFAXIMIN

On information and belief, Teva Pharmaceutical Industries Ltd. (hereinafter, "Teva")[13] and at least two other rifaximin ANDA applicants, Sandoz, Inc. ("Sandoz") and Sun Pharmaceutical Industries, Inc. ("Sun"), engaged in and settled their patent litigation with Salix, Bausch Health Ireland Ltd., and Alfasigma S.p.A., whereby they agreed to refrain from marketing their generic products until January 1, 2028. *See* Press Release, Bausch Health, Bausch Health Announces Resolution of XIFAXAN® Intellectual Property Litigation (Sep. 12,

---

[13] Actavis Laboratories FL, Inc. (hereinafter, "Actavis") was the filer of ANDA No. 208959, but Teva announced that it acquired Actavis on August 2, 2016, and is therefore the holder of ANDA No. 208959. *See* Press Release, Teva, Teva Completes Acquisition of Actavis Generics (August 2, 2016), *available at* https://www.tevapharm.com/news-and-media/latest-news/teva-completes-acquisition-of-actavis-generics/#:~:text=Teva%20Pharmaceutical%20Industries%20Ltd.,(%E2%80%9CActavis%20Generics%E2%80%9D) (last visited June 4, 2023). Any documents discussing "Actavis" therefore apply to Teva.

2018) (hereinafter, "Bausch-Teva Press Release"); Press Release, Bausch Health, Bausch Health And Alfasigma Announce Resolution Of XIFAXAN® Intellectual Property Litigation (May 06, 2020); Press Release, Bausch Health, Bausch Health And Alfasigma Announce Resolution Of XIFAXAN® Intellectual Property Litigation (Sep. 22, 2020) (collectively, "Bausch Press Releases").[14] The terms of that settlement also allow Teva the option to launch an "authorized generic" of rifaximin – an unbranded version of Xifaxan marketed under Salix's NDA[15] – instead of selling its own generic ANDA product. Bausch-Teva Press Release.[16] Finally, the settlement allows all three manufacturers to market their generic rifaximin products before 2028 should a competitor enter the market. *Id*.

## III. NORWICH'S ANDA AND FDA'S REFUSAL TO GRANT IT FINAL APPROVAL

In December 2019, Norwich submitted ANDA No. 214369 ("Norwich's Original ANDA") to FDA, seeking authorization to market generic rifaximin 550 mg tablets ("Norwich's ANDA Product"). *Salix Pharms., Ltd., Salix Pharms., Inc., Bausch Health Ireland Ltd., and Alfasigma S.p.A. v. Norwich Pharms. Inc.*, No. 1-20-cv-00430-RGA (D. Del.) (hereinafter "*Salix v. Norwich*"), ECF No. 158 at ¶ 16, Landmon Decl., Ex. 1. Norwich's

[14] https://ir.bauschhealth.com/tools/viewpdf.aspx?page={3862BA6E-F366-4B8B-80DA-7507A2665FC1} (last visited June 4, 2023); https://www.prnewswire.com/news-releases/bausch-health-and-alfasigma-announce-resolution-of-xifaxan-intellectual-property-litigation-301053561.html (last visited June 4, 2023); https://ir.bauschhealth.com/news-releases/2020/09-22-2020-120037282 (last visited June 4, 2023).

[15] Food and Drug Administration *FDA List of Authorized Generics Drugs*, WWW.FDA.GOV, https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/fda-list-authorized-generic-drugs (explaining that an "'authorized generic' drug is most commonly used to describe an approved brand name drug that is marketed without the brand name on its label.") (last visited June 4, 2023).

[16] https://ir.bauschhealth.com/tools/viewpdf.aspx?page={3862BA6E-F366-4B8B-80DA-7507A2665FC1} (last visited June 4, 2023).

Original ANDA contained Paragraph IV certifications for all 23 patents listed in the Orange Book for rifaximin tablets at the time of filing. *See* 2020 Orange Book at 231.[17]

After receiving Norwich's Notice Letter, Salix filed a patent suit against Norwich in the U.S. District Court for the District of Delaware under 35 U.S.C. § 271(e)(2) based on the Paragraph IV certifications.[18] *Salix v. Norwich*, Exhibit 1 to ECF No. 158 at ¶ 119, Landmon Decl., Ex. 2. A four-day bench trial was held in March 2022, and the court issued its opinion and judgment on August 10, 2022. *Salix v. Norwich*, ECF No. 191, Landmon Decl., Ex. 23; *id.*, ECF No. 193 (hereinafter, the "Final Judgment"), Landmon Decl., Ex. 3. The court held that the patents covering polymorphic forms of the rifaximin drug substance and patents directed to the use of rifaximin to treat IBS-D were invalid as obvious. *Salix v. Norwich*, ECF No. 191 at 46, Landmon Decl., Ex. 2. The court also held that Norwich's original ANDA label seeking approval for the HE Indication would induce a third party to infringe the asserted claims of the HE Patents. It further held that the asserted claims of the HE Patents relating to the HE Indication had not been proven invalid. *Id.* Norwich has not, and does not intend to, appeal the district court's holdings that Norwich's Original ANDA infringes the Asserted HE Patents or that the HE Patents had not been shown invalid.

Based on these mixed holdings and over Norwich's objection to the scope of the Final Judgment, the court ordered "that the effective date of any final approval by [FDA] of [Norwich's Original ANDA] is to be a date not earlier than the date of expiration of the last to

[17] *See* n. 11, 12 *supra*.

[18] Salix eventually asserted all 23 patents plus three additional patents that were not listed in the Orange Book when Norwich submitted its ANDA. *See Salix v. Norwich*, Exhibit 1 to ECF No. 158 at 1, Landmon Decl., Ex. 1.

expire" of the Asserted HE Patents,[19] i.e., October 2029. *Salix v. Norwich*, ECF No. 193 at ¶ 5, Landmon Decl., Ex. 3; *see also id.*, ECF No. 192, Landmon Decl., Ex. 4. In a separate Memorandum regarding a dispute over the Final Judgment, the court recognized that "Norwich may seek to carve out the HE [I]ndication as permitted by 21 U.S.C. § 355(j)(2)(A)(viii)." *Salix v. Norwich*, ECF No. 192 at 2, Landmon Decl., Ex. 4. However, it deemed a section viii carve out "immaterial" to the analysis as to the parameters of the judgment because such a carved out label had not been before the court. *Id.*

Following the entry of the court's Final Judgment, Norwich amended its proposed ANDA label to seek approval for only the IBS-D Indication. Accordingly, Norwich filed an amendment to its ANDA carving out the HE Indication, withdrawing its Paragraph IV certifications to the HE patents ("Norwich's Amended ANDA"), and submitting section viii statements to the HE Patents. J. Ibrahim Ltr. to J. Sachdeva re: ANDA Tenative Approval (hereafter, the "TA Letter"), Compl., Ex. 1. Because Norwich's amended ANDA label carves out the HE Indication, it does not overlap with any patent use code listed by Salix in the Orange Book for the Asserted HE Patents: U-1481: "reduction in the risk of overt [HE] recurrence"; and U-2579: "reduction in a subject's risk of experiencing a breakthrough overt [HE] episode."[20] Norwich's Amended ANDA label for only the IBS-D Indication also does not contain any of the Xifaxan labeling information identified and submitted by Salix for the HE Indication. *See, e.g.,* Salix Pharmaceuticals, Inc. Form FDA 3542 for U.S. Patent No. 10,335,397, Landmon Decl., Ex. 5; *see also* 21 C.F.R. 314.53(d).

---

[19] The "Asserted HE Patents" refers to claim 8 of U.S. Patent No. 8,642,573 (the "'573 Patent"), claim 6 of U.S. Patent No. 9,421,195 (the "'195 Patent"), and claims 11-12 of U.S. Patent No. 10,335,397 (the "'397 Patent").

[20] *See* n. 11, 12 *supra*.

Norwich thereafter moved the court to modify the order relating to the "effective date" of final approval of Norwich's Original ANDA because Norwich's Amended ANDA does not seek approval for the HE Indication, maintains a section viii statement to the Asserted HE Patents, and does not contain a Paragraph IV certification to the Asserted HE Patents. *Salix v. Norwich*, ECF No. 205 at 1, Landmon Decl., Ex. 6. The district court denied Norwich's motion. *Salix v. Norwich,* ECF No. 222 at 5, Landmon Decl., Ex. 7.

Norwich's Amended ANDA seeks approval for the IBS-D Indication. It does not seek approval for the HE Indication and does not contain a Paragraph IV certification to any of the Asserted HE Patents, and therefore a consideration of infringement of the Asserted HE Patents – which have patent use codes directed exclusively to the HE Indication – under Section 271(e)(2) is irrelevant to FDA's grant of final approval of Norwich's Amended ANDA.[21] The Delaware District Court has not rendered any judgment concerning any infringement of the Asserted HE Patents by Norwich's Amended ANDA. *Salix v. Norwich*, ECF No. 222 at 2, Landmon Decl., Ex. 7. Further, because Norwich converted to section viii statements instead of the Paragraph IV certifications for each of the Asserted HE Patents, the district court's order pursuant to 35 U.S.C. §271(e)(4)(A)(1) regarding Norwich's Original ANDA is not relevant to the date of final approval of Norwich's Amended ANDA.

---

[21] Even Salix has recognized this. *See* Press Release, Bausch Health, Bausch Health to Appeal XIFAXAN® Patent Decision to U.S. Court of Appeals for the Federal Circuit (Aug. 10, 2022), *available at* https://www.bauschhealth.com/news-room/news-releases/news-details/202208101800PR_NEWS_USPR_____NY35904 ("Unless and until FDA approves a revised ANDA by Norwich that omits the XIFAXAN HE indication . . . Norwich is not permitted to launch a generic equivalent of rifaximin."). *See also Warner-Lambert*, 316 F.3d at 1365-65 ("[A] request to make and sell a drug labeled with a permissible (non-infringing) use cannot reasonably be interpreted as an act of infringement (induced or otherwise) with respect to a patent on an unapproved use, as the ANDA does not induce anyone to perform the unapproved acts required to infringe.").

On June 2, 2023, FDA granted only tentative approval to Norwich's ANDA. (TA Letter.) FDA's June 2 Tentative Approval Letter stated that "final approval cannot be granted until October 2, 2029 as specified in the [District of Delaware] court order."[22] (TA Letter at 3.) But in the very next paragraph, FDA acknowledged that Norwich's Amended ANDA contained section viii statements regarding the Asserted HE Patents and that "these are method-of-use patents that do not claim any indication for which you are seeking approval under your ANDA." (TA Letter at 3-4.) By granting tentative approval, FDA also apparently agreed that the label sufficiently carved out the HE Indication. (*Id.* (acknowledging that Norwich appropriately filed section viii statements – and thus the corresponding label carve outs – to HE-related use codes, but that it could not provide final approval due to the "court order.").) FDA's arbitrary and capricious determination is denying Norwich its hard-earned market access, degrading Norwich's first-mover advantage, and waylaying any relief to patients and payors from a lower-cost generic rifaximin product.

**ARGUMENT**

Courts must weigh four factors in deciding whether to grant a preliminary injunction: (1) whether there is a substantial likelihood that the movant will succeed on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not granted; (3) whether the injunction will substantially injure other interested parties; and (4) whether the public interest would be furthered by the injunction. *See Pearson v. Shalala*, 130 F. Supp. 2d 105, 112 (D.D.C. 2001) (citing *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998)).[23]

---

[22] FDA's Tentative Approval Letter also states that "[t]his letter does not include information related to the 180-day exclusivity provisions under section 505(j)(5)(B)(iv) of the FD&C Act." (TA Letter at 1.)

[23] Norwich is seeking mandatory preliminary injunctive relief because its request for final approval seeks to alter, rather than preserve, the *status quo*. *See, e.g.*, *Capitol Hill Baptist*

Here, all four factors weigh strongly in favor of granting immediate relief to Norwich by ordering that FDA's decision to grant only tentative approval based on the Delaware District Court's order was arbitrary, capricious, and contrary to law, and that Norwich's Amended ANDA should thus be granted final approval.

## I. NORWICH IS LIKELY TO SUCCEED ON THE MERITS .

### A. FDA Refused Approval of Norwich's Carved Out Label in Contravention of its Regulations, Prior Position Statements, and Case Law Discussing the Policy Interests of Granting Approval for Carved Out Labels.

#### 1. FDA Should Have Approved Norwich's Amended ANDA "Immediately" upon Submitting a Section viii Statement under FDA's Regulations.

FDA's regulations are unambiguous that not only is Norwich's Amended ANDA approvable upon submission of a section viii statement, but it is approvable "[i]mmediately." *See* 21 C.F.R. §§ 314.94(a)(12)(viii)(A), 314.107(b)(1)(ii). FDA withheld final approval of Norwich's Amended ANDA and stated that "final approval cannot be granted until October 2, 2029 as specified in the [district of Delaware] court order" and by the district court's refusal to amend its order. (TA Letter at 3.) Yet FDA also acknowledged that Norwich had filed proper section viii statements and that "these are method-of-use patents that do not claim any indication for which you are seeking approval under your ANDA." (TA Letter at 3-4.) Although FDA apparently believes that it is hamstrung by the district court's order, FDA's decision to not

---

*Church v. Bowser*, 496 F. Supp. 3d 284, 292 (D.D.C. 2020). Although *Capitol Hill* and other cases have suggested that Norwich is subject to a "higher burden" or a "higher standard" for such mandatory preliminary injunctive relief, *see e.g.*, *Pantoja v. Martinez*, No. 21-7118, 2022 WL 893017, at *1 (D.C. Cir. Mar. 25, 2022), the D.C. Circuit has not elaborated on this "higher standard," but has focused on if a party has shown a "substantial likelihood of success on the merits," and that this is often dispositive. *See id.* For the reasons stated below, Norwich has shown a substantial likelihood of success on the merits, the balance of equities is well in Norwich's favor, and given the unambiguous regulations and the policy goals of the Hatch-Waxman Act, Norwich has met this "higher burden" or "higher standard."

approve Norwich's Amended ANDA contravenes FDA's own regulations, FDA's statements when it issued the proposed and final regulations, and numerous cases discussing the importance of quickly approving generic drug products with section viii statements and carved-out labels.

The regulations are clear on their face – "*after finding of infringement,*" i.e., a final court decision finding infringement, the ANDA applicant has two choices: (1) change its Paragraph IV certification to a Paragraph III certification and forego approval until the relevant patent expires; or (2) if the relevant patent covers a method of use, "amend[] its ANDA such that the applicant is no longer seeking approval for a method of use claimed by the patent." 21 C.F.R. § 314.94(a)(12)(viii)(A) (emphasis added). If the applicant chooses this second option, then "[o]nce an amendment for the change has been submitted, the ANDA will no longer be considered to contain a paragraph IV certification to the patent." *Id.*

Once an applicant amends its ANDA and converts the Paragraph IV certification to a section viii statement, 21 C.F.R. § 314.107(b)(1)(ii) then controls. That regulation states that, "if the applicant submits an appropriate [section viii statement] explaining that a method-of-use patent does not claim an indication or other condition of use for which the applicant is seeking approval," FDA may approve this amended ANDA "immediately." 21 C.F.R. § 314.107(b)(1)(ii).[24] In other words, by filing the section viii statement, Norwich's Amended ANDA no longer contains a Paragraph IV certification and thus the section viii statement and the corresponding patents – here, the HE Patents – cannot be the basis for FDA delaying final

[24] 21 C.F.R. § 314.107(b)(1)(ii) provides an exception to this "immediate[]" approval only where the applicant also "submits a paragraph IV certification to the patent" at issue. This is irrelevant here, however, because the Asserted HE Patents do not have both method claims and drug product claims. *See* 59 Fed. Reg. 50338, 50347 (Oct. 3, 1994). Thus, Norwich "does not have the option of making a certification under [Paragraph IV] in lieu of, or in addition to, a [Section viii] statement." *Id*.

approval of the ANDA. The regulation is unambiguous, and it was thus improper for FDA to refuse to grant final approval to Norwich's Amended ANDA based on the district court's order relating to the HE Patents.

FDA reaffirmed the clear directives set forth in 21 C.F.R. § 314.107 during its notice and comment rulemaking in 2016:

> We also proposed to clarify that if a[n] . . . ANDA applicant submits a statement . . . explaining that a method-of-use patent does not claim an indication or other condition of use for which the applicant is seeking approval [i.e., a section viii statement,] and submits proposed labeling that appropriately carves out information related to the patented method of use, then the . . . ANDA may be eligible for *immediate approval* (see proposed § 314.107(b)(1)(ii)).

81 Fed. Reg. 69580, 69624 (Oct. 6, 2016) (emphasis added).

There is a separate regulation, 21 C.F.R. § 314.107(b)(3)(iv), which states that if there is a finding of infringement, the ANDA "may be approved no earlier than the date specified by the district court in an order under 35 U.S.C. 271(e)(4)(A)." *See also* 21 U.S.C. § 355(j)(5)(B)(iii)(II)(bb) ("if the judgment of the district court is not appealed or is affirmed, the approval shall be made effective on the date specified by the district court in a court order under section 271(e)(4)(A) of Title 35"). When the act of infringement under 35 U.S.C. § 271(e)(2) giving rise to an order under 35 U.S.C. 271(e)(4)(A) is based only on a method of use patent, this regulation and the associated statute do not apply unless the ANDA applicant has not converted its Paragraph IV certification to a section viii statement and continues to seek approval for an indication covered by the method of use patent held to be infringed. In fact, the corresponding statute, Section 355(j)(5)(B), only addresses situations where an ANDA maintains a patent certification. *See* 21 U.S.C. § 355(j)(5)(B)(i)-(iii). But here, Norwich's Amended ANDA contains no such patent certification to the Asserted HE Patents, but was instead amended to

maintain section viii statements to those patents pursuant to 21 C.F.R. § 314.94(a)(12)(viii)(A). FDA's approval of Norwich's Amended ANDA is thus governed by 21 U.S.C. § 355(j)(5)(A), which contains no directive to delay the approval to a date specified by a district court order under Section 271(e)(4)(A). And, as explained above, FDA's regulations make it clear that an ANDA that is amended to include a section viii statement can be approved "immediately." *See* 21 C.F.R. § 314.107(b)(1)(ii).

Notably, prior iterations of 21 C.F.R. § 314.94 did not provide that an applicant could file a section viii statement *after a finding of infringement*. *See* 59 Fed. Reg. 50338, 50364-65. But in 2015, FDA proposed amending the 1994 regulations in light of the MMA "in a manner intended to reduce unnecessary litigation [and] reduce delays in the approval of . . . ANDAs that are otherwise ready to be approved[.]" 80 Fed. Reg. 6802, 6803 (Feb. 6, 2015). FDA proposed doing so by adding language to clarify that, following final judgment, "an applicant may change its paragraph IV certification for a method-of-use patent to a statement under [ ] 505(j)(2)(A)(viii) of the FD&C Act only if the applicant amends its [ ] ANDA [ ] such that the applicant is no longer seeking approval for a method of use claimed by the patent[.]" *Id.* at 6844. Thus, after a final judgment of infringement, FDA proposed that an applicant may remove the infringing method of use from its ANDA, obtain approval, and lawfully market its product for any non-infringing indication not covered by the method of use patent. In 2016, FDA implemented the final version of the relevant regulations by providing for the filing of a section viii carve out after a finding of infringement. *See* 81 Fed. Reg. 69580, 69649-51 (Oct. 6, 2016). By amending the ANDA label to remove an indication and converting a Paragraph IV patent certification to a section viii statement after a final judgment of infringement, applicants have a pathway for seeking and obtaining final approval of indications not covered by the infringed

method of use patents. This also prevents the undue or anticompetitive expansion of the narrow right to exclude conveyed by one method of use patent to block approval of a second, non-patented indication.

Norwich's Original ANDA contained the HE Indication and was held to infringe the Asserted HE Patents, and Norwich is not contesting that finding, nor the finding on validity of the HE Patents, thus making this decision a "final decision from which no appeal has been or can be taken[.]"[25] Norwich then amended its ANDA with a section viii statement in accordance with 21 C.F.R. § 314.94(a)(12)(viii)(A) that carved out the HE Indication from Norwich's product labeling, and in doing so withdrew its Paragraph IV certifications to the Asserted HE Patents. Norwich thus seeks approval of its carved out label for only the IBS-D indication, which is not blocked by any valid patents. Thus, not only was Norwich's Amended ANDA approvable, but FDA should have approved Norwich's Amended ANDA "immediately" pursuant to 21 C.F.R. § 314.107(b)(1)(ii). FDA's failure to follow its own regulation should be reversed by this Court, and FDA should be ordered to grant final approval to Norwich's ANDA.

**2. FDA's Guidance and Case Law Both Provide that Norwich's Amended ANDA with a Carved Out Indication is Proper and Satisfies Congress's Purpose of the Hatch-Waxman Act.**

FDA's regulatory framework permits an ANDA applicant to seek approval of one indication when another indication is protected by patents, even after a decision on the merits. *See* 21 C.F.R. § 314.94(a)(12)(viii)(A) (requiring an applicant to amend its Paragraph IV statement "*[a]fter finding of infringement*") (emphasis in original). Moreover, FDA Guidance further contemplates amending an ANDA to carve out a method of use following a final

[25] Norwich's appeal of the district court's order to the extent that it prohibits the final approval of Norwich's Amended ANDA does *not* disturb the finality of the finding of infringement of the Asserted HE Patents or validity of the Asserted HE Patents. *See Salix v. Norwich*, ECF No. 223 (Notice of Appeal), Landmon Decl., Ex. 8.

judgment of infringement by stating that an applicant that does not appeal that final judgment "can amend its ANDA to no longer seek approval for a method of use claimed by the patent and submit a statement under section 505(j)(2)(A)(viii) of the FD&C Act." *See* FDA Good ANDA Submission Practices Guidance for Industry, FDA-2017-D-6854 at 6 (Jan. 2022) (citing 21 C.F.R. § 314.94(a)(12)(viii)(A)).[26]

Indeed, Norwich's Amended ANDA expressly follows the congressional intent behind section viii statements:

> Congress recognized that a single drug could have more than one indication and yet that the ANDA applicant could seek approval for less than all of those indications . . . . Moreover, and perhaps more importantly, Congress made it clear that the ANDA applicant need not certify with respect to every 'use' patent that claims an indication for the drug. Rather, the applicant needs only to certify with respect to use patents that claim an indication for which the applicant is seeking approval to market the drug.

*Warner-Lambert*, 316 F.3d at 1360 (citing H.R. Rep. No. 98-857(I), at 22 (1984)); *see also Bristol-Myers Squibb Co. v. Shalala*, 91 F.3d 1493, 1500 (D.C. Cir. 1996) (discussing that generic companies do not need to match every indication as the brand drug). When a "method of use patent [] does not claim a use for which the applicant is seeking approval, an applicant may [] submit a statement under 21 U.S.C. § 355(j)(2)(A)(viii) averring that the ANDA excludes all uses claimed in the patent ('Section viii statement')" which "limit[s] the scope of regulatory approval . . . and a § 271(e)(2) infringement suit— by excluding patented indications from their ANDAs." *AstraZeneca v. Apotex*, 669 F.3d 1370, 1374, 1379 (Fed. Cir. 2012). And the regulation is clear that a party can choose to file this section viii statement "[*a]fter* finding of infringement." 21 C.F.R. § 314.94(a)(12)(viii)(A) (emphasis added).

[26] https://www.fda.gov/regulatory-information/search-fda-guidance-documents/good-anda-submission-practices-guidance-industry (last visited June 4, 2023).

Moreover, FDA's post-infringement carve-out regulations and guidance comport with the overall purpose of the Hatch-Waxman Act – to facilitate the pursuit, development, and swift approval of affordable generic drugs. *See In re Barr Labs., Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991) ("Congress sought to get generic drugs into the hands of patients at reasonable prices – fast."); *Caraco Pharm. Lab'ys, Ltd. v. Forest Lab'ys, Inc.*, 527 F.3d 1278, 1282 (Fed. Cir. 2008) ("[A] goal of the Act is to . . . enabl[e] competitors to bring low-cost, generic copies of those drugs to market.'"); *Teva Pharms.*, 482 F.3d at 1344 ("A central purpose of the Hatch-Waxman Act . . . is 'to enable competitors to bring cheaper, generic . . . drugs to market as quickly as possible.'") (quoting Sen. Kennedy Remarks, 149 Cong. Rec. S15885 (Nov. 25, 2003)).

Further, the Hatch-Waxman Act was "designed to simplify and expedite the process by which generic drugs are brought to market." *Purepac Pharm. Co. v. Thompson*, 238 F. Supp. 2d 191, 193 (D.D.C. 2002), *aff'd*, 354 F.3d 877 (D.C. Cir. 2004), and *aff'd*, 354 F.3d 877 (D.C. Cir. 2004). To benefit consumers, the Act "creat[es] a streamlined procedure for the approval of generic drugs" allowing applicants to "avoid the costly and time-consuming process associated with NDAs, thus facilitating the approval and dissemination of low-costs generic drugs." *Id.* (citing H.R. Rep. No. 98-857 (Part I) at 14 (Jun. 21, 1984)).

FDA's refusal to grant Norwich final approval subverts its own regulations and directly contradicts the stated policy objectives of 21 C.F.R. § 314.94 and the Hatch-Waxman Act. *Cf. Georgia v. Brooks-La Sure*, No. 2:22-cv-6, 2022 WL 3581859, at *11-*13 (S.D. Ga. Aug. 19, 2022) (finding that the Centers for Medicare & Medicaid Services' ("CMS") decision to withdraw a demonstration project pursuant to its regulation wherein it "may" withdraw such a program was deemed arbitrary and capricious because CMS's decision actually took away from the goal of the statute, namely to decrease medical costs for patients). Consistent with 21 C.F.R.

§ 314.94(a)(12)(viii), after a finding of infringement of the Asserted HE Patents, Norwich amended its ANDA to carve out the infringing method of use, thereby allowing the adjudged noninfringing methods of use for IBS-D to come to market upon final approval. FDA's denial of final approval now blocks these noninfringing uses from reaching the public until the expiry of the HE Patents, which were held not invalid and infringed *only as to the method that has been carved out*. Norwich's Amended ANDA product should now be made available to the public consistent with FDA's clear regulations and Congress' intent.

**B. FDA's Decision is Not Entitled to Deference.**

FDA's decision not to grant Norwich's Amended ANDA final approval is irreconcilable with the plain language and intent of 21 C.F.R. § 314.94(a)(12)(viii)(A) and is therefore not entitled to deference by this Court. The regulation is clear that an ANDA applicant can file a section viii statement "[*a]fter* finding of infringement," thus FDA is able to find that such a court order on infringement occurred, and nevertheless approve the ANDA. 21 C.F.R. § 314.94(a)(12)(viii)(A). A court may only grant deference to an agency's interpretation of its own regulation (referred to as *Auer* deference[27]) if that regulation is "genuinely ambiguous . . . even after a court has resorted to all the standard tools of interpretation." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019). Before concluding that a rule is genuinely ambiguous, "a court must exhaust all the 'traditional tools' of construction. *Id.* at 2415 (citing *Chevron*, 467 U.S. at 843, n.

[27] Also called *Seminole Rock* deference, the doctrine is named for the principles set forth in two Supreme Court cases: *Auer v. Robbins*, 519 U.S. 452, 461 (1997) and *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945).

9, as "adopting the same approach for ambiguous statutes").[28] And, "not all reasonable agency constructions of those truly ambiguous rules are entitled to deference." *Id.* at 2414.

There is no genuine ambiguity here that compels this Court to defer to FDA's refusal to grant final approval to Norwich's ANDA because FDA's regulations are clear on their face – following a finding of infringement, the ANDA applicant may amend its ANDA if "the applicant is no longer seeking approval for a method of use claimed by the patent," i.e., a section viii statement. 21 C.F.R. § 314.94(a)(12)(viii)(A). By converting to a section viii statement, the ANDA is "no longer . . . considered to contain a paragraph IV certification to the patent." *Id.* Norwich provided a section viii statement pursuant to Section 314.94(a)(12)(viii)(A). Because Norwich's ANDA is "no longer [] considered to contain a paragraph IV certification" to any patent claiming a method for treating HE, FDA should have approved Norwich's ANDA "immediately." 21 C.F.R. § 314.107(b)(1)(ii). This Court should thus issue an order finding that FDA's decision to grant only tentative approval to Norwich's Amended ANDA was arbitrary, capricious, and contrary to law, and order FDA to grant final approval to Norwich's Amended ANDA.

---

[28] The Supreme Court has dispensed with the notion that an agency's construction of rules receives a greater deference than an agency's construction of a statute. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019). Further, the Court has described *Auer* as requiring an analogous though not identical inquiry as *Chevron*. It is notable, however, that recent court cases have questioned the precedential value of *Chevron*, which, by these principles, may affect *Auer* deference by extension. *See Am. Hosp. Ass'n v. Becerra*, 142 S. Ct. 1896, 1902 (2022) ("This Court has long recognized a 'strong presumption' in favor of judicial review of final agency action."); *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 45 F.4th 306, 313, (D.C. Cir. 2022) (dispensing with the *Chevron* framework in favor of traditional tools of statutory interpretation); *see also Loper Bright Enterprises v. Raimondo*, No. 22-451, 2023 WL 3158352 (Mem) (May 1, 2023) (granting the petition for *certiorari* regarding Question 2: "Whether the Court should overrule Chevron[]").

## II. NORWICH WILL SUFFER IRREPARABLE HARM ABSENT IMMEDIATE RELIEF FROM THIS COURT.

Norwich will suffer irrecoverable and substantial economic losses and other intangible harms unless this Court enters an injunction requiring FDA to follow its own unambiguous regulations and grant final approval to Norwich's Amended ANDA. Norwich has no adequate remedy at law to recover monetary damages arising from FDA's erroneous decision. Further, each passing day prevents Norwich from capitalizing on its first-mover opportunity in the generic drug market for rifaximin 550 mg tablets for the treatment IBS-D. Thus, Norwich will lose goodwill and key access to customers attributable to being first-to-market with an important generic IBS-D treatment. In addition and given the strong likelihood of success on the merits, "a much smaller quantum of injury will sustain an application for preliminary injunction." *Mova Pharm. Corp. v. Shalala*, 955 F. Supp. 128, 131 (D.D.C. 1997) (citing *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985) (*per curiam*).).

### A. Norwich Will Incur Substantial and Irrecoverable Economic Loss.

Absent final FDA approval, Norwich cannot market its generic rifaximin 550 mg tablets in the U.S. for the treatment of IBS-D. Norwich's ANDA product is a critical asset in Norwich's product pipeline. *See* T. Zaku Decl. at ¶ 8. Each day that FDA improperly withholds final approval of Norwich's ANDA product is another day that Norwich is foreclosed from opening the generic market and monetizing its strategically important asset. If FDA is enjoined from delaying final approval of Norwich's Amended ANDA, however, Norwich will be in a position to promptly launch its product, and obtain a significant share of the generic market for rifaximin to treat IBS-D. *See* T. Zaku Decl. at ¶¶ 7 and 9.

Without a preliminary injunction, Norwich will have no legal recourse either against FDA, or against any generic competitor, to recover any monetary damages. *See Mylan Pharms.,*

*Inc. v. Thompson*, 268 F.3d 1323, 1332 (Fed. Cir. 2001) (holding that FDCA does not create a private right of action) *superseded by statute on other grounds*, *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399 (2012).  This Court has held that economic loss may be irreparable when it cannot be recovered and when the effect of that loss on the plaintiff is serious.  *Mova*, 955 F. Supp. at 131; *see also Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 29 (D.D.C. 1997); *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008) ("where, as here, the plaintiff in question cannot recover damages from the defendant due to the defendant's sovereign immunity . . . any loss of income suffered by a plaintiff is irreparable *per se*") (internal citations omitted).  Even if this Court later orders FDA to grant final approval to Norwich's ANDA, it would be impossible for Norwich to "make up" for lost opportunities to fill generic prescriptions for treating IBS-D.  T. Zaku Decl. at ¶ 13.  Norwich's economic losses, therefore, are unmistakably irreparable.

### B. Norwich Will Be Irreparably Harmed by the Impairment of Its *De Facto* First-Mover Advantage.

Norwich is positioned to enjoy a significant first-mover advantage in the generic rifaximin market for treating IBS-D.  It is one of just four applicants to have submitted an ANDA seeking approval to market rifaximin 550 mg tablets for the IBS-D indication.  *See supra* at 9-10. Norwich, however, is the only applicant that will be in a position to freely launch its generic product before January 1, 2028.  Based on settlement agreements struck with Salix, none of the other three ANDA applicants – Teva, Sun, or Sandoz – may enter the market before January 1, 2028.  Although these settlement agreements might permit Teva, Sun, or Sandoz to enter the

market earlier if Norwich first launches its product, Norwich is necessarily positioned to be the first mover in the generic rifaximin market for the treatment of IBS-D.

"[T]he earliest generic drug manufacturer in a specific market has a distinct advantage over later entrants." *Mova*, 140 F.3d at 1066. This advantage is significant because it "can never be fully recouped through money damages or by 'playing catch-up.'" *Bracco Diagnostics*, 963 F. Supp. at 29. In fact, courts consistently recognize the unique value of the first-mover advantage, acknowledge the irreparable harm that a party suffers when improperly denied that advantage, and grant preliminary injunctions to remedy the harm. *See, e.g.*, *id.* at 29 (issuing a preliminary injunction where "'an officially sanctioned head start in the market' for a discrete pharmaceutical product will cause irreparable injury to the company that is left behind") (citing *Mova Pharm.*, 955 F. Supp. at 130-31); *TorPharm, Inc. v. Shalala*, No. Civ. A. 97–1925(JR), 1997 WL 33472411, at *4 (D.D.C. Sep. 15, 1997) (issuing a preliminary injunction where the plaintiff would "be permanently disadvantaged in the market" because "timely entry into the market is critical for success").

Here, the loss of the *de facto* first-mover advantage for rifaximin will seriously injure Norwich. *See* T. Zaku Decl. at ¶¶ 9-12. Norwich's time as the sole generic marketer of rifaximin for IBS-D is ephemeral, with three other ANDA filers whose settlements may allow them to accelerate their launch date under certain conditions. Bausch Press Releases; *see, e.g., Abbott Labs. v. Sandoz, Inc.*, 500 F. Supp. 2d 846, 855 (N.D. Ill. 2007) ("[T]he subsequent unlawful presence of generic competitors nonetheless inflicts harm . . . because at the very minimum, there is greater supply of competitive product on the market than there otherwise would be."). Each passing day is one day less of *de facto* marketing exclusivity for IBS-D. *See* T. Zaku Decl. at ¶ 10. That period of exclusivity for Norwich provides critical access to

important rifaximin customers that otherwise would not be available. *See Teva Pharms., USA, Inc. v. FDA*, 182 F.3d 1003, 1011 n.8 (D.C. Cir. 1999) (later-entering generic manufacturers "face continued harm because of their denied access to the market . . . ."); *see* T. Zaku Decl. at ¶¶ 9-12. As the first-mover, Norwich "would have advantages that include working with the best facilities and potential customers[.]" *See Butamax Advanced Biofuels LLC v. Gevo, Inc.*, 868 F. Supp. 2d 359, 375 (D. Del. 2012) (finding irreparable harm due to loss of first-mover advantage). Because these opportunities differ vastly from customer to customer, their loss is extremely difficult to quantify. *See Pharmacia & Upjohn Co. v. Ranbaxy Pharms., Inc.*, 274 F. Supp. 2d 597, 614 (D.N.J. 2003) (finding irreparable harm in part due to the "speculative nature of damage assessments"), *aff'd in relevant part*, 85 F. App'x 205 (Fed. Cir. 2003); *see* T. Zaku Decl. at ¶ 11. These opportunities are, however, extremely significant to Norwich, and their loss would cause substantial and irreparable harm. *see* T. Zaku Decl. at ¶¶ 15-17; *see also Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1362 (Fed. Cir. 2008) (holding that, although "loss of market opportunities cannot be quantified or adequately compensated," they nevertheless constitute "evidence of irreparable harm") (internal citations omitted); *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1170 (Fed. Cir. 2014) (collecting cases).

In addition, wrongfully delaying Norwich's approval – and thereby denying Norwich its first-mover advantage – will deprive Norwich of its best opportunity to earn and maintain generic market share for the use of rifaximin for the treatment of IBS-D. S*ee Albany Molecular Research, Inc. v. Dr. Reddy's Labs., Ltd.*, No. 09-cv-4638 (GEB–MCA), 2010 WL 2516465, at *10–11 (D.N.J. June 14, 2010) (concluding that harms such as lost market share and price erosion are difficult to quantify and irreparable); *see* T. Zaku Decl. at ¶¶ 11-12. As a first generic entrant marketing an ANDA product, Norwich will be able to gain a significant share of

the generic rifaximin market for IBS-D. *See* T. Zaku Decl. at ¶¶ 11-12. As of today, Teva and Sun have not even obtained tentative approval to market generic rifaximin 550 mg tablets. Sandoz would still need to (i) receive final approval for its ANDA product, (ii) make launch preparations, and (iii) abide by the terms of its settlement agreement, before it could enter the market. Even after other generic competitors enter the market, Norwich expects that it would be able to maintain a significantly larger market share than its competitors due to its head start. *See* T. Zaku Decl. at ¶¶ 11-12. This enduring market share results from a combination of access to better customers and the long-term nature of many purchasing arrangements. *See TorPharm*, 1997 WL 33472411, at *4 (noting that "timely entry into the market is critical for success"). There will be no way to replicate this market dynamic if other generics obtain final approval at the same time as Norwich and are able to launch their generic rifaximin products together with Norwich by the time this Court reaches the merits of this case. *See* T. Zaku Decl. at ¶¶ 13-14.

Being one of the first companies to offer a generic rifaximin product for IBS-D will also allow Norwich to generate substantial goodwill with existing and prospective customers. The generic drug business is highly competitive, and a small number of wholesalers account for the majority of generic drug purchases in the United States. Yu Yu, and Sachin Gupta, *Pioneering advantage in generic drug competition*, INT'L J. PHARM. AND HEALTHCARE MKTG. 126-150, 130 (2014).[29] These large purchasers prize the ability to offer newly-available generic drugs to their own customers. *See* T. Zaku Decl. at ¶¶ 10, 11, 12 and 15.. As a result, they often aggressively pursue relationships with generic first-movers. *See* T. Zaku Decl. at ¶ 15. Norwich's ability to enter the market as the first generic alternative provides it with a unique

---

[29] *Available at* https://www.researchgate.net/profile/Sachin-Gupta-37/publication/228170826_Pioneering_Advantage_in_Generic_Drug_Competition/links/5c85c001458515831f9aa792/Pioneering-Advantage-in-Generic-Drug-Competition.pdf (last visited June 4, 2023).

opportunity to establish and strengthen its relationships with these key customers through their interest in stocking generic rifaximin for the IBS-D indication as soon as it is available. *See* T. Zaku Decl. at ¶¶ 10, 11, 12 and 15. Moreover, generic companies like Norwich rely on bringing their products to market as soon as possible as a way to maintain their reputation as top-tier generic manufacturers. *See* T. Zaku Decl. at ¶¶ 10 and 15. Launching one of the first generic rifaximin products for IBS-D will therefore enhance Norwich's reputation in this area. *Id.*

Absent an injunction, Norwich will be irreparably harmed.

## III. GRANTING THE PRELIMINARY INJUNCTION WILL NOT SUBSTANTIALLY INJURE ANY INTERESTED PARTY.

In contrast to the significant and irreparable harm that Norwich will suffer absent preliminary relief, ordering FDA to grant final approval to Norwich's ANDA would not cause substantial injury to FDA or any interested party. First, FDA has no financial stake in the outcome of this case. Rather, FDA has an interest in the correct implementation of the FDCA and in the establishment of clear rules to guide the generic pharmaceutical industry. *See* 21 U.S.C. § 393 (describing one of the objectives of FDA's agency plan as "maximizing the availability and clarity about the process for review of applications and submissions . . . made under [the FDCA]"); *see also* 65 Fed. Reg. 67012, 67013 ("To strengthen its performance, FDA developed partnerships with stakeholders and stimulated cooperation and partnership by making its activities more understandable and accessible to stakeholders"); *Bracco Diagnostics*, 963 F. Supp. at 30 ("[r]equiring [FDA] to act lawfully is also very much in the public interest."); *Whitaker v. Thompson*, 248 F. Supp. 2d 1, 16 (D.D.C. 2002) ("[I]t is clearly in the

public interest to ensure that governmental agencies, such as the FDA, fully comply with the law[.]"). The prompt resolution of this suit in Norwich's favor promotes those interests.

There is likewise little risk of substantial harm to other rifaximin ANDA filers. Teva and the other ANDA filers will benefit from being able to bring products to market prior to 2028, because the settlements they entered with Salix only allow them to launch before January 2028 if another ANDA filer obtains FDA approval and comes to market. *See* Bausch Press Releases, *supra* n. 14.

This Court has denied injunctive relief on the basis of harm to other interested parties in situations where the interested parties had already obtained FDA approval and were otherwise ready to enter the market, if they were not already marketing and selling their products. *See, e.g.*, *Biovail Corp. v. U.S. Food & Drug Admin*, 519 F. Supp. 2d 39, 50 (D.D.C. 2007) (giving greater weight to intervenor-defendants' approved ANDA products and ongoing sales and contracts); *Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 221 (D.D.C. 1996) (describing intervenor-defendant's efforts over the years to obtain final FDA approval).

Salix cannot claim to be harmed by the potential loss of sales for Xifaxan for the treatment of IBS-D. The Delaware district court held that the patents directed to a method of use concerning the treatment of IBS-D were invalid. Moreover, Salix has already delayed the introduction of competitive generics by virtue of its patents and settlement agreements. *See Mylan Pharms., Inc. v. Sebelius*, 856 F. Supp. 2d 196, 217 (D.D.C. 2012) (noting that the brand drug manufacturer could not "claim to be harmed by the potential loss of sales" because it had "already delayed the introduction of competitive generics for almost seven years by virtue of its settlement agreements with the filers of paragraph IV certifications referencing" its patent, earning over a billion dollars in sales of its brand name drug in one year alone). Salix cannot

argue that it will suffer irreparable harm because it may lose profits if FDA approves Norwich's Amended ANDA for the IBS-D Indication, as this argument "is insufficient to establish irreparable harm." *Id.* at 218; *cf Abbott Labs. v. Sandoz, Inc.*, 500 F. Supp. 2d at 855 ("The public interest is not served by . . . the extension of monopoly pricing by means of invalid patents over the distribution of low cost pharmaceuticals."); *Butamax* , 868 F. Supp. 2d at 375 (stating that the public interest is best served when the patent owner has failed to establish that the patent is likely valid and infringed, and therefore weighing this factor in favor of the non-infringing party).

Indeed, when balancing the equities between Salix and Norwich, the balance tips well in Norwich's favor. Norwich has cleared a path to market by showing multiple Salix patents to be invalid, and by carving out the sole infringing indication to create a non-infringing ANDA product that is immediately approvable. *See, e.g.*, *Butamax Advanced Biofuels LLC v. Gevo, Inc.*, 868 F. Supp. 2d 359, 375 (D. Del. 2012) (finding that when a party does not infringe the relevant patents, the balance of equities "weighs in favor" of the non-infringing party).

## IV. PRELIMINARY RELIEF WILL FURTHER THE PUBLIC INTEREST.

Granting Norwich's motion for a preliminary injunction will further the public interest by permitting Norwich to open a generic market for rifaximin 550 mg tablets for the treatment of IBS-D that, as discussed above, might not otherwise commence until January 2028. In other words, the prior settlement agreements between other ANDA applicants and Salix practically foreclose generic competition until 2028 unless Norwich's ANDA product for the treatment of IBS-D obtains final approval and forms the generic market.

Generic competition to the brand product for the IBS-D Indication will significantly lower prices for IBS-D patients and payors. *See Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 684 (Fed. Cir. 1990) (recognizing "a public interest in the protection of patent rights,"

but deeming that interest counterbalanced by a competitor's "continuing right to compete"). Thus, the availability of generic rifaximin for treating IBS-D furthers serves the public interest by providing consumers increased access to cheaper, safe generic drugs. The FDCA is structured to give incentives to companies to file ANDAs so that lower-cost generic drugs are brought to market as soon as possible. "[T]he public has an interest in receiving the benefit of ANDA-approved generic drugs as soon as those products can lawfully come to market." *Pharmacia & Upjohn Co.,* 274 F. Supp. 2d at 614, *aff'd in relevant part*, 85 F. App'x 205 (Fed. Cir. 2003); *see also TorPharm*, 1997 WL 33472411, at *5 ("The public interest in competition and in the correct application of the [FDCA] favors issuance of the injunction."). The Hatch-Waxman Act was implemented "'to speed the introduction of low-cost generic drugs to market,' thus increasing competition and, theoretically, lowering prices." *Ranbaxy Labs.*, 82 F. Supp. 3d at 164 (quoting *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S* , 566 U.S. 399, 405 (2012)) (internal citations omitted).

Having Norwich's generic product for IBS-D on the market sooner – rather than being erroneously delayed by FDA – will lead to lower prices for IBS-D patients and payors, which will benefit the public and satisfy the intent of the FDCA. Data from FDA generally show that prices for a drug can drop by as much as 75% within a year of the first generic approval, and that the median price reduction for a single generic on the market is between 31% and 39%.[30]

In fact, in passing the Hatch-Waxman Act, "Congress sought to get generic drugs into the hands of patients at reasonable prices – fast." *In re Barr Labs., Inc.*, 930 F.2d 72, 76 (D.C. Cir.

---

[30] Ryan Conrad, et al., *Estimating Cost Savings from New Generic Drug Approvals in 2018, 2019, and 2020*, at 4 (Aug. 2022) https://www.fda.gov/media/161540/download (last visited June 4, 2023); Ryan Conrad, et al., *Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Drug Prices*, at 9 (December 2019) https://www.fda.gov/media/133509/download (last visited June 4, 2023).

1991). Moreover, ensuring that FDA treats all ANDA applicants the same and interprets the FDCA properly in this case is similarly beneficial to the public. *See Bracco Diagnostics*, 963 F. Supp. at 30 ("[r]equiring [FDA] to act lawfully is also very much in the public interest."); *Whitaker*, 248 F. Supp. 2d at 16 ("[I]t is clearly in the public interest to ensure that governmental agencies, such as the FDA, fully comply with the law."). It is therefore necessary and appropriate for this Court to order FDA to grant final approval to Norwich's ANDA.

**CONCLUSION**

For the foregoing reasons, Norwich respectfully requests that this Court (i) hold that FDA's June 2, 2023 grant of tentative approval rather than final approval to Norwich's ANDA is arbitrary, capricious, and contrary to law, and (ii) enter a preliminary injunction directing Secretary Becerra, Commissioner Califf, and the United States Food and Drug Administration to grant final approval to Norwich's Amended ANDA, as set forth in the Proposed Order submitted herewith.

Dated: June 5, 2023

Respectfully submitted,

/s/*Chad A. Landmon*

Chad A. Landmon (DC Bar No. 990347)
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
T: (860) 275-8100
F: (860) 275-8101
clandmon@axinn.com

*Attorney for Plaintiff Norwich Pharmaceuticals, Inc.*

OF COUNSEL:
Matthew S. Murphy (*pro hac vice* forthcoming)
Aaron Z. Savit (*pro hac vice* forthcoming)

AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
T: (860) 275-8100
F: (860) 275-8101
mmurphy@axinn.com
asavit@axinn.com

Ross E. Blau (*pro hac vice* forthcoming)
AXINN, VELTROP & HARKRIDER LLP
114 W. 47th Street
New York, NY 10036
T: (212) 728-2200
rblau@axinn.com

Gabriella McIntyre (*pro hac vice* forthcoming)
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC 20036
(202) 912-4700
gmcintyre@axinn.com

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NORWICH PHARMACEUTICALS, INC.,

*Plaintiff,*

v.

XAVIER BECERRA,
*Secretary of Health and Human Services, et al.*,

*Defendants.*

Civil Action No. 23-1611 (RDM)

## MEMORANDUM OPINION

Battles over the entry of generic drugs to market are often hard fought, particularly in cases involving brand-named drugs with annual sales that substantially exceed $1 billion. *See* Dkt. 1 at 11 (Compl. ¶ 41). This is a case in point.

Defendant-Intervenor Salix Pharmaceuticals, Inc. ("Salix") currently markets rifaximin (under the brand name Xifaxan) for the treatment of irritable bowel syndrome with diarrhea ("IBS-D") and the reduction of risk of hepatic encephalopathy ("HE") recurrence in adults. Dkt. 1 at 3, 11 (Compl. ¶¶ 10, 39); Dkt. 12-1 at 3. Plaintiff Norwich Pharmaceuticals, Inc. ("Norwich") wants to market a generic version of the drug. Dkt. 1 at 24 (Compl.). But before it may do so, it must obtain final Food and Drug Administration ("FDA") approval of its Abbreviated New Drug Application ("ANDA") for the drug. *See* 21 U.S.C. § 355. Obtaining approval of an ANDA, however, requires more than evidence of bioequivalence, safe manufacturing procedures, and proper labeling. The generic drug applicant must also work its way through a maze rules that lie at the intersection of FDA regulation and the patent laws.

Here, that maze began with the filing of Norwich's original ANDA, which identified twenty-three patents that, according to Salix, protected Xifaxan from competition. Dkt. 4-1 at 14. That filing constituted an act of patent infringement, leading Salix to initiate infringement litigation against Norwich. *Id.* at 17. Over the course of the litigation, the field of dispute narrowed, ultimately leading to a district court decision that invalidated two drug substance patents and the two method-of-use patents covering the IBS-D indication. Dkt. 4-4 at 47. But the district court found that Salix's three HE method-of-use patents were valid and infringed. *Id.* Based on that finding, the court entered an order directing "that the effective date of any final approval order of the [FDA] of Norwich's ANDA . . . is to be the date not earlier than the expiration of the" HE method-of-use patents—that is, October 2, 2029. Dkt. 4-5 at 3.

That, however, was not the end of the road for Norwich. In light of the district court's decision, it returned to the FDA and filed an amended ANDA, which omitted the HE indication from its proposed label, and it filed a motion under Federal Rule of Civil Procedure ("Rule") 60(b) in the district court seeking to modify the judgment to permit the FDA to approve the amended ANDA without delay. Dkt. 4-1 at 18–19. The district court denied that motion, Dkt. 51 at 113–16, and Norwich appealed the scope of the district court's final judgment to the Federal Circuit. Dkt. 4-10 at 2. (Salix, for its part, cross-appealed the district court's invalidity findings.) The FDA, then, tentatively approved Norwich's ANDA, but it declined to grant final approval (that is, the approval necessary to go to market) before October 2, 2029, in compliance with the agency's reading of the district court's final judgment. Dkt. 51 at 119, 121.

That brings us to this case, in which Norwich challenges the FDA's decision only tentatively—and not finally—to approve Norwich's amended ANDA. Dkt. 1 at 23–24 (Compl. ¶¶ 95–103). Invoking the Administrative Procedure Act ("APA"), Norwich maintains that the

FDA's "grant of tentative rather than final approval of Norwich's [a]mended ANDA is arbitrary, capricious, and contrary to law," *id.* at 24, and it seeks injunctive and declaratory relief directing the FDA immediately to approve Norwich's amended ANDA, *id.*, so that the drug can go to market. In Norwich's view, the FDA misread the district court's order and, instead, should have read it to apply only to the company's original ANDA, which included the HE indication. On the same day that Norwich filed suit, it moved for a preliminary injunction. Dkt. 4. The FDA and Salix oppose that motion; the FDA has cross-moved for summary judgment, Dkt. 37; and Salix has both cross-moved for summary judgment and, in the alternative, moved to dismiss, Dkt. 54. At the parties' request, the Court consolidated the hearing on Norwich's motion for a preliminary injunction with proceedings on the merits pursuant to Rule 65(a).

For the reasons explained below, the Court will **DENY** Norwich's motion for a preliminary injunction and will **GRANT** the FDA and Salix's cross-motions for summary judgment.

## I. BACKGROUND

### A. Statutory Background

To obtain approval to market a new drug, the manufacturer must submit a new drug application ("NDA") to the FDA demonstrating, among other things, that the new drug is safe and effective. 21 U.S.C. § 355(b)(1). The NDA must also include "the patent number and expiration date of each patent for which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner of the patent engaged in the manufacture, use, or sale of the drug." *Id.*; *see Caraco Pharm. Lab'ys, Ltd. v. Forest Lab'ys*, Inc., 527 F.3d 1278, 1282 (Fed. Cir. 2008). This listing can include patents that "protect[] the drug compound itself" and those that "gives the [drug] manufacturer exclusive rights over a particular method of using

the drug." *Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 405 (2012). Once the NDA is approved, the drug becomes a "listed drug" and all associated patents are listed in the "Approved Drug Products with Therapeutic Equivalence Evaluations" or, as it is commonly known due to its orange cover, the "Orange Book." *See Mylan Labs. Ltd. v. FDA*, 910 F. Supp. 2d 299, 301 (D.D.C. 2012).

In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98–417, 98 Stat. 1585 (1984), popularly known as the "Hatch–Waxman Act." The Hatch-Waxman Act aims to strike "a balance between two competing policy interests: (1) inducing pioneering research and [the] development of new drugs and (2) enabling competitors to bring low-cost, generic copies of those drugs to market." *Andrx Pharms., Inc. v. Biovail Corp.*, 276 F.3d 1368, 1371 (Fed. Cir. 2002). To that end, the Hatch-Waxman Act streamlined the process for bringing generic versions of previously approved drugs to market by creating the abbreviated new drug application—or ANDA—process, which permits the generic manufacturer to "piggyback[ ] on the original manufacturer's evidence of safety and efficacy," *Teva Pharm., USA, Inc. v. Leavitt*, 548 F.3d 103, 104 (D.C. Cir. 2008), thereby avoiding the "need [to] conduct its own" costly clinical trials, *Mylan Lab'ys, Inc. v. Thompson*, 389 F.3d 1272, 1275 (D.C. Cir. 2004). To obtain FDA approval for a generic drug, the ANDA must demonstrate, among other things, that the generic version of the drug is "bioequivalent" to the listed drug and, at least in the ordinary course, that the labeling for the generic version is "the same as the labeling approved for the listed drug." 21 U.S.C. §355(j)(2)(A). As explained further below, however, the proposed ANDA labeling may—at times—carve out certain methods of use to avoid patent infringement. *See Caraco Pharm. Lab'ys*, 566 U.S. at 406.

Of particular relevance here, the ANDA must also contain "one of four certifications addressing each Orange-Book-listed patent associated with the listed drug." *Caraco Pharm. Lab'ys.*, 527 F.3d at 1282. For "each patent which claims the listed drug . . . or which claims a use for such listed drug for which the applicant is seeking approval," the ANDA must contain a certification:

> (I) that [the required] patent information has not been filed [with the FDA];
>
> (II) that such patent has expired;
>
> (III) of the date on which such patent will expire; or
>
> (IV) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted.

21 U.S.C. § 355(j)(2)(A)(vii). "This certification is significant, in that it determines the date on which approval of an ANDA . . . can be made effective, and hence the date on which commercial marketing may commence." *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 677 (1990). If the applicant makes the first or second certification in its ANDA, "approval can be made effective immediately." *Id.* (citing § 355(c)(3)(A), 355(j)(4)(B)(i)). If the applicant makes the third certification, "approval of the application can be made effective as of the date the patent expires." *Id.* (citing § 355(c)(3)(B), 355(j)(4)(B)(ii). If, however, the applicant relies on the fourth certification—a so-called "Paragraph IV certification"—then a process to adjudicate a potential patent dispute is triggered and the outcome of that dispute will determine the effective date of the ANDA. *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 879 (D.C. Cir. 2004) ("In essence, applicants use paragraph IV certifications to challenge the validity of brand-name manufacturers' patents.").

As an alternative to a Paragraph IV certification, a drug company seeking approval for a generic drug may include a "section viii statement, which asserts that the generic manufacturer

will market the drug for one or more methods of use not covered by [the listed] patents." *Caraco Pharm. Lab'ys*, 566 U.S. at 406 (citing 21 U.S.C. § 355(j)(2)(A)(viii)). "For example, if a brand-name manufacturer's patent covers a drug's use for treating depression, and the ANDA applicant seeks approval to use the drug to treat any other condition, then a section viii statement would be appropriate." *Purepac Pharm.*, 354 F.3d at 880. In short, "applicants use [P]aragraph IV certifications to challenge the validity of admittedly applicable patents, they use section viii statements to assert that patents do not apply." *Id.* "A section viii statement is typically used when the [listed] patent on the drug compound has expired and [the manufacturer] holds patents on only some [but not all] approved methods of using the drug." *Caraco Pharm. Lab'ys*, 566 U.S. at 406. Along with the section viii statement, the ANDA must also include a proposed label for the generic drug that "carves out" from the listed drug's approved label the still-patented methods of use. *Id.* (citing 21 CFR § 314.94(a)(8)(iv)). As noted above, "[t]he FDA may approve such a modified label as an exception to the usual rule that a generic drug must bear the same label as the brand-name product." *Id.* (citing 21 U.S.C. § 355(j)(2)(A)(v), (j)(4)(G)); *Purepac Pharm.*, 354 F.3d at 880 ("The FDA has long required that for every patent ANDA applicants use either a paragraph IV certification or a section viii statement—they may not use both. As the FDA puts it, 'either the applicant is seeking approval for the use claimed in the patent, or it is not.'" (quoting *TorPharm, Inc. v. Thompson*, 260 F. Supp. 2d 69, 77 (D.D.C. 2003))).

If the generic applicant does not pursue the section-viii-statement route and instead relies on a Paragraph IV certification in its ANDA, it "must provide [a] notice of [its] Paragraph IV certification to both the patent owner and the NDA holder," which explains "the factual and legal basis for the opinion of the applicant that the patent is invalid or will not be infringed." *Caraco*

*Pharm. Lab'ys*, 527 F.3d at 1283 (quoting 21 U.S.C. § 355(j)(2)(B)(iv)(II)). Because "the mere act of filing a Paragraph IV ANDA constitutes an act of patent infringement," the patent holder has the option at this point of filing an infringement action in a federal district court against the ANDA filer. *Id.* (citing 35 U.S.C. § 271(e)(2)). If the patent owner or NDA holder does not do so, the FDA's approval of the ANDA "shall be made effective immediately." 21 U.S.C. § 355(j)(5)(B)(iii). But if the patent owner or NDA holder brings suit within 45 days of receiving notice of the Paragraph IV certification, "'the approval shall be made effective upon the expiration of [a] thirty-month period beginning on the date of the receipt of the notice,' unless the district court rules on the infringement claim within the 30-month period." *Mylan Lab'ys*, 389 F.3d at 1275 (quoting 21 U.S.C. § 355(j)(5)(B)(iii)).

"If the district court issues a ruling during the 30-month . . . period, the ANDA approval date is determined by the decision of the district court, or the appellate court if appealed." *Id.* Multiple possibilities exist. Unsurprisingly, "[i]f before the expiration of [the thirty-month] period the district court decides that the patent is invalid or not infringed . . . , the approval shall be made effective on the date on which the court enters judgment reflecting the decision." 21 U.S.C. § 355(j)(5)(B)(iii)(I)(aa). Alternatively, if "the district court decides that the patent has been infringed" and "if the judgment of the district court is appealed, the approval shall be made effective on the date on which the court of appeals decides that the patent is invalid or not infringed." *Id.* § 355(j)(5)(B)(iii)(II)(aa)(AA). Finally, if "the district court decides that the patent has been infringed" and "if the judgment of the district court is not appealed or is

affirmed, the approval shall be made effective on the date specified by the district court in a court order under section 271(e)(4)(A) of Title 35." *Id.* § 355(j)(5)(B)(iii)(II)(bb).[1]

If "an applicant who has submitted a [P]aragraph IV certification . . . is sued for patent infringement" and "if a court enters a final decision from which no appeal has been or can be taken . . . that includes a finding that the patent is infringed," FDA regulations require the ANDA applicant to "submit an amendment to change its certification." 21 C.F.R. § 314.94(a)(12)(viii)(A). The applicant can either certify "under paragraph (a)(12)(i)(A)(3) . . . that the patent will expire on a specific date [(i.e., a Paragraph III certification)]" or, "with respect to a patent claiming a method of use, the applicant may instead provide a statement under paragraph (a)(12)(iii) of this section if the applicant amends its ANDA such that the applicant is no longer seeking approval for a method of use claimed by the patent." *Id.* Paragraph (a)(12)(iii), in turn, implements the section-viii-statement escape hatch and permits the ANDA filer to explain "that the [a listed] method-of-use patent does not claim" a use for which the applicant is seeking approval. 21 C.F.R. § 314.94(a)(12)(iii)(A); *see also* 21 U.S.C. § 355(j)(2)(viii). "Once an amendment for the change has been submitted, the ANDA will no longer be considered to contain a [P]aragraph IV certification to the patent." *Id.*

Finally, "[i]n order to encourage [P]aragraph IV challenges, thereby increasing the availability of low-cost generic drugs, the [Food, Drug, and Cosmetic Act] provides that the first company to win FDA approval of an ANDA containing a [P]aragraph IV certification has the right to sell its drug without [generic] competition for 180 days." *Purepac Pharm.*, 354 F.3d at

[1] FDA regulations mirror this statutory language and provide that "[i]f before the expiration of the 30–month period . . . the district court decides that the patent has been infringed, and if the judgment of the district court is not appealed or is affirmed, the . . . ANDA may be approved no earlier than the date specified by the district court in an order under 35 U.S.C. 271(e)(4)(A)." 21 C.F.R. § 314.107(b)(1)(iv).

879 (quoting 21 U.S.C. § 355(j)(5)(B)(iv)); *Amneal Pharms. LLC v. Food & Drug Admin.*, 285 F. Supp. 3d 328, 334 (D.D.C. 2018) ("To 'compensate [generic] manufacturers for research and development costs as well as the risk of litigation from patent holders,' Congress enacted an incentive for generic drug manufacturers to submit ANDAs and, if necessary, to engage in patent litigation." (quoting *Teva Pharm., USA, Inc. v. Leavitt*, 548 F.3d 103, 104 (D.C. Cir. 2008))). "The statute and the implementing regulation create this exclusivity period by prohibiting the FDA from approving any other ANDA that contains a [P]aragraph IV challenge to the same patent until 180 days after the first [ANDA filer] markets its drug or 180 days after the first [filer] wins a patent-infringement suit involving that patent, whichever comes first." *Purepac Pharm. Co. v. Thompson*, 354 F.3d at 880 (citing 21 C.F.R. § 314.107(c)(1)). In contrast, the approval of an ANDA with "a section viii statement does not entitle a successful applicant to the 180–day period of exclusivity bestowed on [P]aragraph IV applicants." *Id.*

**B. Factual Background**

Norwich filed its original ANDA for a generic form of rifaximin in December 2019. Dkt. 4-1 at 16. That ANDA contained Paragraph IV certifications for twenty-three listed patents. After receiving notice of Norwich's Paragraph IV certifications, Salix filed a timely patent infringement action in the U.S. District Court for the District of Delaware (the "Delaware District Court"). *See Salix Pharmaceuticals, Ltd. et al v. Norwich Pharmaceuticals, Inc.*, 20-cv-430 (D. Del.) (hereafter "*Norwich I*"). Salix's complaint asserted all twenty-three patents, but during the litigation, the parties narrowed the field of dispute to seven patents by stipulating to the entry of "[a] final judgment of noninfringement . . . with respect to Norwich's current ANDA No. 214369, including the current ANDA Product and any use of the current ANDA Product, concerning each claim of the" remaining sixteen patents. *Norwich I*, Dkt. 180 at 1–2. The

stipulation defined "Norwich's current ANDA No. 214369" and "current ANDA Product" to "include[] any amendments or supplements to the ANDA that do not change the indications of use, the polymorph forms, or the formulation, and include[] any amendments or supplements to the label that are required due to an amendment or supplement to the Xifaxan label." *Id.* at 2 n.1.

The seven disputed patents fell into three categories: (1) drug substance and product patents; (2) method-of-use patents covering the HE indication; and (3) method-of-use patents covering the IBS-D indication. After a four-day bench trial, the Delaware District Court issued an opinion on August 10, 2022 finding that (1) the drug substance and product patents were invalid as obvious, (2) the method-of-use patents covering the HE indication were valid and infringed by Norwich's ANDA, and (3) the method-of-use patents covering the IBS-D indication were invalid as obvious. Dkt. 4-4 at 47.

Prior to issuing its final judgment, the Delaware District Court ordered the parties to "meet and confer and file a joint proposed final judgment." *See Norwich I*, July 28, 2022 Min. Order. In response, the parties presented starkly contrasting views about "whether the Court should determine now if Norwich's ANDA would induce infringement in the future based on hypothetical changes Norwich may make to its ANDA (which [at that time was] still under review and lacks tentative approval)." *Norwich I*, Dkt. 196 at 2. Salix challenged Norwich's proposed final judgment on the ground that it

> would automatically allow the FDA to approve [the pending] ANDA if Norwich were to amend it to carve out the HE indication (i.e., a label that is different from the one litigated by the parties) without any further action by [the Delaware District Court], by limiting the relief under § 271(e)(4)(A) (setting the date of earliest ANDA approval) to only an "ANDA with proposed labeling containing the indication 'reduction in risk of overt hepatic encephalopathy (HE) recurrence in adults."

*Id.* Salix argued that that would be "improper because[,] under § 271(e)(4)(A), the date of approval is tied to the drug product, not an indication." *Id.* Instead, Salix argued, the court's order and judgment should "apply to 'Norwich's ANDA,' period." *Id.* According to Salix's submission, "'Norwich's ANDA' served as the act of infringement under § 271(e)(2)(A) giving rise to jurisdiction, not a particular indication. The parties litigated and the [Delaware District Court] asked the parties to assume that it decided that 'Norwich's ANDA' would induce infringement of the Asserted HE Patents." *Id.*

Unsurprisingly, Norwich took a very different view. It argued:

> Salix's assertion that Norwich's proposed judgment seeks an advisory opinion is erroneous. In fact, the opposite is true. Norwich's proposed judgment is based on only what has been adjudicated by this Court—that the HE indication in Norwich's label induces infringement of the HE patents and that the HE patents are valid. In contrast, by ordering that FDA delay the effective date of approval of Norwich's ANDA regardless of whether the ANDA contains an indication directed to HE, Salix seeks a judgment that deems any label proposed in Norwich's ANDA infringing. Yet, Salix is not entitled to such broad or speculative relief because that issue exceeds the scope of jurisdiction of this Court.
>
> This is especially true where the law permits ANDA applicants to carve out an indication from the drug label. 21 U.S.C. § 355(j)(2)(A)(viii). If Norwich were to carve out the HE indication from its proposed ANDA labeling, then the predicate for delaying the approval of Norwich's ANDA until after the expiration of the asserted HE patent claims under Section 271(e) would no longer exist. Norwich does not ask this Court to enter judgment regarding, or "pre-approve," a proposed "skinny" label for only the IBS-D indication. It asks this Court to reject any proposed judgment that presupposes labeling excluding the HE indication would infringe the asserted HE patent claims[] or [that] precludes Norwich's ability to seek a skinny label.

*Id.* at 5.

After considering the parties' submissions, the Delaware District Court issued an order, which provided, in relevant part, as follows:

> Pursuant to 35 U.S.C. § 271(e)(4)(A), it is hereby ordered that the effective date of any final approval by the Food and Drug Administration ("FDA") of

> Norwich's ANDA No. 214369 is to be a date not earlier than the date of expiration of the last to expire of the '573, '195, and '397 Patents (currently October 2, 2029) [(the HE method-of-use patents)], plus any regulatory exclusivity to which Plaintiffs are or become entitled.

Dkt. 4-5 at 3. In a memorandum accompanying this order, the Delaware District Court explained that it chose this formulation because:

> [t]he scope of my ruling is that the HE patents are not invalid, and that the HE indication would infringe the HE patents. Norwich's proposed ANDA has the HE indication. I cannot rule on facts that are not before me. That Norwich may seek to carve out the HE indication as permitted by 21 U.S.C. § 355(j)(2)(A)(viii) is immaterial to this analysis. That label is not before me.

Dkt. 4-6 at 3.

Following this decision, Norwich took steps to fill that vacuum. It submitted "a Patent and Labeling Amendment" to its ANDA, in which it withdrew its Paragraph IV certifications regarding the HE method-of-use patents and substituted a section viii statement in their place. Dkt. 51 at 55–57 (A.R. 301–303). Then, the next day, Norwich filed a Rule 60(b) motion in the Delaware District Court, seeking to modify the court's order and final judgment.[2] In particular, Norwich sought "to modify a portion of the [Delaware District Court's] Final Judgement . . . by limiting the order under Section 271(e)(4)(A) that is blocking the approval of Norwich's ANDA until the expiration of the . . . HE Patents directed to hepatic encephalopathy." Dkt. 51 at 23 (A.R. 269). In support of this request, Norwich provided the court with a copy of its amendment and the revised label, and it argued that because the new, proposed label excluded the HE

[2] Under Rule 60(b), a "court may relieve a party . . . from a final judgment, order, or proceeding," due to: (1) "mistake, inadvertence, surprise, or excusable neglect;" (2) "newly discovered evidence" under certain circumstances; (3) fraud . . . , misrepresentation, or misconduct by an opposing party;" (4) a "void" judgment; (5) the satisfaction, release, or discharge of a judgment; or (6) "any other reason that justifies relief." Fed. R. Civ. P. 60(b).

indication, "the predicate for ordering [the] FDA to delay the effective date of the approval of Norwich's ANDA . . . no longer exists." *Id.*

The Delaware District Court was unpersuaded for three reasons. First, that court disagreed that Norwich's decision to carve-out the HE indication, even if the carve-out was done properly, constituted "a significant change in circumstances" sufficient to warrant relief under Rule 60(b)(5). Dkt. 51 at 113–14 (A.R. 359–60). Rather, the court concluded, Norwich's decision to amend it ANDA was "simply a voluntary decision of the trial loser to change course, which is neither unanticipated nor unforeseeable" and therefore outside the ambit of Rule 60(b)(5). *Id.*

Second, the court observed that "[i]t is not a simple matter to determine whether an ANDA applicant has successfully carved out language from a label to turn infringement into non-infringement" and that Norwich "presented no evidence in support of its assertion" that it had properly done so. *Id.* at 115 (A.R. 361). The court also stressed that Rule 60(b) is not an invitation to relitigate issues that were or could have been resolved at trial and that Norwich had failed to present any basis to conclude "that it could not have litigated the carve-out or that it was denied a full and fair opportunity to do so." *Id.* In response to Norwich's contention that Salix had not even "tried to state a claim against the carve out," the court merely observed that it was "unpersuaded that [Salix] [had] some duty . . . to state a claim on something that [Norwich] never raised as an issue before entry of final judgment." *Id.* In short, in the view of the Delaware District Court, Norwich's Rule 60(b) motion amounted to a request for "a second litigation," a door that the court was unprepared to open based on Norwich's minimal showing. *Id.*

FDA_00672

Finally, the Delaware District Court noted that Norwich's request was "unprecedented in an ANDA case." *Id.* at 116 (A.R. 362). Against this backdrop, the court wrote: "I am hesitant to be the first, because it seems wrong to me that [Norwich] can litigate a case through trial and final judgment based on a particular ANDA, and then, after final judgment, change the ANDA to what it wishes it had started with, and win in a summary proceeding." *Id.*

Both Norwich and Salix have appealed aspects of the Delaware District Court's judgment to the Federal Circuit. Norwich has appealed the court's final judgment "to the extent that it bars the U.S. Food and Drug Administration from approving Norwich's ANDA No. 214369 ('ANDA') prior to the expiration of [the HE indication method-of-use patents] when the ANDA does not contain a Paragraph IV patent certification to any of those patents," Dkt. 4-10 at 2, and, instead, includes a paragraph viii statement. Salix, in turn, has appealed the final judgment to the extent the Delaware District Court found that Salix's IBS-D method-of-use patents and its drug substance and product patents are invalid. *Norwich I*, Dkt. 198 at 1.

After both parties noticed their appeals to the Federal Circuit, the FDA granted "tentative approval" to Norwich's ANDA on June 2, 2023. FDA regulations explain that "[t]entative approval is notification that an NDA or ANDA otherwise meets the requirements for approval under the Federal Food, Drug, and Cosmetic Act, but cannot be approved . . . because a court order pursuant to 35 U.S.C. 271(e)(4)(A) orders that the NDA or ANDA may be approved no earlier than the date specified." 21 C.F.R. § 314.3(b). "A drug product that is granted tentative approval is not an approved drug and will not be approved until FDA issues an approval letter after any necessary additional review of the NDA or ANDA." *Id.*

The FDA explained that it was "unable to grant final approval to [Norwich's] ANDA at this time" for the following reasons:

> [Norwich's] ANDA contains paragraph IV certifications under section 505(j)(2)(A)(vii)(IV) of the FD&C Act stating that the patents are invalid, unenforceable, or will not be infringed by your manufacture, use, or sale of Rifaximin Tablets, 550 mg, under this ANDA. . . . Litigation was initiated within the statutory 45-day period against Norwich for the infringement of the '620, '199, '206, '542, '275, '644, '781, '196, '569, '949, '573, '904, '452, '231, '968, '195, '397 and '384 patents in the United States District Court for the District of Delaware . . . . [Norwich] notified the Agency that on August 10, 2022, the court decided, "Pursuant to 35 U.S.C. § 271(e)(4)(A), it is hereby ordered that the effective date of any final approval by the Food and Drug Administration ("FDA") of Norwich's ANDA No. 214369 is to be a date not earlier than the date of expiration of the last to expire of the '573, '195, and '397 Patents (currently October 2, 2029), plus any regulatory exclusivity to which Plaintiffs are or become entitled. Norwich shall notify the FDA of this judgment within two (2) business days of its entry (with a copy of such notice given simultaneously to Plaintiffs)." [Norwich] further notified the Agency that on May 17, 2023, the court denied Norwich's Rule 60(b) motion to modify the final judgment. Therefore, final approval cannot be granted until October 2, 2029 as specified in the court order.

Dkt. 51 at 119, 121 (A.R. 365, 367). In reaching this conclusion, the FDA acknowledged that Norwich had sought to carve-out the HE indication from its amended ANDA. The agency observed that "with respect to" the '573, '195, and '397 patents, which the Delaware District Court found that Norwich's original ANDA infringed, Norwich's amended ANDA "contains [paragraph viii statements representing that] these are method-of-use patents that do not claim any indication for which you are seeking approval under [its] ANDA." *Id.* at 120–21 (A.R. 367–68); *see also id.* at 123 n.2 (A.R. 369). But, notwithstanding that acknowledgement, the FDA failed to grant final approval to Norwich's amended ANDA.

## C. Procedural History

Disappointed by that decision, Norwich brought this suit on June 6, 2023. Dkt. 1. It alleges that the FDA's decision "refus[ing] to grant Norwich's amened ANDA final approval[,] despite a properly-filed statement under 21 C.F.R. § 314.94(a)(12)(viii)(A) that it is not seeking FDA approval for a patented method of use" was "arbitrary, capricious, and unlawful." *Id.* at 2

(Compl. ¶ 1). It seeks both a declaratory judgment and "an injunction directing [the] FDA to immediately grant Norwich's [a]mended ANDA final approval." *Id.* at 3 (Compl. ¶10). The same day that it initiated the action, Norwich moved for a preliminary injunction. Dkt. 4.

In a joint status report filed on June 12, 2023, the parties urged the Court to consolidate Norwich's motion for a preliminary injunction "with a full consideration of the merits under Rule 65(a)(2) of the Federal Rules of Civil Procedure" in order "to conserve judicial and party resources." Dkt. 8 at 1. That same day, Salix moved to intervene as a defendant, Dkt. 12, and the Court subsequently granted that motion, *see* June 18, 2023 Min. Order. The Court also granted the parties' joint motion to consolidate the pending motion for a preliminary injunction with consideration of the merits of the action and set a schedule for further briefing, *see* June 18, 2023 Min. Order.[3]

Now pending before the Court are Norwich's motion for a preliminary injunction and consolidated motion for judgment on the merits, the FDA's cross-motion for summary judgment, and Salix's cross-motion to dismiss or, in the alternative motion, for summary judgment. *See* Dkt. 4, 37, 54.

[3] About two months later, another generic manufacturer, Teva Pharmaceuticals USA, Inc., moved to intervene, asserting that an order requiring the FDA immediately to grant approval to Norwich's amended ANDA would interfere with Teva's asserted right to a period of 180-days of generic exclusivity. Dkt. 56. After Norwich clarified that it was no longer seeking immediate relief and conceded that, even if Norwich was successful in this case, the FDA would still need to resolve the question of generic exclusivity, if any, in the first instance, *see* Dkt. 58, the Court denied Teva's motion to intervene. The Court left the door open to Teva's intervention, however, should the question of immediate relief reappear in the case. *See* Oct. 6, 2023 Min. Order.

## II. STANDARD OF REVIEW

### A. Federal Rule of Civil Procedure 65

A preliminary injunction "is an extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), but "only when the party seeking the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). To obtain a preliminary injunction, the movant "must establish [1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20.

### B. Federal Rule of Civil Procedure 12(b)(1)

As the party seeking to invoke the Court's jurisdiction, Norwich bears the burden of establishing that it has standing to sue. *Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002). To survive a Rule 12(b)(1) motion to dismiss for a lack of standing, the plaintiff "must state a plausible claim that [it] has suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015). "In this posture, the Court must accept the factual allegations of the complaint as true but must nonetheless assess the 'plausibility' of the plaintiff's standing allegations in light of the relevant context and the Court's 'judicial experience and common sense.'" *Teva Pharms. USA, Inc. v. Azar*, 369 F. Supp. 3d 183, 195 (D.D.C. 2019) (quoting *Pub. Citizen, Inc. v. Trump*, 361 F. Supp. 3d 60, 71 (D.D.C. 2019)).

### C. Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) "tests the legal sufficiency of the complaint." *Browning v. Clinton*, 292 F.3d 235,

242 (D.C. Cir. 2002). In evaluating a Rule 12(b)(6) motion, the Court "must first 'tak[e] note of the elements a plaintiff must plead to state [the] claim' to relief, and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face.'" *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (alterations in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 678 (2009)). A plaintiff may survive a Rule 12(b)(6) motion even if "recovery is . . . unlikely," so long as the facts alleged in the complaint are "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). For the purposes of assessing a Rule 12(b)(6) motion, the Court may consider only "the facts contained within the four corners of the complaint, along with any documents attached to or incorporated into the complaint, matters of which the court may take judicial notice, and matters of public record." *Afanasieva v. Wash. Metro. Area Transit Auth.*, 588 F. Supp. 3d 99, 105 (D.D.C. 2022) (quotation marks omitted).

**D. Federal Rule of Civil Procedure 56**

Under Rule 56, summary judgment is available if the movant demonstrates "that there is no genuine dispute as to any material fact and" that, based on the uncontested facts, "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the unique context of a case brought under the APA, however, the district court "sit[s] as an appellate tribunal," *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1222–23 (D.C. Cir. 1993), to decide "as a matter of law [whether] the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review," *Coal. for Common Sense in Gov't Procurement v. United States*, 821 F. Supp. 2d 275, 280 (D.D.C. 2011). "In short, it is the role of the administrative agency to 'resolve factual issues' and 'to arrive at a decision that is supported by the administrative record,' while it is the role of the district court 'to determine

whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Amneal Pharms. LLC v. Food & Drug Admin.*, 285 F. Supp. 3d 328, 339 (D.D.C. 2018) (quoting *Hi–Tech Pharmacal Co. v. U.S. Food & Drug Admin.*, 587 F. Supp. 2d 1, 18 (D.D.C. 2008)).

## III. ANALYSIS

### A. Standing

Because standing is a threshold issue, the Court addresses it first. *See Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015). "To invoke the jurisdiction of the federal courts, a plaintiff must allege (1) a concrete injury (2) caused by the defendant (3) that a favorable judicial decision will redress." *Common Cause v. Biden*, 748 F.3d 1280, 1284 (D.C. Cir. 2014). "Causation, or 'traceability,' examines whether it is substantially probable that the challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff." *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (quotations and citations omitted).

The FDA argues that Norwich lacks standing to sue because the company has not, and will not, suffer any injury caused by the FDA's decision to grant only preliminary approval to the amended ANDA. As the FDA frames the issue, Norwich's "present inability to market rifaximin is traceable to the Delaware [District] Court's Patent Orders and not [the] FDA." Dkt. 40 at 23. In advancing this argument, the FDA acknowledges that Norwich is challenging the FDA's tentative approval decision, but it counters that because the FDA's reasoning for its tentative-approval decision rests solely on the Delaware District Court's final judgment, any injury that Norwich has suffered, or will suffer, is traceable to that judgment and not to any independent action (or inaction) taken by the FDA. *Id.* at 23–24.

The problem with the FDA's argument is that it assumes that it is right on the merits of the question of whether the Delaware District Court's judgment compelled the FDA to postpone the grant of final approval to Norwich's amended ANDA until October 2, 2029. But that is precisely the question that Norwich asks this Court to resolve. The heart of the dispute in this litigation is whether the FDA correctly read the Delaware District Court's order to apply to Norwich's *amended* ANDA. *See, e.g.*, Dkt. 1 at 19 (Compl. ¶ 69) ("[I]t was . . . improper for FDA to refuse to grant final approval to Norwich's Amended ANDA based on the district court's order relating to the HE Patents."); *id.* at 18 (Compl. ¶ 65) ("FDA's decision to not approve Norwich's Amended ANDA contravenes FDA's own regulations, FDA's statements when it issued the proposed and final regulations, and numerous cases discussing the importance of quickly approving generic drug products with section viii statements and carved-out labels."); *id.* at 23 (Compl. ¶ 96) ("As set forth above, FDA improperly decided that it could not grant final approval to Norwich's Amended ANDA based on the decision by the Delaware District Court.").

An admittedly imperfect parallel can be drawn to *Teva Pharmaceuticals, USA, Inc. v. U.S. Food & Drug Administration*, 182 F.3d 1003 (D.C. Cir. 1999). In that case, an ANDA applicant claimed that the FDA's determination that a district court order did not trigger a period of exclusivity for successful ANDA applicants was arbitrary and capricious. *Id.* at 1004. Specifically, the FDA had declined to "recognize the dismissal of a declaratory judgment complaint for patent infringement as a 'court decision'" because the period of exclusivity was only for applicants who had obtained "a 'decision of a court' in a patent or declaratory judgment action 'holding' that the patent is either "invalid or not infringed" and the FDA did not read the district court order had held as such. *Id.* at 1004–05 In reviewing the lower court's resolution of the arbitrary and capricious claim, the D.C. Circuit did not dismiss the case for lack of standing

for the obvious reason that the alleged injury was traceable to the FDA's interpretation (or understanding) of the district court's order. Here, too, this lawsuit challenges only the FDA's interpretation of the Delaware District Court's final judgment.

The cases that the FDA cites involve a very different scenario, in which the plaintiff is not challenging the agency's reading of a court order but the substance of the order itself. In *Cigar Association of America v. U.S. Food & Drug Administration*, 411 F. Supp. 3d 1 (D.D.C. 2019), for example, the plaintiff sought declaratory relief, "not premised on any claimed violation of law by the FDA, or by the FDA's failure to take required action," *id.* at 4, but on the FDA's implementation of a court order (in a different lawsuit) that compelled the agency "to implement the substantial equivalence requirement for all newly deemed products [including cigar and pipe tobacco products] within ten months." *id.* at 3. There, the asserted injury was "entirely a function of a judicial ruling," and, notably, the plaintiffs "effectively concede[d] as much." *Id.* Here, in contrast, the scope of the Delaware District Court Order is both disputed and central to the case. Although a separate action challenging the substance of the Delaware District Court's order is pending before the Federal Circuit, this case raises the distinct claim that the FDA simply misread the court's final judgment. To be sure, there is a noticeable tension between Norwich's argument before the Federal Circuit that the Delaware District Court's judgment sweeps too broadly and its contention here that the FDA erred in reading the final judgment more broadly than warranted. But nothing in the law precludes the company from hedging against any uncertainty about how this Court and the Federal Circuit might read the judgment.

Finally, the FDA argues that, even if Norwich has Article III standing, this Court should decline to exercise jurisdiction "over Norwich's impermissible collateral attack on the patent

orders." Dkt. 40 at 24 (capitalization altered). As the FDA correctly observes, "federal district courts lack the power to void or otherwise alter other federal courts' orders through a collateral attack." *Id.* at 25 (quoting *McNeil v. Brown*, No. 17-2602, 2018 WL 4623057, at *7 (D.D.C. Sept. 26, 2018)). Salix, for its part, frames this argument in slightly different terms, arguing that (1) Norwich is collaterally estopped from challenging the Delaware District Court's final judgment in this action, rather than simply pursuing the pending Federal Circuit appeal or, in the alternative, (2) that principles of comity preclude this Court from "wading into issues pending" before other courts. Dkt. 39 at 16–18. But however framed, the argument fails for the same reason the FDA's challenge to Norwich's standing fails. As clarified beyond any doubt at oral argument, Norwich is not challenging the correctness of the Delaware District Court's final judgment *in this case* and is not asking *this Court* to substitute its views for those of the Delaware District Court or the Federal Circuit. It is merely challenging the FDA's reading of the final judgment entered by the Delaware District Court. *See* Oct. 6, 2023 Hrg. Tr. at 9–10. Whether that argument is meritorious, and whether "principles of comity" might counsel in favor of waiting for further guidance from the Federal Circuit, is beside the point when it comes to the Court's jurisdiction. And when it comes to the merits, the Court has (as explained below) considered whether it would be prudent to wait for the Federal Circuit before resolving this dispute.

### B. Adequate Alternative Remedy

Defendants also argue that the Court should dismiss Norwich's APA claim because the company has an "adequate alternative remedy" through its appeal to the Federal Circuit and, therefore, does not have a claim under the APA. *See Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017) (holding "the absence of [an adequate alternative] remedy is . . . an element

of the cause of action created by the APA" rather than a jurisdictional question). For reasons similar to those just discussed, the Court is unpersuaded.

The APA "limits judicial review under that statute to agency actions 'for which there is no other adequate remedy in a court.'" *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 846 F.3d 1235, 1238 (D.C. Cir. 2017) (quoting 5 U.S.C. § 704). This limitation "reflects Congress' judgment that 'the general grant of review in the APA' ought not 'duplicate existing procedures for review of agency action' or 'provide additional judicial remedies in situations where Congress has provided special and adequate review procedures.'" *Id.* at 1244 (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988)). "Courts must, however, avoid lightly 'constru[ing] [§ 704] to defeat the [APA's] central purpose of providing a broad spectrum of judicial review of agency action.'" *Id.* (alterations in original) (quoting *Bowen*, 487 U.S. at 903).

To determine "whether an alternative remedy is 'adequate' and therefore preclusive of APA review," the Court must "look for 'clear and convincing evidence' of 'legislative intent' to create a special, alternative remedy and thereby bar APA review." *Id.* (quoting *Garcia v. Vilsack*, 563 F.3d 519, 523 (D.C. Cir. 2009)). "Thus, for example, relief will be deemed adequate 'where a statute affords an opportunity for de novo district-court review' of the agency action." *Garcia v. Vilsack*, 563 F.3d 519, 522–23 (D.C. Cir. 2009) (quoting *El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1270 (D.C. Cir. 2005). In such cases, "Congress did not intend to permit a litigant challenging an administrative denial . . . to utilize simultaneously both [the review provision] and the APA." *Id.* at 523 (quoting *El Rio Santa Cruz Neighborhood Health Ctr.*, 396 F.3d at 1270).

Defendants maintain that the patent-infringement adjudicatory process, including Norwich's Rule 60(b) motion in the underlying patent litigation and its appeal to the Federal

Circuit, have provided (and are continuing to provide) Norwich with a more than adequate remedial process. In their view, "[i]n enacting [the] Hatch-Waxman [Act], 'Congress plainly contemplated that the affirmative patent infringement action [that follows a Paragraph IV certification]'—rather than administrative action by FDA—would 'resolve any dispute between the patentholder and the [ANDA] applicant and lead to the establishment of the effective date of approval for the [ANDA].'" Dkt. 40 at 28 (quoting *Avadel CNS Pharms., LLC v. Becerra*, 638 F. Supp. 3d 23, 33 (D.D.C. 2022)). And "[b]ecause Norwich seeks relief from the consequences of a judgment in a patent suit," they argue that Norwich's "pending Federal Circuit appeal is more than adequate to displace APA review." *Id.*

Although that argument is not without initial appeal, it once again misunderstands the nature of Norwich's claim in this case: Norwich maintains (at least for purposes of this litigation) (1) that the judgment entered by the Delaware District Court did not address—and did not purport to address—an amended ANDA that was not before the court and (2) that the FDA simply misread that final judgment. Norwich is not arguing that the Delaware District Court was wrong in finding the HE method-of-use patents valid and infringed. *See* Dkt. 4-1 at 17 ("Norwich has not, and does not intend to, appeal the district court's holdings that Norwich's Original ANDA infringes the Asserted HE Patents or that the HE Patents had not been shown invalid."). Nor is it arguing—at least here—that the Delaware District Court erred in denying its Rule 60(b) motion or that this Court should expressly or implicitly modify the Delaware District Court's judgment to add clarity that the judgment itself lacks. Rather, it contends that the judgment itself is clear; that it does not apply to the company's amended ANDA; and that the FDA's interpretation of the final judgment was arbitrary and capricious and contrary to law. *See id.* at 21–22 ("Although FDA apparently believes that it is hamstrung by the district court's

order, FDA's decision to not approve Norwich's Amended ANDA contravenes FDA's own regulations, FDA's statements when it issued the proposed and final regulations, and numerous cases discussing the importance of quickly approving generic drug products with section viii statements and carved-out labels."); Dkt. 49 at 8 ("With the benefit of the Administrative Record and FDA's memorandum to this Court, it is now apparent that FDA took it upon itself to (in FDA's own words) 'interpret' the Delaware Court's May 17 Order to arrive at its incorrect determination that the earlier Section 271(e)(4)(A) Order applies to Norwich's Amended ANDA. There is no basis for FDA's interpretation . . . ."). The Hatch-Waxman Act does not provide ANDA applicants with a cause of action to challenge the FDA's interpretation of a § 271(e)(4)(A) order entered by a district court at the conclusion of patent-infringement case.

The distinction between the relief that a Paragraph-IV-triggered adjudication provides and the relief that Norwich is seeking here can be seen in the difference between this case and *Avadel CNS Pharmaceuticals, LLC v. Becerra*, 638 F. Supp. 3d 23 (D.D.C. 2022). In *Avadel*, an ANDA applicant tried to use the APA to challenge the FDA's instruction that it submit a patent certification for a particular patent. *Id.* at 28. The ANDA applicant maintained that the instruction was arbitrary and capricious because the patent at issue was not infringed by the application. *Id.* The district court declined to consider the merits of the ANDA applicant's APA claim, concluding that the applicant could challenge the patent through a patent infringement action as provided for by the Hatch-Waxman Amendments, which would determine whether the ANDA infringed a valid patent or not and therefore whether a patent certification was needed. *Id.* at 32. In other words, the applicant there had an adequate alternative remedy because its claim was of the very sort that a patent infringement suit triggered by a Paragraph IV certification is intended to resolve. Norwich, in contrast, has already gone through that

Paragraph IV-triggered adjudicatory process, and it has already received a judgment, the substance of which it does not challenge. Instead, it merely alleges that the FDA misapplied that judicial decision—an argument that does not differ in material respects from a claim that the FDA has misapplied a statute or regulation. Most fundamentally, the challenge is not directed at the lawfulness of Delaware District Court's final judgment, which is all that the Federal Circuit can consider on appeal, but rather at the FDA's alleged failure to comprehend what that judgment actually means.

The flaw with Defendants' alternative-adequate-remedy argument can be highlighted by imagining that the Delaware District Court's judgment was crystal clear and that the FDA indisputably misread the judgment; imagine, for example, that the judgment unambiguously carved out the IBS-D indication and that the FDA simply failed to notice that exclusion. Under those circumstances, Norwich would lack any remedy in the patent litigation, and its only remedy would lie under the APA. Yet, the only material distinction between that scenario and this case is the strength of Norwich's claim, and that is a distinction without a difference when it comes to Defendants' threshold argument. The question at this stage of the analysis is not whether Norwich's argument has legs, but only whether it can leave the starting blocks. Because no other adequate remedy exists for the wrong that Norwich seeks to remedy in this case, Defendants' threshold § 704 defense is unavailing.

## C. Arbitrary and Capricious Review

As explained, the gravamen of Norwich's claim is that the FDA's determination that the Delaware District Court's final judgment precluded it from granting final approval to Norwich's amended ANDA prior to October 2, 2029, was "arbitrary, capricious, . . . or otherwise not in accordance with law" and must therefore be set aside. 5 U.S.C. § 706(2)(A). Because the Court

consolidated the hearing on Norwich's motion for a preliminary injunction with the merits at the parties' request, and because the parties' legal and factual arguments have been thoroughly developed, the Court need not pause to consider Norwich's likelihood of success of the merits or any of the other preliminary injunction factors. Instead, the Court will proceed to the ultimate merits of the case.

That inquiry might take one of two forms. First, the Court might consider whether the FDA's reading of the Delaware District Court's final judgment was "arbitrary and capricious." That form of judicial review "is 'fundamentally deferential.'" *Amneal Pharms.*, 285 F. Supp. 3d at 340 (quoting *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012)). This "does not mean . . . that courts must 'simply accept whatever conclusion an agency proffers,'" *id.* (quoting *Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 437 F.3d 75, 77 (D.C. Cir. 2006)); rather, "it is the Court's role to decide whether the agency acted 'within the scope of its lawful authority,' and whether it engaged in 'reasoned decision[-]making,' but not to second guess an agency's reasonable exercise of the authority that Congress gave it," *id.* (quoting *Tripoli Rocketry Ass'n*, 437 F.3d at 77). Second, the Court might consider whether the FDA's reading of the Delaware District Court's final judgment was "contrary to law," just as it might consider whether the agency's reading of an unambiguous statute or regulation is contrary to law. In considering that question, the Court cannot discern any basis to defer to the FDA's reading of the order. The FDA has no unique expertise in reading federal court orders (and certainly no greater expertise than a court), nor is this a case in which one can plausibly argue that *Chevron*'s gap-filling or political-accountability rationales are served. *See* Moss, Executive Branch Legal Interpretation: A Perspective from the Office of Legal Counsel, 52 Admin. L. Rev. 1303, 1328 (Fall 2000) (discussing the twin rationales for *Chevron* deference). For present purposes,

however, it makes little difference which approach the Court takes, since the FDA's reading of the Delaware District Court's final judgment was not only reasonable but was by far the better reading.

The FDA read the Delaware District Court's final judgment to preclude the agency—without limitation—from granting final approval to Norwich's ANDA before October 2, 2029. That is, on the FDA's reading, the judgment does not recognize an exception for the IBS-D indication (or any other non-HE indication) and, instead, applies to the ANDA without exception. The FDA explained the basis for this conclusion in two documents. The first is a letter that the FDA sent to Norwich, dated June 2, 2023. That letter explained that the FDA was "unable to grant final approval to [Norwich's] ANDA at this time because" the Delaware District Court "ordered that the effective date of *any* final approval by the Food and Drug Administration ("FDA") of Norwich's *ANDA No. 214369* is to be a date not earlier than the date of expiration of the last to expire of the '573, '195, and '397 Patents (currently October 2, 2029), plus any regulatory exclusivity to which Plaintiffs are or become entitled." Dkt. 51 at 119, 121 (A.R. 365, 367) (emphasis added). Norwich does not dispute that, even as amended, the ANDA at issue is "ANDA No. 214369." Nor was the FDA unaware of the Delaware District Court's decision denying Norwich's Rule 60(b) motion. It added: Norwich "notified the Agency that on May 17, 2023, the [Delaware District Court] denied Norwich's Rule 60(b) motion to modify the final judgment. Therefore, final approval cannot be granted until October 2, 2029 as specified in the court order." *Id.* at 121 (A.R. 365).

The second document in which the FDA explained its tentative-approval decision is a [redacted]

[redacted] explains that:

> Norwich's ANDA is eligible for only a Tentative Approval based on the 271(e)(4)(A) judgment [redacted] we interpret the May 17 order refusing to modify the judgment to say that the prior [redacted] still stands and applies to Norwich's post-amendment ANDA.

[redacted] (A.R. 374); Dkt. 40 at 20, 24.

As a result, the basis for the FDA's decision is clear: in the agency's view, the Delaware District Court's final judgment dictated that the earliest date that the FDA could grant final approval to ANDA No. 214369, regardless of whether the ANDA had been amended to carve-out the HE indication, was October 2, 2029. Dkt. 40 at 19–20; Dkt 4-1 at 21; Dkt. 39 at 9–10. Norwich does not dispute that the basis for the FDA's decision is adequately explained and, instead, argues that the agency's decision is both unreasonable and contrary to law because it "contravenes FDA's own regulations, FDA's statements when it issued the proposed and final regulations, and numerous cases discussing the importance of quickly approving generic drug products with section viii statements and carved-out labels." Dkt. 4-1 at 22.

At this point, the Court must return to Norwich's concession—a concession that is necessary to avoid interjecting this Court in a matter appropriately left to the Federal Circuit—that this case does not challenge the lawfulness of the Delaware District Court's final judgment and, certainly, does not posit that the FDA acted unreasonably or in contravention of law by adhering to a district court order that, in Norwich's view, misunderstood the governing FDA regulations and the "cases discussing the importance of quickly approving generic drug products with section viii statements and carved-out labels." *Id.* At oral argument on the pending motions, Norwich unequivocally disavowed that it was making any such argument, *see* Oct. 6,

2023 Hrg. Tr. at 9–10, and, instead, explained that it merely contends "that the best construction of [the Delaware District Court's] order is that [the court] wasn't saying anything at all about an amended ANDA." *Id.* The reasonableness (and accuracy) of the FDA's reading of that order might, of course, be informed by the surrounding statutory and regulatory environment, but, in the end, all that matters for present purposes is how that order is best understood.

In considering that question, the Court starts with the plain text of the Delaware District Court's final judgment. Paragraph 5 of that judgment provides as follows:

> Pursuant to 35 U.S.C. § 271(e)(4)(A), it is hereby ordered that the effective date of any final approval by the Food and Drug Administration ("FDA") of Norwich's ANDA No. 214369 is to be a date not earlier than the date of expiration of the last to expire of the '573, '195, and '397 Patents (currently October 2, 2029) [(the HE method-of-use patents)], plus any regulatory exclusivity to which Plaintiffs are or become entitled.

Dkt. 4-5 at 3. Norwich's ANDA, even as amended, is still ANDA No. 214369. *Id.* As a result, the FDA's determination tracks the most straightforward reading of the final judgment—the FDA may not grant "final approval" to "Norwich's ANDA No. 214369" before October 2, 2029.

That plain-language reading of the final judgment is reinforced, moreover, by the extensive briefing and argument that came before and after its entry. Prior to issuing its judgment, the Delaware District Court directed the parties to "meet and confer and file a joint proposed final judgment." *See Norwich I*, July 28, 2022 Min. Order. In a letter responsive to that directive, the parties presented their views about whether the Court's judgment should restrict the effective date of approval of Norwich's ANDA only with respect to the HE method-of-use patents and corresponding labeling or with respect to the ANDA more generally, irrespective of any amendment Norwich might submit to the FDA limiting the labeling to the IBS-D indication. Those views were starkly conflicting: Salix asked that the final judgment "apply to 'Norwich's ANDA,' period." *Norwich I*, Dkt. 196 at 2. Norwich, in contrast, argued

that such an order would be overly "broad or speculative" and asked, instead, that the Delaware District Court "reject any proposed judgment that presupposes labeling excluding the HE indication would infringe the asserted HE patent claims, or precludes Norwich's ability to seek a skinny label." *Id.* at 5. Faced with these competing views, the Delaware District Court decided to phrase the final judgment as it did—using broad language with no apparent exemption for a future "skinny label."

To be sure, the Delaware District Court explained in a memorandum accompanying its final judgment that the possibility that "Norwich may seek to carve out the HE indication as permitted by 21 U.S.C. § 355(j)(2)(A)(viii) [was] immaterial to [its] analysis" because such a label was not before the court. Dkt. 4-6 at 3. In Norwich's view, this shows that the court did not intend that its final judgment would foreclose the FDA from approving an amended ANDA that carved-out the HE indication. Had the story ended there, Norwich would have been on stronger footing in challenging the reasonableness of the FDA's interpretation of the final judgment. But it did not end there.

After the Delaware District Court entered its judgment, Norwich amended its ANDA to carve-out the HE indication and then moved to amend the court's judgment to clarify that the judgment did not apply to the amended label. Dkt. 51 at 23 (A.R. 269). Specifically, Norwich asked the court to adopt an amended judgment that would have provided as follows:

> Pursuant to 35 U.S.C. § 271(e)(4)(A), it is hereby ordered that the effective date of any final approval by the Food and Drug Administration ("FDA") of Norwich's ANDA No. 214369 is to be a date not earlier than the date of expiration of the last to expire of the '573, '195, and '397 Patents (currently October 2, 2029), plus any regulatory exclusivity to which Plaintiffs are or become entitled, *to the extent Norwich's ANDA No. 214369 maintains Paragraph IV certifications pursuant to 21 U.S.C. §355(j)(2)(A)(vii)(IV) stating that the '573, '195, and '397 patents are invalid or will not be infringed by the manufacture, use, or sale of the product specified in Norwich's ANDA.*

*Id.* at 48 (A.R. 294) (emphasis added to reflect proposed revision). The Delaware District Court denied that motion—not because the proposed amendment was unnecessary, but because the court thought it "wrong . . . that [Norwich] can litigate a case through trial and final judgment based on a particular ANDA, and then, after final judgment, change the ANDA to what it wishes it had started with, and win in a summary proceeding." Dkt. 4-9 at 6.

Given this history, it is a stretch for Norwich to argue that the final judgment is best read *implicitly* to include the qualifying language that the court *explicitly* declined to include—twice. *Cf. Cigar Ass'n of Am.*, 411 F. Supp. 3d at 4 (concluding that it was implausible to read a court order as exempting cigar and loose tobacco products when "the court's order vacating the [FDA's] Guidance not only notes that the FDA's Guidance applies to cigars," but "declares broadly that 'the August 2017 Guidance must be vacated,'" and "when [p]laintiffs sought clarification from the . . . court as to the breadth of its rulings, that court made clear that its remedial order applies to cigars and pipe tobacco"). Norwich's principal answer to this difficulty merely posits that federal courts, like federal agencies, should be afforded a presumption of regularity, *cf. Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971)), and that reading the final judgment to preclude Norwich from amending its ANDA to exclude labeling for the HE method of use would run afoul of the FDA's governing regulations and the policy favoring the prompt approval of non-infringing generic alternatives to pricier branded drugs. Dkt. 4-1 at 22.

For support, Norwich points to 21 C.F.R. § 314.94(a)(12)(viii)(A), which provides as follows:

> An applicant who has submitted a paragraph IV certification and is sued for patent infringement *must submit an amendment to change its certification if a court enters a final decision from which no appeal has been or can be taken*, or signs and enters a settlement order or consent decree in the action that includes

> a finding that the patent is infringed, unless the final decision, settlement order, or consent decree also finds the patent to be invalid. In its amendment, the applicant must certify under paragraph (a)(12)(i)(A)(3) of this section that the patent will expire on a specific date *or, with respect to a patent claiming a method of use, the applicant may instead provide a statement under paragraph (a)(12)(iii)* of this section if the applicant amends its ANDA such that the applicant is no longer seeking approval for a method of use claimed by the patent. *Once an amendment for the change has been submitted, the ANDA will no longer be considered to contain a paragraph IV certification to the patent.* If a final judgment finds the patent to be invalid and infringed, an amended certification is not required.

21 C.F.R. § 314.94(a)(12)(viii)(A) (emphasis added). According to Norwich, it did just what this regulation contemplates: after the Delaware District Court entered a final judgment finding that its ANDA infringed Salix's HE method-of-use patents, Norwich amended the ANDA under paragraph (a)(12)(iii) to include a section viii statement excluding the infringing method of use. It thereby limited the scope of its amended ANDA to those indications covered exclusively by the invalid or non-infringing patents and removed any and all Paragraph IV certifications from the ANDA. Dkt. 4-1 at 22. Norwich maintains that because its ANDA no longer contains a Paragraph IV certification and contains only a section viii statement, its "ANDA may be approved . . . immediately," 21 C.F.R. § 314.107(b)(1)(ii), like any other ANDA that contains a section viii statement (rather than a Paragraph IV certification). *See also* 81 Fed. Reg. 69580, 69624 (Oct. 6, 2016) (explaining that the current version of 21 C.F.R. § 314.94 "clarif[ies] that if a[n] . . . ANDA applicant submits a statement . . . explaining that a method-of-use patent does not claim an indication or other condition of use for which the applicant is seeking approval and submits proposed labeling that appropriately carves out information related to the patented method of use, then the . . . ANDA may be eligible for immediate approval").

As explained above, however, Norwich does not—and cannot—argue in this case that the Delaware District Court erred. Instead, it is left to argue that the law is so clear, and that the

final judgment is so unclear, that the only path forward is to construe the final judgment in the manner that Norwich proposed to the Delaware District Court and that court declined to embrace. Although Norwich raises a substantial argument regarding the meaning of § 314.94(a)(12)(viii)(A), the Court is unpersuaded that the law is as clear, or that the final judgment is as unclear, as Norwich posits.

To start, 21 C.F.R. § 314.94(a)(12)(viii)(A) does not stand alone. Among other relevant provisions, 21 U.S.C. § 355(j)(5)(B)(iii)(II) mandates that the FDA approve an (otherwise sufficient) ANDA with a Paragraph IV certification that is the subject of patent litigation as follows:

> [I]f before the expiration of [the thirty-month stay] the district court decides that the patent has been infringed—
>
> (aa) if the judgment of the district court is appealed, the approval shall be made effective on—
>
> (AA) the date on which the court of appeals decides that the patent is invalid or not infringed (including any substantive determination that there is no cause of action for patent infringement or invalidity); or
>
> (BB) the date of a settlement order or consent decree signed and entered by the court of appeals stating that the patent that is the subject of the certification is invalid or not infringed; or
>
> (bb) if the judgment of the district court is not appealed or is affirmed, the approval shall be made effective on the date specified by the district court in a court order under section 271(e)(4)(A) of Title 35.

21 U.S.C. § 355(j)(5)(B)(iii)(II). Section 271(e)(4)(A) of Title 35, in turn, requires a district court that has found that a Paragraph IV certification constituted an act of infringement of a valid patent to "order the effective date of *any* approval of *the drug . . . involved in the infringement* to be a date which is not earlier than the date of the expiration of the patent which has been infringed." 35 U.S.C. § 271(e)(4)(A) (emphasis added); *see also Vanda Pharm. Inc. v. West-*

FDA_00693

*Ward Pharm. Int'l Ltd.*, 887 F.3d 1117, 1139 (Fed. Cir. 2018) ("[T]he FDA is entitled not to set an approval date prior to the expiration of a patent that has been found to be infringed under § 271(e)(4)(A) and not invalid in a Hatch-Waxman case."); *In re Omeprazole Pat. Litig.*, 536 F.3d 1361, 1367 (Fed. Cir. 2008) ("[I]f the FDA has not approved the ANDA before the district court determines that the patent has been infringed, the FDA may not approve the ANDA until the effective date specified by the district court under section 271(e)(4)(A).").

How this statutory scheme interacts with the regulatory path to approval following a finding of infringement raises difficult questions, which have occupied the Federal Circuit and lower courts. Although not directly on point, *Ferring B.V. v. Watson Laboratories, Inc.-Fla.*, 764 F.3d 1382 (Fed. Cir. 2014), is instructive. In that case, a generic manufacturer submitted an ANDA that contained a Paragraph IV certification. The patent owner sued the ANDA filer, and the district court found that the ANDA "was silent with respect to [a key issue]" and thus "permitted [the generic manufacturer] to violate the patent." *Id.* at 1386. During trial, however, the applicant "agreed to amend its ANDA specification to include [an important] restriction," leading the district court to find that the generic manufacturer's "proposed amendment would be outside the scope" of the patent. *Id.* Then, after trial, the generic manufacturer amended its ANDA in the relevant respect, the FDA approved the amendment, and the district court subsequently "concluded that the [amended] ANDA did not infringe the patents-in-suit." *Id* at 1387. Ultimately, the district court found that the ANDA, as originally submitted, infringed the patent but that, by amending its ANDA, the generic manufacturer mooted the plaintiff's complaint. *Id.*

On appeal, the patent holder argued that 35 U.S.C. § 271(e)(4)(A) requires "that once a section 271(e)(2) infringement is found based on the ANDA as first submitted, the district court

*must* order a change in the effective date of the ANDA." *Id.* at 1389 (emphasis in original). The Federal Circuit, however, rejected this bright-line rule and, instead, held that a "district court *may* reconsider its own finding of infringement in light of an amended ANDA or other information." *Id.* at 1391 (emphasis added). The court explained, "[w]e do not suggest that a district court must always consider any ANDA amendment;" rather, "[a]llowing an amendment is within the discretion of the district court, guided by principles of fairness and prejudice to the patent-holder." *Id.* Applying that abuse-of-discretion standard, the Federal Circuit affirmed the district court's decision to consider the ANDA that was amended *after trial*. In the view of the Federal Circuit, there was little prejudice to the brand-name drug company in considering the amended ANDA because, "even at trial the district court made clear that it was inclined to allow an amendment by [the ANDA applicant] clarifying the dissolution rate of its product, and the district court judge discussed the language of the amendment on the record." *Id.*

Other courts, however, have declined to grant relief under Rule 60(b) based on post-trial amendments to ANDAs that were found at trial to infringe listed patents. In *Forest Lab'ys, LLC v. Sigmapharm Lab'ys, LLC*, No. 14-1119, 2019 WL 3574249 (D. Del. Aug. 6, 2019), for example, the district court declined to vacate a finding of infringement pursuant to Rule 60(b) based on a post-trial amendment to the defendant's ANDA. In reaching that conclusion, the court distinguished *Ferring* on four grounds. Unlike in *Ferring*: (1) the court's "finding of infringement was not based solely on the ANDA, but also on actual testing of [the] generic product;" (2) "there was no discussion at the trial . . . suggesting that [the defendant] would or should amend its ANDA to moot the issue of infringement;" (3) the plaintiff was likely to suffer prejudice due to the post-amendment amendment, including the cost of further discovery and factfinding regarding the doctrine of equivalents and the risk that the parties would seek to raise

new arguments based on the amendments; and (4) principles of fairness weighed against permitting the defendant "to engage in a do-over, after . . . learn[ing] of the weaknesses in its legal theory." *Id.* at *7–*8. Similarly, in *Allergan, Inc. v. Sandoz Inc.*, No. 09-97, 2013 WL 6253669 (E.D. Tex. Dec. 3, 2013), the district court held that the defendant's "request for a ruling of non-infringement based on the changed ANDA [was] tantamount to seeking summary judgment premised on new allegations that only came to exist after the final judgment was rendered and affirmed." *Id.* at *3. In the court's view, that effort ran afoul of the principle that "a party may not use a Rule 60(b) motion as an occasion to relitigate a case." *Id.* (cleaned-up).

To be sure, the relief that Norwich sought before the Delaware District Court is not on all fours with any of these cases. But many of the same principles apply, and much of the analysis in these decisions mirrors the analysis in the Delaware District Court's decision rejecting Norwich's Rule 60(b) motion. Common sense, moreover, at least arguably suggests that this is not a one-size-fits all question, in which district courts are empowered only to specify an approval date with respect to the infringing methods-of-use and must, invariably, carve out from their judgments any future, amended ANDAs that are limited in scope to those methods-of-use that were not found to be infringing at trial. As Salix notes, that approach might—at least at time—unfairly prejudice patent holders, who focus their litigation strategy and discovery on the ANDA *as it existed at trial*, and might—at least at times—invite multiple rounds of litigation, as patent holders seek to respond to post-trial ANDA amendments by raising arguments that were either left on the cutting-room floor or unapparent prior to the amendment.

The Court expresses no view on the ultimate merits of these questions—and, certainly, takes no view on how these principles might apply to the Delaware District Court's Rule 60(b) decision. Those questions are not before this Court, and they are the sole domain of the Federal

Circuit. All that matters for present purposes is that Norwich has failed to show that the law is so clear that the FDA should have stretched to read the Delaware District Court's final judgment and Rule 60(b) decision in a manner that ignores their plain terms. That proposition is unsustainable, as is Norwich's ultimate contention that the FDA erred as a matter of reasoned-decision-making and law in reading those documents to leave the agency free to approve the company's amended ANDA prior to October 2, 2029.

**D. Summary Judgment**

The Court pauses to consider one final question. Although the Court is persuaded that the Delaware District Court unambiguously directed that the FDA wait until October 2, 2029 to approve ANDA No. 214369 (including any amendment to that ANDA), the direct appeal of the Delaware District Court's judgment is pending before the Federal Circuit, and the Federal Circuit's decision in that appeal might possibly shed additional light on the best reading of the district court's judgment and the surrounding legal principles. For that reason, the Court has considered whether it should simply deny Norwich's motion for a preliminary injunction but wait for any relevant guidance from the Federal Circuit before resolving the parties' cross-motions for summary judgment. For four reasons, however, the Court concludes that there is no reason to postpone the resolution of the pending cross-motions.

First, Norwich and the FDA agreed to consolidate the hearing on Norwich's motion for a preliminary injunction with the merits "[i]n order to conserve judicial and party resources," Dkt. 8 at 1, and they are entitled to the benefit of that streamlined procedure. Second, Norwich has not asked that the Court wait for a decision from the Federal Circuit, nor has it filed an "affidavit or declaration" pursuant to Rule 56(d) showing that it "it cannot present facts essential to justify its opposition." Third, and most importantly, if the Federal Circuit issues a decision that casts

doubt on the FDA's reading of the Delaware District Court's final judgment, Norwich's remedy is not to return to this Court for further consideration but, rather, to ask the FDA to reconsider its decision. Counsel for Norwich conceded as much at oral argument, acknowledging that "there's never a time when you can't" ask the FDA to reconsider and that the only reason it has not done so to date is because the company "didn't think it would be fruitful." *See* Transcript, Oct. 6, 2023 Hrg. Tr. at 17. The Court put the question even more directly to counsel for the FDA, asking what would happen if the Federal Circuit were to read the final judgment in the manner that Norwich urges in this case (and not as Norwich urges in the direct appeal). He responded: "then Norwich would notify [the] FDA of the authoritative construction of the order." *Id.* at 30–31. The availability of reconsideration before the agency resolves the matter, since basic tenets of administrative law require agencies, whenever possible, to consider and opine on new arguments before those arguments are raised in APA litigation, and, here, the parties agree that Norwich will have the opportunity to bring any relevant developments to the attention of the agency in the first instances. Finally, the prospect that the Federal Circuit will construe the Delaware District Court's final judgment in the manner that Norwich urges in this case is, at best, remote. For the reasons explained above, that reading is exceedingly difficult to square with the text of the final judgment and with the court's Rule 60(b) decision, and, notably, no party—not even Norwich—is urging the Federal Circuit to adopt that unconventional reading.

## CONCLUSION

For the foregoing reasons, the Court will **DENY** Plaintiff's motion for a preliminary injunction, Dkt. 4, will **GRANT** the FDA and Salix's cross-motions for summary judgment, Dkt. 37, Dkt. 54.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: November 1, 2023

# United States Court of Appeals for the Federal Circuit

---

**SALIX PHARMACEUTICALS, LTD., SALIX PHARMACEUTICALS, INC., BAUSCH HEALTH IRELAND LTD., ALFASIGMA S.P.A.,**
*Plaintiffs-Appellants*

**v.**

**NORWICH PHARMACEUTICALS INC.,**
*Defendant-Cross-Appellant*

---

2022-2153, 2023-1952

---

Appeals from the United States District Court for the District of Delaware in No. 1:20-cv-00430-RGA, Judge Richard G. Andrews.

---

Decided: April 11, 2024

---

WILLIAM R. PETERSON, Morgan, Lewis & Bockius LLP, Houston, TX, argued for plaintiffs-appellants. Also represented by MICHAEL J. ABERNATHY, KARON NICOLE FOWLER, MICHAEL SIKORA, Chicago, IL; JULIE S. GOLDEMBERG, Philadelphia, PA; JOSHUA DANIEL CALABRO, SHANNON KEOUGH CLARK, STEVEN C. KLINE, ALEXIS M. MCJOYNT, SCOTT K. REED, BECKY E. STEEPHENSON, Venable LLP, New York, NY.

CHAD A. LANDMON, Axinn, Veltrop & Harkrider LLP,

Case: 22-2153 Document: 71 Page: 2 Filed: 04/11/2024

Hartford, CT, argued for defendant-cross-appellant. Also represented by MATTHEW BECKER, REBECCA L. CLEGG, THOMAS K. HEDEMANN, MATTHEW S. MURPHY.

IRENA ROYZMAN, Kramer Levin Naftalis & Frankel LLP, New York, NY, for amici curiae Regeneron Pharmaceuticals, Inc., Ocular Therapeutix, Inc. Also represented by CHRISTINE WILLGOOS; PAUL BRZYSKI, Washington, DC.

PAUL WHITFIELD HUGHES, III, McDermott Will & Emery LLP, Washington, DC, for amicus curiae Vanda Pharmaceuticals Inc. Also represented by CHRISTOPHER MICHAEL BRUNO, SARAH HOGARTH, APRIL ELISE WEISBRUCH.

---

Before LOURIE, CHEN, and CUNNINGHAM, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* LOURIE.

Opinion dissenting-in-part filed by *Circuit Judge* CUNNINGHAM.

LOURIE, *Circuit Judge*.

Salix Pharmaceuticals, Ltd., Salix Pharmaceuticals, Inc., Bausch Health Ireland Ltd., and Alfasigma S.P.A. (collectively, "Salix") appeal from a final judgment of the United States District Court for the District of Delaware holding claim 2 of U.S. Patent 8,309,569, claim 3 of U.S. Patent 10,765,667, claim 4 of U.S. Patent 7,612,199, and claim 36 of U.S. Patent 7,902,206 invalid as obvious. *See Salix Pharms., Ltd. v. Norwich Pharms., Inc.,* No. 20-cv-430, 2022 WL 3225381 (D. Del. Aug. 10, 2022) ("*Decision*").

Norwich Pharmaceuticals Inc. ("Norwich") cross-appeals from an order that issued after the district court concluded that Norwich infringed claim 8 of U.S. Patent 8,624,573, claim 6 of U.S. Patent 9,421,195, and claims 11 and 12 of U.S. Patent 10,335,397 and had failed to prove

that those claims were invalid. That order, contained within the final judgment, instructed the FDA that the effective approval date of Norwich's Abbreviated New Drug Application ("ANDA") may not precede the expiration dates of those claims. J.A. 51. Norwich also cross-appeals from a denial of its motion to modify the final judgment. *See Salix Pharms., Ltd. v. Norwich Pharms., Inc.*, No. 20-430, 2023 WL 3496373 (D. Del. May 17, 2023) ("*Rule 60(b) Order*").

For the following reasons, we affirm.

BACKGROUND

Rifaximin, the active ingredient in Salix's commercial product Xifaxan®, has been widely used as an antibiotic for decades, having been first synthesized in the early 1980s in Italy and approved there as an antibiotic in 1985. *Decision* at *8; J.A. 2532. The FDA approved Xifaxan nearly 20 years later, in 2004, as 200 mg tablets for the treatment of travelers' diarrhea. *Decision* at *1. The FDA subsequently approved 550 mg tablets for hepatic encephalopathy ("HE") in 2010 and for irritable bowel syndrome with diarrhea ("IBS-D") in 2015. *Id.*

Norwich sought to market a generic version of rifaximin and, in 2019, filed an ANDA for 550 mg tablets with the same indications as Xifaxan, certifying pursuant to 21 U.S.C. § 355(j)(2)(vii)(IV) that Salix's rifaximin patents were invalid. Salix timely sued, asserting that Norwich's ANDA infringed dozens of valid, Orange Book-listed patents. By the time of trial, the case had been streamlined to three groups of patents:

- the '573, '195, and '397 patents, directed to treating HE ("the HE patents");
- the '569 and '667 patents, directed to treating IBS-D with 550 mg rifaximin three times a day (1,650 mg/day) for 14 days ("the IBS-D patents"); and,

- the ’199 and ’206 patents, directed to rifaximin form β (“the polymorph patents”).

Following a bench trial, the district court held that Norwich infringed the HE patents’ claims and had failed to establish their invalidity. *Decision* at *10–11. Norwich did not appeal those holdings. The court also held that Norwich’s ANDA infringed the IBS-D and polymorph patents, but that those patents’ claims would have been obvious over certain prior art. *Id.* at *2–3, 16–17. Salix appealed those invalidity holdings.

As part of the entered judgment, the district court ordered that the effective date of a final approval of Norwich’s ANDA should not precede October 2029, which is the latest expiration date associated with the HE patents. J.A. 51. Norwich then amended its ANDA in an attempt to remove the infringing HE indication and moved to modify the judgment under Federal Rule of Civil Procedure 60(b), asserting that the amendment negated any possible infringement. The court denied Norwich’s motion, and Norwich cross-appealed.

We have jurisdiction under 28 U.S.C. § 1295(a)(1).

## DISCUSSION

Salix first contends that the district court’s conclusion that the asserted claims of the IBS-D patents were invalid as obvious was reached in error. Subsumed within that challenge is a question of whether or not a background reference discussed by the court was properly established as prior art. Salix also contends that the court erred in holding that the asserted polymorph patent claims were invalid as obvious. Norwich’s cross-appeal asserts that the court erred in the phrasing of its order precluding final approval of its ANDA until expiration of the HE patents. Norwich further asserts that the court erred in denying its motion to modify after the ANDA was amended in an attempt to avoid infringement. We address each argument in turn.

I

We turn first to Salix's contention that the district court erred in concluding that the asserted claims of the IBS-D patents would have been obvious over the asserted prior art.

Whether or not a claim would have been obvious is a question of law, based on underlying factual determinations. *Hospira, Inc. v. Fresenius Kabi USA, LLC*, 946 F.3d 1322, 1328–29 (Fed. Cir. 2020). We review the ultimate legal question of obviousness *de novo* and the underlying factual determinations for clear error. *Id.* at 1328. A finding is clearly erroneous only if we are "left with a definite and firm conviction that the district court was in error." *Id.* (citations omitted).

The IBS-D patents are directed to treating IBS-D with 550 mg rifaximin, thrice-daily (1,650 mg/day), for 14 days. For example, claim 2 of the '569 patent depends from claim 1 as follows:

> 1. A method of providing acute treatment for diarrhea-associated Irritable Bowel Syndrome (dIBS) comprising: *administering 1650 mg/day* of rifaximin for 14 days to a subject in need thereof, wherein removing the subject from treatment after the 14 days results in a durability of response, wherein the durability of response comprises about 12 weeks of adequate relief of symptoms.
>
> 2. The method of claim 1, wherein *the 1650 mg is administered at 550 mg three times per day*.

'569 patent, col. 30 ll. 4–12 (emphases added); *see also* '667 patent, col. 46 ll. 29–33, 39–40 (claims 1 & 3, similar). The key limitation on appeal is the dosage amount that appears in the claims: 550 mg, three times per day ("TID"), for a total of 1,650 mg/day.

Norwich challenged the IBS-D claims' validity by asserting as prior art references a clinical trial protocol that had been published on the ClinicalTrials.gov website in 2005 ("the Protocol")[1] and a 2006 journal article ("Pimentel").[2] The Protocol describes a Phase II study evaluating twice-daily doses of 550 mg (1,100 mg/day) and 1,100 mg (2,200 mg/day) for 14 and 28 days for the treatment of IBS-D. *See* J.A. 7051. Pimentel teaches administering 400 mg, TID (1,200 mg/day), for the treatment of IBS,[3] but further opines that the "optimal dosage of rifaximin may, in fact, be higher than that used in our study." J.A. 4644.

The district court found that those two references disclose each and every limitation of the challenged IBS-D claims, and further found that a skilled artisan would have been motivated to combine those two references to arrive at what is claimed with a reasonable expectation of success. *Decision* at *17, *19–20. The court then concluded that the challenged IBS-D claims were invalid as obvious. *Id.* at

---

1 ClinicalTrials.gov, *History of Changes for Study: NCT00269412, Randomized, Double Blind, Placebo-Controlled Study to Assess the Efficacy and Safety of Three Different Doses of Rifaximin Administered BID either Two or Four Weeks in the Treatment of Patients with Diarrhea-Associated Irritable Bowel Syndrome* (December 22, 2005); J.A. 7047–55.

2 M. Pimentel *et al.*, *The Effect of a Nonabsorbed Oral Antibiotic (Rifaximin) on the Symptoms of the Irritable Bowel Syndrome*, 145 ANN. INTERN. MED., 557 (2006); J.A. 4639–46.

3 Salix did not argue a difference between a motivation to use rifaximin to treat IBS versus IBS-D. *Decision* at *19 n.3. It concedes on appeal that "[r]oughly one-third of IBS patients suffer from IBS-D," Appellants' Br. at 6, and has not otherwise suggested that treatments for IBS would not inform treatments of IBS-D.

*17–22.  Salix appeals, asserting that the court erred in finding that a skilled artisan would have had a reasonable expectation of success in using the claimed 1,650 mg/day dosage to treat IBS-D.  Appellants' Br. at 39–48.  Whether or not there would have been a reasonable expectation of success is a question of fact, *IXI IP, LLC v. Samsung Elecs. Co.*, 903 F.3d 1257, 1262 (Fed. Cir. 2018), which we review for clear error, *Hospira*, 946 F.3d at 1328.

Salix does not appear to dispute the district court's finding that the Protocol and Pimentel "disclose all limitations of the IBS-D claims."  *See Decision* at *17.  Rather, it contends that even if the asserted combination of references effectively discloses the claimed 1,650 mg/day dosage, there remains insufficient evidence to support a finding of a reasonable expectation of success in using that particular dosage amount.  *See*, *e.g.*, Appellants' Br. at 39–40.  According to Salix, the highest prior art dosage amount that could have been supported with a reasonable expectation of success was the 1,200 mg/day dose evaluated by Pimentel.  *Id.* at 40.  We disagree.

The Protocol provides an outline of a planned Phase II clinical trial in which "three different doses (275, 550 and 1100 mg) of rifaximin" were to be "administered BID [*i.e.*, twice-daily] for either two or four weeks in the treatment of patients with diarrhea-associated irritable bowel syndrome."  J.A. 7050 (cleaned up).  As an outline of that clinical trial plan, the Protocol provides only that those three specific, twice-daily dosage regimens were to be investigated for either two or four weeks.  The Protocol does not include any efficacy or safety data, nor does it mention a 1,650 mg/day dose or TID dosing.

Although we have rejected the idea that "efficacy data [are] always required for a reasonable expectation of success," *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1385 (Fed. Cir. 2019), we are hesitant to conclude as a general matter that the disclosure of a Phase II clinical trial

plan, standing alone, provides an expectation of success sufficient to render obvious a dosage that was not included within the planned clinical trial. *See* Appellants' Reply Br. at 13–14. But the Protocol was not asserted alone; it was asserted in combination with Pimentel.

Pimentel teaches that administration of 400 mg rifaximin, TID (1,200 mg/day), "resulted in greater improvement in IBS symptoms" and "lower bloating score[s] after treatment." J.A. 4639; *see also id.* at 4642–43 (providing supporting data). Pimentel explains that the 400 mg TID regimen was chosen "on the basis of a previous study that demonstrated the efficacy of rifaximin in bacterial overgrowth." *Id.* at 4640. However, Pimentel does not merely provide that daily rifaximin doses of 1,200 mg were likely to be successful in the treatment of IBS. Pimentel further teaches that "[r]ecent data suggest that the *optimal dosage* of rifaximin *may, in fact, be higher* than that used in our study." J.A. 4644; *Decision* at *20 (emphases added).

The district court did not clearly err in finding that a skilled artisan would have looked to both of those references, considered their limits, and had a reasonable expectation of success as to the efficacy of 550 mg TID dosing. The combined message that the skilled artisan would have discerned from the Protocol and Pimentel is that the optimal dosage for treating patients suffering from IBS disorders may be higher than 400 mg TID, and the next higher dosage unit from the Protocol was 550 mg. We see no clear error in the conclusion that there would have been a reasonable expectation of success in administering the claimed 1,650 mg/day to IBS-D patients. Indeed, certainty and absolute predictability are not required to establish a reasonable expectation of success. *See Almirall, LLC v. Amneal Pharms. LLC*, 28 F.4th 265, 275 (Fed. Cir. 2022) ("A finding of a reasonable expectation of success does not require absolute predictability of success."); *Acorda Therapeutics, Inc. v. Roxane Lab'ys, Inc.*, 903 F.3d 1310, 1333 (Fed. Cir. 2018) ("This court has long rejected a

requirement of conclusive proof of efficacy for obviousness." (cleaned up)).

Moreover, references establishing the background knowledge of a person of ordinary skill in the art are consistent with the reasonable expectation of success provided by the combination of the Protocol with Pimentel. For example, Cuoco[4] teaches the efficacy of 1,200 mg rifaximin/day for 14 days for the treatment of small intestinal bacterial overgrowth ("SIBO"). J.A. 4533. Salix has acknowledged that those of ordinary skill in the art identified "bacterial alterations" as a potential underlying cause for IBS, Appellants' Br. at 7, and the literature[5] describes SIBO as a condition that is "highly prevalent in patients with irritable bowel syndrome (IBS)," such that "SIBO decontamination is associated [with] a significant improvement of IBS symptoms." J.A. 4664. We therefore agree with the district court that references describing the treatment of SIBO would have been pertinent to the skilled artisan's considerations as to what treatments would have a potential for success in treating individuals suffering from IBS.

In addition to Cuoco, Lauritano[6] teaches an increase in rifaximin efficacy for the treatment of SIBO as doses were increased from 600 mg/day to 1,200 mg/day, providing the

---

[4] L. Cuoco & M. Salvagnini, *Small intestine bacterial overgrowth in irritable bowel syndrome: a retrospective study with rifaximin*, 52 MINERVA GASTROENTEROL. DIETOL. (2006) 89; J.A. 4533–39.

[5] E. Scarpellini et al., *High dosage rifaximin for the treatment of small intestinal bacterial overgrowth*, 25 ALIMENT. PHARMACOL. THER. 781 (2007); J.A. 4663–67 ("Scarpellini").

[6] E.C. Lauritano et al., *Rifaximin dose-finding study for the treatment of small intestinal bacterial overgrowth*, 22 ALIMENT. PHARMACOL. THER., 31 (2005); J.A. 7267–71.

trend that Pimentel described as indicating that doses higher than 1,200 mg/day may be even more optimal for the treatment of IBS. J.A. 7267 ("Higher doses of rifaximin lead to a significant gain in terms of therapeutic efficacy in [SIBO] eradication without increasing the incidence of side-effects."); *see also id.* at 4644. As evidenced by Scarpellini and Lin,[7] those in the art advanced on those findings, and subsequently evaluated higher doses. For example, Scarpellini reported that a 1,600 mg/day dose "showed a significantly higher efficacy" compared with 1,200 mg/day for the treatment of SIBO. J.A. 4663; *see also id.* at 4666 (Table 1, noting study patients included those suffering from IBS-D); *id.* at 4747 (teaching that "[a]bout 400 to about 600 mg of rifaximin may be administered TID for about 10 days" (*i.e.*, 1,200 mg/day to 1,800 mg/day) for the eradication of bacterial overgrowth).

The record further supports the finding that there would have been a reasonable expectation of success in administering higher doses of rifaximin without an intolerable increase in negative side effects. For example, Cuoco teaches that rifaximin was understood as having "a low risk of causing microbial resistance," J.A. 4533, and that rifaximin was well known for its "profile of tolerability and safety widely described in the literature," *id.* at 4538. Scarpellini further reported that the 1,600 mg/day dose provided a "similar compliance and side-effect profile" compared with the 1,200 mg/day dose. *Id.* at 4663. As the district court noted, the "[w]idespread off-label use" of rifaximin also supported the conclusion that rifaximin was safe and effective "for the treatment of IBS-D with a reasonable expectation of success." *Decision* at *19; *see also* Appellants' Br. at 17 ("There is no dispute that skilled

---

[7] International Patent Application Publication 2006/102536; J.A. 4721–47.

FDA_00711

artisans knew of the general concept of trying off-label use of rifaximin to treat IBS-D.").

In view of the record before us, we see no clear error in the finding that a skilled artisan would have had a reasonable expectation of success in administering the claimed 1,650 mg/day regimen for the treatment of IBS-D. We therefore affirm the district court's holding that the challenged IBS-D claims would have been obvious over the cited references. *See In re Applied Materials, Inc.*, 692 F.3d 1289, 1295 (Fed. Cir. 2012) ("[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation." (citation omitted)).

Salix further contends that a Press Release[8] issued by Salix in a filing with the Securities and Exchange Commission less than a year before the patents' priority date was not prior art because Norwich failed to establish that it was "by others" as required by pre-AIA 35 U.S.C. § 102(a). Appellants' Br. at 30–39. According to Salix, the district court's inclusion of that allegedly non-prior art reference in its discussion of the skilled artisan's expectation of success was harmful error. *Id.*

Although the district court cited the Press Release in its discussion of the skilled artisan's expectations, it ultimately held that the "Protocol and Pimentel [] disclose all limitations of the IBS-D claims" and that a skilled artisan "would have been motivated to combine the . . . Protocol and Pimentel [] with a reasonable expectation of success." *Decision* at *17. We therefore need not decide whether or not the Press Release was prior art because, even assuming that it was not, the Protocol and Pimentel alone established the obviousness of the claims.

---

8 Salix Pharms., Ltd., Current Report (Form 8-K) (Sept. 5, 2007); J.A. 7477–82.

We accordingly affirm the district court's determination that Norwich established that the IBS-D claims would have been obvious in view of the Protocol and Pimentel.

II

We next turn to Salix's contention that the district court clearly erred in finding that there would have been a reasonable expectation of success in obtaining the rifaximin form β recited in the polymorph patents' claims.

Whether or not there would have been a reasonable expectation of success is a question of fact, *IXI IP, LLC v. Samsung Elecs. Co.*, 903 F.3d 1257, 1262 (Fed. Cir. 2018), which we review for clear error, *Hospira*, 946 F.3d at 1328. We review the ultimate conclusion of obviousness *de novo*. *Id.*

The polymorph patents are directed to rifaximin form β. For example, claim 4 of the '199 patent recites:

> 4. Rifaximin in polymorphic form β, wherein the rifaximin has x-ray powder diffraction pattern peaks at about 5.4°; 9.0°; and 20.9°2θ and wherein the rifaximin has a water content of greater than 5%.

'199 patent, col. 10 ll. 24–27; *see also* '206 patent, col. 11 ll. 33–37, 41–43 (claims 34 & 36, similar).

Norwich challenged the polymorph claims' validity by asserting, *inter alia*, Cannata,[9] which discloses that rifaximin exists in crystalline form with "outstanding antibacterial properties." J.A. 4528; *Decision* at *6. Cannata does not discuss rifaximin's crystal structure in detail, but it does disclose several preparation protocols for rifaximin that include solvents used for crystallization. J.A. 4529–31; *see also id.* at 3408.

[9] U.S. Patent 4,557,866; J.A. 4526–32.

FDA_00713

The district court held that expert testimony supported a conclusion that, in view of the prior art, (1) a skilled artisan would have had good reason to characterize the crystalline rifaximin obtained by following the Cannata protocols, (2) that such characterization was routine and could have been performed "in one day," and (3) that doing so would have led the skilled artisan to have "detected rifaximin β." *Decision* at *6–7. The district court subsequently concluded that the challenged polymorph claims would have been obvious over the asserted prior art in view of the common knowledge of the skilled artisan. *Id.* at *7–8.

Salix first challenges the district court's conclusion of obviousness by asserting that *Grunenthal GMBH v. Alkem Laboratories Ltd.*, 919 F.3d 1333 (Fed. Cir. 2019) and *Pharmacyclics LLC v. Alvogen, Inc.*, No. 2021-2270, 2022 WL 16943006 (Fed. Cir. Nov. 15, 2022) compel the opposite result. Appellants' Br. at 49–51. Salix further contends that the court "applied the wrong test" by not following a rationale provided in the district court opinion from *Pharmacyclics*. *Id.* at 55–57. We disagree.

In *Grunenthal*, we held that it was not clear error for the district court to find that the record failed to establish by clear and convincing evidence a reasonable expectation of success in preparing the claimed polymorphic Form A of tapentadol hydrochloride. *See* 919 F.3d at 1341. In that case, the synthesis of tapentadol hydrochloride known in the prior art produced a particular form—Form B. *Id.* The district court found that there was a lack of evidence that a prior art synthesis would have resulted in the claimed Form A and that no prior art guidance existed to establish "what particular solvents, temperatures, agitation rates, etc., were likely to result" in the claimed polymorph. *Id.* at 1343. We found no clear error in that analysis. *Id.* at 1344–45.

We also affirmed a conclusion of non-obviousness of a claimed polymorph in our non-precedential *Pharmacyclics* decision, which issued after the district court released its decision in this case. *See* 2022 WL 16943006, at *10–11. But the court here acted within its discretion when it declined to follow the district court decision in *Pharmacyclics* as though it was binding precedent. *See Decision* at *7 n.1 ("Plaintiffs call to my attention [the district court's decision in] *Pharmacyclics LLC v. Alvogen Pine Brook LLC*. I have considered that case but I do not agree with it on this point."). And our later affirmance of the factual findings in *Pharmacyclics* did not retroactively override the district court's analysis here.

Moreover, a lack of clear error in *Grunenthal* and *Pharmacyclics* does not compel a conclusion of non-obviousness here. Indeed, *Grunenthal* underscored the factual nature of these types of inquiries and expressly held that it did "not rule out the possibility that polymorph patents could be found obvious." 919 F.3d at 1344–45. "The determination of obviousness is dependent on the facts of each case." *Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1089 (Fed. Cir. 2008); *see also Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1366 (Fed. Cir. 2007). In *Grunenthal* and *Pharmacyclics*, the issue was whether a skilled artisan would have had a reasonable expectation of success in *producing* a crystalline form of a compound. *See* 919 F.3d at 1341–43; 2022 WL 16943006, at *10–11. Here, the prior art included a process to produce a crystalline form of rifaximin, and the dispute centered around *characterizing* the crystalline form resulting from that process. *See Decision* at *13–14. These distinct factual predicates support the district courts' factual findings in each of these three cases under the clear error standard of review.

In *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966), the Supreme Court set forth the background against which obviousness is to be assessed: "Under § 103, the scope and content of the prior art are to be determined"

and "differences between the prior art and the claims at issue are to be ascertained." *Id.* at 17. The scope and content of the prior art here includes preparations of crystalline rifaximin, which expert testimony supports would have yielded the β form of rifaximin. *Decision* at *7; J.A. 3391–92 ("[T]he as-synthesized form of rifaximin reported by Examples 1, 6, 7, and 9 [of Cannata] were necessarily rifaximin form Beta, because of the methods used, the solvent system used, and it was later confirmed by later work, including work from the named inventors."); *id.* at 3408–09 (similar testimony); *id.* at 3393–3404 (discussing the evidence of record that supports that conclusion); *id.* at 4700–07, 4846–47, 5007–14 (providing supporting evidence for that conclusion). And the parties do not dispute that the methods for characterizing the resulting crystalline rifaximin were well known and readily available to the skilled artisan. *Decision* at *3. The difference between the prior art and the claims is thus effectively nothing more than the performance of routine characterization to identify the polymorphic forms that result from the known Cannata processes.

In this regard, Salix does not appear to dispute that there would have been a motivation to explore potential polymorphic forms of rifaximin. Appellants' Br. at 48–49. Rifaximin was, after all, a known compound with a known, useful activity. Salix further refers to the district court's finding that "polymorph β is a commonly produced polymorph and the most stable form of rifaximin" as an "undisputed" fact. *Id.*; *see also Decision* at *7. There thus appears to be no dispute that the claimed polymorph can be readily produced from the crystallization conditions disclosed in Cannata and that it would have been well within the abilities of the skilled artisan to procure and characterize the β form of rifaximin.

According to Salix, however, rifaximin's β form constituted a non-obvious invention because, although skilled artisans "actually succeed[ed]" in producing and

characterizing it, they would not have "*expect*[*ed*] to succeed" because, as of the critical date, the polymorphic nature of rifaximin had not yet been reported and the identity of the β form remained undisclosed. Appellants' Br. at 49. Salix further argues that there could have been no expectation of success because the skilled artisan would not have been able to predict what polymorphic forms might result from following the preparation protocols disclosed in the prior art. *Id.* at 20–21, 50–53. Salix's framing of the issue suggests that no unknown entity could ever be obvious, as one cannot reasonably expect what was hitherto unknown, which is incorrect.

Here, the district court found a reasonable expectation of success in characterizing the crystalline product of Cannata for potential polymorphism using routine, conventional methods and skill. *Decision* at *6–7. We see no clear error in that conclusion. Indeed, Salix has done no more than combine known elements of the prior art to verify readily accessible information concerning a compound already in the hands of those of ordinary skill in the art, and such routine efforts do not justify removing this polymorph from the public domain. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007); *see also Pfizer*, 480 F.3d at 1367–68. To be sure, we do not hold that there is always a reasonable expectation of success in accessing or characterizing polymorphs. We are simply reviewing the district court's decision before us as to its factual finding of a reasonable expectation of success, and in so doing, have not been left with a definite and firm conviction that a mistake was made in reaching that finding. *See Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V.*, 528 F.3d 1365, 1374 (Fed. Cir. 2008).

Having found no clear error in the district court's fact findings as to the existence of a reasonable expectation of success, we affirm the court's conclusion that the polymorph patent claims were invalid as obvious. Because we affirm the court's holding that the polymorph patent claims

would have been obvious over the asserted prior art, we need not consider Norwich's separate argument that the polymorph claims would have also been invalid as inherently anticipated.

III

On cross-appeal, Norwich raises two related but distinct arguments that arose after the district court held that Norwich infringed the HE patents and failed to establish invalidity. *See Decision* at *10–16. Norwich first argues that, in issuing its final decision, the district court misinterpreted 35 U.S.C. § 271(e)(4)(A), which directs a court, following a finding of infringement, to order the FDA to defer final approval of an ANDA until the expiration of the infringed patent. According to Norwich, that statute precludes delaying final approval of an entire ANDA, and instead requires delaying only the approval of the infringing use.

Norwich's second argument arises from its decision to amend its ANDA to carve out the infringing HE use after final judgment. Following that amendment, Norwich filed a motion to modify the final judgment to allow for prompt approval of the amended ANDA that purportedly no longer sought approval for the infringing HE use. The district court denied that motion, and Norwich cross-appealed.

We address both of Norwich's concerns in turn.

A.

We first address Norwich's arguments regarding the district court's interpretation of 35 U.S.C. § 271(e)(4)(A) in ordering that a final approval of Norwich's ANDA could not be effective before the HE patents expired. J.A. 50–51.

We review issues of statutory interpretation without deference to the district court's interpretation. *Waymark Corp. v. Porta Sys. Corp.*, 245 F.3d 1364, 1366 (Fed. Cir. 2001). "The starting point in every case involving

construction of a statute is the language itself." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756 (1975) (Powell, J., concurring). Moreover, we "give effect, if possible, to every clause and word of [the] statute." *United States v. Menasche*, 348 U.S. 528, 538–39 (1955) (citation omitted). When a statute does not define a given word or phrase, we presume that Congress intended the word or phrase to have its ordinary meaning. *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995). However, "[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) (citation omitted).

Section 271(e)(4)(A) instructs that, following a finding of infringement, "the court shall order the effective date of any approval of the drug or veterinary biological product involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed." The order here instructed the FDA that "the effective date of any final approval . . . of Norwich's ANDA No. 214369 is to be a date not earlier than the date of expiration of the last to expire of [the HE patents] (currently October 2, 2029)." J.A. 51.

Norwich argues that the language of § 271(e)(4) requires courts to tie the restriction on FDA approval to the *indication* for which the ANDA seeks approval when that indication was the source of infringement. Cross-Appellants' Br. at 14. Norwich's ANDA originally sought approval for the treatment of both IBS-D and HE. Although only the HE indication was found to infringe a valid patent, the order restricted final approval of the entire ANDA, including the non-infringing indication, until 2029. Norwich argues that the statute requires the district court's order "to specify that the approval date pertains to Norwich's ANDA seeking approval for the infringing HE Indication." *Id.* at 18. But the district court order concerned only the

specific ANDA in question that included an infringing use, referred to the ANDA by its number, and enjoined the approval of that ANDA. J.A. 51. Norwich suggests that the district court order unfairly precludes it from receiving final approval of a new non-infringing ANDA.[10] The district court did no such thing.

Section 271(e)(4)(A) describes delaying the approval of "the drug . . . involved in the infringement." Since the FDA does not approve drugs in the abstract, but rather approves drugs for particular uses (indications) of that drug, the statute is appropriately construed as directed to approval of particular infringing uses of the drug, not all uses of the drug including non-infringing uses. The statutory scheme makes clear that it is not the potential use of Norwich's rifaximin for HE that constitutes the relevant infringement here, nor is it the unpatented drug compound itself, but rather it is the submission of the ANDA that included an infringing use. *See* 35 U.S.C. § 271(e)(2)(A) (making it an "act of infringement to submit" an ANDA "for a drug claimed in a patent or the use of which is claimed in a patent"). That the ANDA further recited a non-patent-protected indication does not negate the infringement resulting from the ANDA's submission. The order thus appropriately delayed the effective final approval date of "this infringing ANDA" submission. J.A. 48. The order appropriately said nothing that would prevent approval of a new non-infringing ANDA.

We therefore affirm the district court's order setting the effective approval date of Norwich's ANDA No. 214369

---

[10] Norwich notes that on June 2, 2023, FDA tentatively approved its amended ANDA, which purportedly lacks the HE indication. Cross-Appellant's Br. at 6. The tentative approval letter noted, however, that "final approval cannot be granted until October 2, 2029 as specified in the court order." *Id.*

to be no earlier than the date of expiration of the last to expire of the HE patents.

B.

Following entry of the final judgment, which included the resetting order barring final approval of Norwich's ANDA until 2029, Norwich amended its ANDA in an attempt to remove the infringing HE indication. Norwich then moved to modify the judgment under Federal Rule of Civil Procedure 60(b), asserting that the amendment negated any possible infringement, and that the final approval date of the ANDA, as amended, should not be tied to the HE patents. *See* Cross-Appellant's Br. at 27. The district court denied that motion, holding that Norwich "fully litigated the merits of its non-infringement and invalidity case, lost, and now seeks a way around the final judgment through Rule 60(b)." *Rule 60(b) Order* at *2. Norwich cross-appealed.

"Because denial of a Rule 60(b) motion is a procedural issue not unique to patent law, we apply the rule of the regional circuit where appeals from the district court would normally lie," *Amstar Corp. v. Envirotech Corp.*, 823 F.2d 1538, 1550 (Fed. Cir. 1987), which, here, is the Third Circuit. The Third Circuit "review[s] the denial of Rule 60(b) relief for an abuse of discretion." *Coltec Indus., Inc. v. Hobgood*, 280 F.3d 262, 269 (3d Cir. 2002); *see also Bohus v. Beloff*, 950 F.2d 919, 930 (3d Cir. 1991) (noting that Rule 60(b) motions are "extraordinary relief which should be granted only where extraordinary justifying circumstances are present" (citation omitted)).

"A district court may reconsider its own finding of infringement in light of an amended ANDA," but the court need not do so. *Ferring B.V. v. Watson Lab'ys, Inc. Fla.*, 764 F.3d 1382, 1391 (Fed. Cir. 2014). Rather, "[a]llowing an amendment is within the discretion of the district court, guided by principles of fairness and prejudice to the patentholder." *Id.* Here, the court reasonably held that

consideration of the amended ANDA would be inequitable and inappropriate. *Rule 60(b) Order* at *2. The court noted that "[i]t is not a simple matter to determine whether an ANDA applicant has successfully carved out language from a label to turn infringement into non-infringement" and that what Norwich sought in its Rule 60(b) motion "would essentially be a second litigation" following final judgment. *Id.* (noting also that, other than simply asserting that it carved out the HE indication and providing the court with the amended label, Norwich "ha[d] presented no evidence in support of its assertion" that the amended ANDA would no longer infringe the HE patents).

Norwich nevertheless argues that the amended ANDA satisfies the judgment by not seeking approval for the infringing use and that, in view of the amendment, it is no longer equitable to apply the judgment prospectively. But Rule 60(b) is permissive, holding only that the court "*may* relieve a party or its legal representative from a final judgment, order, or proceeding" under various circumstances. That is—a district court has the discretion, not the obligation, to modify a final judgment in view of a post-judgment ANDA amendment. And as the district court held, simply asserting that a patented indication has been carved out of an ANDA application does not necessarily satisfy the judgment or entitle the applicant to direct entry to the market. *See Rule 60(b) Order* at *2. We see no abuse of discretion in the district court reaching that conclusion or in subsequently denying the motion.

Norwich further argues that the district court erred by not explicitly discussing Rule 60(b)(6), which provides that a court may relieve a party from a final judgment for "any other reason that justifies relief." We disagree that the district court so erred. The court's Memorandum Order thoroughly discussed the law, the equities, the record, and the arguments before it. In so doing, the court implicitly found no additional reason that justified the relief that Norwich sought.

We therefore affirm the district court's denial of the motion to modify the final judgment.

CONCLUSION

We have considered both parties remaining arguments and find them unpersuasive. For the foregoing reasons, we affirm (1) the district court's holding that claim 2 of the '569 patent, claim 3 of the '667 patent, claim 4 of the '199 patent, and claim 36 of the '206 patent would have been invalid as obvious, (2) the district court's order setting the effective approval date of Norwich's ANDA to be no earlier than the date of expiration of the last to expire of the HE patents, and (3) the district court's denial of the motion to modify the final judgment.

**AFFIRMED**

COSTS

No costs.

would have been obvious over the asserted prior art, we need not consider Norwich's separate argument that the polymorph claims would have also been invalid as inherently anticipated.

III

On cross-appeal, Norwich raises two related but distinct arguments that arose after the district court held that Norwich infringed the HE patents and failed to establish invalidity. *See Decision* at *10–16. Norwich first argues that, in issuing its final decision, the district court misinterpreted 35 U.S.C. § 271(e)(4)(A), which directs a court, following a finding of infringement, to order the FDA to defer final approval of an ANDA until the expiration of the infringed patent. According to Norwich, that statute precludes delaying final approval of an entire ANDA, and instead requires delaying only the approval of the infringing use.

Norwich's second argument arises from its decision to amend its ANDA to carve out the infringing HE use after final judgment. Following that amendment, Norwich filed a motion to modify the final judgment to allow for prompt approval of the amended ANDA that purportedly no longer sought approval for the infringing HE use. The district court denied that motion, and Norwich cross-appealed.

We address both of Norwich's concerns in turn.

A.

We first address Norwich's arguments regarding the district court's interpretation of 35 U.S.C. § 271(e)(4)(A) in ordering that a final approval of Norwich's ANDA could not be effective before the HE patents expired. J.A. 50–51.

We review issues of statutory interpretation without deference to the district court's interpretation. *Waymark Corp. v. Porta Sys. Corp.*, 245 F.3d 1364, 1366 (Fed. Cir. 2001). "The starting point in every case involving

Case 1:25-cv-01430-RC Document 22-1 Filed 06/10/25 Page 321 of 342
Case 1:23-cv-01430-RGA-BAH Document 226-1 Filed 07/03/24 Page 18 of 20 PageID #: 213883

construction of a statute is the language itself." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756 (1975) (Powell, J., concurring). Moreover, we "give effect, if possible, to every clause and word of [the] statute." *United States v. Menasche*, 348 U.S. 528, 538–39 (1955) (citation omitted). When a statute does not define a given word or phrase, we presume that Congress intended the word or phrase to have its ordinary meaning. *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995). However, "[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) (citation omitted).

Section 271(e)(4)(A) instructs that, following a finding of infringement, "the court shall order the effective date of any approval of the drug or veterinary biological product involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed." The order here instructed the FDA that "the effective date of any final approval . . . of Norwich's ANDA No. 214369 is to be a date not earlier than the date of expiration of the last to expire of [the HE patents] (currently October 2, 2029)." J.A. 51.

Norwich argues that the language of § 271(e)(4) requires courts to tie the restriction on FDA approval to the *indication* for which the ANDA seeks approval when that indication was the source of infringement. Cross-Appellants' Br. at 14. Norwich's ANDA originally sought approval for the treatment of both IBS-D and HE. Although only the HE indication was found to infringe a valid patent, the order restricted final approval of the entire ANDA, including the non-infringing indication, until 2029. Norwich argues that the statute requires the district court's order "to specify that the approval date pertains to Norwich's ANDA seeking approval for the infringing HE Indication." *Id.* at 18. But the district court order concerned only the

FDA_00796

specific ANDA in question that included an infringing use, referred to the ANDA by its number, and enjoined the approval of that ANDA. J.A. 51. Norwich suggests that the district court order unfairly precludes it from receiving final approval of a new non-infringing ANDA.[10] The district court did no such thing.

Section 271(e)(4)(A) describes delaying the approval of "the drug . . . involved in the infringement." Since the FDA does not approve drugs in the abstract, but rather approves drugs for particular uses (indications) of that drug, the statute is appropriately construed as directed to approval of particular infringing uses of the drug, not all uses of the drug including non-infringing uses. The statutory scheme makes clear that it is not the potential use of Norwich's rifaximin for HE that constitutes the relevant infringement here, nor is it the unpatented drug compound itself, but rather it is the submission of the ANDA that included an infringing use. *See* 35 U.S.C. § 271(e)(2)(A) (making it an "act of infringement to submit" an ANDA "for a drug claimed in a patent or the use of which is claimed in a patent"). That the ANDA further recited a non-patent-protected indication does not negate the infringement resulting from the ANDA's submission. The order thus appropriately delayed the effective final approval date of "this infringing ANDA" submission. J.A. 48. The order appropriately said nothing that would prevent approval of a new non-infringing ANDA.

We therefore affirm the district court's order setting the effective approval date of Norwich's ANDA No. 214369

---

[10] Norwich notes that on June 2, 2023, FDA tentatively approved its amended ANDA, which purportedly lacks the HE indication. Cross-Appellant's Br. at 6. The tentative approval letter noted, however, that "final approval cannot be granted until October 2, 2029 as specified in the court order." *Id.*

FDA_00797

to be no earlier than the date of expiration of the last to expire of the HE patents.

B.

Following entry of the final judgment, which included the resetting order barring final approval of Norwich's ANDA until 2029, Norwich amended its ANDA in an attempt to remove the infringing HE indication. Norwich then moved to modify the judgment under Federal Rule of Civil Procedure 60(b), asserting that the amendment negated any possible infringement, and that the final approval date of the ANDA, as amended, should not be tied to the HE patents. *See* Cross-Appellant's Br. at 27. The district court denied that motion, holding that Norwich "fully litigated the merits of its non-infringement and invalidity case, lost, and now seeks a way around the final judgment through Rule 60(b)." *Rule 60(b) Order* at *2. Norwich cross-appealed.

"Because denial of a Rule 60(b) motion is a procedural issue not unique to patent law, we apply the rule of the regional circuit where appeals from the district court would normally lie," *Amstar Corp. v. Envirotech Corp.*, 823 F.2d 1538, 1550 (Fed. Cir. 1987), which, here, is the Third Circuit. The Third Circuit "review[s] the denial of Rule 60(b) relief for an abuse of discretion." *Coltec Indus., Inc. v. Hobgood*, 280 F.3d 262, 269 (3d Cir. 2002); *see also Bohus v. Beloff*, 950 F.2d 919, 930 (3d Cir. 1991) (noting that Rule 60(b) motions are "extraordinary relief which should be granted only where extraordinary justifying circumstances are present" (citation omitted)).

"A district court may reconsider its own finding of infringement in light of an amended ANDA," but the court need not do so. *Ferring B.V. v. Watson Lab'ys, Inc. Fla.*, 764 F.3d 1382, 1391 (Fed. Cir. 2014). Rather, "[a]llowing an amendment is within the discretion of the district court, guided by principles of fairness and prejudice to the patentholder." *Id.* Here, the court reasonably held that

consideration of the amended ANDA would be inequitable and inappropriate. *Rule 60(b) Order* at *2. The court noted that "[i]t is not a simple matter to determine whether an ANDA applicant has successfully carved out language from a label to turn infringement into non-infringement" and that what Norwich sought in its Rule 60(b) motion "would essentially be a second litigation" following final judgment. *Id.* (noting also that, other than simply asserting that it carved out the HE indication and providing the court with the amended label, Norwich "ha[d] presented no evidence in support of its assertion" that the amended ANDA would no longer infringe the HE patents).

Norwich nevertheless argues that the amended ANDA satisfies the judgment by not seeking approval for the infringing use and that, in view of the amendment, it is no longer equitable to apply the judgment prospectively. But Rule 60(b) is permissive, holding only that the court "*may* relieve a party or its legal representative from a final judgment, order, or proceeding" under various circumstances. That is—a district court has the discretion, not the obligation, to modify a final judgment in view of a post-judgment ANDA amendment. And as the district court held, simply asserting that a patented indication has been carved out of an ANDA application does not necessarily satisfy the judgment or entitle the applicant to direct entry to the market. *See Rule 60(b) Order* at *2. We see no abuse of discretion in the district court reaching that conclusion or in subsequently denying the motion.

Norwich further argues that the district court erred by not explicitly discussing Rule 60(b)(6), which provides that a court may relieve a party from a final judgment for "any other reason that justifies relief." We disagree that the district court so erred. The court's Memorandum Order thoroughly discussed the law, the equities, the record, and the arguments before it. In so doing, the court implicitly found no additional reason that justified the relief that Norwich sought.

We therefore affirm the district court's denial of the motion to modify the final judgment.

CONCLUSION

We have considered both parties remaining arguments and find them unpersuasive. For the foregoing reasons, we affirm (1) the district court's holding that claim 2 of the '569 patent, claim 3 of the '667 patent, claim 4 of the '199 patent, and claim 36 of the '206 patent would have been invalid as obvious, (2) the district court's order setting the effective approval date of Norwich's ANDA to be no earlier than the date of expiration of the last to expire of the HE patents, and (3) the district court's denial of the motion to modify the final judgment.

**AFFIRMED**

COSTS

No costs.

Harvey Bartle IV
**MORGAN, LEWIS & BOCKIUS LLP**
502 Carnegie Center
Princeton, NJ 08540-6241
Phone: (609) 919-6600

OF COUNSEL
Michael J. Abernathy
Wan-Shon Lo
Maria Doukas
**MORGAN, LEWIS & BOCKIUS LLP**
110 North Wacker Drive
Chicago, IL 60606-1511
Phone: (312) 324-1000

Margaret A. McGreal
**MORGAN, LEWIS & BOCKIUS LLP**
2222 Market Street
Philadelphia, PA 19103
Phone: (215) 963-5000

*Attorneys for Plaintiffs Salix Pharmaceuticals, Inc.,*
*Salix Pharmaceuticals, Ltd., and*
*Bausch Health Ireland Ltd.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SALIX PHARMACEUTICALS, INC., SALIX PHARMACEUTICALS, LTD., and BAUSCH HEALTH IRELAND LTD.,<br><br>Plaintiffs,<br><br>v.<br><br>NORWICH PHARMACEUTICALS, INC., ALVOGEN PB RESEARCH & DEVELOPMENT, LLC, ALVOGEN, INC., and ALVOGEN GROUP, INC.,<br><br>Defendants. | Case No.: 3:24-cv-07140<br><br>**COMPLAINT**<br><br>*Document Filed Electronically* |

Plaintiffs Salix Pharmaceuticals, Inc., Salix Pharmaceuticals, Ltd., and Bausch Health Ireland, Ltd. (collectively, "Salix"), by their attorneys, Morgan, Lewis & Bockius LLP, file this Complaint for patent infringement against Norwich Pharmaceuticals, Inc., Alvogen PB Research & Development LLC ("Alvogen PB"), Alvogen, Inc. and Alvogen Group, Inc. (collectively, "Norwich" or "Defendants") and hereby allege as follows:

**PARTIES**

1. Plaintiff Salix Pharmaceuticals, Inc. is a corporation organized and existing under the laws of California having its principal place of business at 400 Somerset Corporate Blvd., Bridgewater, New Jersey 08807.

2. Plaintiff Salix Pharmaceuticals, Ltd. is a corporation organized and existing under the laws of Delaware having its principal place of business at 400 Somerset Corporate Blvd., Bridgewater, New Jersey 08807.

3. Plaintiff Bausch Health Ireland Ltd. is a company organized and existing under the laws of Ireland having an office at 3013 Lake Drive, Citywest Business Campus, Dublin 24, D24 PPT3, Ireland.

4. On information and belief, defendant Norwich Pharmaceuticals, Inc. is a corporation organized and existing under the laws of Delaware, having places of business at 6826 State Highway 12, Norwich, New York 13815, 10 Bloomfield Avenue, Building B, Pine Brook, New Jersey 07058 and 44 Whippany Road, Suite 300, Morristown, New Jersey 07960. On information and belief, defendant Norwich Pharmaceuticals, Inc. is a wholly-owned subsidiary of Alvogen Group, Inc. On further information and belief, defendant Norwich Pharmaceuticals, Inc. is in the business of, among other things, manufacturing and packaging pharmaceutical products that it distributes in New Jersey and throughout the United States.

5. On information and belief, defendant Alvogen PB is a limited liability company organized and existing under the laws of Delaware, having places of business at 44 Whippany Road, Suite 300, Morristown, New Jersey 07960 and 10 Bloomfield Avenue, Building B, Pine Brook, New Jersey 07058 and is the regulatory agent for Norwich Pharmaceuticals, Inc., including with respect to ANDA No. 214370. Defendant Alvogen PB's letter dated May 10, 2024 ("Notice Letter") was signed by Michelle Ryder, who, on information and belief, is the Vice President of US Regulatory Affairs at Alvogen Group, Inc. in Morristown, New Jersey. On information and belief, defendant Alvogen PB is a wholly-owned subsidiary of Alvogen Group, Inc. On further information and belief, defendant Alvogen PB is in the business of, among other things, manufacturing, fabricating or processing pharmaceutical products that it distributes in New Jersey and throughout the United States.

6. On information and belief, defendant Alvogen, Inc. is a corporation organized and existing under the laws of Delaware, having its principal place of business at 44 Whippany Road, Suite 300, Morristown, New Jersey 07960. On information and belief, defendant Alvogen, Inc. is a wholly-owned subsidiary of Alvogen Group, Inc. On further information and belief, defendant Alvogen, Inc. is in the business of, among other things, developing, manufacturing, and selling pharmaceutical products that it distributes in New Jersey and throughout the United States.

7. On information and belief, defendant Alvogen Group, Inc. is a corporation organized and existing under the of Delaware, having its principal place of business at 44 Whippany Road, Suite 300, Morristown, New Jersey 07960. On further information and belief, defendant Alvogen Group, Inc. is in the business of, among other things, developing, manufacturing, and selling pharmaceutical products that it distributes in New Jersey and throughout the United States

8. On information and belief, defendants Norwich Pharmaceuticals, Inc., Alvogen PB, Alvogen, Inc. and Alvogen Group, Inc. acted in concert to prepare and submit Norwich's ANDA to FDA.

9. On information and belief, if Norwich's ANDA were approved, defendants Norwich Pharmaceuticals, Inc., Alvogen PB, Alvogen, Inc. and Alvogen Group, Inc would directly or indirectly market, sell, and distribute the ANDA Product throughout the United States, including in New Jersey. On information and belief, defendants Norwich Pharmaceuticals, Inc., Alvogen PB, Alvogen, Inc. and Alvogen Group, Inc are agents of each other and/or operate in concert as integrated parts of the same business group, including regarding the ANDA Product, and enter into intercompany agreements with each other. On information and belief, defendants Norwich Pharmaceuticals, Inc., Alvogen PB, Alvogen, Inc. and Alvogen Group, Inc. participated in, assisted with, and cooperated with each other in the acts complained of herein.

10. On information and belief, if FDA were to approve Norwich's ANDA, defendants Norwich Pharmaceuticals, Inc., Alvogen PB, Alvogen, Inc. and Alvogen Group, Inc will act in concert to distribute and sell the ANDA Product throughout the United States, including within New Jersey.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201 and 2202.

12. Norwich Pharmaceuticals, Inc. is subject to personal jurisdiction in New Jersey because, among other things, it has purposely availed itself of the benefits and protections of New Jersey's laws such that it should reasonably anticipate being haled into court here. Norwich Pharmaceuticals, Inc. has a place of business in New Jersey, is qualified to do business in New

Jersey, and has appointed a registered agent for service of process in New Jersey. In particular, Norwich Pharmaceuticals, Inc.'s Notice Letter was signed by Michelle Ryder, who, on information and belief, is Executive Director of Regulatory Affairs at Alvogen PB and Vice President of US Regulatory Affairs at Alvogen Group, Inc., both in Morristown, New Jersey. It therefore has consented to general jurisdiction in New Jersey. On information and belief, Norwich Pharmaceuticals, Inc. develops, manufactures, imports, markets, offers to sell, and/or sells generic drugs throughout the United States, including in New Jersey and therefore transacts business within New Jersey related to Salix's claims, and/or has engaged in systematic and continuous business contacts within New Jersey.

13. On information and belief, Norwich Pharmaceuticals, Inc. consented to jurisdiction, did not contest jurisdiction, or asserted counterclaims in the District of New Jersey in one or more prior litigations, including *Takeda Pharmaceuticals, Inc. v. Norwich Pharmaceuticals, Inc.*, No. 2:20-cv-08966 (D.N.J. July 15, 2020).

14. Alvogen PB is subject to personal jurisdiction in New Jersey because, among other things, it has purposely availed itself of the benefits and protections of New Jersey's laws such that it should reasonably anticipate being haled into court here. Alvogen PB is headquartered in New Jersey and has multiple places of business in New Jersey, is qualified to do business in New Jersey, has conducted and continues to conduct business in this judicial district and maintains extensive and systematic contacts with New Jersey, including through the marketing, distribution and/or sale of generic pharmaceutical drugs in New Jersey, either directly or through its affiliates, agents and/or alter egos, including Norwich Pharmaceuticals, Inc., by selling pharmaceutical products in New Jersey. In particular, the Notice Letter was signed by Michelle Ryder, who on

information and belief, is Executive Director of Regulatory Affairs at Alvogen PB and Vice President of US Regulatory Affairs at Alvogen Group, Inc., both in Morristown, New Jersey.

15. On information and belief, Alvogen PB consented to jurisdiction, did not contest jurisdiction, or asserted counterclaims in the District of New Jersey in one or more prior litigations, including *Indivior Inc. v. Alvogen Pine Brook, Inc.*, No. 2:17-cv-07106 (D.N.J. Sept. 14, 2017).

16. Alvogen Inc. is subject to personal jurisdiction in New Jersey because, among other things, it has purposely availed itself of the benefits and protections of New Jersey's laws such that it should reasonably anticipate being haled into court here. Alvogen Inc. is headquartered in New Jersey, is qualified to do business in New Jersey, has conducted and continues to conduct business in this judicial district and maintains extensive and systematic contacts with New Jersey, including through the marketing, distribution and/or sale of generic pharmaceutical drugs in New Jersey, either directly or through its affiliates, agents and/or alter egos, including Norwich Pharmaceuticals, Inc. including by selling pharmaceutical products in New Jersey.

17. On information and belief, Alvogen, Inc. consented to jurisdiction, did not contest jurisdiction, or asserted counterclaims in the District of New Jersey in one or more prior litigations, including *Boehringer Ingelheim Pharmaceuticals, Inc. v. Alvogen, Inc.*, No. 2:23-cv-03911 (D.N.J. 2023).

18. Alvogen Group, Inc. is subject to personal jurisdiction in New Jersey because, among other things, it has purposely availed itself of the benefits and protections of New Jersey's laws such that it should reasonably anticipate being haled into court here. Alvogen Group, Inc. is headquartered in New Jersey, is qualified to do business in New Jersey, has conducted and continues to conduct business in this judicial district and maintains extensive and systematic contacts with New Jersey, including through the marketing, distribution and/or sale of generic

pharmaceutical drugs in New Jersey, either directly or through its affiliates, agents and/or alter egos, including Norwich Pharmaceuticals, Inc. including by selling pharmaceutical products in New Jersey. In particular, the Notice Letter was signed by Michelle Ryder, who on information and belief, is Executive Director of Regulatory Affairs at Alvogen PB and Vice President of US Regulatory Affairs at Alvogen Group, Inc., both in Morristown, New Jersey.

19. On information and belief, if Norwich's ANDA were approved, Norwich would directly or indirectly manufacture, market, sell, and/or distribute the ANDA Product within the United States, including in New Jersey, consistent with Norwich's practices for the marketing and distribution of other generic pharmaceutical products. On information and belief, Norwich regularly does business in New Jersey, and its practices with other generic pharmaceutical products have involved placing those products into the stream of commerce for distribution throughout the United States, including in New Jersey. On information and belief, Norwich's generic pharmaceutical products are used and/or consumed within and throughout the United States, including in New Jersey. On information and belief, the ANDA Product would be prescribed by physicians practicing in New Jersey, dispensed by pharmacies located within New Jersey, and used by patients in New Jersey. Each of these activities would have a substantial effect within New Jersey and would constitute infringement of the patents-in-suit in the event that the ANDA Product were approved before the patents-in-suit expire.

20. Venue is proper in this District as to Norwich Pharmaceuticals, Inc. pursuant to 28 U.S.C. §§ 1391 and 1400(b) because, among other things, it (a) has places of business in New Jersey; (b) has acted in concert with Alvogen PB, Alvogen, Inc. and Alvogen Group, Inc. to seek approval from FDA to market and sell the Norwich ANDA Products in this District; (c) has engaged in regular and established business contacts with New Jersey by, among other things,

contracting and engaging in related commercial activities related to the marketing, making, shipping, using, offering to sell or selling Defendants' products in this District, and deriving substantial revenue from such activities; and (d) has made agreements with retailers, wholesalers or distributors providing for the distribution of Defendants' products in New Jersey.

21. On information and belief, Norwich Pharmaceuticals, Inc. consented to venue, did not contest venue, or asserted counterclaims in the District of New Jersey in one or more prior litigations, including *Takeda Pharmaceuticals, Inc. v. Norwich Pharmaceuticals, Inc.*, No. 2:20-cv-08966 (D.N.J. July 15, 2020).

22. Venue is proper in this District as to Alvogen PB pursuant to 28 U.S.C. §§ 1391 and 1400(b) because, among other things, it (a) has its principal place of business in New Jersey; (b) has acted in concert with Norwich Pharmaceuticals, Inc., Alvogen, Inc. and Alvogen Group, Inc. to seek approval from FDA to market and sell the Norwich ANDA Products in this District; (c) conducts business, individually and/or in concert with Norwich Pharmaceuticals, Inc., Alvogen, Inc. and Alvogen Group, Inc., from its places of businesses located in New Jersey, in this District; and (d) has engaged in regular and established business contacts with New Jersey by, among other things, contracting and engaging in related commercial activities related to the marketing, making, shipping, using, offering to sell or selling Defendants' products in this District, and deriving substantial revenue from such activities.

23. On information and belief, Alvogen PB consented to venue, did not contest venue, or asserted counterclaims in the District of New Jersey in one or more prior litigations, including *Indivior Inc. v. Alvogen Pine Brook, Inc.*, No. 2:17-cv-07106 (D.N.J. Sept. 14, 2017).

24. Venue is proper in this District as to Alvogen, Inc. pursuant to 28 U.S.C. §§ 1391 and 1400(b) because, among other things, it (a) has its principal place of business in New Jersey;

(b) has acted in concert with Norwich Pharmaceuticals, Inc., Alvogen PB and Alvogen Group, Inc. to seek approval from FDA to market and sell the Norwich ANDA Products in this District; (c) conducts business, individually and/or in concert with Norwich Pharmaceuticals, Inc., Alvogen PB and Alvogen Group, Inc., from its places of businesses located in New Jersey, in this District; and (d) has engaged in regular and established business contacts with New Jersey by, among other things, contracting and engaging in related commercial activities related to the marketing, making, shipping, using, offering to sell or selling Defendants' products in this District, and deriving substantial revenue from such activities.

25. On information and belief, Alvogen, Inc. consented to venue, did not contest venue, or asserted counterclaims in the District of New Jersey in one or more prior litigations, including *Boehringer Ingelheim Pharmaceuticals, Inc. v. Alvogen, Inc.*, No. 2:23-cv-03911 (D.N. J. 2023).

26. Venue is proper in this District as to Alvogen Group, Inc. pursuant to 28 U.S.C. §§ 1391 and 1400(b) because, among other things, it (a) has its principal place of business in New Jersey; (b) has acted in concert with Norwich Pharmaceuticals, Inc., Alvogen PB and Alvogen, Inc. to seek approval from FDA to market and sell the Norwich ANDA Products in this District; (c) conducts business, individually and/or in concert with Norwich Pharmaceuticals, Inc., Alvogen PB and Alvogen, Inc., from its places of businesses located in New Jersey, in this District; and (d) has engaged in regular and established business contacts with New Jersey by, among other things, contracting and engaging in related commercial activities related to the marketing, making, shipping, using, offering to sell or selling Defendants' products in this District, and deriving substantial revenue from such activities.

## NATURE OF THE ACTION

27.     This is an action for patent infringement under the patent laws of the United States, Title 35, United States Code, and for a declaratory judgment of patent infringement under 28 U.S.C. §§ 2201 and 2202 and the patent laws of the United States, Title 35, United States Code, that arises out of Norwich's submission of an amendment to an Abbreviated New Drug Application ("ANDA") to the U.S. Food and Drug Administration ("FDA") seeking approval to commercially manufacture, use, offer for sale, sell, and/or import generic versions of Xifaxan® (rifaximin tablets, 550 mg) before the expiration of U.S. Patent Nos. 11,779,571 ("the '571 patent"), and 11,564,912 ("the '912 patent) (collectively, the "Xifaxan® patents" or "patents-in-suit").

## THE XIFAXAN® NDA

28.     Salix Pharmaceuticals, Inc. holds the approved New Drug Application ("NDA") Nos. 021361 and 022554 (a supplement to NDA No. 021361 that was granted a new NDA number for Xifaxan® (rifaximin) 550 mg tablets).

29.     FDA approved NDA No. 021361 for Xifaxan® 200 mg tablets on May 25, 2004 and approved NDA No. 022554 for Xifaxan® 550 mg tablets on March 24, 2010.  Xifaxan® 550 mg tablets are indicated for, among other things, the treatment of irritable bowel syndrome with diarrhea ("IBS-D") in adults.

## THE PATENTS-IN-SUIT

30.     On October 10, 2023, the '571 patent, titled "Methods for Treating Irritable Bowel Syndrome (IBS)," was duly and legally issued to Salix Pharmaceuticals, Inc. as assignee.  A true and correct copy of the '571 patent is attached hereto as Exhibit A.

FDA_00864

31. On January 31, 2023, the ’912 patent, titled “Methods for Treating Irritable Bowel Syndrome (IBS),” was duly and legally issued to Salix Pharmaceuticals, Inc. as assignee. A true and correct copy of the ’912 patent is attached hereto as Exhibit B.

32. In accordance with 21 U.S.C. § 355(b)(1) and 21 C.F.R. § 314.53, the ’571 patent and the ’912 patent are listed in the FDA’s Approved Drug Products with Therapeutic Equivalence Evaluations (also known as the “Orange Book”) for Xifaxan®.

**CLAIMS FOR RELIEF – PATENT INFRINGEMENT**

33. By letter dated May 10, 2024 (“Notice Letter”), Alvogen PB, agent for Norwich Pharmaceuticals, Inc., notified Salix that Norwich had submitted to FDA an amendment to ANDA No. 214370 (“Norwich’s ANDA”), seeking approval from FDA to engage in the commercial manufacture, use, and/or sale of generic rifaximin 550 mg tablets (“ANDA Product”) under 21 U.S.C. § 355 (j) before the expiration of the Xifaxan® patents. The Notice Letter states that Norwich has received an acknowledgement letter for Norwich’s ANDA from FDA. It also states that it included a Paragraph IV certification for the ’571 and ’912 patents. Michelle Ryder, Executive Director of Regulatory Affairs at Alvogen PB and Vice President of US Regulatory Affairs at Alvogen Group, Inc., signed the Notice Letter.

34. On information and belief, Norwich submitted an amendment to ANDA No. 214370 to FDA under Section 505(j) of the Federal Food, Drug, and Cosmetic Act, seeking approval to engage in the commercial manufacture, use, and sale of Norwich’s ANDA Product as a generic version of Xifaxan® 550 mg tablets.

35. On information and belief, Norwich’s ANDA seeks FDA approval of Norwich’s ANDA Product for the indication of the treatment of irritable bowel syndrome with diarrhea (IBS-D) in adults.

36. The Notice Letter stated that Norwich's ANDA includes a certification pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) ("Paragraph IV Certification") regarding several Xifaxan® patents, including the '571 patent and the '912 patent, and that, in Norwich's opinion, certain claims of the Xifaxan® patents are invalid, unenforceable, and/or not infringed.

37. On information and belief, Norwich's statements of the factual and legal bases for its assertions regarding non-infringement and invalidity of the Xifaxan® patents are devoid of an objective good faith basis in either facts or the law. This case is therefore exceptional.

38. An actual, real, immediate, and justiciable controversy exists between Salix and Norwich regarding the infringement, validity, and enforceability of the Xifaxan® patents.

39. Salix is commencing this action within 45 days of receiving the Notice Letter pursuant to 21 U.S.C. § 355(j)(5)(B)(iii).

**COUNT I**
**(Infringement of the '571 Patent)**

40. Salix incorporates the allegations in the preceding paragraphs as if fully set forth herein.

41. By submitting the Norwich ANDA to FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale and/or importation of Norwich's ANDA Product throughout the United States, including New Jersey, before the expiration of the '571 patent, Norwich committed an act of infringement of the '571 patent under 35 U.S.C. § 271(e)(2)(A).

42. The '571 patent claims, *inter alia*, methods of treating bloating associated with diarrhea-predominant irritable bowel syndrome in females with rifaximin.

43. Norwich's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product before the expiration of the '571 patent, including any

applicable exclusivities or extensions, will infringe one or more claims of the ’571 patent under 35 U.S.C. §§ 271(b) and/or (c), either literally or under the doctrine of equivalents.

44. On information and belief, Norwich’s ANDA Product, if approved by FDA, will be prescribed and administered to human patients, including females to relieve the signs and symptoms of diarrhea-predominant irritable bowel syndrome, which uses will constitute direct infringement of one or more claims of the ’571 patent.

45. On information and belief, these directly infringing uses will occur with Norwich’s specific intent and encouragement, and will be uses that Norwich knows will occur.

46. On information and belief, Norwich will actively induce, encourage, and aid and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Salix’s rights under the ’571 patent.

47. On information and belief, Norwich knows that its commercial manufacture, use, offer for sale, sale and/or importation of Norwich’s ANDA Product before the ’571 patent’s expiry will induce the direct infringement of one or more claims of the ’571 patent.

48. On information and belief, Norwich’s acts will be performed with knowledge of the ’571 patent and with intent to encourage infringement before the ’571 patent’s expiry.

49. Norwich was aware of the ’571 patent and its listing in the Orange Book as demonstrated by Norwich’s reference to the ’571 patent in the Notice Letter.

50. Salix will be substantially and irreparably harmed by these infringing activities unless those activities are enjoined by this Court. Salix does not have an adequate remedy at law.

**COUNT II**
**(Infringement of the ’912 Patent)**

51. Salix incorporates the allegations in the preceding paragraphs as if fully set forth herein.

52. By submitting the Norwich ANDA to FDA to obtain approval under the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, offer for sale, sale and/or importation of Norwich's ANDA Product throughout the United States, including New Jersey, before the expiration of the '912 patent, Norwich committed an act of infringement of the '912 patent under 35 U.S.C. § 271(e)(2)(A).

53. The '912 patent claims, *inter alia*, methods of treating irritable bowel syndrome in females with rifaximin.

54. Norwich's manufacture, use, sale, offer for sale, or importation into the United States of Norwich's ANDA Product before the expiration of the '912 patent, including any applicable exclusivities or extensions, will infringe one or more claims of the '912 patent under 35 U.S.C. §§ 271(b) and/or (c), either literally or under the doctrine of equivalents.

55. On information and belief, Norwich's ANDA Product, if approved by FDA, will be prescribed and administered to human patients, including females, to relieve the signs and symptoms of irritable bowel syndrome in patients, which uses will constitute direct infringement of one or more claims of the '912 patent.

56. On information and belief, these directly infringing uses will occur with Norwich's specific intent and encouragement, and will be uses that Norwich knows will occur.

57. On information and belief, Norwich will actively induce, encourage, and aid and abet this prescription and administration, with knowledge and specific intent that these uses will be in contravention of Salix's rights under the '912 patent.

58. On information and belief, Norwich knows that its commercial manufacture, use, offer for sale, sale and/or importation of Norwich's ANDA Product before the '912 patent's expiry will induce the direct infringement of one or more claims of the '912 patent.

59. On information and belief, Norwich's acts will be performed with knowledge of the '912 patent and with intent to encourage infringement before the '912 patent's expiry.

60. Norwich was aware of the '912 patent and its listing in the Orange Book as demonstrated by Norwich's reference to the '912 patent in the Notice Letter.

61. Salix will be substantially and irreparably harmed by these infringing activities unless those activities are enjoined by this Court. Salix does not have an adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Salix requests the following relief:

i. A judgment that the patents-in-suit have been infringed under 35 U.S.C. § 271(e)(2) by Norwich's submission of Norwich's ANDA to the FDA;

ii. A judgment ordering that the effective date of any FDA approval of commercial manufacture, use, or sale of the Norwich ANDA Product, or any other drug product the use of which infringes the patents-in-suit, be not earlier than the expiration dates of said patents, inclusive of any extension or additional period of exclusivity pursuant to 35 U.S.C. § 271(e)(4)(A);

iii. A permanent injunction enjoining Norwich, and all persons acting in concert with Norwich, from the commercial manufacture, use, sale, offer for sale, or importation into the United States of the ANDA Product, or any other drug product whose use is covered by the patents-in-suit, before the expiration of said patents, inclusive of any extension or additional period of exclusivity;

iv. A judgement that the commercial manufacture, use, sale, offer for sale, or importation into the United States of the ANDA Product, or any other drug product whose use is covered by the patents-in-suit, before the expiration of said patents, will infringe and induce infringement of said patents;

v. An order under 35 U.S.C. § 271(e)(4)(A) that the effective date of any FDA approval of ANDA No. 214370 under Section 505(j) of the Federal Food, Drug and Cosmetic Act (21 U.S.C. § 355(j)) shall be a date that is not earlier than the expiration date of any of the patents in suit, inclusive of any extension or additional period of exclusivity;

vi. A declaration that this is an exceptional case and an award of attorneys' fees pursuant to 35 U.S.C. § 285;

vii. Costs and expenses in this action; and

viii. Such further and other relief as this Court may deem just and proper.

Dated: June 20, 2024

Respectfully submitted,

By: *s/ Harvey Bartle IV*
Harvey Bartle IV
**MORGAN, LEWIS & BOCKIUS LLP**
502 Carnegie Center
Princeton, NJ 08540-6241
Phone: (609) 919-6600

OF COUNSEL
Michael J. Abernathy
Wan-Shon Lo
Maria Doukas
**MORGAN, LEWIS & BOCKIUS LLP**
110 North Wacker Drive
Chicago, IL 60606-1511
Phone: (312) 324-1000

Margaret A. McGreal
**MORGAN, LEWIS & BOCKIUS LLP**
2222 Market Street
Philadelphia, PA 19103
Phone: (215) 963-5000

FDA_00870

*Attorneys for Plaintiffs Salix Pharmaceuticals, Inc., Salix Pharmaceuticals, Ltd., and Bausch Health Ireland Ltd.*